# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| HANS MOKE NIEMANN, <br><br> Plaintiff, <br><br> vs. <br><br> SVEN MAGNUS ØEN CARLSEN A/K/A MAGNUS CARLSEN; PLAY MAGNUS AS, D/B/A PLAY MAGNUS GROUP; CHESS.COM, LLC; DANIEL RENSCH A/K/A "DANNY" RENSCH; AND HIKARU NAKAMURA, <br><br> Defendants. | Case No: 4:22-cv-01110-AGF <br><br><br> Hon. Audrey G. Fleissig |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT MAGNUS CARLSEN'S MOTION TO
## DISMISS UNDER CONNECTICUT GENERAL STATUTES
## <u>SECTION 52-196A AND FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)</u>


J. Nicci Warr
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105

Craig M. Reiser*
Denise L. Plunkett*
Eva H. Yung*
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, New York 10036

John M. Tanski+
Caroline P. Boisvert+
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, Connecticut 06103

* admitted *pro hac vice*
+ *pro hac vice* pending

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................... 1

BACKGROUND ............................................................................................. 3

ARGUMENT .................................................................................................. 5

I.    Connecticut's Anti-SLAPP Statute Requires Dismissal of
      All of Niemann's State-Law Claims (Counts I, II, IV, and V) .............................. 5

      A.    Connecticut's Anti-SLAPP Statute
            Applies to Niemann's State-Law Claims
            Because Niemann is a Connecticut Citizen ................................ 6

      B.    Niemann's State-Law Claims Fail
            Under Connecticut's Anti-SLAPP Statute .................................. 8

            1.   Connecticut's Anti-SLAPP Statute Would
                 Apply in Connecticut State Court Had Niemann Filed Suit There ............. 9

            2.   Connecticut's Anti-SLAPP Statute Is
                 Substantive and Does Not Conflict With the Federal Rules ..................... 11

            3.   Niemann's State-Law Claims Fail To Satisfy the
                 Rigorous Showing Required by Connecticut's Anti-SLAPP Statute ....... 14

II.   Niemann's Defamation Claims Fail for the Separate Reason
      That Niemann Has Failed to Plausibly Allege Them (Counts I and II) ................ 15

      A.    Niemann Fails to Specifically
            Identify Defamatory Statements Made by Carlsen ................................... 16

      B.    Niemann Fails to Plausibly Allege
            That Carlsen Acted With Actual Malice .................................... 16

      C.    The Allegedly Defamatory
            Statements Are Not Actionable In Any Event .......................... 19

            1.   Niemann Cannot Assert Defamation Claims Based on Conduct.............. 19

            2.   Carlsen's Alleged Statements to Tournament
                 Officials Are Protected by Qualified Privilege ........................ 20

       3.  Carlsen's Alleged
          Statements Are Non-Actionable Opinions ................................................ 21

III.    Niemann Has Not Plausibly Alleged
      A Claim For Tortious Interference (Count IV) ....................................................... 21

IV.   Niemann Has Not Plausibly Alleged
      A Claim For Civil Conspiracy (Count V) ............................................................. 24

V.    Niemann Has Not Plausibly
      Alleged An Antitrust Claim (Count III) ................................................................ 25

CONCLUSION .......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelson v. Harris*,
    774 F.3d 803 (2d Cir. 2014)..................................................................9, 11, 12, 13

*Aguilar v. PNC Bank, N.A.*,
    2014 WL 12700618 (E.D. Mo. Nov. 19, 2014)............................................................6

*Am. Guar. & Liab. Ins. Co. v. U.S. Fidelity & Guar. Co.*,
    668 F.3d 991 (8th Cir. 2012) ......................................................................................7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................5

*Britt v. Unknown Officers*,
    2019 WL 2453763 (D. Conn. June 12, 2019)...........................................................15

*Butler Am., LLC v. Ciocca*,
    2020 WL 6781488 (Conn. Super. Ct. Mar. 12, 2020)...............................................22

*Calhoun v. Goodwill Indus. of S. New England, Inc.*,
    2021 WL 3609677 (Conn. Super. Ct. July 26, 2021)................................................13

*Caranchini v. Peck*,
    355 F. Supp. 3d 1052 (D. Kan. 2018)......................................................................12

*Charamut v. Savage*,
    2022 WL 620782 (Conn. Super. Ct. Feb. 2, 2022)..................................................16

*Colon v. Town of W. Hartford*,
    2001 WL 45464 (D. Conn. Jan. 5, 2001)..................................................................21

*Consul Gen. of Republic of Indonesia v. Bill's Rentals, Inc.*,
    330 F.3d 1041 (8th Cir. 2003) ....................................................................................6

*Cronin v. Pelletier*,
    2018 WL 3965004 (Conn. Super. Ct. July 26, 2018)...............................................17

*Cweklinsky v. Mobil Chem. Co.*,
    837 A.2d 759 (Conn. 2004) ......................................................................................16

*Day v. Dodge*,
    2019 WL 994532 (Conn. Super. Ct. Jan. 25, 2019).................................................14

*Dellacamera v. New Haven Reg.*,
　2002 WL 31501855 (Conn. Super. Ct. Oct. 28, 2002) .........................................................15

*Dorman v. Emerson Elec. Co.*,
　23 F.3d 1354 (8th Cir. 1994) ..........................................................................................8

*Elmore v. Owens-Illinois, Inc.*,
　673 S.W.2d 434 (Mo. 1984) ...........................................................................................7

*Erie R. Co. v. Tompkins*,
　304 U.S. 64 (1938)...........................................................................................................9

*Forgione v. Bette*,
　2005 WL 1545278 (Conn. Super. Ct. June 2, 2005)........................................................16

*Fuqua Homes, Inc. v. Beattie*,
　388 F.3d 618 (8th Cir. 2004) ..........................................................................................7

*Gifford v. Taunton Press, Inc.*,
　2019 WL 3526461 (Conn. Super. Ct. July 11, 2019) ................................................11, 14

*Godin v. Schencks*,
　629 F.3d 79 (1st Cir. 2010)....................................................................................8, 12, 13

*Henry v. Lake Charles Am. Press, LLC*,
　566 F.3d 164 (5th Cir. 2009) ..........................................................................................12

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*,
　761 A.2d 1268 (Conn. 2000) ...........................................................................................22

*Hohmann v. GTECH Corp.*,
　910 F. Supp. 2d 400 (D. Conn. 2012).........................................................................16, 17

*Ins. & Consulting Assocs. v. ITT Hartford Ins. Grp.*,
　48 F. Supp. 2d 1181 (W.D. Mo. 1999) .............................................................................8

*Inst. Food Mktg. Assocs., Ltd. v. Golden State Strawberries, Inc.*,
　747 F.2d 448 (8th Cir. 1984) ..........................................................................................7

*Johnson v. Chesebrough-Pond's USA Co.*,
　918 F. Supp. 543 (D. Conn. 1996)....................................................................................21

*Knowles v. TD Ameritrade Holding Corp.*,
　2 F.4th 751 (8th Cir. 2021) .............................................................................................25

*Kopperl v. Bain*,
　23 F. Supp. 3d 97 (D. Conn. 2014).............................................................................23, 24

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020) ..................................................................................13

*LEGO A/S v. ZURU, Inc.*,
    2020 WL 13145135 (D. Conn. Apr. 22, 2020) ....................................................23

*Litchfield Asset Mgmt. Corp. v. Howell*,
    799 A.2d 298 (Conn. App. 2002) ........................................................................24

*Makaeff v. Trump Univ., LLC*,
    736 F.3d 1180 (9th Cir. 2013) ............................................................................12

*Martin v. Griffin*,
    2000 WL 872464 (Conn. Super. Ct. June 13, 2000)....................................10, 20

*Mercer v. Cosley*,
    955 A.2d 550 (Conn. App. Ct. 2008)...................................................................19

*Metcoff v. Lebovics*,
    2 A.3d 942 (Conn. App. Ct. 2010) ......................................................................23

*Newsham v. Lockheed Missiles & Space Co.*,
    190 F.3d 963 (9th Cir. 1999) ........................................................................12, 13

*Noble v. Hennessey*,
    2021 WL 830014 (Conn. Super. Ct. Jan. 12, 2021).......................................14, 21

*Pacheco Quevedo v. Hearst Corp.*,
    2019 WL 7900036 (Conn. Super. Ct. Dec. 19, 2019) .......................................5, 11

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017).........................................................................................9

*Primrose Cos. v. McGee*,
    2022 WL 3712636 (Conn. Super. Ct. Aug. 26, 2022)...............................9, 10, 18

*Rivas v. Pepi*,
    2018 WL 4199211 (Conn. Super. Ct. Aug. 16, 2018).....................................12, 13

*S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*,
    2015 WL 4509425 (D. Conn. July 24, 2015) ......................................................22

*Sentementes v. Lamont*,
    2021 WL 5447125 (D. Conn. Nov. 22, 2021) ......................................................13

*Smith v. Planned Parenthood of St. Louis Region*,
    225 F.R.D. 233 (E.D. Mo. 2004) ........................................................................11

*Stefanoni v. Darien Little League, Inc.*,
   2014 WL 3360571 (Conn. Super. Ct. May 22, 2014)...........................................................20

*Stevens v. Helming*,
   135 A.3d 728 (Conn. App. Ct. 2016) ....................................................................................16

*Tobinick v. Novella*,
   108 F. Supp. 3d 1299 (S.D. Fla. 2015) .................................................................................12

*Wolfley v. Solectron USA, Inc.*,
   541 F.3d 819 (8th Cir. 2008) ..................................................................................................6

*Youngman v. Robert Bosch LLC*,
   923 F. Supp. 2d 411 (E.D.N.Y. 2013) ....................................................................................7

*Zean v. Fairview Health Servs.*,
   858 F.3d 520 (8th Cir. 2017) ..................................................................................................5

*ZeeBaaS, LLC v. Koelewyn*,
   2012 WL 2327693 (D. Conn. June 19, 2012) .......................................................................23

**Statutes**

Conn. Gen. Stat. § 52-196a ................................................................................................ *passim*

Conn. Gen. Stat. § 52-237 ............................................................................................................15

Mo. Stat. § 537.528(1) ...................................................................................................................6

**Rules**

Conn. Prac. Bk. § 17-49 ...............................................................................................................13

Fed. R. Civ. P. 56 .........................................................................................................................13

## PRELIMINARY STATEMENT

After years of trying to curate a reputation as the bad boy of chess, Plaintiff Hans Niemann wants to cash in by blaming others for the fallout from his own admitted misconduct. Niemann's Amended Complaint concedes that he has a well-known history of cheating.  But rather than dealing with the unsurprising consequences of his own actions, Niemann now seeks to shift blame to reigning World Chess Champion Magnus Carlsen and others, claiming a wholly implausible conspiracy to defame and boycott Niemann that somehow damaged his already dubious reputation to the tune of $100 million.

Niemann's claims all fail on the face of the Amended Complaint.  Even accepting all of his allegations as true, Niemann cannot escape his own admissions that he has cheated in chess more than once, and as recently as two years ago.  Indeed, cheating was an indelible part of Niemann's chess career and reputation well before the events alleged in the Amended Complaint.  His first admitted instance of cheating happened at age 12, not long after he received his first chess title of Federation Master at age 11, Am. Compl. ("AC") ¶¶ 61, 102; and he became a Grandmaster at age 17, roughly a year after another admitted instance of cheating at age 16.  *Id.* ¶¶ 63, 102.  In 2020, Chess.com banned Niemann from its platform for six months for cheating, something that Niemann at the time acknowledged was "more than completely fair."  Chess.com Report at 7, Image 5; *see, e.g.*, AC ¶ 151 (discussing Chess.com report).

Niemann attempts to minimize his history of cheating by claiming that he was simply "experimenting with a chess engine on Chess.com as a child."  AC ¶ 102 n.1.  Despite Niemann's attempt to pretend otherwise, his Amended Complaint leaves no doubt that his history of known misconduct is the reason that top-ranked chess players and tournament organizers question the integrity of his play.  Even accepting Niemann's baseless allegations as

true, his fatal admissions and lack of plausible allegations make it impossible for him to state any valid claim against Carlsen:

*First*, the Court should immediately dismiss Niemann's four state-law claims (Counts I, II, IV, and V) pursuant to Connecticut's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute.  Missouri federal courts apply the law of the jurisdiction in which the plaintiff resides—here, Connecticut—when evaluating state-law claims that, like Niemann's, are rooted in alleged defamation.  Connecticut's anti-SLAPP statute is a substantive state law that applies here because Niemann admits in his Amended Complaint that he is a public figure, and he is suing Carlsen and others for speech that he acknowledges is a matter of public concern. This requires dismissal of each of Niemann's state-law claims, because Connecticut's anti-SLAPP law does not allow plaintiffs like Niemann to sue defendants like Carlsen for protected speech unless they can show "probable cause" that they are likely to prevail.  Niemann cannot come close to meeting this standard.

*Second*, Niemann's defamation claims (Counts I and II) fail to state plausible claims for relief.  As a public figure, Niemann must allege either that Carlsen knew the statements he allegedly made were false or was reckless about whether they were true.  Niemann's own allegations show he cannot meet this high bar.  Read liberally, Niemann appears to allege that Carlsen defamed him by insinuating that Niemann cheated during the Sinquefield Cup.  But Niemann's own Amended Complaint admits that Niemann has cheated in chess games before, *id.* ¶ 102, and that he played Carlsen prior to the Sinquefield Cup.  *Id.* ¶ 7.  Under these circumstances, Niemann cannot plausibly allege—much less prove—that Carlsen *knew* that Niemann did not cheat or that Carlsen's cheating concerns were not sincere.  Moreover, many of

the statements that Niemann attributes to Carlsen are not actionable for other reasons, including because they at most reflect Carlsen's opinions.

*Third*, Niemann's claims for tortious interference and civil conspiracy (Counts IV and V) likewise fail because they are based on the same alleged conduct as his defective defamation claims and because Niemann has not alleged the essential elements of these claims.

*Fourth*, Niemann's antitrust claim (Count III) candidly reveals what this case is really about: a series of grievances in search of a legal theory.  Niemann's attempt to make a federal case out of implausible state-law defamation claims fails at every step of the analysis.  He does not allege any harm to competition.  Instead, the only injury he asserts results from the harm he caused to his own reputation through his own admitted cheating.  He fails to plead any agreement among the defendants, much less a plausible one.  And he fails to allege any unreasonable restraint of trade under either the per se rule or the rule of reason.

For all of these reasons, this Court should dismiss all of Niemann's claims against Carlsen.  And because Niemann cannot salvage those claims, the dismissal should be with prejudice.  This Court also should award Carlsen his attorneys' fees and costs in connection with this Motion, as is required under Connecticut's anti-SLAPP statute. Conn. Gen. Stat. § 52-196a(f)(1).

## **BACKGROUND**

Magnus Carlsen is the world's number one chess player and has been the World Chess Champion since 2013.  AC ¶ 4.  Over his storied chess career, Carlsen has played in countless tournaments against countless others in the chess community: a list of Carlsen's recorded games alone runs 71 pages long.  *See id.* ¶¶ 38, 43 (citing Chess.com's statistics on Carlsen).  Niemann is just one of many Grandmasters who beat Carlsen during his time as World Chess Champion.

*See id.* ¶ 7.  But he is the only one to have filed a lawsuit against Carlsen over a game—their September 4, 2022 match in the Sinquefield Cup.

Niemann bases his state-law tort and federal antitrust claims on a parade of alleged grievances flowing out of what he perceives as Carlsen raining on his career's biggest victory. In particular, he complains that Carlsen purportedly spoke with Michael Khodarkovsky, the Executive Director of the Grand Chess Tour, to accuse Niemann of cheating, demand Niemann be disqualified, and request that Khodarkovsky "dramatically enhance the anti-cheating measures at the Sinquefield Cup."  *Id.* ¶¶ 80, 82.  Niemann also alleges that Carlsen then withdrew from the Sinquefield Cup entirely, *id.* ¶ 86, and tweeted about it in ways Niemann found objectionable.  *Id.* ¶¶ 83–84.  Later, Carlsen resigned after only one move in an online match against Niemann in the Julius Baer Generation Cup.  *Id.* ¶ 113.  He then shared his thoughts about his Sinquefield Cup match against Niemann in a September 26, 2022 tweet.  *Id.* ¶¶ 124–26, 128.  Finally, Carlsen allegedly linked Niemann to another admitted chess cheater, Maxim Dlugy, in an interview.  *Id.* ¶¶ 118–19.

In his five-count Amended Complaint, Niemann claims that some or all of these words and actions—he does not specify exactly which ones—constitute slander (Count I) or libel (Count II) against him.  He further contends that through the alleged defamation, Carlsen and others tortiously interfered with his opportunities to play competitive chess in the 2022 Chess.com Global Championship, the Tata Steel Chess Tournament, and a private match against Grandmaster Vincent Keymer (Count IV).  *Id.* ¶ 194.  Niemann also accuses Carlsen and the other defendants of conspiracy (Count V), alleging that they "schemed and agreed amongst themselves to repeatedly defame Niemann to members of the chess community and the public at large."  *Id.* ¶ 199.  And he alleges that the defendants violated Section 1 of the Sherman Act

(Count III) by "act[ing] in concert to improperly refuse to deal with Niemann." *Id.* ¶ 185.  But rather than stating any valid claim against Carlsen and the other defendants, the Amended Complaint only highlights the stark difference between how Niemann wants the chess world to perceive him—as an "American chess prodigy," *id.* ¶ 60—and the disappointing reality.

## ARGUMENT

Niemann's state-law claims are governed by Connecticut law, and Connecticut's anti-SLAPP statute requires their immediate dismissal, with an award of attorneys' fees and costs.  Beyond that, all of Niemann's claims also fail under Rule 12(b)(6) for the independent reason that his Amended Complaint and the materials it embraces do not contain "factual content that allows the court to draw the reasonable inference that [Carlsen] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[1]

**I.      Connecticut's Anti-SLAPP Statute Requires
         Dismissal of All of Niemann's State-Law Claims (Counts I, II, IV, and V)**

Connecticut law offers Carlsen an anti-SLAPP defense to all of Niemann's state-law claims.  Specifically, Connecticut's anti-SLAPP statute, Conn. Gen. Stat. § 52-196a, broadly "protect[s] parties from meritless lawsuits designed to chill free speech" by offering defendants like Carlsen the opportunity to file a special motion to dismiss at the beginning of a case. *Pacheco Quevedo v. Hearst Corp.*, 2019 WL 7900036, *1 (Conn. Super. Ct. Dec. 19, 2019).

---

[1] "[D]ocuments necessarily embraced by the complaint are not matters outside the pleading" and therefore may be considered in resolving this Motion.  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citation omitted).  Niemann's Amended Complaint embraces many documents, including the Chess.com Report, Chess.com's statistics on Carlsen, and an interview that Niemann gave to the Saint Louis Chess Club.  *See* AC ¶¶ 38, 43, 102, 150; *see also The Hans Niemann Report*, CHESS.COM, https://www.chess.com/blog/CHESScom/hans-niemann-report (last visited Dec. 2, 2022); *Magnus Carlsen Chess Games*, CHESS.COM, https://www.chess.com/games/search?fromSearchShort=1&p1=Magnus%20Carlsen&playerId=822231&sort=7&page=70 (last visited Dec. 2, 2022); Saint Louis Chess Club, *Niemann: I Have NEVER Cheated Over The Board | Round 5*, YOUTUBE (Sept. 6, 2022), https://www.youtube.com/watch?v=CJZuT-_kij0 (last visited Dec. 2, 2022) (the "Niemann Interview").

This substantive shield would be unavailable to Carlsen under Missouri law because Missouri's anti-SLAPP statute is inapplicable here. *See* Mo. Stat. § 537.528(1) (explaining that the statute applies only to "speech undertaken or made in connection with a public hearing or public meeting [or] in a quasi-judicial proceeding"). Accordingly, there is an outcome-determinative conflict between the defenses available under the laws of Missouri (the State where this case is pending) and Connecticut (the State where Niemann alleges he resides and intends to remain indefinitely, *see* AC ¶ 19) that this Court must resolve with a choice-of-law analysis. *See Consul Gen. of Republic of Indonesia v. Bill's Rentals, Inc.*, 330 F.3d 1041, 1046 (8th Cir. 2003) (explaining that choice-of-law analysis is required when "there actually is a difference between the relevant laws of the different states"). As demonstrated below, Connecticut's anti-SLAPP statute bars Niemann's state-law claims.

## A. Connecticut's Anti-SLAPP Statute Applies to Niemann's State-Law Claims Because Niemann is a Connecticut Citizen

Resolving the conflict between Connecticut and Missouri law requires this Court to apply Missouri's choice-of-law rules. *See Aguilar v. PNC Bank, N.A.*, 2014 WL 12700618, at *2 n.2 (E.D. Mo. Nov. 19, 2014) (explaining that the forum's choice-of-law analysis applies where a "federal court is exercising supplemental jurisdiction over state law claims" (internal quotation and citation omitted)); *see also Wolfley v. Solectron USA, Inc.*, 541 F.3d 819, 823 (8th Cir. 2008) (explaining the same for a court exercising diversity jurisdiction).

Missouri determines choice-of-law issues in tort actions by considering the following factors to identify the state having the "most significant relationship" to a particular claim: "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered."

*Am. Guar. & Liab. Ins. v. U.S. Fidelity & Guar. Co.*, 668 F.3d 991, 996 (8th Cir. 2012).  As applied to Niemann's specific tort claims, the place where the injury occurred—here, Connecticut, where Niemann resides—is the most important consideration in determining which state bears the most significant relationship to each claim.  Accordingly, Connecticut substantive law applies to Niemann's state-law claims and, thus, to Carlsen's defenses.  *See Youngman v. Robert Bosch LLC*, 923 F. Supp. 2d 411, 417 (E.D.N.Y. 2013) (evaluating New Jersey state-law defenses after determining that New Jersey law governed the plaintiff's substantive claims).

In particular, for Niemann's slander and libel claims, "the residence of the party allegedly defamed" is "the most important consideration in choosing the applicable law" where, as here, the plaintiff claims "widespread dissemination of the allegedly defamatory matter." *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 622 (8th Cir. 2004) (affirming application of Missouri law to a defamation claim brought by a corporate plaintiff because "[Missouri] is where [the plaintiff] maintains its principal place of business"); *see* AC ¶ 111 (alleging "worldwide" dissemination of the allegedly defamatory statements).  This is because "defamation produces a special kind of injury that has its principal effect among one's friends, acquaintances, neighbors and business associates in the place of one's residence." *Fuqua*, 388 F.3d at 622 (internal quotations and citation omitted); *see Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434, 437 (Mo. 1984) ("An injury from defamation . . . ha[s] a center in one's place of domicile.").

Connecticut law independently bears the "most significant relationship" to Niemann's tortious interference and civil conspiracy claims because, just as for defamation, courts employing the "most significant relationship" test give the most weight to the plaintiff's residence as the place where the injury occurred.  *See, e.g.*, *Inst. Food Mktg. Assocs., Ltd. v. Golden State Strawberries, Inc.*, 747 F.2d 448, 454 n.5 (8th Cir. 1984) (determining under

Missouri choice-of-law rules that Missouri substantive law applied to a tortious interference

claim brought by a plaintiff residing in Missouri, where the other parties involved were in

Missouri and California and the alleged interference was conducted over telephone and mail);

*Ins. & Consulting Assocs. v. ITT Hartford Ins. Grp.*, 48 F. Supp. 2d 1181, 1188 (W.D. Mo. 1999)

(applying Missouri choice-of-law rules to tort claims, including civil conspiracy, and concluding

that Missouri law governs where "the alleged injury occurred in Missouri and Missouri is the

location of plaintiff's business").  As with Niemann's defamation claims, any injury was felt in

Niemann's state of residence: Connecticut.  And even if the "most significant relationship"

analysis were inconclusive, "Missouri law establishes that" trial courts should apply "the

substantive law of the place where the injury occurred"—which again points to Connecticut,

where Niemann resides.  *Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1358 (8th Cir. 1994).

### B. <u>Niemann's State-Law Claims Fail Under Connecticut's Anti-SLAPP Statute</u>

This Court should dismiss Niemann's state-law claims under Connecticut's anti-SLAPP

statute because they are based on Carlsen's exercise of free speech, and because Niemann cannot

demonstrate with particularity any circumstances giving rise to a meritorious claim or show

probable cause that he will prevail.  *See* Conn. Gen. Stat. § 52-196a(e)(3) (requiring "the party

that brought the complaint . . . [to] set[] forth with particularity the circumstances giving rise to

the complaint . . . and demonstrate[] to the court that there is probable cause, considering all

valid defenses, that the party will prevail on the merits").

Many courts have held that various states' anti-SLAPP statutes apply in federal court

because the statutes "serve[] the . . . distinct function of protecting those specific defendants that

have been targeted with litigation on the basis of their protected speech."  *See, e.g.*, *Godin v.

Schencks*, 629 F.3d 79, 89 (1st Cir. 2010) (concluding that Maine's anti-SLAPP statute applies in

federal court). This Court should follow those decisions and apply Connecticut's anti-SLAPP statute to dismiss Niemann's state-law claims because that statute "(1) would apply in [Connecticut] state court had suit been filed there; (2) is substantive within the meaning of [*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)], since it is consequential enough that enforcement in federal proceedings will serve to discourage forum shopping and avoid inequity; and (3) does not squarely conflict with a valid federal rule." *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014).

1.    Connecticut's Anti-SLAPP Statute Would
      Apply in Connecticut State Court Had Niemann Filed Suit There

Connecticut's anti-SLAPP statute applies to Niemann's state-law claims because they are based on (1) Carlsen's exercise of the right of free speech regarding (2) a public figure. *See* Conn. Gen. Stat. § 52-196a(b). Under the statute, free speech means communicating "in a public forum on a matter of public concern," and a "[m]atter of public concern" includes "an issue related to" a "public figure." *Id.* § 52-196a(a)(1)–(2) (internal quotations omitted).

As discussed earlier, all of Niemann's claims against Carlsen are based on allegations that Carlsen accused Niemann of cheating through a series of actions and statements in which Carlsen exercised his right to free speech in a public forum. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (explaining that there is a "wide array of protected First Amendment activity on topics 'as diverse as human thought'" that occurs on social media and elsewhere (internal citation omitted)). Specifically, the Amended Complaint targets Carlsen's statements and actions in publicly broadcasted chess tournaments, on Twitter, and in press interviews.[2] Niemann himself alleges that Carlsen's statements were intended to produce an effect on "the chess community and the public." AC ¶¶ 82, 199.

---

[2] Social media outlets like Twitter constitute "public fora for the purposes of" Connecticut's anti-SLAPP statute. *Primrose Cos. v. McGee*, 2022 WL 3712636, at *6 (Conn. Super. Ct. Aug. 26, 2022).

Niemann's allegations also establish that he is a "public figure," meaning that speech about him in that capacity constitutes a "matter of public concern" under Connecticut's anti-SLAPP statute.  Conn. Gen. Stat. § 52-196a(a)(1)(D); *see Primrose*, 2022 WL 3712636, at *11 (analyzing a special motion to dismiss under Connecticut's anti-SLAPP law and explaining that a "general purpose" public figure is one with "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts").  According to Niemann, he not only earned several chess titles at a young age, but he rapidly developed into the "40th best chess player in the world" after becoming "the youngest-ever winner" of the "Tuesday Night Marathon" at the oldest chess club in the United States.  AC ¶¶ 2, 61, 64.  Niemann also has a "lucrative streaming career," in which he has played chess online for a wide audience, and he has "travel[ed] the world to compete" in tournaments for which he was paid thousands of dollars in "appearance fees."  AC ¶¶ 3, 168; *see* Niemann Interview at 17:40–17:56; AC ¶ 102 (referencing the Niemann Interview).  Niemann's own Amended Complaint therefore demonstrates that he has "assumed roles of especial prominence in the affairs of society" sufficient for him to be considered a "public figure."  *Martin v. Griffin*, 2000 WL 872464, at *8 (Conn. Super. Ct. June 13, 2000) (concluding that a former police officer and head of the police union is a public figure because of the "public nature of his position itself" and because he "thrust[] himself into the most public of disputes—an election campaign"); *see* Memorandum of Law in Support of Defendant Chess.com, LLC's Motion to Dismiss (the "Chess.com Motion") at Section III.A.2.a (collecting authority holding that professional sports figures are public figures).[3]

---

[3] Niemann is, at a minimum, a limited-purpose public figure, which also satisfies the "public figure" requirement under Connecticut's anti-SLAPP statute.  *See Primrose*, 2022 WL 3712636, at *11–12 (finding that the plaintiff was a "limited purpose public figure" for purposes of Connecticut's anti-SLAPP statute).  Indeed, sources integral to the Amended Complaint reflect that Niemann "thrust himself to the forefront of [this] particular public controversy."  *Id.* at *12 (quotations and citation omitted).  Specifically, in the interview discussing his reaction to the Sinquefield Cup tournament, Niemann made it

Accordingly, Niemann's own allegations establish the threshold requirements for applicability of Connecticut's anti-SLAPP statute by a preponderance of the evidence.  *See Pacheco*, 2019 WL 7900036, at *4–9 (granting special motion to dismiss because "defendants have established by a preponderance of the evidence that the claims . . . fit within the protection of the anti-SLAPP statute" where allegations showed that newspaper coverage constituted the exercise of free speech in a public forum on community well-being, a matter of public concern). Carlsen therefore would be able to invoke Connecticut's anti-SLAPP statute in Connecticut state court for all of Niemann's state-law claims, satisfying the first requirement for applying Connecticut's anti-SLAPP defense in this forum.  *See Adelson*, 774 F.3d at 809; *see also Gifford v. Taunton Press, Inc.*, 2019 WL 3526461, at *17 (Conn. Super. Ct. July 11, 2019) (granting an anti-SLAPP special motion to dismiss for defamation and tortious interference claims).

> 2. Connecticut's Anti-SLAPP Statute
> <u>Is Substantive and Does Not Conflict With the Federal Rules</u>

Connecticut's anti-SLAPP statute applies in this Court because it creates a substantive statutory protection for state-law claims that are based on free speech.  *See* Conn. Gen. Stat. § 52-196a(e)(3).  This Court previously concluded that a Missouri statute "intended to 'cull at an early stage of litigation' meritless suits" was "bound up with the rights and obligations created by state law in such a way that its application in federal court [was] required."  *Smith v. Planned Parenthood of St. Louis Region*, 225 F.R.D. 233, 241 (E.D. Mo. 2004).  This was because "[b]y requiring dismissal for failure to adhere to the statute, the . . . legislature clearly intended to influence substantive outcomes."  *Id.* (citation omitted).  The same is true of Connecticut's

---

clear that "[he's] putting [him]self in the public now" regarding any alleged controversy over the Sinquefield Cup.  Niemann Interview at 17:50–18:02.  In fact, Niemann describes himself as being at the "center" of the "single biggest chess scandal in history," which has garnered attention and public comment from major news organizations and well-known celebrities.  *See* AC ¶¶ 11, 87–92, 109, 115.

anti-SLAPP statute.  Its legislative history confirms that its purpose is to allow defendants who,

like Carlsen, are "sued on their free speech rights to have a means to quickly get rid of frivolous

lawsuits." *Rivas v. Pepi*, 2018 WL 4199211, at *2 (Conn. Super. Ct. Aug. 16, 2018) (quoting

Connecticut House and Senate debates on Conn. Gen. Stat. § 52-196a).

The First, Second, and Ninth Circuits—among other courts—have concluded that certain

anti-SLAPP statutes afford defendants substantive rights that should be applied in federal court.[4]

As these courts have recognized, enforcing state substantive law in this manner does not conflict

with the Federal Rules of Civil Procedure.  This is because anti-SLAPP statutes "ask[] an

entirely different question" than Federal Rules 12 or 56: namely, "whether the claims rest on the

SLAPP defendant's protected First Amendment activity and whether the plaintiff can meet the

substantive requirements [the State] has created to protect such activity from strategic, retaliatory

lawsuits." *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1182 (9th Cir. 2013) (Wardlaw, J. and

Callahan, J., concurring in the denial of reh'g en banc).  Put differently, anti-SLAPP statutes

fashion "a supplemental and substantive rule to provide added protections, beyond those in Rules

12 and 56." *Godin*, 629 F.3d at 88; *see Newsham*, 190 F.3d at 972 (explaining that "there is no

indication that [Federal] Rules 8, 12, and 56 were intended to 'occupy the field' with respect to

pretrial procedures aimed at weeding out meritless claims").

Anti-SLAPP statutes vary from state to state, and some courts have concluded that certain

anti-SLAPP laws cannot coexist with the Federal Rules.  For example, although the Second

---

[4] *See Godin*, 629 F.3d at 89 (affirming application of certain of Maine's anti-SLAPP provisions in federal court); *Adelson*, 774 F.3d at 809 (affirming application of certain of Nevada's anti-SLAPP provisions in federal court); *Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972 (9th Cir. 1999) (concluding that relevant provisions of California's anti-SLAPP statute apply in federal court); *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 168–69 (5th Cir. 2009) (applying Louisiana's anti-SLAPP statute in federal court); *Caranchini v. Peck*, 355 F. Supp. 3d 1052, 1061 (D. Kan. 2018) (holding that Kansas's anti-SLAPP statute applies in federal court); *Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1305 (S.D. Fla. 2015) (applying California's anti-SLAPP statute in federal court).

Circuit previously upheld a trial court's application of certain provisions of Nevada's anti-SLAPP statute, *see Adelson*, 774 F.3d at 809, it later disagreed with the Ninth Circuit's holding that California's anti-SLAPP statute applies in federal court, *see La Liberte v. Reid*, 966 F.3d 79, 88 (2d Cir. 2020).  Relying on that analysis, the District of Connecticut followed *La Liberte* in an unreported decision declining to apply Connecticut's anti-SLAPP law in federal court.  *See Sentementes v. Lamont*, 2021 WL 5447125, at *2–3 (D. Conn. Nov. 22, 2021).

But this Court is not bound by *La Liberte* and should not follow it here.  Reviewing the issue afresh, it is evident that Connecticut's anti-SLAPP statute supplements, rather than conflicts with, the Federal Rules of Civil Procedure.  Connecticut's anti-SLAPP statute does not ask the same question as Federal Rules 12 or 56; it instead focuses on whether "defendants [were] wrongly targeted for simply exercising" their First Amendment rights.  *Rivas*, 2018 WL 4199211, at *2.  And like the anti-SLAPP statutes of Maine and California, Connecticut's anti-SLAPP statute works in tandem with Connecticut's Federal Rule 12 and 56 equivalents.[5] Accordingly, rather than creating a conflict with the Federal Rules, Connecticut's anti-SLAPP statute "adds an additional, unique weapon to the pretrial arsenal."  *Newsham*, 190 F.3d at 973.

"Declining to apply [Connecticut's anti-SLAPP statute] in federal court would . . . result in an inequitable administration of justice between a defense asserted in state court and the same defense asserted in federal court."  *Godin*, 629 F.3d at 92.  To discourage forum shopping and avoid this inequitable result, the Court should apply Connecticut's statutory shield and vindicate

---

[5] *See Calhoun v. Goodwill Indus. of S. New England, Inc.*, 2021 WL 3609677, at *3 n.3 (Conn. Super. Ct. July 26, 2021) (explaining that a motion to strike filed pursuant to Conn. Prac. Bk. § 10-39 is "the functional equivalent" of a Rule 12(b)(6) motion); *compare* Conn. Prac. Bk. § 17-49 ("[Summary judgment] shall be rendered forthwith if the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."), *with* Fed. R. Civ. P. 56 ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

the Connecticut state legislature's goal of protecting free speech by barring claims like the ones Niemann has brought here.

### 3.     Niemann's State-Law Claims Fail To Satisfy the Rigorous Showing Required by Connecticut's Anti-SLAPP Statute

Because Niemann has not met—and cannot meet—his burden to "demonstrate[] to the court that there is probable cause . . . that [he] will prevail on the merits of the complaint" with the particularity that Connecticut law requires, each of his state-law claims should be dismissed. Conn Gen. Stat. § 52-196a(e)(3).

First, Niemann has failed to adequately allege essential elements of each of his state-law claims and, on the face of those claims, cannot show probable cause that he will prevail.  In this context, "[p]robable cause is a bona fide belief in the existence of facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence, and judgment, under the circumstances, in entertaining it." *Day v. Dodge*, 2019 WL 994532, at *4 (Conn. Super. Ct. Jan. 25, 2019) (internal quotation and citation omitted); *see Gifford*, 2019 WL 3526461, at *12, 14 (explaining that "probable cause of success on the merits of any of his claims . . . require[s] the plaintiff to demonstrate libel" and dismissing claims because the plaintiff had not done so).[6]  As discussed below, Niemann's Amended Complaint is missing the factual allegations needed to support his state-law claims.  *See infra* Parts II, III, and IV.

Second, Niemann cannot overcome Carlsen's defenses.  Courts dismiss actions under Connecticut's anti-SLAPP statute for failure to satisfy the probable cause standard where plaintiffs cannot overcome valid defenses.  *See Day*, 2019 WL 994532, at *4–6 (dismissing

---

[6] Moreover, "[b]ecause '[e]ach statement furnishes a separate cause of action and requires proof of each of the elements for defamation,' the plaintiff must show probable cause that []he will prevail as to each alleged defamatory statement."  *Noble v. Hennessey*, 2021 WL 830014, at *7 (Conn. Super. Ct. Jan. 12, 2021) (internal citation omitted); *see infra* Part II.A.

claims for lack of probable cause on the basis that "plaintiffs cannot sustain their burden of showing that they are likely to succeed on the merits" because plaintiffs had not demonstrated that the defendants were not "entitled to immunity"); Conn. Gen. Stat. § 52-196a(e)(3) (requiring the court to "consider[] all valid defenses").  Carlsen has several such defenses, including that Niemann has not alleged actual malice, *see infra* Part II.B; that the conduct Carlsen allegedly engaged in cannot form the basis of a defamation claim, *see infra* Part II.C.1; that qualified privilege shields Carlsen from liability for his alleged statements to tournament officials, *see infra* Part II.C.2; and that all of Carlsen's allegedly defamatory statements are protected opinions, *see infra* Part II.C.3.  Any one of these defenses is sufficient to prevent Niemann from prevailing on one or more of his claims.

For these reasons, Connecticut's anti-SLAPP statute bars all of Niemann's state-law claims and they should be expeditiously dismissed.[7]

## II.     Niemann's Defamation Claims Fail for the Separate Reason That Niemann Has Failed to Plausibly Allege Them (Counts I and II)

Because "each alleged defamatory statement constitutes a separate cause of action," Niemann is required to plead the necessary elements for each separate libelous or slanderous statement.  *Britt v. Unknown Officers*, 2019 WL 2453763, at *4 (D. Conn. June 12, 2019) (applying Connecticut law).  Those elements are that: "(1) [Carlsen] published a defamatory statement; (2) the defamatory statement identified [Niemann] to a third person; (3) the

---

[7] Although Niemann's state-law claims should be dismissed in their entirety, Connecticut law also limits Niemann's recovery for his libel claim to "actual damage[s]" because Niemann has neither alleged that he requested Carlsen to retract his allegedly libelous statements nor alleged actual malice.  *See* Conn. Gen. Stat. § 52-237; *see infra* Part II.B.  Under Connecticut law, the "actual pecuniary losses" a libel plaintiff can recover do not include damages for "general harm to reputation, injured feelings or mental anguish." *Dellacamera v. New Haven Reg.*, 2002 WL 31501855, at *3 (Conn. Super. Ct. Oct. 28, 2002). Accordingly, at an absolute minimum, the Court should dismiss Niemann's libel claim to the extent it seeks anything other than actual damages.

defamatory statement was published to a third person; and (4) [Niemann's] reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759, 763–64 (Conn. 2004).  In addition, because Niemann is a public figure, *see supra* Part I.B.1 & n.3, he also must "allege and demonstrate that [Carlsen] acted with actual malice." *Charamut v. Savage*, 2022 WL 620782, at *5 (Conn. Super. Ct. Feb. 2, 2022).

As explained below, Niemann has neither pleaded his defamation claims with the requisite specificity nor plausibly alleged that Carlsen made defamatory statements.

### A.    Niemann Fails to Specifically Identify Defamatory Statements Made by Carlsen

The jumbled morass of asserted statements and conduct by Carlsen alleged in the Amended Complaint fails to meet Niemann's burden of specifically identifying "what allegedly defamatory statements were made, by whom, and to whom." *Stevens v. Helming*, 135 A.3d 728, 732 n.3 (Conn. App. Ct. 2016) (internal quotation and citation omitted).  Such "[i]mprecise pleading is not permitted in the context of alleged defamation." *Id.* (internal quotation and citation omitted).  For this reason alone, Niemann has not alleged a prima facie case of defamation for any of the alleged statements attributed to Carlsen, and his defamation claims fail as a matter of law.  *See Forgione v. Bette*, 2005 WL 1545278, at *5 (Conn. Super. Ct. June 2, 2005) (dismissing defamation claim where plaintiff identified reports containing allegedly defamatory statements but not "which statements in the reports are alleged to be defamatory").

### B.    Niemann Fails to Plausibly Allege That Carlsen Acted With Actual Malice

Niemann's defamation claims also fail for the independent reason that Niemann has failed to plausibly allege that Carlsen acted with actual malice as to any allegedly defamatory statement.  "Actual malice requires that [a] statement, when made, be made with actual knowledge that it was false or reckless disregard of whether it was false." *Hohmann v. GTECH*

*Corp.*, 910 F. Supp. 2d 400, 406 (D. Conn. 2012) (internal quotation and citation omitted); *see id.* at 407 (applying Connecticut law and dismissing defamation claim where "[t]he Complaint does not allege that [the defendant] knew the statement was false, or that he made the statement with reckless disregard of whether it was false"). "Reckless disregard" may be shown when an individual publishes a defamatory statement with "a high degree of awareness of . . . probable falsity" or "entertain[s] serious doubts" as to the statement's truth. *Id*.

Given the allegations in the Amended Complaint and Niemann's acknowledged history of cheating, Niemann has failed to—and cannot—plausibly allege that Carlsen knew his purported statements were false, had an awareness of their probable falsity, or entertained serious doubts as to their truth. *See Cronin v. Pelletier*, 2018 WL 3965004, at *3 (Conn. Super. Ct. July 26, 2018) (dismissing claim for lack of actual malice because there was no allegation that "the defendant *knew* that his pejorative remarks were untrue when he mailed them or did so without regard to truth or falsity" and explaining that even allegations of "*intent* to cause consternation, hurt feelings, and tarnish the plaintiffs' reputation . . . are insufficient in the absence of an allegation that the defendant did not believe in his assessments" (emphasis in original)).

Niemann claims that Carlsen "falsely accus[ed]" Niemann of cheating at the Sinquefield Cup, but he does not allege—and cannot allege—any facts to support this conclusory assertion. *See* AC ¶ 8. Highlighting the lack of any such allegations, Niemann relies exclusively on post-hoc sources such as the claimed lack of "statistical evidence" of cheating and statements by Sinquefield Cup organizers that there were "no indications of cheating." *See id.* ¶¶ 140–42, 137–39. These after-the-fact sources could not have informed Carlsen's personal impressions and evaluation of Niemann's play at the Sinquefield Cup match. *See Hohmann*, 910 F. Supp. 2d at 407 (allegations that a defendant "should have known" a statement "widely diverged from the

17

truth" merely state that the defendant "engaged in a negligent misstatement of fact, which is not enough to constitute reckless disregard").  Nor do the Sinquefield Cup organizers' alleged statements prove that Niemann did not cheat.  To the contrary, Niemann concedes in his Amended Complaint that the types of anti-cheating measures that could have helped to rule out cheating were *not* in place during his match with Carlsen.  *See* AC ¶ 82 (alleging that it was only after Niemann's match with Carlsen that the Sinquefield Cup instituted a 15-minute broadcast delay and other anti-cheating measures).

Further, Niemann's own allegations demonstrate that each of Carlsen's allegedly defamatory statements were personal impressions.  Niemann acknowledges that he played Carlsen prior to the Sinquefield Cup game, meaning that Carlsen had a history with Niemann informing his evaluation of Niemann's performance at their Sinquefield Cup match.  *See id.* ¶ 7. And even if the statements Carlsen allegedly made were in fact accusations that Niemann cheated in the Sinquefield Cup, the Amended Complaint illustrates that those statements have a basis in fact: Niemann concedes that he has cheated in the past, and he incorporates by reference documents in which he admits that he has previously been accused of cheating by others in the chess community.  *See id.* ¶ 102; *see also* Chess.com Report at 7, Image 5 (Niemann acknowledging in November 2020 that others have accused him of cheating).

Finally, Niemann's bald assertions that Carlsen acted with "reckless disregard," *see* AC ¶¶ 175, 181, are insufficient to plead actual malice.  *See, e.g.*, *Primrose*, 2022 WL 3712636, at *13 (concluding that "the plaintiff's conclusory allegations of willfulness, wantonness, and recklessness aside, the record is devoid of evidence of actual malice on the part of the defendant").  And they are particularly implausible given the numerous facts alleged by Niemann undercutting his insistence that Carlsen somehow knew his allegedly defamatory statements

were untrue.  On the contrary, Niemann's own allegations show that he is trying to hold Carlsen liable for sincerely held beliefs that Carlsen formed based on his own interactions with Niemann and Niemann's reputation.

### C.  The Allegedly Defamatory Statements Are Not Actionable In Any Event

Niemann's failure to identify specific statements or plausibly allege actual malice is, on its own, grounds to dismiss his defamation claims.  But these claims also fail for the separate reason that none of the allegedly defamatory statements is actionable.  While Niemann's Amended Complaint obfuscates the subject of his grievances, he appears to complain that Carlsen defamed him by:

- Withdrawing from the Sinquefield Cup and resigning the Julius Baer Generation Cup game.  AC ¶¶ 86, 113;

- Expressing concerns about Niemann's cheating to Khodarkovsky, a chess tournament official, at the Sinquefield Cup.  *Id.* ¶¶ 80, 82; and

- Expressing his opinion that Niemann cheated at the Sinquefield Cup.  *Id.* ¶¶ 83–84, 118–19, 124–26.

Even if true, none of these complaints gives rise to a defamation claim.

#### 1.  Niemann Cannot Assert Defamation Claims Based on Conduct

First, as a matter of law, Niemann's allegations regarding Carlsen's resignations in various chess tournaments cannot support a defamation claim.  Under Connecticut law, defamation is an oral or written statement.  *See Mercer v. Cosley*, 955 A.2d 550, 561 (Conn. App. Ct. 2008) ("Defamation is comprised of the torts of libel and slander. . . .  Slander is oral defamation. . . .  Libel is written defamation.").  Accordingly, to the extent Niemann's defamation claims are premised on conduct such as Carlsen's tournament or game resignations,

those claims fail as a matter of law.  *See Martin*, 2000 WL 872464, at *17 (no recovery for libel resulting "from the editorial choice of layout" of a media communication).

        2.      Carlsen's Alleged Statements to
                  Tournament Officials Are Protected by Qualified Privilege

        Second, to the extent Niemann's defamation claims are based on Carlsen's alleged statements to chess tournament officials, those statements are all protected by qualified privilege. Qualified privilege exists where, as here, there is "(1) an interest to be upheld, (2) a statement limited in scope to this purpose, (3) good faith, (4) a proper occasion, and (5) a publication in a proper manner to proper parties only."  *Stefanoni v. Darien Little League, Inc.*, 2014 WL 3360571, at *3 (Conn. Super. Ct. May 22, 2014).

        Indeed, even assuming that Carlsen in fact expressed concerns about Niemann's cheating to Khodarkovsky—the Executive Director of the Grand Chess Tour—such statements would not be actionable.  Niemann's own allegations show that both Carlsen and Khodarkovsky had a common interest in preventing cheating at the Sinquefield Cup, which is one of the Grand Chess Tour's featured events.  *See* AC ¶¶ 80 (alleging that Carlsen spoke to Khodarkovsky about cheating during the Sinquefield Cup match with Niemann); *id.* ¶ 82 (alleging that Carlsen asked Khodarkovsky to "dramatically enhance anti-cheating measures").  The alleged statements to Khodarkovsky are thus protected by qualified privilege.  *See Stefanoni*, 2014 WL 3360571, at *10 (finding that a Little League's comments were protected by qualified privilege due to "an interest in informing Little League participants and their parents that the plaintiff's comments [that the Little League had demoralized her son] were considered incorrect").  Niemann can only defeat qualified privilege with a showing of actual malice, which, as discussed earlier, he has not alleged and cannot plausibly allege.  *See supra* Part II.B.

Accordingly, to the extent Niemann's defamation claims are premised on Carlsen's alleged communications with Khodarkovsky, they fail as a matter of law.

3.      Carlsen's Alleged Statements Are Non-Actionable Opinions

Finally, Niemann's claims should be dismissed because the allegedly defamatory statements at most amount to non-actionable opinions.  Statements of opinion, even if negative or otherwise harmful, cannot, as a matter of law, form the basis for a defamation claim.  *See Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 551–52 (D. Conn. 1996) (applying Connecticut law); *see also Noble*, 2021 WL 830014, at *9 (dismissing defamation claim based on a defendant's statement that an agreement was "probably illicit" because "the use of the word 'probably' inherently does not suggest a fact but, rather, is more like a 'personal comment about another's conduct' constituting an opinion" (citation omitted)).

As discussed earlier, Niemann's own allegations demonstrate that Carlsen's allegedly defamatory statements constituted his own personal impressions based on his firsthand observations and what was already known throughout the chess community.  *See supra* Parts II.B; II.C.3.  Accordingly, Niemann's allegations regarding Carlsen's purported statements cannot support a defamation claim as a matter of law.  *See Colon v. Town of W. Hartford*, 2001 WL 45464, at *4 (D. Conn. Jan. 5, 2001) (applying Connecticut law and explaining that "an opinion that appears to be in the form of a factual statement may still be an opinion if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts" (internal quotations and citation omitted)).

## III.  **Niemann Has Not Plausibly Alleged A Claim For Tortious Interference (Count IV)**

Like his defamation claims, Niemann fails to adequately allege a claim for tortious interference.  A tortious interference claim requires "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business

relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff [to] suffer[] actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1273 (Conn. 2000). Niemann fails to allege the second and third of these required elements.

First, Niemann has not alleged that Carlsen had actual knowledge of any alleged contracts or business relationships Niemann has. *Cf. S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*, 2015 WL 4509425, at *11 (D. Conn. July 24, 2015) (applying Connecticut law to an intentional interference with contractual relations claim and explaining that it requires "actual knowledge of the particular contractual provision alleged to have been violated" (internal quotations and citation omitted)). Nowhere in the Amended Complaint does Niemann allege that Carlsen had actual knowledge of, for example, Niemann's opportunity to attend the Tata Steel Chess Tournament or his desire to play against Keymer. *See* AC ¶¶ 165–66. Niemann cannot avoid his obligation to plead actual knowledge by pointing to Carlsen's position as a "fellow[] member[] of the competitive chess industry," *id.* ¶ 193, because Carlsen's "general knowledge of the industry cannot substitute for actual knowledge of a specific contract." *S. Home Care Servs.*, 2015 WL 4509425, at *11 (internal quotations and citation omitted). For this reason alone, Niemann's tortious interference claim fails. *See Butler Am., LLC v. Ciocca*, 2020 WL 6781488, at *3–4 (Conn. Super. Ct. Mar. 12, 2020) (dismissing claims for tortious interference with contract and tortious interference with business relations because the plaintiff's allegations as to knowledge of the contracts or expectancies were "mere legal conclusions that are unsupported by other facts alleged").

Second, Niemann has not adequately alleged that Carlsen had any intent to interfere with any contracts or business relationships. To allege an intent to interfere, a plaintiff must plead "at least some improper motive or improper means. . . . In other words, the [plaintiff] bears the

burden of alleging . . . lack of justification on the part of the" defendant for interfering.

*ZeeBaaS, LLC v. Koelewyn,* 2012 WL 2327693, at *4 (D. Conn. June 19, 2012) (internal

quotations and citations omitted); *see id.* (applying Connecticut law and granting motion to

dismiss tortious interference claim where the plaintiffs' complaint was "devoid of any factual

allegations which support the reasonable inference that [defendant] had an improper motive or

employed improper means"). Niemann's only factual allegation about Carlsen's allegedly

"improper motive" is that Carlsen does not "want to play against people" who, like Niemann,

"have cheated repeatedly in the past." AC ¶ 126 (emphasis omitted). Niemann's legal

conclusions about supposedly nefarious motivations cannot transform an objectively rational

opinion into an improper motive. *See Metcoff v. Lebovics*, 2 A.3d 942, 949 (Conn. App. Ct.

2010) (explaining that "[c]onclusory allegations of improper motivation are not sufficient" and

affirming dismissal of tortious interference claim where plaintiffs ascribed sinister motives to

conduct taken in the normal course of business). And Niemann's claims that Carlsen engaged in

"improper means" by defaming him or violating antitrust law, *see* AC ¶ 194, illustrate that his

tortious interference claim is merely derivative of his failed defamation and antitrust claims. *See*

*LEGO A/S v. ZURU, Inc.*, 2020 WL 13145135, at *10 (D. Conn. Apr. 22, 2020) (applying

Connecticut law and dismissing derivative interference claim because plaintiff failed to state

underlying antitrust claim).

Finally, Niemann has not alleged any factual basis for his contention that Carlsen's

alleged conduct was the proximate cause of his purported injury, such as being disinvited from

the tournaments and the match against Keymer. *See Kopperl v. Bain*, 23 F. Supp. 3d 97, 110 (D.

Conn. 2014) (applying Connecticut law and explaining that "to succeed on a claim of tortious

interference . . . the plaintiff must . . . show [at least] that the defendant's actions proximately

caused a loss to the plaintiff's business" (citation omitted)).  Instead, Niemann's own Amended

Complaint supplies several other—and more likely—causes for the rescinded tournament

invitations, including his own admissions of past cheating.  *See* AC ¶¶ 87–92, 102.  The Court

should dismiss Niemann's tortious interference claim.

IV.     <u>**Niemann Has Not Plausibly Alleged A Claim For Civil Conspiracy (Count V)**</u>

This Court should dismiss Niemann's civil conspiracy claim because he has failed to

adequately allege an underlying tort, as is required to state a claim for civil conspiracy.  *See*

*Litchfield Asset Mgmt. Corp. v. Howell*, 799 A.2d 298, 306 (Conn. App. 2002) ("[W]here the

plaintiff is unable to establish the underlying cause of action . . . the cause of action for

conspiracy to [commit the underlying action] must also fail.").

Niemann also has failed to sufficiently allege the required elements for civil conspiracy

under Connecticut law: "(1) a combination between two or more persons, (2) to do a criminal or

unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the

conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in

damage to the plaintiff."  *Kopperl*, 23 F. Supp. 3d at 119.  He makes no allegations of an

agreement or combination among the defendants, relying entirely on conclusory statements that

provide no specificity as to the purported actions of any of them.  *See* AC ¶¶ 188 (referencing an

undescribed "agreement to ban and blacklist"); *id.* ¶¶ 199–200 (referencing a general "scheme

and agreement").  In fact, Niemann does not allege that any or all of the defendants were in

communication about their alleged statements at all.

The only allegation Niemann provides in his failed effort to conjure an agreement is the

timing of defendants' asserted acts, alleging that his "sudden ban" by Chess.com was "at the

precise time that Carlsen accused Niemann of cheating against him," and that Nakamura's

commentary came after Carlsen's tweet regarding his withdrawal from the Sinquefield Cup.  *Id.*

¶¶ 95–97.  Notwithstanding Niemann's assertion that "there would be no reason for Chess.com to suddenly ban Niemann immediately after he defeated Carlsen," *id.* ¶ 95, the allegedly close timing of these unilateral actions does not amount to a plausible allegation of coordination or agreement among the defendants.  Niemann's failure to allege any facts supporting the existence of an agreement among defendants dooms his civil conspiracy claim.

**V.      Niemann Has Not Plausibly Alleged An Antitrust Claim (Count III)**

As discussed in Section I of the Chess.com Motion, which is incorporated by reference, Niemann's federal antitrust claim fails as a matter of law.  This claim is nothing more than an artful repackaging of Niemann's defective defamation and related state-law claims, which fails for at least the three independent reasons discussed in the Chess.com Motion: (1) Niemann does not plausibly allege an agreement among the defendants; (2) Niemann does not allege the threshold requirement of antitrust injury; and (3) Niemann does not allege that any purported agreement "unreasonably restrained trade" under either the per se rule or the rule of reason.

## CONCLUSION

For the foregoing reasons, the Court should dismiss each of Niemann's five claims against Carlsen.  Because all of Niemann's claims against Carlsen suffer from fundamental inadequacies that cannot be cured, Niemann's claims should be dismissed with prejudice.  *See Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 758 (8th Cir. 2021) ("It is well settled that a district court may dismiss a complaint with prejudice . . . when amendment of a complaint would be futile.").  Carlsen also respectfully requests that this Court award him his attorneys' fees and costs in connection with this Motion under Connecticut's anti-SLAPP statute.  Conn. Gen. Stat. § 52-196a(f)(1).

Dated: December 2, 2022

Respectfully submitted,

**STINSON LLP**

**AXINN, VELTROP & HARKRIDER LLP**

J. Nicci Warr (State Bar No. 59975)
7700 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105
Office: 314.259.4570
Email: nicci.warr@stinson.com

By:  /s/ Craig M. Reiser
Craig M. Reiser, admitted *pro hac vice*
Denise L. Plunkett, admitted *pro hac vice*
Eva H. Yung, admitted *pro hac vice*
114 West 47th Street
New York, New York 10036
Office: 212.728.2200
Fax: 212.728.2201
Email: creiser@axinn.com
      dplunkett@axinn.com
      eyung@axinn.com

John M. Tanski, *pro hac vice* pending
Caroline P. Boisvert, *pro hac vice* pending
90 State House Square
Hartford, Connecticut 06103
Office: 860.275.8100
Fax: 860.275.8101
Email: jtanski@axinn.com
      cboisvert@axinn.com

*Counsel for Defendant Magnus Carlsen*

## <u>CERTIFCATE OF SERVICE</u>

I hereby certify that on December 2, 2022, the foregoing was filed electronically using the CM/ECF system which will automatically provide notice to all attorneys of record by electronic means.

Dated: December 2, 2022

Respectfully submitted,

**Axinn, Veltrop & Harkrider LLP**

By:  /s/ Craig M. Reiser
Craig M. Reiser, admitted *pro hac vice*
114 West 47th Street
New York, New York 10036
Office: 212.728.2200
Fax: 212.728.2201
Email: creiser@axinn.com

*Counsel for Defendant Magnus Carlsen*