HANS MOKE NIEMANN,

    Plaintiff,

      vs.

SVEN MAGNUS ØEN CARLSEN A/K/A
MAGNUS CARLSEN, PLAY MAGNUS AS
D/B/A PLAY MAGNUS GROUP, CHESS.COM,
LLC, DANIEL RENSCH A/K/A "DANNY"
RENSCH, AND HIKARU NAKAMURA,

    Defendants.

Case No. 4:22-cv-01110-AGF

Hon. Audrey G. Fleissig

## **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CHESS.COM, LLC'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Nima H. Mohebbi (# 275453CA)
Sarah F. Mitchell (# 308467CA)
Michael A. Hale (# 319056CA)
**LATHAM & WATKINS LLP**
355 S. Grand Ave., Suite 100
Los Angeles, CA 90071
Tel: (213) 485-1234
*nima.mohebbi@lw.com*
*sarah.mitchell@lw.com*
*michael.hale@lw.com*


Jeffrey B. Jensen (# 46745MO)
Kate Ledden (# 66026MO)
**HUSCH BLACKWELL LLP**
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel: (314) 480 1500
*jeff.jensen@huschblackwell.com*
*kate.ledden@huschblackwell.com*

Jamie L. Wine (# 4529251NY)
Blake E. Stafford (# 888324775DC)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
*jamie.wine@lw.com*


Derek Teeter (# 59031MO)
Spencer Tolson (# 74467MO)
**HUSCH BLACKWELL LLP**
4801 Main, Suite 1000
Kansas City, MO 64112
Tel: (816) 983-8000
*derek.teeter@huschblackwell.com*
*spencer.tolson@huschblackwell.com*

*Counsel for Defendant Chess.com, LLC*

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

BACKGROUND ...............................................................................................................2

    A.    Niemann Is An Admitted Cheater On Chess.com's Platform. ................................2

    B.    Niemann's Game Against Carlsen At The Sinquefield Cup. ..................................3

    C.    The Public Fallout, Interest From The Game, And Niemann's Interviews. ............3

    D.    Chess.com Issues A 72-Page Report Following An Investigation. ........................5

LEGAL STANDARD.........................................................................................................6

ARGUMENT .....................................................................................................................6

I.     NIEMANN'S ANTITRUST CLAIM MUST BE DISMISSED.........................................6

    A.    Niemann Fails To Plausibly Allege The Existence Of An Antitrust
        Conspiracy. ...........................................................................................................7

    B.    Niemann Fails To Allege Antitrust Injury Sufficient To Confer Standing. ............8

    C.    Niemann Could Not Otherwise Invoke The *Per Se* Rule And Fails To
        Plausibly Allege That Any Purported Agreement Unreasonably Restrained
        Trade. ..................................................................................................................10

II.    CONNECTICUT'S ANTI-SLAPP STATUTE BARS THE STATE LAW
    CLAIMS ....................................................................................................................12

III.   NIEMANN'S STATE LAW CLAIMS FAIL ON THE MERITS ...................................12

    A.    Niemann's Defamation Claims Fail........................................................................13

        1.    Niemann Fails To Allege Statements That Are Actionable......................13

            a.    The September 8, 2022 Tweet Is Not Actionable..........................14

            b.    Nothing In The Chess.com Report Is Actionable. .........................15

        2.    Niemann Fails To Adequately Allege Actual Malice...............................19

            a.    Niemann Is A Public Figure. ........................................................19

            b.    Niemann Fails To Allege That Any Of The Challenged
                Statements Was Made With Actual Malice. ..................................21

B.       Niemann's Tortious Interference Claim Fails..........................................................23

C.       Niemann's Derivative Civil Conspiracy Claim Fails. ...........................................25

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Cable Techs. Servs., Inc. v. AT & T Corp.*,
140 F. Supp. 2d 1026 (W.D. Mo. 2001) ..............................................25

*Ariel Preferred Retail Grp., LLC v. CWCapital Asset Mgmt.*,
2011 WL 4501049 (E.D. Mo. Sept. 28, 2011) ......................................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................6, 23

*Aviation Charter, Inc. v. Aviation Rsch. Grp./US*,
416 F.3d 864 (8th Cir. 2005), *abrogated on other grounds by Syngenta Seeds,
Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58 (8th Cir. 2014) ......................16

*Bassett v. Nat'l Collegiate Athletic Ass'n*,
528 F.3d 426 (6th Cir. 2008) ...............................................................11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................1, 2, 6, 7

*Britt v. Unknown Officers*,
2019 WL 2453763 (D. Conn. June 12, 2019) ........................................13

*Brookins v. Int'l Motor Contest Ass'n*,
219 F.3d 849 (8th Cir. 2000) ......................................................8, 10, 11

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
429 U.S. 477 (1979) ................................................................................8

*Butler Am., LLC v. Ciocca*,
2020 WL 6781488 (Conn. Super. Ct. Mar. 12, 2020) ............................24

*Campbell v. Citizens for an Honest Gov't, Inc.*,
255 F.3d 560 (8th Cir. 2001) ...............................................................22

*Castle Rock Rem., LLC v. Better Bus. Bur. of Greater St. Louis, Inc.*,
354 S.W.3d 234 (Mo. Ct. App. 2011) .......................................23, 24, 25

*Cha–Car, Inc. v. Calder Race Course, Inc.*,
752 F.2d 609 (11th Cir. 1985) .............................................................11

*Chapman v. J. Concepts, Inc.*,
528 F. Supp. 2d 1081 (D. Haw. 2007), *aff'd on other grounds*, 401 F. App'x
243 (9th Cir. 2010) ...............................................................................20

*Chuy v. Philadelphia Eagles Football Club*,
    595 F.2d 1265 (3d Cir. 1979)......................................................................20

*Cockram v. Genesco, Inc.*,
    680 F.3d 1046 (8th Cir. 2012) ..................................................................19

*Daley v. Aetna Life & Casualty Co.*,
    249 Conn. 766 (1999) ...............................................................................24

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
    136 F.3d 554 (8th Cir. 1998) ...............................................................10, 11

*Envtl. Energy Ptnrs., Inc. v. Siemens Bldg. Techs., Inc.*,
    178 S.W.3d 691 (Mo. Ct. App. 2005).....................................................24

*Fair Isaac Corp. v. Experian Info. Sols. Inc.*,
    645 F. Supp. 2d 734 (D. Minn. 2009).......................................................9

*Fraser v. Franco*,
    2022 WL 4367576 (D. Conn. Sept. 21, 2022) .........................................13

*Fuqua Homes, Inc. v. Beattie*,
    388 F.3d 618 (8th Cir. 2004) ...................................................................12

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)..................................................................................19

*Gillick v. Elliott*,
    1 F.4th 608 (8th Cir. 2021) ........................................................................3

*Gleason v. Smolinski*,
    125 A.3d 920 (Conn. 2015) ......................................................................13

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..................................................................................22

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*,
    255 Conn. 20 (Conn. 2000)................................................................23, 24

*Hogan v. Winder*, 2012 WL 4356326 (D. Utah Sept. 24, 2012),
    *aff'd*, 762 F.3d 1096 (10th Cir. 2014)......................................................17

*King v. Union Station Holdings, LLC*,
    2012 WL 5351598 (E.D. Mo. Oct. 30, 2012)..........................................15

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..................................................................................11

*LEGO A/S v. ZURU, Inc.*,
    2020 WL 13145135 (D. Conn. Apr. 22, 2020).........................................24

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
884 F.2d 504 (9th Cir. 1989) ...........................................9

*Lichtor v. Mo. Bd. of Registration for the Healing Arts*,
884 S.W.2d 49 (Mo. Ct. App. 1994)...............................13

*Litchfield Asset Mgmt. v. Howell*,
70 Conn. App. 133 (2002) .............................................25

*Little Rock Cardiology Clinic PA v. Baptist Health*,
591 F.3d 591 (8th Cir. 2009) .........................................12

*Marcone v. Penthouse Int'l Mag. For Men*,
754 F.2d 1072 (3d Cir. 1985)........................................20

*Martin v. Am. Kennel Club, Inc.*,
697 F. Supp. 997 (N.D. Ill. 1988) ....................................9

*Mathias v. Daily News, L.P.*,
152 F. Supp. 2d 465 (S.D.N.Y. 2001)...............................7

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
713 F. Supp. 2d 527 (W.D.N.C. 2010) ..........................20

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) ......................................22

*Midwest Commc'ns v. Minn. Twins, Inc.*,
779 F.2d 444 (8th Cir. 1985) ...........................................9

*Miljas v. Greg Cohen Promotions, LLC*,
536 F. Supp. 3d 409 (S.D. Iowa 2021) ..........................20

*MNG 2005, Inc. v. Paymentech, LLC*,
2020 WL 6582660 (E.D. Mo. Nov. 9, 2020) .......................9

*Molinas v. NBA*,
190 F. Supp. 241 (S.D.N.Y. 1961)................................11

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)........................................................7

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018)............................................11

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)......................................................19

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
951 F.3d 952 (8th Cir. 2020) ............................... *passim*

*NetScout Sys., Inc. v. Gartner, Inc.*,
223 A.3d 37 (Conn. 2020) ........................................................................ *passim*

*NHL Players' Ass'n v. Plymouth Whalers Hockey Club*,
325 F.3d 712 (6th Cir. 2003) ...............................................................9

*Nitro Distrib., Inc. v. Alticor, Inc.*,
2008 WL 11384211 (W.D. Mo. Feb. 8, 2008) ....................................24

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ........................................................................12

*Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*,
829 F.3d 576 (8th Cir. 2016) ............................................14, 16, 17, 18

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) ...............................................................7

*Park Ridge Assocs. v. U.M.B. Bank*,
613 S.W.3d 456 (Mo. Ct. App. 2020)................................................25

*Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*,
2019 WL 1239705 (D. Minn. Jan. 24, 2019)......................................10

*Process Controls Int'l, Inc. v. Emerson Process Mgmt.*,
753 F. Supp. 2d 912 (E.D. Mo. 2010)..................................................7

*S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Ct.*,
2015 WL 4509425 (D. Conn. July 24, 2015) ......................................23

*Schatz v. Rep. State Leadership Comm.*,
669 F.3d 50 (1st Cir. 2012).............................................................22, 23

*Schuler v. McGraw-Hill Cos., Inc.*,
989 F. Supp. 1377 (D.N.M. 1997),
*aff'd*, 145 F.3d 1346 (10th Cir. 1998)................................................18

*Smith v. Humane Soc'y of U.S.*,
519 S.W.3d 789 (Mo. 2017) ...............................................................16

*Southridge Partners II Ltd. P'ship v. SND Auto Grp., Inc.*,
2019 WL 6936727 (D. Conn. Dec. 19, 2019)......................................24

*St. Louis Convention & Visitors Comm'n v. Nat'l Football League*,
154 F.3d 851 (8th Cir. 1998) ...............................................................8

*Stockley v. Joyce*,
2019 WL 630049 (E.D. Mo. Feb. 14, 2019),
*aff'd*, 963 F.3d 809 (8th Cir. 2020).......................................13, 14, 23

*Strada v. Ct. Newspapers, Inc.*,
    477 A.2d 1005 (Conn. 1984) ........................................................16

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018) ..................................................21

*U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*,
    665 F.2d 781 (7th Cir. 1981) ......................................................11

*Wellington Sys. v. Redding Grp.*,
    49 Conn. App. 152 (1998) ..........................................................23

*Zimmerman v. Al Jazeera Am., LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017) ...........................................20

*Zipper v. Health Midwest*,
    978 S.W.2d 398 (Mo. Ct. App. 1998) .........................................23

*Zupa v. Zupa*,
    2018 WL 3518552 (Conn. Super. Ct. June 20, 2018) ...............25

## STATUTES

15 U.S.C. § 1 ...............................................................................6, 7, 8

Conn. Gen. Stat. § 52-196a .......................................................12, 25

## RULES

Fed. R. Civ. P. 12(b)(6) ....................................................................12

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ..................................................................13, 19

# INTRODUCTION

Plaintiff Hans Niemann is a talented chess player.  He is also an admitted cheater, having cheated in several online games played on Defendant Chess.com, LLC's ("Chess.com's") website. In order to preserve the integrity of its service, Chess.com privately closed his account, withdrew his invitation to its Global Championship tournament, and gave him an opportunity to explain his conduct.  He did not; rather, he opted to make public Chess.com's private actions and filed this lawsuit.  He then openly pronounced that his "lawsuit speaks for itself."[1]  He is right.  It is so plainly without merit that it could have been brought only as a public relations stunt.  The Court should not allow it to move forward.

*First*, Niemann's effort to concoct a federal antitrust claim fails.  A plaintiff may not slap the label of "conspiracy" or "boycott" on pleaded facts that reveal no such thing.  That is the teaching of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 549 (2007), whose plausibility standard requires factual allegations "suggesting agreement, as distinct from identical, independent action." Without any support, Niemann asserts that only a conspiracy could explain Chess.com's decision to remove him from its website and future events, just as only "collusion" explains why Defendant Magnus Carlsen allegedly accused him of cheating.  No matter how generously construed, the allegations in the Amended Complaint ("AC") (ECF No. 20) allow for no such inference, plausible or otherwise.  Niemann publicly "admitt[ed]" that he "cheated" multiple times in chess.  (AC ¶ 102.)  Yet he alleges that supposedly conspiratorial actions were taken "[j]ust days later[.]"

This is the definition of pleading oneself out of court, and it is fatal not only to the so-called "boycott" theory of Count III and the "civil conspiracy" of Count V, but to the whole action. Conclusory allegations, fatal admissions, and implausibility infect the entire pleading.  Niemann cannot cure the lack of allegations that "tend[] to exclude the possibility of independent action" by

---

[1] *See* https://twitter.com/HansMokeNiemann/status/1583164606029365248.

Defendants in response to Niemann's own conduct. *Twombly*, 550 U.S. at 554. He also fails, as he must, to plead facts showing antitrust injury or harm to competition in any market. His improper effort to invoke the antitrust laws' *per se* rule—which is reserved for textbook cartels—reveals that he cannot meet even the most basic elements of an antitrust claim.

*Second*, Niemann's state law claims for defamation, tortious interference, and conspiracy (Counts I-II, IV-V) are equally meritless. Connecticut's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute bars all of these claims, which seek to punish Chess.com for its protected speech. They also fail as a matter of law on their own terms.

As for Niemann's defamation claims (Counts I and II), he has failed to plausibly allege that any of the supposed defamatory statements by Chess.com is false. Many of the challenged statements derive from Chess.com's analysis of Niemann's behavior and thus constitute non-actionable opinions. As for the rest, Niemann does not even attempt to allege how they are false. Even had he pleaded an actionably false statement (which he has not), Niemann is a public figure and thus must adequately allege that Chess.com made the challenged statements with "actual malice"—*i.e.*, with knowledge of, or reckless disregard for, their falsity. This standard is a high bar, and Niemann's allegations do not come close to surmounting it.

Finally, Niemann's tortious interference and conspiracy claims (Counts IV and V) are entirely derivative of his deficient antitrust and defamation claims, and thus fall with those claims. In any event, Niemann fails to allege required elements of these claims.

Chess.com thus respectfully requests the Court dismiss the AC.

## **BACKGROUND**

### A. **Niemann Is An Admitted Cheater On Chess.com's Platform**.

Chess.com operates one of the world's largest and most popular platforms for online recreational chess. (AC ¶ 37.) Nearly a hundred million users play more than ten million chess games on the website each day. (*Id.*) Niemann is one of those users—and one of the most famous.

(*See id.* ¶¶ 60-64.)  A "19-year-old, self-taught chess prodigy," Niemann achieved the title of "chess Grandmaster"—the highest title awarded by FIDE, the international governing body of chess.  (*Id.* ¶¶ 1-2.)  By October 2022, FIDE ranked Niemann as the 40th best player in the world.

But Niemann is an admitted cheater.  (*See id.* ¶ 102.)  As Chess.com detailed in an October 2022 report, it first closed Niemann's account in August 2020 due to numerous instances of suspected cheating by using a computer chess engine to guide his play.  (D. Rensch Decl., Ex. 1 (hereinafter, the "Chess.com Report" or "Report") at 5-7.)[2]  Thus, Chess.com instituted a temporary ban on his ability to play in online prize events "through the end of [2020]."  (*Id.* at 7.)  But as a measure of goodwill, Chess.com gave Niemann "a second chance," and allowed him to resume playing after 2020, as long as he acknowledged his cheating.  (*Id.* at 6-7.)  Niemann agreed: "That is more than completely fair and I really really appreciate you trusting me and giving me this chance.  I also agree and don't think I should play[;] . . . not even my closest friends have given me the benefit of the doubt and you've gone out of your way to help me."  (*Id.* at 7.)

**B.**     **Niemann's Game Against Carlsen At The Sinquefield Cup.**

Magnus Carlsen is currently the highest ranked chess player in history.  (AC ¶ 4.)  On September 4, 2022, Niemann defeated Carlsen during an in-person, FIDE-sanctioned game at the Sinquefield Cup chess tournament.  (*Id.* ¶¶ 6-7, 79.)  After the game, Carlsen withdrew from the Sinquefield Cup.  (*Id.* ¶¶ 9, 79, 85.)  Carlsen then posted on Twitter that he had "withdrawn from the tournament" and included a link to a YouTube video in which a soccer manager stated: "If I speak, I am in big trouble."  (*Id.* ¶¶ 9, 83-84.)

**C.**     **The Public Fallout, Interest From The Game, And Niemann's Interviews.**

On September 5, 2022, due to concerns about his prior cheating and the integrity of its

---

[2] The Chess.com Report is repeatedly referenced and quoted in the AC, and it is a central part of Niemann's claims against Chess.com.  (*See* AC ¶¶ 152-57.)  It is therefore "necessarily embraced by [Niemann's AC]" and part of "the pleadings" that the Court may consider in resolving this motion.  *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 955-56 (8th Cir. 2020); *see Gillick v. Elliott*, 1 F.4th 608, 610 n.2 (8th Cir. 2021).

platform and tournaments, Chess.com notified Niemann by email that it was privately closing his Chess.com account and rescinding his invitation to Chess.com's Global Championship tournament ("CGC"). (AC ¶ 94; Report at 2, Ex. A.) A day later, Niemann made Chess.com's actions public, and admitted in an interview that he in fact had cheated on the platform by using a "chess engine," which is "a computer program designed to calculate the optimal move in any given situation." (AC ¶ 102.) But he downplayed the extent of his cheating, suggesting he cheated only in "random," "recreational games" when he was 12 and 16 years old and that he never cheated "in a tournament with prize money," and never cheated while he was publicly "streaming" his games to other Chess.com users. (*Id.*; Report at 4.)

Based on its collected data and prior communications with Niemann, Chess.com knew that his public statements were *false*. Thus, on September 8, 2022, Chess.com sent him a letter with the stated goals of "clarify[ing] factual inaccuracies in the statement [Niemann] recently made regarding [his] fair play violations on Chess.com[,]" explaining "reasons for withdrawing our invitation to Chess.com prize events, including the upcoming [CGC]," and to "[t]alk about a path back to Chess.com events." (Report at 2, Ex. B.) In the letter, Chess.com stated that its "strongest data" suggested Niemann had been cheating in prize-money tournaments or events in 2015, 2017, and 2020, and in matches with his peers from June through August 2020. (*Id.*) Later that day, Chess.com issued a statement on Twitter referencing the letter it had sent:

> The last few days have been tumultuous for many in the chess community. At this time, we have reached out to Hans Niemann to explain our decision to privately remove him from Chess.com and our events. We have shared detailed evidence with him concerning our decision, including information that contradicts his statements regarding the amount and seriousness of his cheating on Chess.com. We have invited Hans to provide an explanation and response with the hope of finding a resolution where Hans can again participate on Chess.com. We want nothing more than to see the best chess players in the world succeed in the greatest events. We will always act to protect the integrity of the game that we all love.

(AC ¶ 104.) These events, including Niemann's post-game interviews in which he admitted to cheating in the past, "sent shock waves through the chess world," with Niemann at "the center of

what is now widely reported as the single biggest chess scandal in history." (*Id.* ¶¶ 7, 11, 102.) Indeed, Slate, ABC News, The Guardian, and VICE, among other new outlets, reported on the controversy. (*Id.* ¶¶ 87-92.) The controversy even "garnered the attention" of prominent celebrities such as Elon Musk and Stephen Colbert. (*Id.* ¶ 109.)

On September 19, 2022, Carlsen was scheduled to play Niemann in another tournament. (*Id.* ¶¶ 10, 111.) Carlsen dropped out after one move. (*Id.* ¶¶ 10, 113.) In an interview on September 21, 2022, Carlsen stated: "I have to say, I'm very impressed by Niemann's play and I think his mentor Maxim Dlugy must be doing a great job." (*Id.* ¶ 118.) Niemann claims that "falsely associating Niemann's play with Dlugy was a direct accusation that Maxim Dlugy somehow helped Niemann cheat against Carlsen at the Sinquefield Cup." (*Id.* ¶ 119.) A week later, VICE published an article containing emails between Dlugy and Daniel Rensch (a Chess.com executive) concerning Dlugy's own history of cheating. (*Id.* ¶¶ 129-30.)

### D. <u>Chess.com Issues A 72-Page Report Following An Investigation</u>.

On October 4, 2022, Chess.com published the Report on its website. (AC ¶ 151.) The Chess.com Report contains 72 pages detailing Chess.com's research, findings, and conclusions regarding Niemann's past play on Chess.com and his over-the-board ("OTB")[3] play generally, and the specific game with Carlsen. The Report discusses the timeline of events surrounding the controversy, the basis of Chess.com's decision to close Niemann's account and to withdraw his CGC invitation, Niemann's past cheating on Chess.com, how Chess.com's cheat detection system works, and statistics and analysis surrounding Niemann's OTB rise over the years. (*See generally* Report.) It further explains the details of Chess.com's world-class cheat detection methods, which Niemann himself described as "the best cheat detection in the world." (*Id.* at 8-11.)

As detailed in the Chess.com Report, Niemann "likely cheated *online* much more than his

---

[3] OTB signifies in-person—as opposed to online—games. (*See* AC ¶¶ 31-32.)

public statements suggest." (*Id.* at 1.) The Report explained that Chess.com "gathered detailed evidence on [Niemann's] play" and "determined through extensive review of that evidence"—which consisted of statistical analysis and manual review by expert analysts—"that there were numerous games where [Niemann's] gameplay fell along [the cheating] spectrum, strongly suggesting that he violated our fair play regulations." (*Id.* at 4.) This analysis revealed "that [Niemann] has likely cheated in more than 100 online chess games, including several prize money events," that he was streaming in 25 of these games, and that he was 17 years old at the time of some of them. (*Id.* at 5.) Regarding Niemann's game with Carlsen and his OTB play more generally, the Chess.com Report made clear—several times—that Chess.com did not have "direct evidence that proves [Niemann] cheated at the September 4, 2022 game with [Carlsen], or proves that he has cheated in other OTB games in the past." (*Id.* at 3; *see id.* at 1, 17, 19.)

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face." *Twombly*, 550 U.S. at 570. In evaluating the sufficiency of a claim, courts require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If plaintiffs fail to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## ARGUMENT

## I. NIEMANN'S ANTITRUST CLAIM MUST BE DISMISSED

Niemann's attempt to assert a federal antitrust claim under the Sherman Act, 15 U.S.C. § 1 ("Section 1"), against Chess.com and all other Defendants suffers from multiple, incurable defects.[4] The claim rests on allegations that Defendants unreasonably restrained trade by engaging

---

[4] Niemann's claim is also procedurally improper. Private plaintiffs "do not literally sue under the

in "concerted actions to ban and blacklist Niemann" from the "global competitive chess industry." (AC ¶¶ 185-87.) Niemann fails to adequately allege the requirements of his claim, including (1) the existence of a "conspiracy" or "group boycott" among the Defendants in violation of Section 1, (2) an antitrust injury, and (3) that any alleged agreement "unreasonably restrained trade."

A. **Niemann Fails To Plausibly Allege The Existence Of An Antitrust Conspiracy.**

First, Niemann fails to allege facts that the challenged conduct was the result of a "contract, combination . . . , or conspiracy" among the Defendants, rather than independent action. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516 (8th Cir. 2018) (quoting 15 U.S.C. § 1); *see also Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984) (Section 1 requires a showing conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective")*.* Where a plaintiff relies on allegations of parallel conduct (rather than an explicit agreement), "a bare assertion of conspiracy will not suffice"; rather, the plaintiff must plausibly allege factual "context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 556-57. For example, the court in *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 920-22 (E.D. Mo. 2010), held that an agreement between a manufacturer and an organization issuing safety certifications was not plausibly alleged—even though the organizations shared common board members and acted in parallel to prevent the plaintiff's certification—because the complaint never directly alleged an agreement, and "the mere opportunity to conspire, even in the context of parallel business activity, is insufficient."

Niemann entirely fails to allege *any* express agreement among the Defendants and provides no factual context for an inferred agreement. The alleged facts suggest an "obvious alternative explanation" for the challenged conduct, undermining any inference of an agreement, *see Twombly*, 550 U.S. at 567—Niemann admitted to cheating on Chess.com but lied about the extent

---

Sherman Act. Rather, sections 4 and 15 of the Clayton Act provide separate statutory vehicles" through which a private plaintiff may seek "relief for violations of the Sherman Act." *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 477 (S.D.N.Y. 2001).

of cheating (AC ¶ 102), providing Chess.com a clear reason for making the independent decision to keep him banned from its platform and to write the Report, regardless of other Defendants' actions. Moreover, despite claiming that Chess.com acted "in collusion with [Defendants] Carlsen and Play Magnus" when it banned Niemann, and that Defendant Hiraku Nakamura published video content regarding Niemann "in collusion with Carlsen and Chess.com," Niemann provides no detail regarding any meeting, agreement, contract, or other activity supporting any inference of concerted action. (*Id.* ¶¶ 14, 110; *see also id.* ¶¶ 185, 187-88, 199-200 (conclusory allegations that Defendants took "concerted actions" or had an "agreement," with *no supporting detail*).) At most, Niemann alleges that Defendants "bolster[ed]" or "piled on" to each other's actions by engaging in *separate conduct* or making *separate statements* around the same time in response to a common stimuli (*i.e.*, the "biggest chess scandal in history") (*id.* ¶¶ 11, 14, 103, 107), but the pleaded facts in no way suggest that an *agreement* preceded any allegedly anticompetitive conduct.[5]

At bottom, Niemann's claim does not fall within Section 1's ambit because it fails to plausibly allege *any* "contract, combination . . . , or conspiracy." 15 U.S.C. § 1.

### B.    Niemann Fails To Allege Antitrust Injury Sufficient To Confer Standing.

Separately, to have standing to bring an antitrust claim, a plaintiff must allege an antitrust injury, *i.e.*, an "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1979). Without allegations that "harm to competition actually existed and that competition was diminished by the defendants' actions," *St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851, 864 (8th Cir. 1998),

---

[5] Further, because Chess.com does not even compete with Niemann, it has no incentive to enter any agreement to boycott Niemann, making the inference of concerted action even more implausible. *See, e.g.*, *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 855 (8th Cir. 2000) (Section 1 claim against auto racing organization failed where no evidence that the defendant "had a financial incentive to accede to the wishes of" plaintiffs' competitors in setting auto racing rules). Indeed, Chess.com reached out to Niemann on multiple occasions in an effort to find a resolution to allow him to return to the platform, evidencing its attempts to allow Niemann to compete under acceptable conditions, rather than any "conspiracy" to "boycott" him from competition. (*See* AC ¶ 104; Report at 2, 5-7, Ex. B.)

a plaintiff "does not have a claim cognizable under the antitrust laws," *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 450 (8th Cir. 1985); *see, e.g.*, *MNG 2005, Inc. v. Paymentech, LLC*, 2020 WL 6582660, at *7 (E.D. Mo. Nov. 9, 2020) (dismissing antitrust claim where plaintiff alleged "injury to his own business" rather than "market-wide anticompetitive behavior"). In particular, courts have required a showing of harm to *competition*, rather than mere harm to individual *competitors*, in claims brought against sporting leagues and associations that must enforce rules of conduct that may harm certain competitors. *See, e.g.*, *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508-09 (9th Cir. 1989) (dismissing antitrust boycott claims because plaintiffs (sellers of jet-powered vehicles banned from racing events) did not allege that "the removal of the eight plaintiffs from the pool of competing sellers would adversely and unreasonably affect overall competitive conditions").[6]

Here, Niemann alleges injury only to *himself*, and entirely fails to allege actual harm to competition. Specifically, he claims Defendants' actions caused "monetary damage *to Niemann*" by preventing him from "making a living" through chess tournaments, endorsements, and other business opportunities. (AC ¶ 189 (emphasis added).) Such alleged injuries are insufficient to state an antitrust claim because, at most, they reflect harm to Niemann as an individual *competitor* rather than harm to *competition* itself. *See, e.g.*, *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 751 (D. Minn. 2009) ("the fact that the alleged goal of [a] conspiracy was to 'eliminate' [the plaintiff] from the . . . industry [does not] automatically establish" antitrust injury). Chess.com, as the operator of a successful, respected online chess platform, must be able to protect

---

[6] *See also, e.g.*, *Martin v. Am. Kennel Club, Inc.*, 697 F. Supp. 997, 999, 1002 (N.D. Ill. 1988) (dismissing antitrust boycott claim because a dog handler's suspension from a dog club "had no significant effect on either the supply of or demand for professional handlers' services" or "on the fees charged for handling dogs"); *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 720 (6th Cir. 2003) (denying preliminary injunction where the plaintiffs, in challenging a hockey league age requirement, only showed personal injury to an individual as a result of the rule and not injury to a definable market).

the integrity of its services by taking reasonable actions that may harm individual competitors (like Niemann, an admitted cheater (AC ¶ 102)), without facing millions of dollars in antitrust discovery costs. To allow Niemann's claim to proceed without plausible allegations of harm to overall competition in chess would turn antitrust law on its head by attacking *procompetitive* action in regulating gaming. Niemann's failure to allege antitrust injury requires dismissal of his claim.

      **C.**    **Niemann Could Not Otherwise Invoke The *Per Se* Rule And Fails To Plausibly Allege That Any Purported Agreement Unreasonably Restrained Trade.**

      Beyond his failure to plead an agreement and his lack of antitrust standing, Niemann also fails to allege that any agreement "result[ed] in an unreasonable restraint of trade"—a fundamental element of an antitrust claim. *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir. 1998). Again, there is no "agreement" here at all. But even were it otherwise, whether such "agreement" violates the antitrust laws typically is analyzed under the "rule of reason," which requires "an inquiry into the market structure and the defendant's market power in order to assess the actual effect of the restraint." *Id.* It is true that "[c]ertain types of restraint"—such as "price-fixing, division of markets, group boycotts, and tying arrangements"—"are so inherently anticompetitive that they are illegal per se, without inquiry into the reasonableness of the restraint or the harm caused." *Id.* But Niemann's claim fails here again because (1) the *per se* standard is inapplicable, and (2) he otherwise fails to allege a relevant market to support a rule of reason claim.

      *First*, Niemann improperly frames his antitrust claim as a group boycott subject to the *per se* rule. This characterization fails as a matter of law because "[p]recedent limits the *per se* rule in the boycott context to cases involving *horizontal* agreements," which are agreements "among direct competitors." *Brookins*, 219 F.3d at 852 n.3 (emphasis added). By Niemann's own allegations, Defendants are not all horizontal competitors: Chess.com and Play Magnus are online chess companies; Rensch is a Chess.com executive and chess commentator; Nakamura engages in streaming chess content; and Carlsen is a top chess player. (AC ¶¶ 35, 46-48, 50, 54-57.) The *per se* rule does not apply. *See, e.g., Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*,

2019 WL 1239705, at *4 (D. Minn. Jan. 24, 2019) (*per se* rule applies to boycotts "only when the competitors directly compete with each other"); *Cha–Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 613-14 (11th Cir. 1985) (no *per se* rule where defendants not direct competitors).

Moreover, "to justify a *per se* prohibition[,] a restraint must have 'manifestly anticompetitive' effects, . . . and 'lack . . . any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Courts consistently decline to apply the *per se* rule in the sporting context, where restraints must be imposed to keep an organization functioning properly, particularly to preserve the organization's integrity. For example, the court in *Brookins*, 219 F.3d at 854, declined to apply the *per se* rule to an auto racing organization's rules amendment, recognizing the organization's legitimate interests in issuing "game-defining rules decisions" to further its "purposes as a sports organization."[7]

Chess.com's decisions to close Niemann's account and disinvite him from future events were not "manifestly anticompetitive" or lacking "any redeeming virtue," *Leegin*, 551 U.S. at 886—they were rational and unilateral responses to Niemann's admitted prior online cheating. (*See* AC ¶¶ 102, 104, 155-56.) Courts have long recognized that organizations regulating competitive play have valid reasons for banning members in order to preserve overall integrity of competition, making the *per se* rule inapplicable. *See, e.g.*, *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 432-33 (6th Cir. 2008).

*Second*, Niemann's claim even fails under the rule of reason—which requires a careful inquiry into the actual anticompetitive effect of a restraint on a defined market—because he did not make any attempt to meet his "burden to define the relevant market," *Double D*, 136 F.3d at

---

[7] *See also, e.g.*, *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018) ("Regulation of league sports is a textbook example of when the rule of reason applies."); *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 790 (7th Cir. 1981) ("in the context of organized sports . . . courts should be hesitant to fasten upon tags such as 'group boycott' and 'per se' in order to preclude inquiry into the business necessity for or precise harm occasioned by particular rules"); *Molinas v. NBA*, 190 F. Supp. 241, 244 (S.D.N.Y. 1961) (similar).

560—a "necessary predicate" for an antitrust claim, *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 601 (8th Cir. 2009); *see also Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2285 (2018) (a court is unable to apply the rule of reason to measure the defendants' ability to lessen or destroy competition without a proper definition of the relevant market). Indeed, Niemann's *only* reference to a "market" is a perfunctory statement that Defendants "coerce[d] other market actors," without any explanation of who those actors are, or in which product or geographic market they operate. (AC ¶ 188.) Niemann's failure to identify a relevant market is fatal is his claim. For all the above reasons, Niemann's Section 1 claim fails.

## II.     <u>CONNECTICUT'S ANTI-SLAPP STATUTE BARS THE STATE LAW CLAIMS</u>

Niemann next asserts claims against Chess.com under state law for libel, slander, tortious interference, and civil conspiracy. As explained below, these claims are meritless on their face. But they must be dismissed at the threshold because they are barred by Connecticut's anti-SLAPP statute, Conn. Gen. Stat. § 52-196a. That statute requires dismissal of claims "based on [the defendant's] exercise of its [constitutional] right to free speech . . . or right of association . . . in connection with a matter of public concern." *Id.* § 52-196a(b). As Carlsen explains in his motion, Connecticut's anti-SLAPP statute precludes all of Niemann's state law claims. (Carlsen MTD 6-15.) Chess.com does not repeat those arguments but incorporates them by reference.

## III.     <u>NIEMANN'S STATE LAW CLAIMS FAIL ON THE MERITS</u>

In addition to the anti-SLAPP statute, the Court should dismiss Niemann's state law claims because Niemann fails to allege a plausible claim for relief under Rule 12(b)(6). As an initial matter, the claims are governed by Connecticut law because, as Niemann's place of residence, Connecticut has the "most significant relationship to the issues presented in the case." *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 621-22 (8th Cir. 2004); (*see also* Carlsen MTD 6-8.) That said, the choice-of-law question only must be answered for purposes of applying Connecticut's anti-SLAPP statute. The Court need not dwell on choice-of-law with respect to its substantive

analysis of Niemann's state law claims because the principles foreclosing Niemann's state law claims are universal; the claims fail under Missouri law as well.

### A.    Niemann's Defamation Claims Fail.

Niemann asserts claims against "all Defendants" for "libel" and "slander."  (AC ¶¶ 172-83.)  Libel and slander are two types of "[d]efamation"—"slander is oral defamation and libel is written defamation."  *Gleason v. Smolinski*, 125 A.3d 920, 947 n.30 (Conn. 2015).[8]

The elements of defamation are substantially similar under Connecticut and Missouri law.[9] As relevant here, both states require allegations that "the defendant published a defamatory statement" that is "actionable"—*i.e.*, objectively "false." *NetScout*, 223 A.3d at 47; *see Stockley*, 963 F.3d at 819.  Additionally, when a defamatory statement is allegedly made about a "public figure," the First Amendment to the U.S. Constitution requires the plaintiff to also demonstrate that the statement was published with "actual malice."  *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956 (8th Cir. 2020).  Because "each alleged defamatory statement constitutes a separate cause of action," Niemann is required to plead the necessary elements for each statement.  *Britt v. Unknown Officers*, 2019 WL 2453763, at *4 (D. Conn. June 12, 2019). In this case, none of the alleged defamatory statements is actionable, and Niemann has failed to allege facts demonstrating actual malice.  The defamation claims should be dismissed.

### 1.    Niemann Fails To Allege Statements That Are Actionable.

To state a claim for defamation, the complaint must "specifically identify what allegedly defamatory statements were made, by whom, and to whom," and "how they were false."  *Fraser v. Franco*, 2022 WL 4367576, at *6 (D. Conn. Sept. 21, 2022).  And for an allegedly defamatory statement "to be actionable, the statement in question must convey an objective fact" rather than

---

[8] Because the only allegations against Chess.com concern written statements (*see infra*), Niemann cannot state a claim for "slander" against Chess.com.  *See, e.g.*, *Lichtor v. Mo. Bd. of Registration for the Healing Arts*, 884 S.W.2d 49, 52–53 (Mo. Ct. App. 1994).

[9] *Compare NetScout Sys., Inc. v. Gartner, Inc.*, 223 A.3d 37, 47 (Conn. 2020) (Connecticut defamation) *with Stockley v. Joyce*, 963 F.3d 809, 819 (8th Cir. 2020) (Missouri defamation).

an "opinion." *NetScout*, 223 A.3d at 47; *see Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 581-83 (8th Cir. 2016) (same in Missouri). In this case, Niemann challenges the September 8, 2022 tweet issued by Chess.com and various statements in the Chess.com Report. (*See* AC ¶¶ 104, 152-56.) None of the challenged statements is actionable.

a.     ***The September 8, 2022 Tweet Is Not Actionable.***

On September 8, 2022, Chess.com posted on Twitter that it "reached out to [Niemann] to explain [its] decision to privately remove him from Chess.com and [its] events," "shared detailed evidence with [Niemann] concerning [its] decision, including information that contradicts his statements regarding the amount and seriousness of his cheating on Chess.com," and "invited [Niemann] to provide an explanation and response." (AC ¶ 104.) Niemann alleges this statement was "false" because he "did not lie about the 'amount and seriousness of his cheating on Chess.com,'" and "Chess.com had not shared 'detailed evidence . . . that contradicts his statements regarding the amount and seriousness of his cheating.'" (*Id.* ¶ 105.)

Niemann's allegation of falsity distorts Chess.com's statement and highlights the shortcomings of his own allegations. Chess.com did not say that it "shared 'detailed evidence with [Niemann] that contradicts his statements.'" (*Id.* (alterations by Niemann).) Rather, it shared "detailed evidence with [Niemann] *concerning [its] decision*" to remove him from Chess.com's platform and events, "*including information* that contradicts his statements." (*Id.* ¶ 104 (emphasis added).) Niemann does not deny that Chess.com shared evidence about its decision, and its letter clearly lays out the contradictory information. (Report at 2, Ex. B (letter to Niemann).)

Nor did Chess.com state that Niemann "lie[d]." (AC ¶ 105.) To the contrary, the statement merely noted that Chess.com had shared with Niemann "information that contradict[ed] his statements." (*Id.* ¶ 104.) Niemann cannot rewrite what Chess.com said to create a defamatory statement; defamation must be assessed according to "the actual words used." *Stockley v. Joyce*, 2019 WL 630049, at *10 (E.D. Mo. Feb. 14, 2019), *aff'd*, 963 F.3d 809 (8th Cir. 2020). Far from

14

accusing Niemann of lying, Chess.com specifically "invited [Niemann] to provide an explanation and response." (AC ¶ 104.) His arguments to the contrary fail.

**b.** ***Nothing In The Chess.com Report Is Actionable.***

Niemann also challenges statements in the Chess.com Report. Each allegation falls short.

<u>**Cheating On Chess.com**</u>. Niemann first challenges two statements in the Report concerning his cheating on Chess.com. (AC ¶¶ 152-54.) Neither statement is actionable.

*First*, he challenges the statement that he "cheated much more than he has publicly admitted to, including in many prize events, at least 25 streamed games, and 100+ rated games on Chess.com, as recently as when he was 17 years old." (*Id.* ¶ 152.) Niemann appears to challenge only the reference to "games where [Niemann] was streaming," which he claims is "false" because "Rensch previously admitted to Niemann that he knew Niemann had never cheated in any games he played while streaming." (*Id.* ¶ 153.) But the Chess.com Report explains the basis for the statement by specifically identifying the games "in which it appears [Niemann] cheated" and noting that, "in 25 of these games," Niemann was "streaming." (Report at 4-5.) Vaguely alleging that Rensch made a contradictory statement at some undefined "previous[]" point in time does not plausibly demonstrate Chess.com's statement in the Chess.com Report is false. (AC ¶ 153.)

*Second*, Niemann challenges the statement "that Niemann purportedly 'confessed' to these so-called 'cheating offenses' during a call with Rensch in 2020." (AC ¶ 154.) But Niemann fails to allege any acts plausibly demonstrating how or why it is false; he merely labels it "false" and calls it a day. (*Id.*) "[C]onclusory statements without any actual support" plainly "fail[] to meet federal pleading standards." *King v. Union Station Holdings, LLC*, 2012 WL 5351598, at *4-5 (E.D. Mo. Oct. 30, 2012).

<u>**OTB Analysis**</u>. Niemann also plucks out various statements in the Report analyzing his OTB play and contends that they represent a "slanted analysis" that "support[s] the conclusion that Niemann did cheat over the board." (AC ¶ 155.) These allegations fail for several reasons.

Again, Niemann does not allege that these statements are false. "[A]rticle[s] concerning a public figure composed of true or substantially true statements [are] not defamatory regardless of the tone or innuendo evident." *Strada v. Ct. Newspapers, Inc.*, 477 A.2d 1005, 1010 (Conn. 1984); *see Smith v. Humane Soc'y of U.S.*, 519 S.W.3d 789, 801 (Mo. 2017) ("[A] negative connotation alone . . . [is not] actionable."). Niemann thus cannot "claim[] that the 'slant' of the [Report] gives rise to allegedly false and defamatory implications" when he fails to allege that any statements within it are actually false. *Strada*, 477 A.2d at 1010.

Moreover, these conclusions are *statements of opinion* based on objective data. For a statement to be defamatory, it cannot be an "opinion;" it must "convey an objective fact." *NetScout*, 223 A.3d at 47; *accord Others First*, 829 F.3d at 580-81. Although courts have developed various factor-based tests for determining whether a statement is an opinion, *see NetScout*, 223 A.3d at 48-50, the cross-cutting point is that "[a]n opinion . . . is a personal comment about another's conduct, qualifications or character that has some basis in fact," *id.* at 48 (citation and emphasis omitted); *see also Others First*, 829 F.3d at 581 (an "opinion" is "a subjective assessment and not an objectively verifiable fact"). And among the types of statements that "constitute[] [an] opinion" is a statement reflecting a "'subjective interpretation of multiple objective data points.'" *NetScout*, 223 A.3d at 50 n.6 (quoting *Aviation Charter, Inc. v. Aviation Rsch. Grp./US*, 416 F.3d 864, 871 (8th Cir. 2005), *abrogated on other grounds by Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58 (8th Cir. 2014)). Thus, in *Aviation Charter*, for example, the Eighth Circuit explained that the statement "Aviation Charter, relative to other carriers of its size, has an unfavorable safety record" was a non-actionable opinion rested on a "subjective assessment" of "objectively verifiable [carrier safety] data." 416 F.3d at 870-71.

The same is true here. Each statement challenged by Niemann about his OTB play reflects Chess.com's subjective, comparative assessment of Niemann in relation to his peer players. (AC ¶ 155(a)-(g).) That assessment reflected detailed analysis of objectively verifiable data identified

in the Report itself.  (*See* Report at 11-17.)  And words used to describe Chess.com's assessment of that data—that Niemann's results are comparatively "extraordinary," "unusual," and "uncharacteristically erratic" (AC ¶ 155(a), (d), (g))—are quintessential words of opinion.  *Cf. Hogan v. Winder*, 2012 WL 4356326, at *8 (D. Utah Sept. 24, 2012) ("statements about . . . erratic behavior are mere opinion"), *aff'd*, 762 F.3d 1096 (10th Cir. 2014).

In any event, the implication that Niemann attempts to draw from the challenged statements—*i.e.*, the Report "support[s] the conclusion that Niemann did cheat over the board" (AC ¶ 155)—totally collapses when they are read "in the context of the [Report] as a whole." *Others First*, 829 F.3d at 581; *see id.* at 580 ("To determine if the statement is defamatory, the challenged words . . . 'must be considered in context[.]'"); *NetScout*, 223 A.3d at 49 (requiring an "examination of the overall context").  As Niemann admits, the Chess.com Report makes clear that "there is no 'concrete evidence proving that Hans is cheating over the board'" and "does not 'advocate' for that conclusion."  (AC ¶ 155.)  Chess.com was emphatic on this point, stressing again and again that it "is unaware of any evidence that [Niemann] cheated in th[e] [Sinquefield Cup]" and that "there is nothing in our statistical investigation to raise any red flags regarding [Niemann's] [OTB] play and rise."  (Report at 17, 19; *see also id.* at 1, 3 (repeating point).)  Indeed, Chess.com included its "in-depth review of [Niemann's] OTB games" in the Chess.com Report as a response to the "public speculation on" whether Niemann "cheated in the [OTB] game against Magnus" and "in other OTB games."  (*Id.* at 3.)  Niemann's allegation that the Report somehow creates an implication that is directly contrary to its express statements is not plausible.

**_Sinquefield Cup._**  Finally, Niemann attempts to challenge statements in the Report concerning his game with Carlsen at the Sinquefield Cup.  (AC ¶ 156.)  These allegations are also unavailing.  Niemann alleges that the Report "[f]alsely claims that [his] explanation of his preparation [for the Sinquefield Cup] was not supported by records of Carlsen's prior games." (AC ¶ 156(a).)  But Niemann does not allege *facts* showing how or why this statement was false.

Nor could he—Niemann claimed he "prepared specifically for the opening that [Carlsen] played" by reviewing Carlsen's prior games, and the Chess.com Report analyzed that contention in light of Carlsen's prior games. (Report at 18.) Niemann's conclusory assertion of falsity is insufficient.

Niemann also asserts that the Chess.com Report "[d]emeans" his "post-game analysis" of the Sinquefield Cup game against Carlsen by concluding that his analysis "'seem[ed] to be at odds with the level of preparation that [Niemann] claimed was at play in the game and the level of analysis needed to defeat the World Chess Champion.'" (AC ¶ 156(b); *see* Report at 18.) But this statement is Chess.com's *opinion* of Niemann's post-game analysis, which is confirmed by the language: Niemann's post-game analysis "*seems to be* at odds" with the circumstances. (AC ¶ 156(b) (emphasis added).) Such a statement, "couched in equivocal language," is plainly "presented as opinion." *Others First*, 829 F.3d at 582; *see, e.g., id.* ("'appears'" is "equivocal language"). That Niemann found this opinion to be "demeaning" does not make it defamatory. *See, e.g., NetScout*, 223 A.3d at 47 ("[A] writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be.").

The same is true of the statement that "the 'game and the surrounding behaviors and explanations are bizarre.'" (AC ¶ 156(e).) The AC omits the first part of the statement: "*In our view*, this game and the surrounding game and the surrounding behaviors and explanations are bizarre." (Report at 19 (emphasis added).) And as the omitted language confirms, the statement that Niemann's behavior was "bizarre" was merely Chess.com's "view"—*i.e.*, its opinion. *See, e.g., Schuler v. McGraw-Hill Cos., Inc.*, 989 F. Supp. 1377, 1385 (D.N.M. 1997) (statement that "the Printron case is 'bizarre'" is a "protected opinion[]"), *aff'd*, 145 F.3d 1346 (10th Cir. 1998). The Chess.com Report set forth the reasons for holding that opinion, including Niemann's explanations for his pre-game preparation, his behavior upon beating Carlsen, and his reactions during the post-game analysis. (Report at 18-19.)

Finally, the remaining allegations concern statements that merely "[r]eport" what Carlsen

"shared in a private conversation" regarding Niemann's in-game behavior and compare Niemann's post-game behavior to other "notable players who have beaten [Carslen]" with linked videos. (AC ¶ 156(c)-(d).) Niemann does not allege that these statements are false, and there is no plausible basis for doing so, as they are quite literally just reporting others' reactions to Niemann's behavior.

### 2. Niemann Fails To Adequately Allege Actual Malice.

Even had Niemann adequately alleged an actionable statement by Chess.com (which he did not), his defamation claim independently fails because he has failed to allege actual malice.

The First Amendment prohibits "public figures" from asserting defamation claims unless they can demonstrate that the defendant made the allegedly defamatory statement "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Nelson Auto*, 951 F.3d at 956 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). This requirement recognizes that, unlike private figures, "public figures typically 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved,' thus 'invit[ing] attention and comment,'" and they "are more likely to have access to the media" to publicly respond. *Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1053 (8th Cir. 2012). This dooms Niemann's defamation claims: Niemann is a "public figure," and Chess.com did not act with "actual malice."

### a. *Niemann Is A Public Figure.*

The AC leaves no doubt that Niemann is a public figure. As the Supreme Court has explained, a public figure is a person who either (a) "achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts"; or (b) "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). In both cases, public figures must satisfy the heightened actual malice standard. *Id.*

Courts have frequently held that professional sports figures, "at least as to their playing

careers, generally assume a position of public prominence" and are thus "public figures." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1280 (3d Cir. 1979) (football player); *see also, e.g.*, *Miljas v. Greg Cohen Promotions, LLC*, 536 F. Supp. 3d 409, 421 (S.D. Iowa 2021) (boxer); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 263 (D.D.C. 2017) (baseball player); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 713 F. Supp. 2d 527, 538 (W.D.N.C. 2010) (race car driver); *cf. Marcone v. Penthouse Int'l Mag. For Men*, 754 F.2d 1072, 1083 (3d Cir. 1985) ("sports figures are generally considered public figures"). That consensus is unsurprising, as professional sports players, by virtue of their careers, intentionally "command the attention of sports fans." *Chuy*, 595 F.2d at 1280. This is particularly true for players who relish their "fame and notoriety in [the sports] community" by, for example, participating in interviews and appearing in "high-profile [competitions] [that are] filmed . . . for the public." *Chapman v. J. Concepts, Inc.*, 528 F. Supp. 2d 1081, 1093-94 (D. Haw. 2007), *aff'd on other grounds*, 401 F. App'x 243 (9th Cir. 2010).

Niemann is plainly a public figure. A self-described "chess prodigy," Niemann rose through the ranks after becoming "the youngest-ever winner" of "the Tuesday Night Marathon" at the oldest chess club in the U.S. at the age of 11. (AC ¶¶ 2, 61.) Since then, he claims his career has skyrocketed, launching him to be ranked the "40th best chess player in the world." (*Id.* ¶ 2.) He has regularly appeared in high-stakes and publicly watched chess tournaments, including the Sinquefield Cup—a "prestigious, high-profile professional chess tournament" where he played Carlsen. (*Id.* ¶ 85.) Indeed, Niemann alleges that he was "proudly touted" as a "brand ambassador[]" for Play Magnus—"an incredibly lucrative global brand and online chess company." (*Id.* ¶ 4.) He not only "travel[ed] the world to compete" in these tournaments but was paid to do so, raking in thousands of dollars in "appearance fees." (*Id.* ¶¶ 3, 168.) And Niemann alleges that he live-streamed chess games online, "during which top players play chess live and/or offer commentary regarding topics of interest to chess fans." (*Id.* ¶¶ 38, 72, 152-153.)

Moreover, even aside from Niemann's general notoriety in the chess community, Niemann "voluntarily inject[ed] himself . . . into [the] particular public controversy" at issue in this case and therefore, at a minimum, has "become[] a public figure" for purposes of that controversy. *Nelson Auto*, 951 F.3d at 956. Niemann is at the "center" of what he describes as the "single biggest chess scandal in history." (AC ¶ 11.) This scandal has been covered by chess-specific news outlets and also by well-known, national news organizations, including The Wall Street Journal, BBC, The Guardian, and VICE News. (*Id.* ¶¶ 87-92, 115, 131, 149.) It even garnered attention and public comment from celebrities like Elon Musk and Stephen Colbert. (*Id.* ¶ 109.) And Niemann, for his part, has responded to this coverage in the press. (*See id.* ¶ 102; *see also* Report at 4.) He has thus plainly injected himself into the controversy. *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) (football coach "inserted himself into the controversy . . . after it had made national news" by involving himself with the news coverage).

In fact, Niemann's public responses only fanned the flames of the controversy and increased its publicity. Chess.com historically handled concerns about its users, including high-profile users like Niemann, "privately." (Report at 4.) It followed that approach when it privately removed Niemann from the platform for six months in 2020, and again when it privately removed him from the platform in September 2022. (*Id.* at 4-7.) But Niemann chose to turn this into "a public conversation" by "publicly address[ing] his ban" and making "several comments to the press about alleged instances of prior cheating." (*Id.* at 2, 4.) That, in turn, "compelled" Chess.com to respond "publicly." (*Id.* at 4.) Niemann thus has undeniably thrust himself into the forefront of a public controversy and, as a result, is a public figure.

**b.** ***Niemann Fails To Allege That Any Of The Challenged Statements Was Made With Actual Malice.***

Because Niemann is a public figure, his defamation claim can survive only if he alleges facts plausibly demonstrating that Chess.com made the allegedly defamatory statements "with 'actual malice'—that is, with knowledge that [they were] false or with reckless disregard of

whether [they were] false or not." *Nelson Auto*, 951 F.3d at 956. The "concept of 'reckless disregard'" requires that the defendant "made the false publication with a 'high degree of awareness of probable falsity'" or "'entertained serious doubts as to the truth of [the] publication.'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (internal citations and alterations omitted). The actual malice "standard is, therefore, a 'daunting' one." *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 569 (8th Cir. 2001). At the motion-to-dismiss stage, conclusory allegations of actual malice are insufficient; the plaintiff must "lay out enough facts" in the complaint "sufficient to give rise to a reasonable inference of actual malice." *Nelson Auto*, 951 F.3d at 958 (quoting *Schatz v. Rep. State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) and *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)).

Niemann's allegations do not come close to satisfying that standard. As for Chess.com's Twitter post (*see* AC ¶ 104), Niemann does not allege any knowledge or reckless disregard of falsity at all. Instead, he baldly claims that this "statement is false," which he attempts to support by mischaracterizing the statement itself. (*Id.* ¶ 105.) As explained, that is insufficient to plead falsity. But Niemann's complete failure to allege any facts demonstrating actual malice by Chess.com independently requires dismissal of his defamation claim as to this statement.

Niemann fares no better with respect to his challenges to the Chess.com Report. The most he can muster is the assertion that "Chess.com and Rensch knew" of the supposed falsity with respect to the statement in the Chess.com Report that Niemann was "cheating in games where he was streaming" because "Rensch previously admitted to Niemann that he knew Niemann had never cheated in any games he played while streaming." (AC ¶ 153.) But the Chess.com Report followed a "deeper dive" by Chess.com into the "aggregate historical evidence of [Niemann's] play" to identify "instances where he cheated on [Chess.com's] site." (Report at 4.) Thus, whatever Rensch might have "previously" told Niemann (AC ¶ 153), it would not demonstrate that, following this deeper review and aggregation of objectively verifiable information about

Niemann's play history, Chess.com or Rensch knew *at the time the Report was published* that the statement was false. *See Stockley*, 2019 WL 630049, at *12 (plaintiff must plead "that [the defendant] acted with 'actual malice' at the time of publication") (internal citations omitted).

Beyond that, the AC does not contain any allegations even suggesting that Chess.com made any of the challenged statements with actual malice. Instead, Niemann simply declares that the statements are "false[]" (AC ¶¶ 152, 154, 156(a)) and that "Defendants made the defamatory statements with full knowledge that such statements were false, or with reckless disregard as to whether such statements were false." (*Id.* ¶ 181.) This "[t]hreadbare recital[] of the elements" of the actual malice standard is insufficient. *Iqbal*, 556 U.S. at 678; *see, e.g.*, *Schatz*, 669 F.3d at 56 (plaintiff cannot merely "use[] actual-malice buzzwords" to state a plausible claim).

### B.    Niemann's Tortious Interference Claim Fails.

Niemann's tortious interference claim fails too. At the base of this claim, he alleges Defendants' actions in "defaming" and "blacklist[ing]" him resulted in (1) Vincent Keymer (another famous player) refusing to play a planned match against him, and (2) the Tata Steel Chess Tournament halting negotiations regarding him competing in the tournament.[10] (AC ¶ 194.) In order to state a claim for tortious interference with business expectancies, Niemann must allege "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship [with knowledge of the same]; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (Conn. 2000); *see Castle Rock Rem., LLC v. Better Bus. Bur. of Greater St. Louis, Inc.*, 354 S.W.3d 234, 245 (Mo. Ct. App. 2011).[11] Niemann fails to allege the requirements of this claim.

---

[10] Niemann also alleges that Defendants' interference caused Chess.com to revoke his invitation to the CGC, but his claim against Chess.com (and Rensch) cannot be based on alleged interference with his business relationship *with Chess.com*. *See Zipper v. Health Midwest*, 978 S.W.2d 398, 419 (Mo. Ct. App. 1998); *Wellington Sys. v. Redding Grp.*, 49 Conn. App. 152, 168 (1998).

[11] Given that he does not identify *any* contract, Niemann's claim appears to be limited to alleged interference with business expectancies. *See S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Ct.*, 2015 WL 4509425, at *11 n.16 (D. Conn. July 24, 2015).

*First*, he fails to allege any facts regarding Chess.com's actual knowledge of his negotiations with the Tata Steel Chess Tournament or a planned match with Keymer. *See Hi-Ho*, 255 Conn. at 27. Instead, he relies on a conclusory allegation that all Defendants generally had knowledge of these relationships "[a]s fellow members of the competitive chess industry." (AC ¶ 193.) This is insufficient. *See, e.g.*, *Butler Am., LLC v. Ciocca*, 2020 WL 6781488, at *3-4 (Conn. Super. Ct. Mar. 12, 2020) (dismissing tortious interference claim for failure to plead actual knowledge beyond mere conclusions); *Ariel Preferred Retail Grp., LLC v. CWCapital Asset Mgmt.*, 2011 WL 4501049, at *4 (E.D. Mo. Sept. 28, 2011) (same).

*Second*, Niemann must allege that Chess.com's interference was "wrongful by some measure beyond the fact of the interference itself," *i.e.*, it acted with "improper motive or [through] improper means." *Butler*, 2020 WL 6781488, at *3; *see also Envtl. Energy Ptnrs., Inc. v. Siemens Bldg. Techs., Inc.*, 178 S.W.3d 691, 703 (Mo. Ct. App. 2005). "This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation," or "malice on the part of the defendant, not in the sense of ill will, but 'intentional interference without justification.'" *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766, 805-06 (1999).

Niemann claims Chess.com engaged in "improper means" by defaming him or violating antitrust law. (AC ¶ 194.) Thus, his tortious interference claim is merely derivative of his defamation and antitrust claims and fails for the same reasons those claims fail. *See, e.g., Castle Rock*, 354 S.W.3d at 245 ("where a tortious interference claim is based upon an alleged defamation, if a plaintiff's defamation claim fails, the tortious interference claim must also fail"); *LEGO A/S v. ZURU, Inc*., 2020 WL 13145135, at *10 (D. Conn. Apr. 22, 2020) (derivative interference claim failed because antitrust claim failed); *Nitro Distrib., Inc. v. Alticor, Inc*., 2008 WL 11384211, at *12 (W.D. Mo. Feb. 8, 2008) (same). Moreover, Niemann alleges no specific facts showing that Chess.com acted maliciously and without justification. *See Southridge Partners II Ltd. P'ship v. SND Auto Grp., Inc.*, 2019 WL 6936727, at *8 (D. Conn. Dec. 19, 2019) (plaintiff

"fail[ed] to provide any particularized allegations to support" its contention that defendant acted with improper motives); *Castle Rock*, 354 S.W.3d at 246 ("conclusory allegations that [defendant] was carrying out a personal vendetta to destroy [plaintiff] are insufficient").[12]

*Third*, Niemann fails to allege facts to support that Chess.com's actions actually caused him to lose opportunities, or that Chess.com ever had any contact with Keymer or Tata Steel Chess Tournament. *See Zupa v. Zupa*, 2018 WL 3518552, at *3 (Conn. Super. Ct. June 20, 2018) (conduct must result "in harm to the plaintiff"); *Am. Cable Techs. Servs., Inc. v. AT & T Corp.*, 140 F. Supp. 2d 1026, 1032 (W.D. Mo. 2001) (same). In other words, he fails to allege facts to support that Keymer's or Tata Steel Chess Tournament's actions were *caused by Chess.com*, rather than as a result of their independent decision making or the numerous statements Niemann made.

## C. Niemann's Derivative Civil Conspiracy Claim Fails.

Finally, Niemann's standalone claim for civil conspiracy fails because it is derivative of his other claims. *See, e.g.*, *Litchfield Asset Mgmt. v. Howell*, 70 Conn. App. 133, 140 (2002) (standalone civil conspiracy claim is "insufficient unless based on [a valid] underlying cause of action"); *Park Ridge Assocs. v. U.M.B. Bank*, 613 S.W.3d 456, 464 (Mo. Ct. App. 2020) (same). And, the conspiracy claim fails for the independent reason that Niemann does not allege any *agreement* among the Defendants. *See Litchfield*, 70 Conn. App. at 139 (conspiracy requires two or more persons combined "to do [an] unlawful act"); *Park Ridge*, 613 S.W.3d at 463 (same); *see also* § I.A, *supra*.

## CONCLUSION

Chess.com thus respectfully requests that the Court dismiss Niemann's claims against it with prejudice and award it fees and costs. Conn. Gen. Stat. § 52-196a(f)(1).

---

[12] Chess.com's actions demonstrate a *lack of* malicious intent. Chess.com *privately* informed Niemann of its decision to close his account—only publicly disclosing the details after Niemann made the matter public—and stated in the Report that there is a lack of statistical evidence that Niemann cheated in his game with Carlsen or in any other OTB games. (*See* Report at 1-2.)

DATED:  December 2, 2022                    Respectfully submitted,

/s/ Nima H. Mohebbi                         /s/ Jamie L. Wine
Nima H. Mohebbi (# 275453CA)               Jamie L. Wine (# 4529251NY)
Sarah F. Mitchell (# 308467CA)             Blake E. Stafford (# 888324775DC)
Michael A. Hale (# 319056CA)               **LATHAM & WATKINS LLP**
**LATHAM & WATKINS LLP**                   1271 Avenue of the Americas
355 S. Grand Ave., Suite 100               New York, NY 10020
Los Angeles, CA 90071                      Tel: (212) 906-1200
Tel: (213) 485-1234                        *jamie.wine@lw.com*
*nima.mohebbi@lw.com*                      *blake.stafford@lw.com*
*sarah.mitchell@lw.com*
*michael.hale@lw.com*
                                           Derek Teeter (# 59031MO)
                                           Spencer Tolson (# 74467MO)
/s/ Jeffrey B. Jensen                      **HUSCH BLACKWELL LLP**
Jeffrey B. Jensen (# 46745MO)              4801 Main, Suite 1000
Kate Ledden (# 66026MO)                    Kansas City, MO 64112
**HUSCH BLACKWELL LLP**                    Tel: (816) 983-8000
190 Carondelet Plaza, Suite 600            *derek.teeter@huschblackwell.com*
St. Louis, MO 63105                        *spencer.tolson@huschblackwell.com*
Tel: (314) 480 1500
*jeff.jensen@huschblackwell.com*
*kate.ledden@huschblackwell.com*


                    *Counsel for Defendant Chess.com, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 2, 2022, the foregoing document was

served on all counsel of record by ECF.

DATED:     December 2, 2022     */s/ Nima H. Mohebbi*
                        Nima H. Mohebbi (# 275453CA)
                        Attorney for Defendant Chess.com, LLC
                        **LATHAM & WATKINS LLP**
                        355 S. Grand Ave., Suite 100
                        Los Angeles, CA 90071
                        Tel: (213) 485-1234