# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| HANS MOKE NIEMANN,<br><br>     Plaintiff,<br><br> vs.<br><br>SVEN MAGNUS ØEN CARLSEN A/K/A<br>MAGNUS CARLSEN; PLAY MAGNUS AS,<br>D/B/A PLAY MAGNUS GROUP;<br>CHESS.COM, LLC; DANIEL RENSCH A/K/A<br>"DANNY" RENSCH; AND HIKARU<br>NAKAMURA,<br><br>     Defendants. | Case No: 4:22-cv-01110-AGF<br><br><br>Hon. Audrey G. Fleissig |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MAGNUS CARLSEN'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT UNDER CONNECTICUT GENERAL STATUTES <u>SECTION 52-196A AND FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)</u>

J. Nicci Warr
Jacob R. Schlueter
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105

Craig M. Reiser*
Denise L. Plunkett*
Eva H. Yung*
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, New York 10036

John M. Tanski*
Caroline P. Boisvert*
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, Connecticut 06103

* admitted *pro hac vice*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................... 1

BACKGROUND ........................................................................................ 4

ARGUMENT ........................................................................................... 5

I.   Connecticut's Anti-SLAPP Statute Requires Dismissal of
     All of Niemann's State-Law Claims (Counts I, II, V, and VI) ............................. 6

     A.   Connecticut's Anti-SLAPP Statute
          Applies to Niemann's State-Law Claims
          Because Niemann is a Connecticut Citizen ..................................... 7

     B.   Niemann's State-Law Claims Fail
          Under Connecticut's Anti-SLAPP Statute ................................... 11

          1.   Connecticut's Anti-SLAPP Statute Would
               Apply in Connecticut State Court Had Niemann Filed Suit There .......... 12

          2.   Connecticut's Anti-SLAPP Statute Is
               Substantive and Does Not Conflict With the Federal Rules .................... 14

          3.   Niemann's State-Law Claims Fail To Satisfy the
               Rigorous Showing Required by Connecticut's Anti-SLAPP Statute ....... 17

II.  Niemann's Defamation Claims Fail for the Separate Reason
     That Niemann Has Failed to Plausibly Allege Them (Counts I and II)................ 18

     A.   Niemann Fails to Specifically
          Identify Defamatory Statements Made by Carlsen ................................... 19

     B.   Niemann Fails to Plausibly Allege
          That Carlsen Acted With Actual Malice.................................... 20

     C.   The Allegedly Defamatory
          Statements Are Not Actionable In Any Event ......................................... 23

          1.   Niemann Cannot Assert Defamation Claims Based on Conduct............. 23

          2.   Carlsen's Alleged Statements to Tournament
               Officials Are Protected by Qualified Privilege ......................... 23

3.  Carlsen's Remaining Alleged Statements
Are Non-Actionable Because They Reflect Opinions or Are True .......... 24

III.    Niemann Has Not Plausibly Alleged
A Claim For Tortious Interference (Count V) ....................................................... 25

IV.    Niemann Has Not Plausibly Alleged
A Claim For Civil Conspiracy (Count VI) ............................................................ 28

V.    Niemann Has Not Plausibly Alleged
Any Antitrust Claims (Counts III and IV) ........................................................... 29

CONCLUSION ................................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adelson v. Harris*,
    774 F.3d 803 (2d Cir. 2014)........................................................................12, 14, 15, 16

*Adelson v. Harris*,
    973 F. Supp. 2d 467 (S.D.N.Y. 2013)........................................................................10

*Aguilar v. PNC Bank, N.A.*,
    2014 WL 12700618 (E.D. Mo. Nov. 19, 2014)..........................................................7

*Am. Guar. & Liab. Ins. Co. v. U.S. Fidelity & Guar. Co.*,
    668 F.3d 991 (8th Cir. 2012) .....................................................................................7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................21

*Britt v. Unknown Officers*,
    2019 WL 2453763 (D. Conn. June 12, 2019)..........................................................19

*Butler Am., LLC v. Ciocca*,
    2020 WL 6781488 (Conn. Super. Ct. Mar. 12, 2020) ............................................26

*Calhoun v. Goodwill Indus. of S. New England, Inc.*,
    2021 WL 3609677 (Conn. Super. Ct. July 26, 2021) ............................................16

*Campbell v. Porter*,
    275 A.3d 684 (Conn. App. Ct. 2022)......................................................................29

*Caranchini v. Peck*,
    355 F. Supp. 3d 1052 (D. Kan. 2018)......................................................................15

*Chadha v. Shimelman*,
    818 A.2d 789 (Conn. App. Ct. 2003)................................................................20, 21

*Charamut v. Savage*,
    2022 WL 620782 (Conn. Super. Ct. Feb. 2, 2022)................................................19

*Colliton v. Cravath, Swaine & Moore LLP*,
    2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008)................................................... 9-10

*Colon v. Town of W. Hartford*,
    2001 WL 45464 (D. Conn. Jan. 5, 2001)...............................................................................25

*Consul Gen. of Republic of Indonesia v. Bill's Rentals, Inc.*,
    330 F.3d 1041 (8th Cir. 2003) ..........................................................................................7

*Cronin v. Pelletier*,
    2018 WL 3965004 (Conn. Super. Ct. July 26, 2018) ...........................................................20

*Cweklinsky v. Mobil Chem. Co.*,
    837 A.2d 759 (Conn. 2004) ..............................................................................................19

*Day v. Dodge*,
    2019 WL 994532 (Conn. Super. Ct. Jan. 25, 2019)....................................................17, 18

*Dellacamera v. New Haven Reg.*,
    2002 WL 31501855 (Conn. Super. Ct. Oct. 28, 2002) ..........................................................18

*Dorman v. Emerson Elec. Co.*,
    23 F.3d 1354 (8th Cir. 1994) ...........................................................................................11

*Eckerberg v. Inter-State Studio & Publ'g Co.*,
    860 F.3d 1079 (8th Cir. 2017) .........................................................................................10

*ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*,
    355 F. Supp. 3d 785 (D. Minn. 2019) ................................................................................9

*Elmore v. Owens-Illinois, Inc.*,
    673 S.W.2d 434 (Mo. 1984) ............................................................................................10

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938)...........................................................................................................12

*Flotech, Inc. v. E.I. Du Pont de Nemours Co.*,
    627 F. Supp. 358 (D. Mass. 1985) ...................................................................................10

*Forgione v. Bette*,
    2005 WL 1545278 (Conn. Super. Ct. June 2, 2005)..........................................................20

*Fuqua Homes, Inc. v. Beattie*,
    388 F.3d 618 (8th Cir. 2004) .............................................................................................8

*Gifford v. Taunton Press, Inc.*,
    2019 WL 3526461 (Conn. Super. Ct. July 11, 2019) ....................................................14, 17

*Godin v. Schencks*,
    629 F.3d 79 (1st Cir. 2010).................................................................... 11-12, 15, 17

*Gomez v. Larson*,
   1999 WL 417819 (Conn. Super. Ct. June 8, 1999)..............................................21

*Goodrich v. Waterbury Republican-Am., Inc.*,
   448 A.2d 1317 (Conn. 1982) ....................................................................25

*Henry v. Lake Charles Am. Press, LLC*,
   566 F.3d 164 (5th Cir. 2009) ....................................................................15

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*,
   761 A.2d 1268 (Conn. 2000) ....................................................................26

*Hohmann v. GTECH Corp.*,
   910 F. Supp. 2d 400 (D. Conn. 2012)......................................................20

*Holmes v. Sopuch*,
   639 F.2d 431 (8th Cir. 1981) ....................................................................10

*Ins. & Consulting Assocs. v. ITT Hartford Ins. Grp.*,
   48 F. Supp. 2d 1181 (W.D. Mo. 1999) .......................................................8

*Inst. Food Mktg. Assocs., Ltd. v. Golden State Strawberries, Inc.*,
   747 F.2d 448 (8th Cir. 1984) ......................................................................8

*James v. City of Long Beach*,
   18 F. Supp. 2d 1078 (C.D. Cal. 1998) .....................................................13

*Johnson v. Chesebrough-Pond's USA Co.*,
   918 F. Supp. 543 (D. Conn. 1996)...........................................................25

*Knowles v. TD Ameritrade Holding Corp.*,
   2 F.4th 751 (8th Cir. 2021) .................................................................4, 30

*Kopperl v. Bain*,
   23 F. Supp. 3d 97 (D. Conn. 2014).....................................................27, 28

*La Liberte v. Reid*,
   966 F.3d 79 (2d Cir. 2020)......................................................................16

*LEGO A/S v. ZURU, Inc.*,
   2020 WL 13145135 (D. Conn. Apr. 22, 2020)........................................27

*Litchfield Asset Mgmt. Corp. v. Howell*,
   799 A.2d 298 (Conn. App.Ct. 2002)........................................................28

*Makaeff v. Trump Univ., LLC*,
   736 F.3d 1180 (9th Cir. 2013) .................................................................15

*Martin v. Griffin*,
    2000 WL 872464 (Conn. Super. Ct. June 13, 2000).....................................................13-14, 23

*Mercer v. Cosley*,
    955 A.2d 550 (Conn. App. Ct. 2008)......................................................................................23

*Metcoff v. Lebovics*,
    2 A.3d 942 (Conn. App. Ct. 2010)...........................................................................................27

*Newsham v. Lockheed Missiles & Space Co.*,
    190 F.3d 963 (9th Cir. 1999) ...........................................................................................15, 16

*Noble v. Hennessey*,
    2021 WL 830014 (Conn. Super. Ct. Jan. 12, 2021).........................................................18, 25

*Pacheco Quevedo v. Hearst Corp.*,
    2019 WL 7900036 (Conn. Super. Ct. Dec. 19, 2019) .........................................................6, 14

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ...........................................................................................................12

*Pastore v. Bell Tel. Co.*,
    24 F.3d 508 (3d Cir. 1994).......................................................................................................30

*Primrose Cos. v. McGee*,
    2022 WL 3712636 (Conn. Super. Ct. Aug. 26, 2022)...............................................12, 13, 22

*Reyes v. Bridgeport Dentist, LLC*,
    2015 WL 4430850 (Conn. Super. Ct. June 18, 2015).............................................................19

*Rivas v. Pepi*,
    2018 WL 4199211 (Conn. Super. Ct. Aug. 16, 2018) .....................................................15, 16

*Rodgers v. Lincoln Towing Serv., Inc.*,
    771 F.2d 194 (7th Cir. 1985) ....................................................................................................5

*S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*,
    2015 WL 4509425 (D. Conn. July 24, 2015) .........................................................................26

*Sentementes v. Lamont*,
    2021 WL 5447125 (D. Conn. Nov. 22, 2021) ........................................................................16

*Sherr v. HealthEast Care Sys.*,
    262 F. Supp. 3d 869 (D. Minn. 2017)......................................................................................30

*Smith v. Planned Parenthood of St. Louis Region*,
    225 F.R.D. 233 (E.D. Mo. 2004) ......................................................................................14, 15

*Stefanoni v. Darien Little League, Inc.*,
  2014 WL 3360571 (Conn. Super. Ct. May 22, 2014).............................................24

*Stevens v. Helming*,
  135 A.3d 728 (Conn. App. Ct. 2016).....................................................................19

*Tansil v. Honda Motor Co.*,
  2016 WL 6396166 (E.D. Mo. Oct. 28, 2016)..........................................................9

*Tobinick v. Novella*,
  108 F. Supp. 3d 1299 (S.D. Fla. 2015) ..................................................................15

*Wolfley v. Solectron USA, Inc.*,
  541 F.3d 819 (8th Cir. 2008) ..................................................................................7

*Woodcock v. J. Pub. Co.*,
  646 A.2d 92 (Conn. 1994) .....................................................................................21

*Youngman v. Robert Bosch LLC*,
  923 F. Supp. 2d 411 (E.D.N.Y. 2013) .....................................................................8

*Zean v. Fairview Health Servs.*,
  858 F.3d 520 (8th Cir. 2017) ...................................................................................6

*ZeeBaaS, LLC v. Koelewyn*,
  2012 WL 2327693 (D. Conn. June 19, 2012)........................................................27

## Statutes

Conn. Gen. Stat. § 52-196a............................................................................ *passim*

Conn. Gen. Stat. § 52-237.....................................................................................18

Mo. Stat. § 537.528(1) .............................................................................................6

## Rules

Conn. Prac. Bk. § 17-49.........................................................................................16

Fed. R. Civ. P. 11(b)(3)............................................................................................9

Fed. R. Civ. P. 56..................................................................................................16

## PRELIMINARY STATEMENT

After years of trying to curate a reputation as the bad boy of chess, Plaintiff Hans Niemann wants to cash in by blaming others for the fallout from his own admitted misconduct. Like his prior two complaints, Niemann's Second Amended Complaint concedes Niemann's well-known history of cheating.  But rather than accepting the unsurprising consequences of his own actions, Niemann now seeks to shift blame to reigning World Chess Champion Magnus Carlsen and others, claiming a wholly implausible conspiracy to defame and boycott Niemann that somehow damaged his already dubious reputation to the tune of at least $100 million.

Niemann's claims against Carlsen all fail on their face.  Even accepting all allegations as true, Niemann cannot escape his own admissions that he has cheated in chess more than once, and as recently as two-and-a-half years ago.  Indeed, cheating was an indelible part of Niemann's chess career and reputation well before the events alleged in the Second Amended Complaint. His first admitted instance of cheating was at age 12, not long after he received his first chess title of Federation Master.  Second Am. Compl. ("SAC") ¶¶ 63, 109.  And he has admitted to another instance of cheating at the age of 16, roughly a year before he became a Grandmaster. *Id.* ¶¶ 65, 109.  In 2020, Chess.com banned Niemann from its platform for six months for cheating, something Niemann at the time acknowledged was "more than completely fair." Chess.com Report at 7, Image 5; *see, e.g.*, SAC ¶ 171.

Niemann attempts to minimize his history of cheating by claiming that he was simply "experimenting with a chess engine on Chess.com as a child."  SAC ¶ 109 n.1.  Despite Niemann's attempt to pretend otherwise, his pleading leaves no doubt that his known history of misconduct is the reason that top-ranked chess players and tournament organizers question the integrity of his play.  Even after filing a Second Amended Complaint to address the legal

deficiencies identified in defendants' prior motions to dismiss, Niemann still cannot state any valid claim against Carlsen:

*First*, the Court should immediately dismiss Niemann's four state-law claims (Counts I, II, V, and VI) pursuant to Connecticut's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute.  As Niemann expressly acknowledged in his Original Complaint, he "is a natural person *and a Connecticut resident*."  Compl. ¶ 19 (emphasis added).  In his first Amended Complaint, he likewise alleged—without reservation—that he is a Connecticut citizen.  Am. Compl. ¶ 19.  Missouri federal courts apply the law of the jurisdiction where a plaintiff resides when evaluating state-law claims that, like Niemann's, are rooted in alleged defamation.  Connecticut's anti-SLAPP statute is a substantive state law that applies here because Niemann admits that he is a public figure and is suing Carlsen and others for speech that he acknowledges is a matter of public concern.  This requires dismissal of each of Niemann's state-law claims, because Connecticut's anti-SLAPP law does not allow plaintiffs like Niemann to sue defendants like Carlsen for protected speech unless they can show "probable cause" that they are likely to prevail.

Recognizing that he cannot come close to meeting Connecticut's probable cause standard, Niemann responded to defendants' prior motions to dismiss by claiming that his citizenship in Connecticut is a technicality and that he does not "keep a residence in Connecticut" after all.  SAC ¶ 20.  Niemann's desperate attempt to avoid Connecticut law's dispositive reach through contradiction does not and cannot change the fact that Connecticut's anti-SLAPP law bars the state-law claims he is asking this Court to resolve.

*Second*, Niemann's defamation claims (Counts I and II) fail to state plausible claims for relief.  As a public figure, Niemann must allege either that Carlsen knew the statements he

allegedly made were false or was reckless about whether they were true.  Niemann's own allegations show he cannot meet this high bar.  Read liberally, Niemann appears to allege that Carlsen defamed him by insinuating or saying that Niemann cheated during the Sinquefield Cup.  But Niemann admits that he has in fact cheated in chess games before, *id.* ¶ 109, and that he played Carlsen *prior* to the Sinquefield Cup.  *Id.* ¶ 7.  Under these circumstances, Niemann cannot plausibly allege—much less prove—that Carlsen *knew* that Niemann did not cheat or that Carlsen's beliefs about Niemann cheating were not sincere.  *Id.* ¶ 84.  Moreover, many of the statements that Niemann attributes to Carlsen are not actionable for other reasons, including because they are literally true or at most reflect Carlsen's opinions.

*Third*, Niemann's claims for tortious interference and civil conspiracy (Counts V and VI) likewise fail because they are based on the same alleged conduct as his defective defamation claims and because Niemann has not alleged the essential elements of these claims.

*Fourth*, Niemann's antitrust claims (Counts III and IV) candidly reveal what this case is really about:  a series of grievances in search of a legal theory.  Niemann's attempt to make a federal case out of defective state-law defamation claims fails at every step of the analysis.  He does nothing to explain how an individual chess player and chess-platform user like Carlsen could have—or did—attempt to monopolize a so-called market for "[p]rofessional chess tournaments and online recreational chess platforms."  *Id.* ¶ 47.  He also does not allege any harm to competition.  Instead, the only injury he asserts results from the harm he caused to his own reputation through his own admitted cheating.  Niemann also fails to plead any agreement among the defendants, much less a plausible one.  And he fails to allege any unreasonable restraint of trade under either the per se rule or the rule of reason.

Niemann has now amended his complaint multiple times.  The most Niemann has been

able to do in these amendments is double down on his tale of persecution by engaging in gamesmanship and asserting new—but equally specious—claims. This Court should dismiss with prejudice all of Niemann's claims against Carlsen. *See Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 758 (8th Cir. 2021). This Court also should award Carlsen his attorneys' fees and costs in connection with this Motion, as is required under Connecticut's anti-SLAPP statute. Conn. Gen. Stat. § 52-196a(f)(1).

## **BACKGROUND**

Magnus Carlsen is the world's number one chess player and has been the World Chess Champion since 2013. SAC ¶¶ 4, 50. Over his storied chess career, Carlsen has played in countless tournaments against countless others in the chess community: a list of Carlsen's recorded games alone runs 74 pages long. *See id.* ¶ 44 (citing Chess.com's statistics on Carlsen). Niemann is just one of many Grandmasters who have beaten Carlsen during his time as World Chess Champion. *See id.* ¶¶ 7, 44. But he is the only one to have filed a lawsuit against Carlsen over a game—their September 4, 2022 game in the Sinquefield Cup.

Niemann bases his state-law tort and federal antitrust claims on a parade of alleged grievances flowing out of what he perceives as Carlsen raining on his career's biggest victory. In particular, he complains that Carlsen purportedly spoke with Michael Khodarkovsky, the Executive Director of the Grand Chess Tour, to accuse Niemann of cheating, demand Niemann be disqualified, and request that Khodarkovsky "dramatically enhance the anti-cheating measures at the Sinquefield Cup." *Id.* ¶¶ 83, 87. Niemann also alleges that Carlsen then withdrew from the Sinquefield Cup entirely, *id.* ¶ 91, and tweeted about it in ways Niemann found objectionable. *Id.* ¶¶ 88–89. Later, Carlsen resigned after only one move in an online game against Niemann in the Julius Baer Generation Cup. *Id.* ¶ 129. He then shared his thoughts about his Sinquefield Cup game against Niemann in a September 26, 2022 tweet. *Id.* ¶¶

142–44, 148.  Niemann further alleges that Carlsen also linked him to another admitted chess

cheater, Maxim Dlugy, in an interview, *id.* ¶¶ 134–36; and told Norwegian Grandmaster Aryan

Tari and unspecified "prominent chess players" that Niemann cheated in the Sinquefield Cup, *id.*

¶ 123.  Finally, Niemann asserts that while in Austria, Carlsen chanted "Ukse Hans"—a phrase

Niemann incorrectly claims means "Cheater Hans" in Norwegian.  *Id.* ¶¶ 125–26.

In his seven-count Second Amended Complaint, Niemann claims that some or all of these

words and actions—he does not specify exactly which ones—constitute slander (Count I) or libel

(Count II) against him.  He further contends that through the alleged defamation, Carlsen and

others tortiously interfered with his opportunities to play competitive chess in various

tournaments and matches (Count V).  *Id.* ¶¶ 17, 237.  Niemann also accuses Carlsen and the

other defendants of "civil conspiracy" (Count VI), alleging that they "schemed and agreed

amongst themselves to repeatedly defame Niemann to members of the chess community and the

public at large."  *Id.* ¶ 242.  And he asserts two Sherman Act claims, claiming that defendants

violated Section 1 (Count III) by "act[ing] in concert to improperly refuse to deal with

Niemann," *id.* ¶ 221, and Section 2 (Count IV) by "intentionally foreclosing competition" in "an

attempt to monopolize" the purported "Competitive Chess Market."  *Id.* ¶ 228.  But rather than

stating any valid claim against Carlsen and the other defendants, the Second Amended

Complaint only highlights the stark difference between how Niemann wants the chess world to

perceive him—as an "American chess prodigy," *id.* ¶ 62—and the disappointing reality.

## ARGUMENT

Niemann's Second Amended Complaint is procedurally improper and fails on multiple

grounds.[1]  His state-law claims are governed by Connecticut law, and Connecticut's anti-SLAPP

---

[1] Because Niemann amended his Original Complaint on November 22, 2022, he was not permitted to file
a Second Amended Complaint as a matter of right.  *See, e.g.*, *Rodgers v. Lincoln Towing Serv., Inc.*, 771

statute requires their immediate dismissal, with an award of attorneys' fees and costs.  All of

Niemann's claims also fail under Rule 12(b)(6) for the independent reason that his Second

Amended Complaint and the materials it embraces do not contain "factual content that allows the

court to draw the reasonable inference that [Carlsen] is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[2]

## I.      Connecticut's Anti-SLAPP Statute Requires
        Dismissal of All of Niemann's State-Law Claims (Counts I, II, V, and VI)

Connecticut law offers Carlsen an anti-SLAPP defense to all of Niemann's state-law

claims.  Specifically, Connecticut's anti-SLAPP statute, Conn. Gen. Stat. § 52-196a, broadly

"protect[s] parties from meritless lawsuits designed to chill free speech" by offering defendants

like Carlsen the opportunity to file a special motion to dismiss at the beginning of a case.

*Pacheco Quevedo v. Hearst Corp.*, 2019 WL 7900036, *1 (Conn. Super. Ct. Dec. 19, 2019).

This substantive shield would be unavailable to Carlsen under Missouri law because Missouri's

anti-SLAPP statute is inapplicable here.  *See* Mo. Stat. § 537.528(1) (explaining that the statute

applies only to "speech undertaken or made in connection with a public hearing or public

meeting [or] in a quasi-judicial proceeding").  Accordingly, although Niemann's state-law claims

---

F.2d 194, 203 (7th Cir. 1985) (holding that plaintiff had already amended as a matter of course even though "the amendments were 'technical' ones requested by the district court judge").  Regardless, as his third failed attempt to state valid claims demonstrates, Niemann's claims against Carlsen should be dismissed with prejudice.

[2] "[D]ocuments necessarily embraced by the complaint are not matters outside the pleading" and therefore may be considered in resolving this Motion.  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citation omitted).  Niemann's Second Amended Complaint embraces many documents, including the Chess.com Report, Chess.com's statistics on Carlsen, and an interview that Niemann gave to the Saint Louis Chess Club.  *See* SAC ¶¶ 44, 109, 170; *see also The Hans Niemann Report*, CHESS.COM, https://www.chess.com/blog/CHESScom/hans-niemann-report (last visited Jan. 24, 2023); *Magnus Carlsen Chess Games*, CHESS.COM, https://www.chess.com/games/search?fromSearchShort=1&p1= Magnus%20Carlsen&playerId=822231&sort=7&page=74 (last visited Jan. 24, 2023); Saint Louis Chess Club, *Niemann: I Have NEVER Cheated Over The Board | Round 5*, YOUTUBE (Sept. 6, 2022), https://www.youtube.com/watch?v=CJZuT-_kij0 (last visited Jan. 24, 2023) (the "Niemann Interview").

fail under both Connecticut and Missouri law, there is an outcome-determinative conflict between the defenses available under those states' laws that this Court must resolve with a choice-of-law analysis. *See Consul Gen. of Republic of Indonesia v. Bill's Rentals, Inc.*, 330 F.3d 1041, 1046 (8th Cir. 2003) (explaining that choice-of-law analysis is required when "there actually is a difference between the relevant laws of the different states"). As highlighted by Niemann's artful but unavailing attempt to plead around his prior admission that he is a Connecticut resident, Connecticut's anti-SLAPP statute bars Niemann's state-law claims.

## A. Connecticut's Anti-SLAPP Statute Applies to Niemann's State-Law Claims Because Niemann is a Connecticut Citizen

Resolving the conflict between Connecticut and Missouri law requires this Court to apply Missouri's choice-of-law rules. *See Aguilar v. PNC Bank, N.A.*, 2014 WL 12700618, at *2 n.2 (E.D. Mo. Nov. 19, 2014) (explaining that the forum's choice-of-law analysis applies where a "federal court is exercising supplemental jurisdiction over state law claims" (internal quotation and citation omitted)); *see also Wolfley v. Solectron USA, Inc.*, 541 F.3d 819, 823 (8th Cir. 2008) (applying the same rule in case brought under diversity jurisdiction).

Missouri determines choice-of-law issues in tort actions by considering the following factors to identify the state having the "most significant relationship" to a particular claim: "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered." *Am. Guar. & Liab. Ins. v. U.S. Fidelity & Guar. Co.*, 668 F.3d 991, 996 (8th Cir. 2012). As applied to Niemann's specific tort claims, the place where the injury occurred—here, Connecticut—is the most important consideration in determining which state bears the most significant relationship to each claim. Accordingly, Connecticut substantive law applies to

Niemann's state-law claims and, thus, to Carlsen's defenses. *See Youngman v. Robert Bosch LLC*, 923 F. Supp. 2d 411, 417 (E.D.N.Y. 2013) (evaluating New Jersey state-law defenses after determining that New Jersey law governed the plaintiff's substantive claims).

For Niemann's slander and libel claims, "the residence of the party allegedly defamed" is "the most important consideration in choosing the applicable law" where, as here, the plaintiff claims "widespread dissemination of the allegedly defamatory matter." *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 622 (8th Cir. 2004); *see id.* (affirming application of Missouri law to a defamation claim brought by a corporate plaintiff because "[Missouri] is where [it] maintains its principal place of business"); SAC ¶ 127 (alleging "worldwide" dissemination of the allegedly defamatory statements). This is because "defamation produces a special kind of injury that has its principal effect among one's friends, acquaintances, neighbors and business associates in the place of one's residence." *Fuqua*, 388 F.3d at 622 (internal quotations and citation omitted).

Connecticut law independently bears the most significant relationship to Niemann's tortious interference and civil conspiracy claims because, as with defamation, courts employing the "most significant relationship" test give the most weight to the plaintiff's residence as the place where the injury occurred. *See, e.g.*, *Inst. Food Mktg. Assocs., Ltd. v. Golden State Strawberries, Inc.*, 747 F.2d 448, 454 n.5 (8th Cir. 1984) (determining under Missouri choice-of-law rules that Missouri substantive law applied to a tortious interference claim brought by a plaintiff residing in Missouri); *Ins. & Consulting Assocs. v. ITT Hartford Ins. Grp.*, 48 F. Supp. 2d 1181, 1188 (W.D. Mo. 1999) (applying Missouri choice-of-law rules to tort claims, including civil conspiracy, and concluding that Missouri law governs where "the alleged injury occurred in Missouri and Missouri is the location of plaintiff's business"). As with Niemann's defamation claims, any injury was felt in Niemann's state of residence—i.e., Connecticut.

Recognizing that application of Connecticut law dooms his claims, Niemann attempts to minimize his connections to Connecticut in his Second Amended Complaint.  Contrary to his express admission in his Original Complaint that he is a "Connecticut resident," Compl. ¶ 19, Niemann now claims that he does not "keep a residence in Connecticut."  SAC ¶ 20.  And contrary to his unequivocal allegation in his Amended Complaint that he is a "Connecticut citizen," Am. Compl. ¶ 19, Niemann now asserts that his Connecticut citizenship is a technicality and that he feels a deeper affinity for Missouri.  SAC ¶ 20.  Niemann's thinly veiled attempt to manipulate the judicial process is unavailing and should not be countenanced.

Niemann cannot change the applicable law by distorting the reality he twice acknowledged before he saw Carlsen's motion to dismiss his prior complaint.  Courts routinely reject such "transparent attempt[s] to remove dispositive admissions and replace them with different allegations that would [purportedly] survive a . . . motion to dismiss."  *ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 795 (D. Minn. 2019).  Having signed the prior two complaints they filed before Carlsen moved to dismiss, Niemann's counsel represented that the factual allegations they presented on behalf of their client have "evidentiary support." Fed. R. Civ. P. 11(b)(3).  They cannot abandon those allegations now that they understand the legal consequences of Niemann's admissions.  *See Tansil v. Honda Motor Co.,* 2016 WL 6396166, at *2 (E.D. Mo. Oct. 28, 2016) (explaining that in responding to a motion to dismiss, plaintiff could not rely on "documents [that] establish that her connections to Michigan are of some substance" where she had pleaded in her original complaint "that she is a citizen of Missouri").  Indeed, courts have sanctioned plaintiffs for taking Niemann's tack of jettisoning factual averments in a misguided effort to avoid dispositive legal defenses.  *See, e.g.*, *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *13 (S.D.N.Y. Sept. 24, 2008)

(sanctioning plaintiff for filing an amended complaint that was a "transparent attempt to plead around the legal defenses" asserted by the defendant), *aff'd*, 356 Fed. Appx. 535 (2d Cir. 2009).

In any event, Niemann's newly minted assertion that he "has virtually no connection to Connecticut," SAC ¶ 20, does not allow him to avoid Connecticut law.  Notwithstanding his attempt to downplay his prior admissions, Niemann still acknowledges that he is a "Connecticut citizen." *Id.* ¶ 20.  This reluctant admission means he is a Connecticut resident as well.  *See Eckerberg v. Inter-State Studio & Publ'g Co.*, 860 F.3d 1079, 1086 (8th Cir. 2017) ("For purposes of federal jurisdiction, 'domicile' and 'citizenship' are synonymous terms."); *Holmes v. Sopuch*, 639 F.2d 431, 433 n.2 (8th Cir. 1981) (explaining that "domicile" requires "residence at a particular place").  Niemann does not allege that he resides in Missouri or anywhere else.  To the contrary, he admits that "he moved to Connecticut with his family in 2015 and never established citizenship in another state," and he appears to allege that his parents' home in Connecticut has been his only permanent residence since 2015.  SAC ¶ 20.

Niemann's admission that he is a Connecticut citizen further confirms that his claimed injury was suffered in Connecticut.  In determining the state with the "most significant relationship," courts recognize that any injury flowing from defamation is felt where the defamation plaintiff is a citizen, and that state "has an interest in protecting its citizens from tortious conduct."  *Adelson v. Harris*, 973 F. Supp. 2d 467, 478 (S.D.N.Y. 2013); *see Flotech, Inc. v. E.I. Du Pont de Nemours Co.,* 627 F. Supp. 358, 363 (D. Mass. 1985) (applying the "most significant relationship" test and reasoning that "[a]s a citizen of Massachusetts, [plaintiff] first suffered injury, if any, within [Massachusetts]"); *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434, 437 (Mo. 1984) ("An injury from defamation . . . ha[s] a center in one's place of domicile.").

Niemann cannot evade this result—and application of Connecticut law to his state-law claims—through his conclusory allegations about Missouri's purported connection to this case. As he alleges, only "some of the defamatory statements forming the basis of [his] Complaint" occurred in Missouri.  SAC ¶ 28.  And as his Second Amended Complaint reveals, much of the alleged conduct actually occurred elsewhere.  For example, Niemann claims to have been injured by alleged actions and statements that happened online and in Austria, *id*. ¶¶ 123–27, and from being excluded from chess games online and internationally.  *See, e.g.*, *id.* ¶ 17.  Indeed, none of the "most significant relationship" factors point to application of any jurisdiction's law other than Connecticut.  And even if that analysis were inconclusive, which it is not, "Missouri law establishes that" trial courts should apply "the substantive law of the place where the injury occurred"—which again points to Connecticut, where Niemann is a citizen and resident. *Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1358 (8th Cir. 1994).

### B.  Niemann's State-Law Claims Fail Under Connecticut's Anti-SLAPP Statute

This Court should dismiss Niemann's state-law claims under Connecticut's anti-SLAPP statute because they are based on Carlsen's exercise of free speech, and because Niemann cannot demonstrate with particularity any circumstances giving rise to a meritorious claim or show probable cause that he will prevail.  *See* Conn. Gen. Stat. § 52-196a(e)(3) (requiring "the party that brought the complaint . . . [to] set[] forth with particularity the circumstances giving rise to the complaint . . . and demonstrate[] to the court that there is probable cause, considering all valid defenses, that the party will prevail on the merits").

Many courts have held that various states' anti-SLAPP statutes apply in federal court because the statutes "serve[] the . . . distinct function of protecting those specific defendants that have been targeted with litigation on the basis of their protected speech."  *See, e.g.*, *Godin v.*

*Schencks*, 629 F.3d 79, 89 (1st Cir. 2010) (concluding that Maine's anti-SLAPP statute applies in

federal court). This Court should likewise apply Connecticut's anti-SLAPP statute to dismiss

Niemann's state-law claims because that statute "(1) would apply in [Connecticut] state court

had suit been filed there; (2) is substantive within the meaning of [*Erie R. Co. v. Tompkins*, 304

U.S. 64 (1938)], since it is consequential enough that enforcement in federal proceedings will

serve to discourage forum shopping and avoid inequity; and (3) does not squarely conflict with a

valid federal rule." *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014).

        1.    Connecticut's Anti-SLAPP Statute Would
                <u>Apply in Connecticut State Court Had Niemann Filed Suit There</u>

Connecticut's anti-SLAPP statute applies to Niemann's state-law claims because they are

based on (1) Carlsen's exercise of the right of free speech regarding (2) a public figure. *See*

Conn. Gen. Stat. § 52-196a(b).  Under the statute, free speech means communicating "in a public

forum on a matter of public concern," and a "[m]atter of public concern" includes "an issue

related to" a "public figure." *Id.* § 52-196a(a)(1)–(2) (internal quotations omitted).

As discussed above, all of Niemann's claims against Carlsen are based on allegations that

Carlsen accused Niemann of cheating through a series of actions and statements in which

Carlsen exercised his right to free speech about a public figure in a public forum. *See*

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (explaining that there is a

"wide array of protected First Amendment activity on topics 'as diverse as human thought'" that

occurs on social media and elsewhere (internal citation omitted)).  Specifically, the Second

Amended Complaint targets Carlsen's statements and actions in publicly broadcasted chess

tournaments, on Twitter, and in press interviews.[3]  Niemann himself alleges that Carlsen's

---

[3] Social media outlets like Twitter constitute "public fora for the purposes of" Connecticut's anti-SLAPP
statute. *Primrose Cos. v. McGee*, 2022 WL 3712636, at *6 (Conn. Super. Ct. Aug. 26, 2022).  And even
if not publicly broadcasted, chess events that are open to the public are analogous to sports stadiums,

statements were intended to produce an effect on "the chess community and the public."  SAC
¶¶ 87, 242.

Niemann's allegations also establish that he is a "public figure," meaning that speech
about him constitutes a "matter of public concern" under Connecticut's anti-SLAPP statute.
Conn. Gen. Stat. § 52-196a(a)(1)(D); *see Primrose*, 2022 WL 3712636, at *11 (analyzing a
special motion to dismiss under Connecticut's anti-SLAPP law and explaining that a "general
purpose" public figure is one with "such pervasive fame or notoriety that he becomes a public
figure for all purposes and in all contexts").  According to Niemann, he not only earned several
chess titles at a young age, but he rapidly developed into the "40th best chess player in the world"
after becoming "the youngest-ever winner" of the "Tuesday Night Marathon" at the oldest chess
club in the United States.  SAC ¶¶ 2, 63, 66.  Niemann also has a "lucrative streaming career," in
which he has played chess online for a wide audience, and he has "travel[ed] the world to
compete" in tournaments for which he was paid thousands of dollars in "appearance fees."  SAC
¶¶ 3, 196, 198; *see* Niemann Interview at 17:40–17:56; SAC ¶ 109 (referencing the Niemann
Interview).  The Second Amended Complaint therefore concedes that Niemann has "assumed
roles of especial prominence in the affairs of society" sufficient for him to be considered a
"public figure."[4]  *Martin v. Griffin*, 2000 WL 872464, at *8 (Conn. Super. Ct. June 13, 2000)

---

which are "considered public forums for the purpose of First Amendment analysis."  *James v. City of
Long Beach*, 18 F. Supp. 2d 1078, 1082 (C.D. Cal. 1998).

[4] Niemann is, at a minimum, a limited-purpose public figure, which satisfies the "public figure"
requirement under Connecticut's anti-SLAPP statute.  *See Primrose*, 2022 WL 3712636, at *11–12
(finding that plaintiff was a "limited purpose public figure" for purposes of Connecticut's anti-SLAPP
statute).  Indeed, sources integral to the Second Amended Complaint reflect that Niemann "thrust himself
to the forefront of [this] particular public controversy."  *Id.* at *12 (quotations and citation omitted).
Specifically, in the interview discussing his reaction to the Sinquefield Cup tournament, Niemann made it
clear that "[he's] putting [him]self in the public now" regarding any alleged controversy over the
Sinquefield Cup.  Niemann Interview at 17:50–18:02.  In fact, Niemann describes himself as being at the
"center" of the "single biggest chess scandal in history," which has garnered attention and public
comment from major news organizations and well-known celebrities.  *See* SAC ¶¶ 11, 92–97, 117, 131.

(concluding that a former police officer and head of the police union is a public figure because of the "public nature of his position itself" and because he "thrust[] himself into the most public of disputes—an election campaign"); *see* Memorandum of Law in Support of Defendant Chess.com, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint and/or Compel Arbitration (the "Chess.com Motion") at Section III.A.2.a (collecting authority holding that professional sports figures are public figures).

Accordingly, Niemann's own allegations establish the threshold requirements for applicability of Connecticut's anti-SLAPP statute by a preponderance of the evidence. *See Pacheco*, 2019 WL 7900036, at *4–9 (granting special motion to dismiss because "defendants have established by a preponderance of the evidence that the claims . . . fit within the protection of the anti-SLAPP statute" where allegations showed that newspaper coverage constituted the exercise of free speech in a public forum on community well-being, a matter of public concern). Carlsen therefore would be able to invoke Connecticut's anti-SLAPP statute in Connecticut state court for all of Niemann's state-law claims, satisfying the first requirement for applying Connecticut's anti-SLAPP defense in this forum. *See Adelson*, 774 F.3d at 809; *see also Gifford v. Taunton Press, Inc.*, 2019 WL 3526461, at *17 (Conn. Super. Ct. July 11, 2019) (granting an anti-SLAPP special motion to dismiss for defamation and tortious interference claims).

2.   Connecticut's Anti-SLAPP Statute
       Is Substantive and Does Not Conflict With the Federal Rules

Connecticut's anti-SLAPP statute applies here because it creates a substantive statutory protection for state-law claims that are based on free speech. *See* Conn. Gen. Stat. § 52-196a(e)(3). This Court previously concluded that a Missouri statute "intended to 'cull at an early stage of litigation' meritless suits" was "bound up with the rights and obligations created by state law in such a way that its application in federal court [was] required." *Smith v. Planned*

*Parenthood of St. Louis Region*, 225 F.R.D. 233, 241 (E.D. Mo. 2004).  This was because "[b]y requiring dismissal for failure to adhere to the statute, the . . . legislature clearly intended to influence substantive outcomes."  *Id.* (citation omitted).  The same is true of Connecticut's anti-SLAPP statute.  Its legislative history confirms that its purpose is to allow defendants who, like Carlsen, are "sued on their free speech rights to have a means to quickly get rid of frivolous lawsuits."  *Rivas v. Pepi*, 2018 WL 4199211, at *2 (Conn. Super. Ct. Aug. 16, 2018) (quoting Connecticut House and Senate debates on Conn. Gen. Stat. § 52-196a).

The First, Second, and Ninth Circuits—among other courts—have concluded that certain anti-SLAPP statutes afford defendants substantive rights that should be applied in federal court.[5] As these courts have recognized, enforcing state substantive law in this manner does not conflict with the Federal Rules of Civil Procedure.  This is because anti-SLAPP statutes "ask[] an entirely different question" than Federal Rules 12 or 56: namely, "whether the claims rest on the SLAPP defendant's protected First Amendment activity and whether the plaintiff can meet the substantive requirements [the State] has created to protect such activity from strategic, retaliatory lawsuits."  *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1182 (9th Cir. 2013) (Wardlaw, J. and Callahan, J., concurring in the denial of reh'g en banc).  Put differently, anti-SLAPP statutes fashion "a supplemental and substantive rule to provide added protections, beyond those in Rules 12 and 56."  *Godin*, 629 F.3d at 88; *see Newsham*, 190 F.3d at 972 (explaining that "there is no indication that [Federal] Rules 8, 12, and 56 were intended to 'occupy the field' with respect to

---

[5] *See Godin*, 629 F.3d at 89 (affirming application of certain of Maine's anti-SLAPP provisions in federal court); *Adelson*, 774 F.3d at 809 (affirming application of certain provisions of Nevada's anti-SLAPP statute in federal court); *Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972 (9th Cir. 1999) (concluding that relevant provisions of California's anti-SLAPP statute apply in federal court); *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 168–69 (5th Cir. 2009) (applying Louisiana's anti-SLAPP statute in federal court); *Caranchini v. Peck*, 355 F. Supp. 3d 1052, 1061 (D. Kan. 2018) (holding that Kansas's anti-SLAPP statute applies in federal court); *Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1305 (S.D. Fla. 2015) (applying California's anti-SLAPP statute in federal court).

pretrial procedures aimed at weeding out meritless claims").

Anti-SLAPP statutes vary from state to state, and some courts have concluded that certain anti-SLAPP laws cannot coexist with the Federal Rules.  For example, although the Second Circuit previously upheld a trial court's application of certain provisions of Nevada's anti-SLAPP statute, *see Adelson*, 774 F.3d at 809, it later disagreed with the Ninth Circuit's holding that California's anti-SLAPP statute applies in federal court, *see La Liberte v. Reid*, 966 F.3d 79, 88 (2d Cir. 2020).  Relying on that analysis, the District of Connecticut followed *La Liberte* in an unreported decision declining to apply Connecticut's anti-SLAPP law in federal court.  *See Sentementes v. Lamont*, 2021 WL 5447125, at *2–3 (D. Conn. Nov. 22, 2021).

But this Court is not bound by *La Liberte* and should not follow it here.  Reviewing the issue afresh, it is evident that Connecticut's anti-SLAPP statute supplements, rather than conflicts with, the Federal Rules of Civil Procedure.  Connecticut's anti-SLAPP statute does not ask the same question as Federal Rules 12 or 56; it instead focuses on whether "defendants [were] wrongly targeted for simply exercising" their First Amendment rights.  *Rivas*, 2018 WL 4199211, at *2.  And like the anti-SLAPP statutes of Maine and California, Connecticut's anti-SLAPP statute works in tandem with Connecticut's Federal Rule 12 and 56 equivalents.[6]  Accordingly, rather than creating a conflict with the Federal Rules, Connecticut's anti-SLAPP statute "adds an additional, unique weapon to the pretrial arsenal."  *Newsham*, 190 F.3d at 973.

"Declining to apply [Connecticut's anti-SLAPP statute] in federal court would . . . result

---

[6] *See Calhoun v. Goodwill Indus. of S. New England, Inc.*, 2021 WL 3609677, at *3 n.3 (Conn. Super. Ct. July 26, 2021) (explaining that a motion to strike filed pursuant to Conn. Prac. Bk. § 10-39 is "the functional equivalent" of a Rule 12(b)(6) motion; *compare* Conn. Prac. Bk. § 17-49 ("[Summary judgment] shall be rendered forthwith if the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."), *with* Fed. R. Civ. P. 56 ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

in an inequitable administration of justice between a defense asserted in state court and the same

defense asserted in federal court."  *Godin*, 629 F.3d at 92.  It would also encourage the type of

forum shopping Niemann is attempting to engage in by contradicting himself in his Second

Amended Complaint.  To avoid this inequitable result and discourage forum shopping, the Court

should apply Connecticut's statutory shield and vindicate the Connecticut state legislature's goal

of protecting free speech by barring claims like the ones Niemann has brought here.

        3.      Niemann's State-Law Claims Fail To Satisfy the
                <u>Rigorous Showing Required by Connecticut's Anti-SLAPP Statute</u>

      Because Niemann has not met—and cannot meet—his burden to "demonstrate[] to the

court that there is probable cause . . . that [he] will prevail on the merits of the complaint" with

the particularity that Connecticut law requires, each of his state-law claims should be dismissed.

Conn Gen. Stat. § 52-196a(e)(3).

      First, Niemann has failed to adequately allege essential elements of each of his state-law

claims and, on the face of those claims, cannot show probable cause that he will prevail.  In this

context, "[p]robable cause is a bona fide belief in the existence of facts essential under the law

for the action and such as would warrant a [person] of ordinary caution, prudence, and judgment,

under the circumstances, in entertaining it."  *Day v. Dodge*, 2019 WL 994532, at *4 (Conn.

Super. Ct. Jan. 25, 2019) (internal quotation and citation omitted); *see Gifford*, 2019 WL

3526461, at *12, 14 (explaining that "probable cause of success on the merits of any of his

claims . . . require[s] the plaintiff to demonstrate libel" and dismissing claims because the

plaintiff had not done so).  As discussed below, Niemann's Second Amended Complaint is

missing the factual allegations needed to support his state-law claims.[7]

---

[7] Moreover, "[b]ecause '[e]ach statement furnishes a separate cause of action and requires proof of each
of the elements for defamation,' the plaintiff must show probable cause that []he will prevail as to each

Second, Niemann cannot overcome Carlsen's defenses.  Courts dismiss actions under Connecticut's anti-SLAPP statute for failure to satisfy the probable cause standard where plaintiffs cannot overcome valid defenses.  *See Day*, 2019 WL 994532, at *4–6 (dismissing claims for lack of probable cause on the basis that "plaintiffs cannot sustain their burden of showing that they are likely to succeed on the merits" because plaintiffs had not demonstrated that the defendants were not "entitled to immunity"); Conn. Gen. Stat. § 52-196a(e)(3) (requiring the court to "consider[] all valid defenses").  Carlsen has several such defenses, including that Niemann has not alleged actual malice, *see infra* Part II.B; that the conduct Carlsen allegedly engaged in cannot form the basis of a defamation claim, *see infra* Part II.C.1; that qualified privilege shields Carlsen from liability for his alleged statements to tournament officials, *see infra* Part II.C.2; and that all of Carlsen's allegedly defamatory statements are protected opinions or are true, *see infra* Part II.C.3.  Any one of these defenses is sufficient to prevent Niemann from prevailing on one or more of his claims.

For these reasons, Connecticut's anti-SLAPP statute bars all of Niemann's state-law claims, and they should be expeditiously dismissed with an award of attorneys' fees and costs.[8]

## II.    Niemann's Defamation Claims Fail for the Separate Reason That Niemann Has Failed to Plausibly Allege Them (Counts I and II)

Because "each alleged defamatory statement constitutes a separate cause of action,"

---

alleged defamatory statement."  *Noble v. Hennessey*, 2021 WL 830014, at *7 (Conn. Super. Ct. Jan. 12, 2021) (internal citation omitted); *see infra* Part II.A.

[8] Although Niemann's state-law claims should be dismissed in their entirety, Connecticut law also limits Niemann's recovery for his libel claim to "actual damage[s]" because Niemann has neither alleged that he requested Carlsen to retract his allegedly libelous statements, nor alleged actual malice.  *See* Conn. Gen. Stat. § 52-237; *see infra* Part II.B.  Under Connecticut law, the "actual pecuniary losses" a libel plaintiff can recover do not include damages for "general harm to reputation, injured feelings or mental anguish."  *Dellacamera v. New Haven Reg.*, 2002 WL 31501855, at *3 (Conn. Super. Ct. Oct. 28, 2002).  Accordingly, at an absolute minimum, the Court should dismiss Niemann's libel claim to the extent it seeks anything other than actual damages.

Niemann is required to plead the necessary elements for each separate allegedly libelous or slanderous statement. *Britt v. Unknown Officers*, 2019 WL 2453763, at *4 (D. Conn. June 12, 2019) (applying Connecticut law). Those elements are that: "(1) [Carlsen] published a defamatory statement; (2) the defamatory statement identified [Niemann] to a third person; (3) the defamatory statement was published to a third person; and (4) [Niemann's] reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759, 763–64 (Conn. 2004). In addition, because Niemann is a public figure, *see supra* Part I.B.1 & n.4, he also must "allege and demonstrate that [Carlsen] acted with actual malice." *Charamut v. Savage*, 2022 WL 620782, at *5 (Conn. Super. Ct. Feb. 2, 2022). As explained below, Niemann has neither pleaded his defamation claims with the requisite specificity nor plausibly alleged that Carlsen made defamatory statements.

### A.   Niemann Fails to Specifically Identify Defamatory Statements Made by Carlsen

The jumbled morass of asserted statements and conduct by Carlsen alleged in the Second Amended Complaint fails to meet Niemann's burden of specifically identifying "what allegedly defamatory statements were made, by whom, and to whom." *Stevens v. Helming*, 135 A.3d 728, 732 n.3 (Conn. App. Ct. 2016) (internal quotation and citation omitted). For example, Niemann alleges that Carlsen defamed him by "publicly chanting 'Ukse Hans' in bars and the streets of the Austrian town where the European Club Cup was held," SAC ¶ 126, without identifying who heard this purportedly defamatory statement. *See Reyes v. Bridgeport Dentist, LLC*, 2015 WL 4430850, at *8 (Conn. Super. Ct. June 18, 2015) (allegation that the defendant "made the defamatory statements in the hearing of diverse persons, with no other specific facts provided" was insufficient (emphasis omitted)). Such "[i]mprecise pleading is not permitted in the context of alleged defamation." *Stevens*, 135 A.3d at 732 n.3 (internal quotation and citation omitted).

For this reason alone, Niemann has not alleged a prima facie case of defamation for any of the alleged statements attributed to Carlsen, and his defamation claims fail as a matter of law.  *See Forgione v. Bette*, 2005 WL 1545278, at *5 (Conn. Super. Ct. June 2, 2005) (dismissing defamation claim where plaintiff identified reports containing allegedly defamatory statements but not "which statements in the reports are alleged to be defamatory").

## B.      Niemann Fails to Plausibly Allege That Carlsen Acted With Actual Malice

Niemann's defamation claims also fail for the independent reason that Niemann has not plausibly alleged that Carlsen acted with actual malice as to any allegedly defamatory statement. "Actual malice requires that [a] statement, when made, be made with actual knowledge that it was false or reckless disregard of whether it was false." *Chadha v. Shimelman*, 818 A.2d 789, 794 (Conn. App. Ct. 2003) (internal quotation and citation omitted); *see id*. at 795 (applying Connecticut law and affirming dismissal of defamation claim where the allegations were "conclusory" and plaintiff did not "plead specific facts, which, if true, would allow a fact finder to reach the conclusion that the defendants did indeed act with malice").  "Reckless disregard" may be shown when an individual publishes a defamatory statement with "a high degree of awareness of . . . probable falsity" or "entertain[s] serious doubts" as to the statement's truth.  *Hohmann v. GTECH Corp.*, 910 F. Supp. 2d 400, 407 (D. Conn. 2012).

Given the allegations in the Second Amended Complaint and Niemann's acknowledged history of cheating, Niemann has failed to—and cannot—plausibly allege that Carlsen knew his purported statements were false, had an awareness of their probable falsity, or entertained serious doubts as to their truth.  *See Cronin v. Pelletier*, 2018 WL 3965004, at *3 (Conn. Super. Ct. July 26, 2018) (dismissing claim for lack of actual malice because there was no allegation that "the defendant *knew* that his pejorative remarks were untrue when he mailed them or did so without

regard to truth or falsity" and explaining that even allegations of "*intent* to cause consternation, hurt feelings, and tarnish the plaintiffs' reputation . . . are insufficient in the absence of an allegation that the defendant did not believe in his assessments" (emphasis in original)).

Niemann claims that Carlsen acted "maliciously" and that he "falsely accus[ed]" Niemann of cheating at the Sinquefield Cup, *e.g.*, SAC ¶¶ 8, 15, 83, 99, 123, 125, but he does not allege—and cannot allege—any facts to support these conclusory assertions.[9]  *See Chadha*, 818 A.2d at 795 ("Although the plaintiff did allege quite clearly that the defendants acted maliciously . . . those allegations are conclusory.").  Highlighting the lack of any such allegations, Niemann relies exclusively on post hoc sources such as the claimed lack of "statistical evidence" of cheating and statements by Sinquefield Cup organizers that there were "no indications of cheating."  *See* SAC ¶¶ 157–62.  These after-the-fact sources could not have informed Carlsen's personal impressions and evaluation of Niemann's play during the Sinquefield Cup game.  *See Woodcock v. J. Pub. Co.*, 646 A.2d 92, 97 (Conn. 1994) ("Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false.").  Niemann also relies on the non sequitur that "Carlsen knows full well when he has played a game of chess poorly."  *Id*. ¶ 84.  But poor play by one competitor does not mean his opponent was not cheating.  Nor do the Sinquefield Cup organizers' alleged subsequent statements prove that Niemann did not cheat.  To the contrary,

---

[9] The Court need not accept as true Niemann's legal conclusions that Carlsen's purported chant of "Ukse Hans" and references to Dlugy being Niemann's "mentor" and "doing a great job" would have been understood to be accusing Niemann of cheating in the Sinquefield Cup.  SAC ¶¶ 126, 135; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that courts do not need to accept as true "a legal conclusion couched as factual allegation" (internal quotation and citation omitted)).  Contrary to what Niemann asserts, these phrases "leave[] open the interpretation to the listener or reader's imagination [and] cannot, as required by the law of defamation, charge a verifiably false fact."  *Gomez v. Larson*, 1999 WL 417819, at *6 n.5 (Conn. Super. Ct. June 8, 1999).  In any event, even if a reasonable listener would have understood them to be referring to Niemann cheating in the Sinquefield Cup, they are not actionable because Niemann does not and cannot allege actual malice.

Niemann concedes in his Second Amended Complaint that the types of anti-cheating measures that could have helped to rule out cheating were *not* in place during his game with Carlsen.  *See* SAC ¶ 87 (alleging that it was only after Niemann's game with Carlsen that the Sinquefield Cup instituted a 15-minute broadcast delay and other anti-cheating measures).

Further, Niemann's allegations demonstrate that each of Carlsen's allegedly defamatory statements were personal impressions.  Niemann acknowledges that he played Carlsen prior to the Sinquefield Cup game, meaning that Carlsen had a history with Niemann informing his evaluation of Niemann's performance at their Sinquefield Cup game.  *See id.* ¶ 7.  And even if the statements Carlsen allegedly made were in fact accusations that Niemann cheated in the Sinquefield Cup, the Second Amended Complaint illustrates that those statements have a basis in fact: Niemann concedes that he has cheated in the past, and he incorporates by reference documents in which he admits that he has previously been accused of cheating by others in the chess community.  *See id.* ¶ 109; *see also* Chess.com Report at 7, Image 5.

Finally, Niemann's bald assertions that Carlsen acted with "reckless disregard," *see* SAC ¶¶ 211, 217, are insufficient to plead actual malice.  *See, e.g.*, *Primrose*, 2022 WL 3712636, at *13 (holding that "the plaintiff's conclusory allegations of willfulness, wantonness, and recklessness aside, the record is devoid of evidence of actual malice on the part of the defendant").  And they are particularly implausible given the numerous facts alleged by Niemann undercutting his insistence that Carlsen somehow knew his allegedly defamatory statements were untrue.  On the contrary, Niemann's own allegations show that he is trying to hold Carlsen liable for sincerely held beliefs that Carlsen formed based on his own interactions with Niemann and Niemann's reputation.

## C.     The Allegedly Defamatory Statements Are Not Actionable In Any Event

Niemann's failure to identify specific defamatory statements or plausibly allege actual malice is, on its own, grounds to dismiss his defamation claims.  But these claims also fail for the separate reason that none of the allegedly defamatory statements is actionable.  While Niemann's Second Amended Complaint obfuscates the bases of his grievances, he appears to complain that Carlsen defamed him by:

- Withdrawing from the Sinquefield Cup and resigning the Julius Baer Generation Cup game.  SAC ¶¶ 91, 129;

- Expressing concerns about Niemann's cheating to Khodarkovsky, a chess tournament official, at the Sinquefield Cup.  *Id.* ¶¶ 83, 87; and

- Expressing his opinion that Niemann cheated at the Sinquefield Cup.  *Id.* ¶¶ 88–89, 123–26, 142–44.

Even if true, none of these complaints gives rise to a defamation claim.

### 1.     Niemann Cannot Assert Defamation Claims Based on Conduct

First, as a matter of law, Niemann's allegations regarding Carlsen's resignations in various chess tournaments cannot support a defamation claim.  Under Connecticut law, defamation is an oral or written statement.  *See Mercer v. Cosley*, 955 A.2d 550, 561 (Conn. App. Ct. 2008) ("Defamation is comprised of the torts of libel and slander. . . .  Slander is oral defamation. . . .  Libel is written defamation.").  Accordingly, to the extent Niemann's defamation claims are premised on conduct such as Carlsen's tournament or game resignations, those claims fail.  *See Martin*, 2000 WL 872464, at *17 (no recovery for libel resulting "from the editorial choice of layout" of a media communication).

### 2.     Carlsen's Alleged Statements to
### Tournament Officials Are Protected by Qualified Privilege

Second, any defamation claims based on Carlsen's alleged statements to tournament

officials are protected by qualified privilege.  Qualified privilege exists where, as here, there is

"(1) an interest to be upheld, (2) a statement limited in scope to this purpose, (3) good faith, (4) a

proper occasion, and (5) a publication in a proper manner to proper parties only."  *Stefanoni v.

Darien Little League, Inc.*, 2014 WL 3360571, at *3 (Conn. Super. Ct. May 22, 2014).

Indeed, even assuming that Carlsen in fact expressed concerns about Niemann's cheating

to Khodarkovsky, the Executive Director of the Grand Chess Tour, such statements would not be

actionable.  Niemann's own allegations show that both Carlsen and Khodarkovsky had a

common interest in preventing cheating at the Sinquefield Cup, which is one of the Grand Chess

Tour's featured events.  *See* SAC ¶¶ 83 (alleging that Carlsen spoke to Khodarkovsky about

cheating during the Sinquefield Cup game with Niemann); *id.* ¶ 87 (alleging that Carlsen asked

Khodarkovsky to "dramatically enhance . . . anti-cheating measures").  The alleged statements

to Khodarkovsky are thus protected by qualified privilege.  *See Stefanoni*, 2014 WL 3360571,

at *10 (finding that a Little League's comments were protected by qualified privilege due to

"an interest in informing Little League participants and their parents that the plaintiff's

comments [that the Little League had demoralized her son] were considered incorrect").

Niemann pleads no facts that would defeat qualified privilege—and as discussed earlier,

Niemann has failed to, and cannot, plausibly allege actual malice.  *See supra* Part II.B.

Accordingly, to the extent Niemann's defamation claims are premised on Carlsen's

alleged communications with chess tournament officials, they fail as a matter of law.

3.    Carlsen's Remaining Alleged Statements
      <u>Are Non-Actionable Because They Reflect Opinions or Are True</u>

Finally, Niemann's defamation claims should be dismissed because the allegedly

defamatory statements at most amount to non-actionable opinions or are true.

As a matter of law, opinions, even if alleged to be negative or harmful, cannot form the

basis for a defamation claim.  *See Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543,

551–52 (D. Conn. 1996) (applying Connecticut law); *see also Noble*, 2021 WL 830014, at *9

(dismissing defamation claim based on defendant's statement that an agreement was "probably

illicit" because "the use of the word 'probably' inherently does not suggest a fact but, rather, is

more like a 'personal comment about another's conduct' constituting an opinion" (citation

omitted)).  As discussed above, Niemann's allegations demonstrate that Carlsen's allegedly

defamatory statements constituted his own personal impressions based on his firsthand

observations and what was already known in the chess community.  *See supra* Part II.B.

Accordingly, Niemann's allegations regarding Carlsen's purported statements cannot support a

defamation claim as a matter of law.  *See Colon v. Town of W. Hartford*, 2001 WL 45464, at *4

(D. Conn. Jan. 5, 2001) (applying Connecticut law and explaining that "an opinion that appears

to be in the form of a factual statement may still be an opinion if it is clear from the context that

the maker is not intending to assert another objective fact but only his personal comment on the

facts" (internal quotations and citation omitted)).

    Truthful statements also cannot be defamatory.  *See Goodrich v. Waterbury Republican-

Am., Inc.*, 448 A.2d 1317, 1322 (Conn. 1982) ("[T]he rule in Connecticut is that the truth of an

allegedly [defamatory] statement of fact provides an absolute defense.").  As Niemann

acknowledges, he has cheated in chess before.  SAC ¶ 109.  Accordingly, even if Niemann were

correct that "Ukse Hans" means "Cheater Hans" in Norwegian and that Carlsen's utterance of

those words to some unspecified listener in Austria somehow injured him, *id.* ¶ 126, it cannot be

defamatory because it is literally true that Niemann has cheated.

## III.  <u>Niemann Has Not Plausibly Alleged A Claim For Tortious Interference (Count V)</u>

    Like his defamation claims, Niemann fails to adequately allege a claim for tortious

interference.  A tortious interference claim requires "(1) a business relationship between the

plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff [to] suffer[] actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1273 (Conn. 2000). Niemann fails to allege the second and third of these required elements.

First, Niemann has not alleged that Carlsen had actual knowledge of any alleged contracts or business relationships Niemann might have. *Cf. S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*, 2015 WL 4509425, at *11 (D. Conn. July 24, 2015) (under Connecticut law, an intentional interference with contractual relations claim requires "actual knowledge of the particular contractual provision alleged to have been violated" (internal quotations and citation omitted)). Nowhere in the Second Amended Complaint does Niemann allege that Carlsen had actual knowledge of, for example, Niemann's opportunity to attend the Tata Steel Chess Tournament or his desire to play against Keymer. *See* SAC ¶¶ 193–94. Niemann cannot avoid his obligation to plead actual knowledge by pointing to Carlsen's position as a "fellow[] member[] of the Competitive Chess Market," *id.* ¶ 236, because Carlsen's "general knowledge of the industry cannot substitute for actual knowledge of a specific contract." *S. Home Care Servs.*, 2015 WL 4509425, at *11 (D. Conn. July 24, 2015) (internal quotations and citation omitted). This alone is fatal to Niemann's tortious interference claim. *See Butler Am., LLC v. Ciocca*, 2020 WL 6781488, at *3–4 (Conn. Super. Ct. Mar. 12, 2020) (dismissing tortious interference claims because plaintiff's allegations as to knowledge of the contracts or expectancies were "mere legal conclusions that are unsupported by other facts alleged").

Second, Niemann has not adequately alleged that Carlsen had any intent to interfere with any contracts or business relationships. To allege an intent to interfere, a plaintiff must plead "at least some improper motive or improper means. . . . In other words, the [plaintiff] bears the

burden of alleging . . . lack of justification on the part of the" defendant for interfering.

*ZeeBaaS, LLC v. Koelewyn,* 2012 WL 2327693, at *4 (D. Conn. June 19, 2012) (internal

quotations and citations omitted); *see id.* (applying Connecticut law and granting motion to

dismiss tortious interference claim where the plaintiffs' complaint was "devoid of any factual

allegations which support the reasonable inference that [defendant] had an improper motive or

employed improper means").

Niemann's only factual allegations about Carlsen's allegedly "improper motive" are that

Carlsen is purportedly angry that Niemann won a single game against him at the Sinquefield

Cup, SAC ¶ 122, and does not "want to play against people" who, like Niemann, "have cheated

repeatedly in the past." *Id.* ¶ 144 (emphasis omitted).  Niemann's legal conclusions about

supposedly nefarious motivations cannot transform an objectively rational opinion into an

improper motive.  *See Metcoff v. Lebovics*, 2 A.3d 942, 949 (Conn. App. Ct. 2010) (explaining

that "[c]onclusory allegations of improper motivation are not sufficient" and affirming dismissal

of tortious interference claim where plaintiffs ascribed sinister motives to conduct taken in the

normal course of business).  And Niemann's claims that Carlsen engaged in "improper means"

by defaming him or violating antitrust law, *see* SAC ¶ 237, illustrate that his tortious interference

claim is merely derivative of his failed defamation and antitrust claims.  *See LEGO A/S v. ZURU,*

*Inc.*, 2020 WL 13145135, at *10 (D. Conn. Apr. 22, 2020) (applying Connecticut law and

dismissing derivative interference claim because plaintiff failed to state underlying claim).

Finally, Niemann has not alleged any factual basis for his contention that Carlsen's

alleged conduct was the proximate cause of his purported injury, such as being disinvited from

tournaments and a game against Keymer.  *See Kopperl v. Bain*, 23 F. Supp. 3d 97, 110 (D. Conn.

2014) (applying Connecticut law and explaining that "to succeed on a claim of tortious

interference . . . the plaintiff must . . . show [at least] that the defendant's actions proximately caused a loss to the plaintiff's business" (citation omitted)).  Instead, Niemann supplies several other—and more likely—causes for the rescinded tournament invitations, including his own admissions of past cheating.  *See* SAC ¶ 109.  The Court should dismiss Niemann's tortious interference claim.

## IV.    Niemann Has Not Plausibly Alleged A Claim For Civil Conspiracy (Count VI)

This Court should dismiss Niemann's civil conspiracy claim because he has failed to adequately allege an underlying tort, as is required to state a claim for civil conspiracy.  *See Litchfield Asset Mgmt. Corp. v. Howell*, 799 A.2d 298, 306 (Conn. App. Ct. 2002) ("[W]here the plaintiff is unable to establish the underlying cause of action . . . the cause of action for conspiracy to [commit the underlying action] must also fail.").

Niemann also has failed to sufficiently allege the required elements for civil conspiracy: "(1) a combination between two or more persons, (2) to do a criminal or unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Kopperl*, 23 F. Supp. 3d at 119.  He makes no allegations of an agreement or combination among the defendants, relying entirely on conclusory statements that provide no specificity as to the purported actions of any of them.  *See* SAC ¶ 224 (referencing an undescribed "agreement to ban and blacklist"); *id.* ¶¶ 242–43.  In fact, Niemann does not allege that any or all of the defendants were in communication about their alleged statements at all.

Niemann provides only two types of allegations in his failed effort to conjure an agreement: the timing of defendants' asserted acts, and Chess.com purportedly sharing information about Niemann and Dlugy with Carlsen and Nakamura.  First, Niemann alleges that his "sudden ban" by Chess.com was "at the precise time that Carlsen accused Niemann of

cheating against him," and that Nakamura's commentary came after Carlsen's tweet regarding his withdrawal from the Sinquefield Cup.  *Id.* ¶¶ 102–04.  Notwithstanding Niemann's assertion that "there would be no reason for Chess.com to suddenly ban Niemann immediately after he defeated Carlsen," *id.* ¶ 102, the allegedly close timing of these unilateral actions does not amount to a plausible allegation of coordination or agreement among the defendants.  Nor does Niemann's conclusory statement that the ban "was specifically designed" to lend Carlsen's statements "instant credibility" come close to alleging the existence of an agreement; Niemann does not even allege that Carlsen or Chess.com were in contact around this time at all.  *Id.*; *see also Campbell v. Porter,* 275 A.3d 684, 699–700 (Conn. App. Ct. 2022) (declining to infer conspiratorial agreement where defendants took unilateral actions).

Second, Niemann alleges that Chess.com shared "private and undisclosed" information about both Niemann and Dlugy with Carlsen, who used it to "falsely associat[e] Niemann's play with Dlugy"—"a professional chess player . . . rumored to have cheated in online games on Chess.com."  SAC ¶¶ 134–36, 140.  But Niemann also alleges that the rumors of Dlugy's cheating were neither private nor undisclosed, *id.* ¶ 135, and sharing information does not suffice to allege the existence of an agreement in any event.  *See Campbell*, 275 A.3d at 699–700 (explaining that "[a]n allegation that one defendant merely took action based on a request of, and false information provided by, another defendant" is insufficient to allege an agreement).  Niemann's failure to allege any facts supporting the existence of an agreement among the defendants dooms his civil conspiracy claim.

## V.  **Niemann Has Not Plausibly Alleged Any Antitrust Claims (Counts III and IV)**

As discussed in Section I of the Chess.com Motion, which is incorporated by reference, Niemann's federal antitrust claims fail as a matter of law.  First, Niemann's Section 1 claim is nothing more than an artful repackaging of his defective defamation and related state-law claims,

which fails for at least the three independent reasons discussed in the Chess.com Motion: Niemann does not plausibly allege: (1) an agreement among the defendants; (2) the threshold requirement of antitrust injury; or (3) any purported agreement that "unreasonably restrained trade" under either the per se rule or the rule of reason.  Second, Niemann fails to plead any of the essential elements of a Section 2 claim, including a well-defined market.  Indeed, Niemann's apparent claim that Carlsen—an individual player—has the market power or intent to monopolize a purported market of "[p]rofessional chess tournaments and online recreational chess platforms," SAC ¶ 47, is nonsensical.  Niemann has not alleged that Carlsen owns any share of this so-called market and "[w]ithout any share in the relevant market as described by plaintiff[], there can be no inference that [a] defendant[] hold[s] sufficient economic power in that market to create a dangerous probability of monopoly." *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 513 (3d Cir. 1994) (emphasis omitted).  The Court should dismiss Niemann's antitrust claims and follow "the Eighth Circuit and district courts within [this] circuit[, which] consistently dismiss antitrust claims at the pleading stage where a plaintiff fails to adequately allege a viable relevant market." *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 885 (D. Minn. 2017) (listing cases).

## CONCLUSION

For the foregoing reasons, the Court should dismiss each of Niemann's six claims against Carlsen.  Because all of Niemann's claims against Carlsen suffer from fundamental inadequacies that Niemann has tried and failed to cure, Niemann's claims should be dismissed with prejudice. *See Knowles*, 2 F.4th at 758.  Carlsen also respectfully requests that this Court award him his attorneys' fees and costs in connection with this Motion under Connecticut's anti-SLAPP statute. Conn. Gen. Stat. § 52-196a(f)(1).

Dated: January 24, 2023

Respectfully submitted,

**STINSON LLP**

**AXINN, VELTROP & HARKRIDER LLP**

J. Nicci Warr (State Bar No. 59975)
Jacob R. Schlueter (State Bar No. 73929)
7700 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105
Office: 314.259.4570
Email: nicci.warr@stinson.com
Email: jacob.schlueter@stinson.com

By:  /s/ Craig M. Reiser
Craig M. Reiser, admitted *pro hac vice*
Denise L. Plunkett, admitted *pro hac vice*
Eva H. Yung, admitted *pro hac vice*
114 West 47th Street
New York, New York 10036
Office: 212.728.2200
Fax: 212.728.2201
Email: creiser@axinn.com
         dplunkett@axinn.com
         eyung@axinn.com

John M. Tanski, admitted *pro hac vice*
Caroline P. Boisvert, admitted *pro hac vice*
90 State House Square
Hartford, Connecticut 06103
Office: 860.275.8100
Fax: 860.275.8101
Email: jtanski@axinn.com
         cboisvert@axinn.com

*Counsel for Defendant Magnus Carlsen*

## <u>CERTIFCATE OF SERVICE</u>

I hereby certify that on January 24, 2023, the foregoing was filed electronically using the CM/ECF system which will automatically provide notice to all attorneys of record by electronic means.

Dated: January 24, 2023

Respectfully submitted,

**AXINN, VELTROP & HARKRIDER LLP**

By:  /s/ Craig M. Reiser
Craig M. Reiser, admitted *pro hac vice*
114 West 47th Street
New York, New York 10036
Office: 212.728.2200
Fax: 212.728.2201
Email: creiser@axinn.com

*Counsel for Defendant Magnus Carlsen*