## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |
|---|---|
| HANS MOKE NIEMANN,<br><br>Plaintiff,<br><br>v.<br><br>SVEN MAGNUS ØEN CARLSEN A/K/A MAGNUS CARLSEN, PLAY MAGNUS AS D/B/A PLAY MAGNUS GROUP, CHESS.COM, LLC, DANIEL RENSCH A/K/A "DANNY" RENSCH, AND HIKARU NAKAMURA,<br><br>Defendants. | Case No. 4:22-cv-01110-AGF<br><br>Hon. Audrey G. Fleissig |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT CHESS.COM, LLC'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT AND/OR TO COMPEL ARBITRATION

Nima H. Mohebbi (# 275453CA)
Sarah F. Mitchell (# 308467CA)
Michael A. Hale (# 319056CA)
**LATHAM & WATKINS LLP**
355 S. Grand Ave., Suite 100
Los Angeles, CA 90071
Tel: (213) 485-1234
*nima.mohebbi@lw.com*
*sarah.mitchell@lw.com*
*michael.hale@lw.com*

Jeffrey B. Jensen (# 46745MO)
Kate Ledden (# 66026MO)
**HUSCH BLACKWELL LLP**
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel: (314) 480 1500
*jeff.jensen@huschblackwell.com*
*kate.ledden@huschblackwell.com*

Jamie L. Wine (# 4529251NY)
Blake E. Stafford (# 888324775DC)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
*jamie.wine@lw.com*
*blake.stafford@lw.com*

Derek Teeter (# 59031MO)
Spencer Tolson (# 74467MO)
**HUSCH BLACKWELL LLP**
4801 Main, Suite 1000
Kansas City, MO 64112
Tel: (816) 983-8000
*derek.teeter@huschblackwell.com*
*spencer.tolson@huschblackwell.com*

*Counsel for Defendant Chess.com, LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................1

BACKGROUND ..................................................................................................2

    A.    Niemann Is An Admitted Cheater On Chess.com's Platform. ...............................2

    B.    Chess.com Privately Revokes Niemann's CGC Invitation And Closes His Chess.com Account.....................................................................................3

    C.    Niemann Takes The Controversy With Chess.com Public......................................4

    D.    Chess.com Issues The 72-Page Report Following A Detailed Investigation........................................................................................5

LEGAL STANDARD............................................................................................6

ARGUMENT......................................................................................................6

I.    NIEMANN'S ANTITRUST CLAIMS SHOULD BE DISMISSED ...............................6

    A.    Niemann Fails To Allege Antitrust Injury. .....................................................6

    B.    Niemann Fails To Allege The Elements Of A Section 1 Claim. .............................8

        1.    Niemann Fails To Plausibly Allege The Existence Of An Agreement.................................................................................8

        2.    Niemann Fails To Plausibly Allege An Unreasonable Restraint Of Trade In A Well-Defined Market. ..............................................10

    C.    Niemann Fails To Allege The Elements Of A Section 2 Claim. ...........................12

II.    CONNECTICUT'S ANTI-SLAPP STATUTE BARS NIEMANN'S TORT CLAIMS ......................................................................................................15

III.    NIEMANN'S STATE LAW TORT CLAIMS FAIL ON THE MERITS........................15

    A.    Niemann's Defamation Claims Fail...............................................................16

        1.    Niemann Fails To Allege Actionable Statements......................................16

            a.    The September 8, 2022 Tweet Is Not Actionable...........................17

            b.    Nothing In The Chess.com Report Is Actionable. ..........................18

            c.    The Challenged News Articles Are Not Actionable.......................22

2.    Niemann Fails To Adequately Allege Actual Malice. ................................ 23

a.    Niemann Is A Public Figure. .......................................... 23

b.    Niemann Fails To Satisfy The Actual Malice Standard. .............. 25

B.    Niemann's Tortious Interference Claim Fails ........................................ 26

C.    Niemann's Derivative Civil Conspiracy Claim Fails. ........................................... 28

IV.    NIEMANN'S NEW BREACH OF CONTRACT CLAIM FAILS .................................. 29

CONCLUSION .................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*100 Mount Holly Bypass v. Axos Bank*,
    2021 WL 3172024 (D. Utah July 27, 2021) ............................................................29

*Am. Cable Techs. Servs., Inc. v. AT&T Corp.*,
    140 F. Supp. 2d 1026 (W.D. Mo. 2001) ..............................................................28

*Am. W. Bank Members, L.C. v. State*,
    342 P.3d 224 (Utah 2014) ....................................................................................29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................6, 26

*ASi Indus. GmbH v. MEMC Elec. Materials, Inc.*,
    2006 WL 8458683 (E.D. Mo. Nov. 1, 2006) ......................................................11

*Aviation Charter, Inc. v. Aviation Rsch. Grp./US*,
    416 F.3d 864 (8th Cir. 2005), *abrogated on other grounds by Syngenta Seeds,*
    *Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58 (8th Cir. 2014) .....................................18

*Barry v. Time, Inc.*,
    584 F. Supp. 1110 (N.D. Cal. 1984) ...................................................................24

*Bassett v. NCAA*,
    528 F.3d 426 (6th Cir. 2008) ................................................................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................6, 8, 9, 14

*Britt v. Unknown Officers*,
    2019 WL 2453763 (D. Conn. June 12, 2019) .....................................................16

*Brookins v. Int'l Motor Contest Ass'n*,
    219 F.3d 849 (8th Cir. 2000) .........................................................................9, 10

*Butler Am., LLC v. Ciocca*,
    2020 WL 6781488 (Conn. Super. Ct. Mar. 12, 2020) .........................................27

*Campbell v. Citizens for an Honest Gov't, Inc.*,
    255 F.3d 560 (8th Cir. 2001) ..............................................................................25

*Castle Rock Rem., LLC v. Better Bus. Bur. of Greater St. Louis, Inc.*,
    354 S.W.3d 234 (Mo. Ct. App. 2011) .............................................................27, 28

*Chapman v. J. Concepts, Inc.*,
    528 F. Supp. 2d 1081 (D. Haw. 2007), *aff'd on other grounds*, 401 F. App'x
    243 (9th Cir. 2010).................................................................................................24

*Daley v. Aetna Life & Casualty Co.*,
    734 A.2d 112 (Conn. 1999) ....................................................................................28

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
    136 F.3d 554 (8th Cir. 1998) ............................................................................10, 11

*E-Z Dock, Inc. v. Shoremaster, Inc.*,
    2006 WL 1153901 (W.D. Mo. Apr. 25, 2006) ........................................................11

*Envtl. Energy Ptnrs., Inc. v. Siemens Bldg. Techs., Inc.*,
    178 S.W.3d 691 (Mo. Ct. App. 2005)......................................................................27

*Ferguson Med. Grp., L.P. v. Mo. Delta Med. Ctr.*,
    2006 WL 2225454 (E.D. Mo. Aug. 2, 2006)...........................................................11

*Fraser v. Franco*,
    2022 WL 4367576 (D. Conn. Sept. 21, 2022) ........................................................16

*Fuqua Homes, Inc. v. Beattie*,
    388 F.3d 618 (8th Cir. 2004) ..................................................................................15

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)................................................................................................23

*Gillick v. Elliott*,
    1 F.4th 608 (8th Cir. 2021) .......................................................................................2

*Gleason v. Smolinski*,
    125 A.3d 920 (Conn. 2015) ....................................................................................16

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)................................................................................................25

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*,
    761 A.2d 1268 (Conn. 2000) ..................................................................................27

*Hogan v. Winder*,
    2012 WL 4356326 (D. Utah Sept. 24, 2012), *aff'd*, 762 F.3d 1096 (10th Cir. 2014) ............20

*Houlihan v. Offerman & Co.*,
    31 F.3d 692 (8th Cir. 1994) ....................................................................................30

*King v. Union Station Holdings, LLC*,
    2012 WL 5351598 (E.D. Mo. Oct. 30, 2012).........................................................21

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)................................................................................................10

iv

*LEGO A/S v. ZURU, Inc.*,
  2020 WL 13145135 (D. Conn. Apr. 22, 2020) .......................................................................27

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
  884 F.2d 504 (9th Cir. 1989) .............................................................................................7

*Litchfield Asset Mgmt. v. Howell*,
  799 A.2d 298 (Conn. App. Ct. 2002).................................................................................28

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
  573 F. Supp. 2d 1125 (E.D. Ark. 2008), *aff'd*, 591 F.3d 591 (8th Cir. 2009) .......................13

*Little Rock Cardiology Clinic PA v. Baptist Health*,
  591 F.3d 591 (8th Cir. 2009) .....................................................................................11, 14

*Mahaska Bottling Co. v. PepsiCo Inc.*,
  271 F. Supp. 3d 1054 (S.D. Iowa 2017) .............................................................................14

*Martin v. Am. Kennel Club, Inc.*,
  697 F. Supp. 997 (N.D. Ill. 1988) .......................................................................................7

*Midwest Commc'ns v. Minn. Twins, Inc.*,
  779 F.2d 444 (8th Cir. 1985) ..........................................................................................6, 7

*Miljas v. Greg Cohen Promotions, LLC*,
  536 F. Supp. 3d 409 (S.D. Iowa 2021) ........................................................................23, 24

*Morgan v. Ponder*,
  892 F.2d 1355 (8th Cir. 1989) ......................................................................................13, 14

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)...........................................................................................................23

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
  951 F.3d 952 (8th Cir. 2020) ..................................................................................... *passim*

*NetScout Sys., Inc. v. Gartner, Inc.*,
  223 A.3d 37 (Conn. 2020) ..........................................................................16, 18, 20, 21

*Nitro Distrib., Inc. v. Alticor, Inc.*,
  2008 WL 11384211 (W.D. Mo. Feb. 8, 2008) ....................................................................27

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998)...........................................................................................................10

*Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*,
  829 F.3d 576 (8th Cir. 2016) ......................................................................16, 18, 20, 21

*Park Ridge Assocs. v. U.M.B. Bank*,
  613 S.W.3d 456 (Mo. Ct. App. 2020)...........................................................................28, 29

*Process Controls Int'l, Inc. v. Emerson Process Mgmt.*,
    753 F. Supp. 2d 912 (E.D. Mo. 2010) ......................................................................8, 13, 14

*Restored Images Consulting, LLC v. Dr. Vinyl & Assocs., Ltd.*,
    2015 WL 13729924 (W.D. Mo. Mar. 10, 2015) ....................................................................30

*Robbins v. Becker*,
    794 F.3d 988 (8th Cir. 2015) ......................................................................................................8

*Rosemann v. Sigillito*,
    877 F. Supp. 2d 763 (E.D. Mo. 2012) ...................................................................................30

*Schatz v. Rep. State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012) ................................................................................................25, 26

*Schuler v. McGraw-Hill Cos., Inc.*,
    989 F. Supp. 1377 (D.N.M. 1997), *aff'd*, 145 F.3d 1346 (10th Cir. 1998) ............................22

*Smith v. Humane Soc'y of U.S.*,
    519 S.W.3d 789 (Mo. 2017) ....................................................................................................20

*Southridge Partners II Ltd. P'ship v. SND Auto Grp., Inc.*,
    2019 WL 6936727 (D. Conn. Dec. 19, 2019) .......................................................................28

*St. Louis Convention & Visitors Comm'n v. NFL*,
    154 F.3d 851 (8th Cir. 1998) ......................................................................................................7

*Stockley v. Joyce*,
    2019 WL 630049 (E.D. Mo. Feb. 14, 2019), *aff'd*, 963 F.3d 809 (8th Cir. 2020) ............17, 26

*Stockley v. Joyce*,
    963 F.3d 809 (8th Cir. 2020) ...................................................................................................16

*Strada v. Ct. Newspapers, Inc.*,
    477 A.2d 1005 (Conn. 1984) ...................................................................................................20

*Trone Health Servs., Inc. v. Express Scripts Holding Co.*,
    2019 WL 1207866 (E.D. Mo. Mar. 14, 2019), *aff'd*, 974 F.3d 845 (8th Cir. 2020) ..............12

*Trone Health Servs., Inc. v. Express Scripts Holding Co.*,
    974 F.3d 845 (8th Cir. 2020) .............................................................................................12, 14

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018) ...............................................................................................25

*Wellington Sys. v. Redding Grp.*,
    714 A.2d 21 (Conn. App. Ct. 1998) ........................................................................................27

*Zimmerman v. Al Jazeera Am., LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017) ........................................................................................24

*Zipper v. Health Midwest*,
   978 S.W.2d 398 (Mo. Ct. App. 1998) ...................................................................27

*Zupa v. Zupa*,
   2018 WL 3518552 (Conn. Super. Ct. June 20, 2018) ...........................................28

## STATUTES

15 U.S.C.
   § 1.......................................................................................................................6, 8
   § 2..........................................................................................................................6

Conn. Gen. Stat.
   § 52-196a ...............................................................................................................15
   § 52-196a(f)(1).......................................................................................................30

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ........................................................................................16, 23

## <u>INTRODUCTION</u>

Since its inception, this lawsuit has been nothing more than a publicity stunt designed to amplify Plaintiff Hans Niemann's public profile—a fact made even more obvious by the filing of his Second Amended Complaint ("SAC") (ECF No. 75).  Niemann is an admitted cheater, and a recent investigation by Defendant Chess.com, LLC ("Chess.com") confirmed that he cheated in dozens of online games played on its website.  To preserve the integrity of its platform and the game of chess, Chess.com privately closed Niemann's account, withdrew his invitation to the Chess.com Global Championship tournament ("CGC"), and gave him ample opportunity to explain his behavior.  But Niemann chose to instead make this a public spectacle and, when that backfired, filed this suit.  Like his two complaints before it, the SAC is long on rhetoric but devoid of legal merit.  The Court should dismiss the SAC.

*First*, Niemann's attempt to turn his grievances with Defendants into federal antitrust claims (Counts III-IV) is frivolous.  The claims rest on conspiracy theories conjured by Niemann to explain actions he simply did not like.  Only a sinister agreement, Niemann insists, could explain Chess.com's decision to remove him from its website and future prize events—not, say, his public admissions of cheating on Chess.com's platform or Chess.com's thorough and objective examination of his suspicious gameplay.  Unsurprisingly, Niemann's antitrust claims unravel upon minimal scrutiny.  He fails to allege actual facts showing an unlawful agreement among Defendants, and he also fails to allege harm to competition within a well-defined market.  Unwilling to abandon his claims but also unable to fix them, Niemann's SAC adds a new and unfounded "attempted-monopolization" claim, revealing that he has no legitimate antitrust theory.

*Second*, Niemann's state law claims for defamation, tortious interference, and conspiracy (Counts I-II, V-VI) are equally meritless.  Connecticut's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute bars these claims, which seek to punish Chess.com for

protected speech, and the claims fail on their own terms.  As for Niemann's defamation claims, he continues his failure to plausibly allege the objective falsity of any of the supposedly defamatory statements by Chess.com—most of which derive from Chess.com's analysis of Niemann's behavior.  And he fails to surmount the high bar of alleging that the challenged statements were made with "actual malice"—*i.e.*, with knowledge of, or reckless disregard for, their falsity.  Niemann's tortious interference and conspiracy claims are entirely derivative of his deficient antitrust and defamation claims, and thus fall with those claims.

*Finally*, Niemann's newly-added breach of contract claim (Count VII) fails because it ignores the plain text of the agreement itself and, in any event, is the subject of an enforceable arbitration agreement.  This claim, like the rest, should be dismissed.

## BACKGROUND

### A.   Niemann Is An Admitted Cheater On Chess.com's Platform.

Chess.com operates a popular platform for online recreational chess, where more than one hundred million users play over ten million chess games each day.  (SAC ¶ 38.)  Niemann has been one of those users—and one of the most famous.  (*See id.* ¶¶ 62-66.)  A "19-year old, self-taught chess prodigy," Niemann achieved the title of "chess Grandmaster"—the highest title awarded by FIDE, the international governing body of chess.  (*Id.* ¶¶ 1-2.)  By October 2022, FIDE ranked Niemann as the 40th best player in the world.  (*Id.* ¶ 2.)

But Niemann is also an admitted cheater.  (*See id.* ¶ 109.)  As Chess.com detailed in an October 2022 report, it first closed Niemann's account in August 2020 due to suspected cheating on its platform.  (D. Rensch Jan. 24, 2023 Decl., Ex. 1 at 5-7 (hereinafter, the "Report").)[1]

---

[1] The Report is repeatedly referenced and quoted in the SAC, and it is a central part of Niemann's claims against Chess.com.  (*See* SAC ¶¶ 172-77, 179-80.)  It is therefore "necessarily embraced by [Niemann's SAC]" and part of "the pleadings" that the Court may consider in resolving this motion.  *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 955 (8th Cir. 2020); *see Gillick v. Elliott*, 1 F.4th 608, 610 n.2 (8th Cir. 2021).  The same is true of the agreement between Chess.com and Niemann concerning the CGC (*see* SAC ¶¶ 100, 247), and a news article from The Guardian (*see id.* ¶ 114), which are also being submitted with this motion.

Chess.com banned him from online prize events "through the end of [2020]."  (*Id.* at 7.)  But, as a measure of goodwill, Chess.com gave Niemann "a second chance" and allowed him to resume playing after 2020, as long as he acknowledged his cheating.  (*Id.*)  At the time, Niemann agreed "[t]hat is more than completely fair."  (*Id.*)

### B.    Chess.com Privately Revokes Niemann's CGC Invitation And Closes His Chess.com Account.

In September 2022, Niemann defeated Magnus Carlsen—currently the highest ranked chess player in history—in an in-person, FIDE-sanctioned chess game at the Sinquefield Cup.  (*Id.* ¶¶ 4, 6-7, 82.)  After the game, Carlsen withdrew from the Cup.  (*Id.* ¶¶ 9, 88.)  Carlsen then posted on Twitter that he had "withdrawn" and included a link to a YouTube video in which a soccer manager stated: "If I speak, I am in big trouble."  (*Id.* ¶¶ 9, 88-89.)

In order to preserve the integrity of its service, Chess.com reevaluated its decision to invite Niemann to play at the 2022 CGC, which was scheduled to occur days later.  (Report at 1, 3-4.)  As an invitee to the CGC, Niemann signed an agreement with Chess.com concerning the tournament (the "CGC Agreement"), which incorporated the CGC Event Official Rules ("CGC Rules").  (SAC ¶¶ 100, 247; *see* D. Rensch Jan. 24, 2023 Decl., Ex. 2 (CGC Agreement); D. Rensch Jan. 24, 2023 Decl., Ex. 3 (CGC Rules).)   In signing the agreement, Niemann "acknowledge[d] reading and agreeing to the terms and conditions of the [CGC] Rules" (CGC Agreement § B.6.6; *see also id.* at 5), under which "*Chess.com may remove any Player from the event at its sole discretion*."  (CGC Rules § 4 (emphasis added).)[2]

On September 5, 2022, Chess.com privately notified Niemann that it was rescinding his invitation to the CGC and tendering $5,000, the base amount for having qualified.  (SAC ¶ 99; *see* Report at 2.)   Chess.com also informed Niemann that it was closing his Chess.com account.

---

[2] Niemann also agreed to submit any dispute relating to the CGC Agreement to an alternative dispute resolution ("ADR") path of mediation and binding arbitration.  (CGC Agreement § 10.1.)

(Report at 2.)  These decisions reflected Chess.com's considered judgment regarding Niemann's prior cheating and growing suspicions in the chess community about his behavior.  (*Id.* at 1-4.)

### C.    **Niemann Takes The Controversy With Chess.com Public.**

A day later, Niemann chose to make Chess.com's decisions public, admitting in an interview that he had cheated on the platform by using a "chess engine."  (SAC ¶ 109.)  But he downplayed the extent of his cheating, suggesting that he cheated in only a few "random" games when he was 12 and 16 years old, and that he never cheated "in a tournament with prize money" or while he was publicly "streaming" his games to other users.  (*Id.* ¶¶ 109; Report at 2.)

This was a *lie*.  Based on its collected data and prior communications with Niemann, Chess.com knew that his public statements regarding the extent of his prior cheating were false. Thus, on September 8, 2022, Chess.com sent him a letter with the stated goals of "clarify[ing] factual inaccuracies in the statements [Niemann] recently made regarding [his] fair play violations on Chess.com[,]" explaining "reasons for withdrawing our invitation to Chess.com prize events, including the upcoming [CGC]," and "[t]alk[ing] about a path back to Chess.com events." (Report, Ex. B.)  Chess.com explained that, even after Niemann's initial suspension in 2020, "there always remained serious concerns about how rampant [his] cheating was in prize events."  (*Id.*) The letter noted the "strong[] data" suggesting Niemann had cheated in prize-money tournaments or events in 2015, 2017, and 2020, and in matches with his peers from June through August 2020. (*Id.*)  Later that day, Chess.com issued a statement on Twitter referencing the letter, noting that it had "privately removed [Niemann] from Chess.com and [its] events" and "shared detailed evidence with him concerning [that] decision, including information that contradicts his statements regarding the amount and seriousness of his cheating on Chess.com."  (SAC ¶ 111.)

These events, including Niemann's post-game interviews in which he admitted to cheating in the past, "sent shock waves through the chess world," with Niemann at "the center of what is now widely reported as the single biggest chess scandal in history."  (*Id.* ¶¶ 11, 109.)  Indeed,

numerous global news outlets reported on the controversy, which even "garnered the attention" of prominent celebrities like Elon Musk and Stephen Colbert.  (*Id.* ¶¶ 92-97, 117.)  And as reflected in a September 23, 2022 article in The Guardian cited by Niemann (*id.* ¶ 114), the media clamored to write about "cheating in chess" and how to detect and prevent it.  (N. Mohebbi Decl., Ex. 1 at 3 ("Guardian Article").)  But Chess.com and its officers "declined to elaborate on Niemann" to the media and refused to "'go[] on the record . . . about the over-the-board scandal with [Niemann] or [Carlsen].'"  (*Id.* (quoting Daniel Rensch, Chess.com's Chief Chess Officer).)

**D.**     **Chess.com Issues The 72-Page Report Following A Detailed Investigation.**

On October 4, 2022, Chess.com published the Report on its website.  (SAC ¶ 171.)  The Report contains 72 pages detailing Chess.com's research, findings, and conclusions regarding Niemann's past online play on Chess.com and his in-person, over-the-board ("OTB") play.  It discusses the timeline of events surrounding the current controversy, the basis of Chess.com's decision to close Niemann's account and to withdraw his CGC invitation, Niemann's past cheating on Chess.com, and statistics and analysis surrounding Niemann's OTB rise over the years.  (*See* Report at 1-7, 11-20.)  It also explains Chess.com's world-class cheat-detection system, which Niemann himself described as "the best cheat detection in the world."  (*Id.* at 7-11.)

As detailed in the Report, Niemann "likely cheated *online* much more than his public statements suggest."  (*Id.* at 1.)  The Report explained that Chess.com "determined through extensive review" of "detailed evidence on [Niemann's] play"—including statistical analysis and manual review by expert analysts—"that there were numerous games where [Niemann's] gameplay fell along [the cheating] spectrum, strongly suggesting that he violated [Chess.com's] fair play regulations."  (*Id.* at 4.)  This analysis of the suspicious games revealed "that [Niemann] has likely cheated in more than 100 online chess games, including several prize money events," that he was streaming in 25 of these games, and that he was 17 years old at the time of some of them.  (*Id.* at 5.)  The Report also made clear—several times—that Chess.com did *not* identify

"evidence that proves [Niemann] cheated at the September 4, 2022 [OTB] game with [Carlsen], or proves that he has cheated in other OTB games in the past." (*Id.* at 3; *see id.* at 1, 17, 19.)

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor do "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* The complaint must allege sufficient "factual content" to create "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

## I.   NIEMANN'S ANTITRUST CLAIMS SHOULD BE DISMISSED

Niemann's federal antitrust claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, suffer from multiple, incurable defects. His Section 1 claim rests on a theory that Defendants conspired to blacklist him from professional and recreational chess. (SAC ¶¶ 220-26.) His Section 2 claim tries to shoehorn the same theory into an attempted monopolization claim, alleging that Defendants exerted power "over who participates in competitive chess online and which players are invited to play in professional chess tournaments" in an attempt to monopolize the alleged market for "[p]rofessional chess tournaments and online recreational chess platforms." (*Id.* ¶¶ 47, 227-33.) For both claims, Niemann has failed to establish antitrust injury and failed to allege sufficient facts to support other elements of his claims.

### A.   Niemann Fails To Allege Antitrust Injury.

To state a "cognizable [claim] under the antitrust laws," a plaintiff must allege an "antitrust injury"—*i.e.*, an injury "directly related to the harm the antitrust laws were designed to protect." *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 450 (8th Cir. 1985) (citation omitted). The

antitrust laws "protect competition, not competitors." *Id.* Thus, an antitrust claim must be dismissed unless the plaintiff adequately alleges that injury resulted from "harm to competition [that] actually existed and that competition was diminished by the defendants' actions." *St. Louis Convention & Visitors Comm'n v. NFL*, 154 F.3d 851, 864 (8th Cir. 1998). Courts frequently apply this principle to dismiss claims against sporting organizations, explaining that individualized injuries that reflect no adverse effect on overall market competition are insufficient. *See, e.g.*, *Martin v. Am. Kennel Club, Inc.,* 697 F. Supp. 997, 999, 1002 (N.D. Ill. 1988) (dismissing antitrust boycott claim because dog handler's suspension "had no significant effect on either the supply of or demand for professional handlers' services" or "on the fees charged for handling dogs").

For *both* of his claims (under Sections 1 and 2), Niemann fails to allege injury to *competition* in a purported market for "[p]rofessional chess tournaments and online recreational chess platforms"—what he terms a so-called "Competitive Chess Market." (SAC ¶ 47.) Even aside from the fatal deficiencies in this definition (*see* pp. 11-12, *infra*), Niemann does not identify harm to competition among competitors in his alleged market (*i.e.*, chess platforms and tournament organizers), nor does he allege that participants in the alleged market (*i.e.*, chess players) have seen an adverse effect on market conditions (*e.g.*, lower prize pools or less demand for their services). Instead, he focuses on monetary and reputational harm to himself. (SAC ¶¶ 225, 230.) Such alleged injuries are insufficient to state an antitrust claim because, at most, they reflect *individualized* injury and fail to reflect harm to overall competitive conditions of the market. *See, e.g.*, *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508-09 (9th Cir. 1989) (dismissing antitrust claims because the eight plaintiffs failed to show how their removal from the market "would adversely and unreasonably affect overall competitive conditions").

Ultimately, as the operator of a respected online chess platform, Chess.com must be able to protect the integrity of its services. Player trust in the platform would be destabilized if known and admitted cheaters were allowed to compete without any repercussions. And while

Chess.com's actions in maintaining an even playing field might in some sense "harm" certain individual players, such as cheaters like Niemann, by foreclosing their access to the platform, that is not an injury to *market competition*.  *See, e.g.*, *Bassett v. NCAA*, 528 F.3d 426, 433-34 (6th Cir. 2008) (rejecting Section 1 group boycott claim for failure to show how the enforcement of college recruiting integrity rules against plaintiff had anticompetitive effect on the market).  Allowing Niemann's claims to proceed would turn antitrust law on its head by attacking *procompetitive* gaming regulation.  Niemann's failure to allege antitrust injury requires dismissal of his claims.

### B.    Niemann Fails To Allege The Elements Of A Section 1 Claim.

In addition to his failure to establish antitrust injury, Niemann's Section 1 claim (SAC ¶¶ 220-26) fails on the merits.  To state a claim under Section 1, a plaintiff must allege, among other elements, (1) a "contract, combination, or conspiracy" (*i.e.*, an "agreement") between the defendants that (2) causes an "unreasonable restraint[] of trade."  *Twombly*, 550 U.S. at 553 (citations omitted); *see* 15 U.S.C. § 1.  Niemann has not alleged either of those elements here.

### 1.    Niemann Fails To Plausibly Allege The Existence Of An Agreement.

Niemann first fails to allege an illegal "agreement"—*i.e.*, "a conscious commitment [among Defendants] to a common scheme designed to achieve an unlawful objective."  *Robbins v. Becker*, 794 F.3d 988, 997 (8th Cir. 2015) (citation omitted).  "[C]onclusory allegation[s] of agreement" are insufficient, as are allegations of "parallel conduct that could just as well be independent action"; the complaint must identify an explicit agreement or allege facts that establish "plausible grounds to infer an agreement."  *Twombly*, 550 U.S. at 556-57; *see, e.g.*, *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 922 (E.D. Mo. 2010) (alleging an "opportunity to conspire, even in the context of parallel business activity, is insufficient").

Niemann fails to allege *any* express agreement among the Defendants.  He also provides no factual context from which to plausibly infer one.  To the contrary, the alleged facts suggest an overwhelmingly "obvious alternative explanation" for the challenged conduct, *Twombly*, 550 U.S.

at 567:  Chess.com had evidence that Niemann cheated on its platform, and Niemann admitted to cheating but downplayed the extent of it.  (SAC ¶¶ 109, 111, 172.)  Chess.com thus had a clear basis for independently deciding to ban him from its platform and to issue the Report. Additionally, because Chess.com does not compete with Niemann, it had no reason to agree with others to "boycott" him.  *See, e.g.*, *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 855 (8th Cir. 2000) (Section 1 claim against auto racing organization failed where no evidence that the defendant "had a financial incentive to accede to the wishes of" plaintiffs' competitors in setting auto racing rules).  Indeed, Chess.com reached out to Niemann on multiple occasions in an effort to find a resolution to allow him to return to the platform under acceptable conditions—conduct flatly at odds with any "conspiracy" to "boycott" him.  (*See* SAC ¶ 111; Report at 2, 5-7, Ex. B.)

Niemann's only attempt to allege an agreement rests on conclusory assertions.  He claims, for example, that Chess.com acted in "collusion with Carlsen and Play Magnus" when it banned Niemann, and that Nakamura published video content regarding Niemann as "part of a coordinated scheme."  (*Id.* ¶¶ 14, 118, 124; *see also, e.g.*, *id.* ¶¶ 221-24, 242-43.)  But he provides no facts to support these legal conclusions; he alleges no meeting, agreement, contract, or other activity supporting any inference of concerted action.   At most, Niemann alleges that Defendants "bolster[ed]" or "piled on" to each other's actions by engaging in *separate conduct* or making *separate statements* around the same time (*id.* ¶¶ 11, 14, 110, 115)—and then speculates that they "leaked" information *after* Niemann was banned from Chess.com (*id.* ¶¶ 124, 140, 187).  But the pleaded facts in no way suggest the existence of an *agreement*.  Particularly in light of the "obvious alternative explanation[s]" for the conduct at issue, Niemann's inability to allege anything other than conclusory speculation—even after amending his complaint—dooms this claim.  *Twombly*, 550 U.S. at 567.

9

### 2.      Niemann Fails To Plausibly Allege An Unreasonable Restraint Of Trade In A Well-Defined Market.

Niemann also fails to allege that any agreement "result[ed] in an unreasonable restraint of trade" in a valid market under a "rule of reason" analysis.  *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558, 560 (8th Cir. 1998).

As an initial matter, Niemann wrongly attempts to avoid the rule of reason analysis altogether by framing his antitrust claim as a boycott that is illegal "*per se*."  (SAC ¶ 224.)  This characterization fails as a matter of law, as the *per se* rule does not apply here.  The *per se* rule is a "departure from the rule-of-reason standard," applicable to only a narrow subset of restraints that are so "manifestly anticompetitive" that they "lack any redeeming virtue" and may be "deemed unlawful *per se*."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (citations omitted).  And while certain "group boycotts" have been deemed illegal *per se*, binding "[p]recedent limits the *per se* rule in the boycott context to cases involving *horizontal* agreements among direct competitors."  *Brookins*, 219 F.3d at 852 n.3 (emphasis added) (quoting *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998)).  By Niemann's own account, Defendants are *not* direct competitors:  Chess.com and Play Magnus are online chess companies; Rensch is a Chess.com executive and chess commentator; Nakamura streams chess content; and Carlsen is a chess player.  (SAC ¶¶ 36, 48-50, 52, 54-57.)  The *per se* rule does not apply here.

Moreover, because the *per se* rule applies only to "manifestly anticompetitive" conduct that lacks "any redeeming virtue," *Leegin*, 551 U.S. at 886, courts consistently refuse to apply it in the sporting context, where restraints are vital to an organization's proper functioning.  *See, e.g.*, *Brookins*, 219 F.3d at 852-54 & n.3 (refusing to apply the *per se* rule to racing organization's rules amendment given its legitimate interests "as a sports organization" in issuing "game-defining rules decisions").  So too here.  Chess.com's decisions to close Niemann's account and disinvite him from future events were not "manifestly anticompetitive" or lacking "any redeeming virtue"—they

were responses by a sporting organization to a player's admitted prior online cheating.  (SAC ¶¶ 109, 111, 172-76.)  The *per se* exception to the rule of reason is thus inapplicable.

Niemann's claim fails under the rule of reason, which requires a plaintiff to allege facts showing an actual anticompetitive effect in "a well-defined relevant market."  *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009).  As explained above, Niemann fails to allege any anticompetitive effect.  (*See* pp. 6-8, *supra*.)  But even if he had, Niemann also fails to allege a well-defined relevant market.  A relevant market has two necessary components: "a product market and a geographic market."  *Little Rock*, 591 F.3d at 596.  Defining a relevant market is a "necessary predicate" for stating an antitrust claim, *id.* at 601; *see Double D*, 136 F.3d at 560, and Niemann has failed to do so here.

The SAC for the first time makes an attempt to allege a relevant market, which is overbroad and deficient on its face:  "Professional chess tournaments and online recreational chess platforms are collectively defined as the 'Competitive Chess Market.'"  (SAC ¶ 47.)  It fails entirely to describe the relevant geographic market—*i.e.*, the geographic area in which customers can "practically seek alternative sources of a product."  *Ferguson Med. Grp., L.P. v. Mo. Delta Med. Ctr.*, 2006 WL 2225454, at *2 (E.D. Mo. Aug. 2, 2006).  That failure alone warrants dismissal.  *See, e.g.*, *id.* at *3-5 (dismissing antitrust claims for failure to plead relevant geographic market).

Niemann's cursory description of the market is likewise insufficient.  For a proposed market to be well-defined, a plaintiff must provide a "detailed description" of the products making up the alleged market and their "interchangeability."  *E-Z Dock, Inc. v. Shoremaster, Inc.*, 2006 WL 1153901, at *2 (W.D. Mo. Apr. 25, 2006) (citation omitted).  The failure to "allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand" requires dismissal.  *Id.* at *2-3; *see ASi Indus. GmbH v. MEMC Elec. Materials, Inc.,* 2006 WL 8458683, at *5-6 (E.D. Mo. Nov. 1, 2006).  Here, Niemann's one-sentence statement that the Competitive Chess Market is made up of

"[p]rofessional chess tournaments and online recreation chess platforms" (SAC ¶ 47) fails to explain what constitutes these vague categories, and also neglects to address potential substitute products or cross-elasticity of demand.  Niemann's failure to allege these basic components of a relevant market is fatal to his claim.

### C.     Niemann Fails To Allege The Elements Of A Section 2 Claim.

Getting nowhere with his Section 1 claim, Niemann now tries—and fails—to assert a claim for attempted monopolization under Section 2.  (SAC ¶¶ 227-33.)  To state a Section 2 claim, a plaintiff must allege "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success."  *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 857 (8th Cir. 2020) (citation omitted).  Niemann fails to plausibly allege any of these elements, let alone all of them.

*First*, he fails to allege Chess.com acted with the "specific intent" to "control prices or destroy competition" as a means of achieving monopoly power.  *Id.*  Indeed, the SAC does not contain any allegations of conduct normally associated with Section 2 claims at all—such as predatory pricing, refusals to deal, or entry barriers—let alone conduct that could support an inference of anticompetitive intent.  *See, e.g.*, *Trone Health Servs., Inc. v. Express Scripts Holding Co.,* 2019 WL 1207866, at *6 (E.D. Mo. Mar. 14, 2019) (dismissing attempted monopolization claim for failure to allege anticompetitive conduct from which "specific intent" could be inferred), *aff'd*, 974 F.3d 845 (8th Cir. 2020).

Instead, Niemann makes only conclusory statements that Chess.com intended to "foreclose competition" by precluding certain "players" from tournaments, which supposedly "chill[s]" "up-and-coming chess players" from challenging "Chess.com's dominance or business interests." (SAC ¶¶ 200-07, 230.)  Even accepting these speculative allegations as true, they speak to actions Chess.com has taken against individual chess *players*, not competitors in the alleged market for

"[p]rofessional chess tournaments and online recreational chess platforms." (SAC ¶ 47.)  Niemann and other individual players indisputably do not have any market share in this purported market. *See Process Controls*, 753 F. Supp. 2d at 924 (dismissing attempted monopolization claim because defendant did not compete with plaintiff in the proposed market).  Niemann does not even allege how the conduct challenged in this case could have impacted Chess.com's ability to gain dominant market share from other online recreational platforms and professional tournaments.  Niemann simply fails to allege that Chess.com intended to restrain other competitors in his alleged market.

Niemann's allegations, if anything, suggest precisely the opposite intent.  If Niemann is the prodigy and popular streamer he claims to be (*id.* ¶¶ 1, 62-66), then banning him from Chess.com's platform would *weaken* its market position by jettisoning a popular source of user engagement.  Similarly, if players fear being accused of cheating by Chess.com's "self-serving 'cheat detection' system" as Niemann claims (*id.* ¶¶ 204-06), this would seemingly encourage these players to play on other platforms, thereby undermining, rather than enhancing, Chess.com's supposed market power.  Ultimately, absent a plausible allegation of Chess.com's intent to monopolize, Niemann's Section 2 claim fails.

*Second*, Niemann fails to adequately allege how Chess.com's challenged actions were "predatory or anticompetitive," meaning that the conduct lacks any "legitimate business purpose [and] makes sense only because it eliminates competition."  *Morgan v. Ponder*, 892 F.2d 1355, 1358 (8th Cir. 1989).  As discussed, Niemann fails to allege how Chess.com's alleged conduct was designed to eliminate market competitors or, for that matter, how it affected them at all. Niemann has not identified any Competitive Chess Market competitor that Chess.com attempted to weaken or push out by creating a chilling effect or threatening foreclosure.  *See Little Rock Cardiology Clinic, P.A. v. Baptist Health,* 573 F. Supp. 2d 1125, 1141-42 (E.D. Ark. 2008)*, aff'd*, 591 F.3d 591 (8th Cir. 2009) (dismissing Section 2 claim for failing to allege anticompetitive conduct).

13

Chess.com's decision to ban Niemann also has an obvious "legitimate business purpose," undermining any conceivable inference of "predatory" and "anticompetitive" conduct. *Morgan*, 892 F.2d at 1358. Chess.com reasonably strives to keep its platform free of cheaters to preserve the platform's integrity for its users, and its decision to ban Niemann based on his cheating history reflects that goal. Rather than confront these legitimate business reasons, Niemann simply declares, without elaboration, that Chess.com's actions had "no legitimate efficiency benefits." (SAC ¶ 232.) That conclusory assertion is insufficient. *See Twombly*, 550 U.S. at 555.

*Finally*, Niemann fails to allege that Chess.com or any Defendant had a "dangerous probability of success" in achieving monopoly power. *Trone Health*, 974 F.3d at 857. "Dangerous probability of success is examined by reference to the offender's share of the relevant market," so a plaintiff must initially "plead sufficient facts to meet the[] 'burden of alleging a relevant market.'" *Id.* at 858 (quoting *Little Rock*, 591 F.3d at 596). As explained above, Niemann fails this threshold requirement, as his relevant market definition is legally deficient (*see* pp. 11-12, *supra*), which requires dismissal of this claim as well. *See Trone Health*, 974 F.3d at 857-58 (affirming dismissal of Section 2 claim for failure to properly allege relevant market).

Even if he had alleged a well-defined market, Niemann fails to allege facts showing that Chess.com had a "dangerous probability" of monopolizing it. To do so, a plaintiff must allege facts showing how the "market structure" is "capable of monopolization," such as "the existence of high entry barriers, high concentration, and consumer preferences," as well as facts showing that the defendant possesses a sufficient "market share" to achieve that monopolization. *Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1074-75 (S.D. Iowa 2017).

Niemann's only allegation regarding any Defendants' market share is that Chess.com's is "significant." (SAC ¶ 229.) This statement—devoid of further elaboration—is "conclusory" and thus insufficient. *Twombly*, 550 U.S. at 557; *see, e.g.*, *Mahaska Bottling*, 271 F. Supp. 3d at 1075-77 (rejecting "bare allegations of market share"); *Process Controls*, 753 F. Supp. 2d at 927

(rejecting conclusory allegation of a "dominant" market share).  Niemann offers zero allegations about relative market shares among the competitors in his alleged market or the alleged market's structure in terms of entry barriers or other metrics.  Indeed, his allegations indicate that Chess.com does *not* have a significant market share among the "[p]rofessional chess tournament" competitors in his alleged market (SAC ¶ 47), as Chess.com only "occasionally hosts tournaments" on its platform and "generally does not host FIDE-rated events" (*id.* ¶ 43).  And despite acknowledging that FIDE consists of "chess organizations in 200 countries" (*id.* ¶ 29), he alleges nothing about them or their role in the market.  Niemann cannot allege a dangerous probability of monopolizing a relevant market without alleging any actual facts about the market or Chess.com's share of it.

## II.   CONNECTICUT'S ANTI-SLAPP STATUTE BARS NIEMANN'S TORT CLAIMS

Niemann again asserts claims against Chess.com under state law for libel, slander, tortious interference, and civil conspiracy.  They should be dismissed as an initial matter because they are barred by Connecticut's anti-SLAPP statute, Conn. Gen. Stat. § 52-196a, which Niemann now transparently seeks to avoid through artful and contradictory pleading.  (SAC ¶¶ 20-25.)  As Defendant Carlsen explains in his motion to dismiss, Connecticut's anti-SLAPP statute precludes all of Niemann's state law tort claims.  (Carlsen MTD Section I.)  Chess.com incorporates those arguments by reference.

## III.   NIEMANN'S STATE LAW TORT CLAIMS FAIL ON THE MERITS

Niemann's state law tort claims should also independently be dismissed for failure to state a claim.  Despite Niemann's attempt to plead around it, the claims are governed by Connecticut law because, as his place of residence and citizenship, Connecticut has the "most significant relationship to the issues presented in the case." *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 621-22 (8th Cir. 2004); (*see also* Carlsen MTD Section I.A).  That said, the choice-of-law question must be answered only for purposes of applying Connecticut's anti-SLAPP statute, as the principles foreclosing Niemann's tort claims are universal and apply under Missouri law as well.

15

A.     <u>Niemann's Defamation Claims Fail</u>.

Niemann asserts claims against "all Defendants" for "libel" and "slander." (SAC ¶¶ 208-19.) Libel and slander are two types of "[d]efamation"—"slander is oral defamation and libel is written defamation." *Gleason v. Smolinski*, 125 A.3d 920, 947 n.30 (Conn. 2015).

The elements of defamation are substantially similar under Connecticut and Missouri law.[3] As relevant here, both states require allegations that "the defendant published a defamatory statement" that is "actionable"—*i.e.*, objectively "false." *NetScout*, 223 A.3d at 47; *see Stockley*, 963 F.3d at 819. Additionally, when the plaintiff is a "public figure," the First Amendment to the U.S. Constitution requires the plaintiff to also demonstrate that the statement was published with "actual malice." *Nelson Auto*, 951 F.3d at 956. Because "each alleged defamatory statement constitutes a separate cause of action," Niemann is required to plead the necessary elements for each statement. *Britt v. Unknown Officers*, 2019 WL 2453763, at *4 (D. Conn. June 12, 2019). Niemann has not done so; none of the alleged defamatory statements is actionable, and Niemann has failed to allege actual malice. The defamation claims should be dismissed.

1.     **Niemann Fails To Allege Actionable Statements.**

To state a claim for defamation, the complaint must "specifically identify what allegedly defamatory statements were made, by whom, and to whom," and "how they were false." *Fraser v. Franco*, 2022 WL 4367576, at *6 (D. Conn. Sept. 21, 2022). And for an allegedly defamatory statement "to be actionable, the statement in question must convey an objective fact" rather than an "opinion." *NetScout*, 223 A.3d at 47; *see Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 581-83 (8th Cir. 2016) (same in Missouri). Niemann challenges the September 8, 2022 tweet issued by Chess.com, various statements in the Chess.com Report, and

---

[3] *Compare NetScout Sys., Inc. v. Gartner, Inc.*, 223 A.3d 37, 47 (Conn. 2020) (Connecticut defamation), *with Stockley v. Joyce*, 963 F.3d 809, 819 (8th Cir. 2020) (Missouri defamation).

statements quoted in articles published by The Guardian and the New York Times.  (*See* SAC ¶¶ 111, 114, 171-79, 185.)  None of the challenged statements is actionable.

### a.   *The September 8, 2022 Tweet Is Not Actionable.*

On September 8, 2022, Chess.com posted on Twitter that it "reached out to [Niemann] to explain [its] decision to privately remove him from Chess.com and [its] events," "shared detailed evidence with [Niemann] concerning [its] decision, including information that contradicts his statements regarding the amount and seriousness of his cheating on Chess.com," and "invited [Niemann] to provide an explanation and response."  (*Id.* ¶ 111.)  Niemann alleges this statement was "false" because he "did not lie about the 'amount and seriousness of his cheating on Chess.com,'" and "Chess.com had not shared *any* evidence with Niemann, let alone 'detailed evidence' that 'contradict[ed] [Niemann's] statements regarding the amount and seriousness of his cheating.'"  (*Id.* ¶ 112 (alterations by Niemann).)

Niemann's allegation of falsity distorts Chess.com's statement and highlights the shortcomings of his own allegations.  Chess.com did not say that it shared with Niemann "'detailed evidence' that 'contradict[ed] [Niemann's] statements.'"  (*Id.*)  Rather, it shared "detailed evidence with [Niemann] *concerning [its] decision*" to remove him from Chess.com's platform and events, "*including information* that contradicts his statements."  (*Id.* ¶ 111 (emphasis added).)  Niemann cannot deny that Chess.com shared evidence about its decision in its September 8 letter to him, which clearly lays out the contradictory information.  (*See* Report at 2 & Ex. B.)

Nor did Chess.com state that Niemann "lie[d]."  (SAC ¶ 112.)  To the contrary, it noted it shared with Niemann "information that contradict[ed] his statements" and, far from accusing him of lying, "invited [him] to provide an explanation and response."  (*Id.* ¶ 111.)  Niemann cannot rewrite what Chess.com said to create a defamatory statement; defamation must be assessed according to "the actual words used."  *Stockley v. Joyce*, 2019 WL 630049, at \*10 (E.D. Mo. Feb. 14, 2019), *aff'd*, 963 F.3d 809 (8th Cir. 2020).

<strong>b.</strong>    <strong><em>Nothing In The Chess.com Report Is Actionable.</em></strong>

<u><strong><em>Cheating On Chess.com</em></strong></u>.    Niemann initially challenges two statements in the Report concerning his cheating on Chess.com.  (SAC ¶¶ 172, 176.)  Neither is actionable.

*First*, he challenges the Report's final conclusion: "[Chess.com's] investigation has concluded that [Niemann] did, however, cheat much more than he has publicly admitted to, including in many prize events, at least 25 streamed games, and 100+ rated games on Chess.com, as recently as when he was 17 years old."  (Report at 20; *see* SAC ¶ 172.)

Like other statements in the Report, this conclusion is a non-actionable opinion based on objective data.  For a statement to be defamatory, it cannot be an "opinion"; it must "convey an objective fact."  *NetScout*, 223 A.3d at 47; *accord Others First*, 829 F.3d at 580-81.  Although courts have developed various factor-based tests for determining whether a statement is an opinion, *see NetScout*, 223 A.3d at 48-50, the cross-cutting point is that an opinion "is a personal comment about another's conduct, qualifications or character that has some basis in fact."  *Id.* at 48 (citation omitted); *see also Others First*, 829 F.3d at 581 ("opinion" is "a subjective assessment").  And among the types of statements that "constitute[] [an] opinion" is a statement reflecting a "'subjective interpretation of multiple objective data points.'"  *NetScout*, 223 A.3d at 50 n.6 (quoting *Aviation Charter, Inc. v. Aviation Rsch. Grp./US*, 416 F.3d 864, 871 (8th Cir. 2005), *abrogated on other grounds by Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58 (8th Cir. 2014)).  Thus, in *Aviation Charter*, for example, the Eighth Circuit explained that the statement "Aviation Charter, relative to other carriers of its size, has an unfavorable safety record" was a non-actionable opinion that rested on a "subjective assessment" of "objectively verifiable [safety] data."  416 F.3d at 870-71.

The same is true here.  Although Niemann omits this part of the sentence from the SAC, the challenged statement is a "conclu[sion]" derived from "[Chess.com's] investigation."  (Report at 20; *see* SAC ¶ 172.)  And that investigation involved Chess.com's detailed assessment of

18

objective data about Niemann's games.  (*See* Report at 4-17.)  While Niemann may disagree with Chess.com's conclusions, that disagreement cannot be the basis of a defamation claim.

Niemann's theories of falsity only confirm that he simply disagrees with Chess.com's investigative conclusions.   He claims the reference to games Niemann played "while livestreaming" is "false" because "Rensch previously admitted to Niemann that he knew Niemann had never cheated in any games he played while streaming" and "Niemann's face and computer screen were clearly visible in real time during those games." (SAC ¶ 173.)  But the Report explains the basis for the statement by specifically identifying the games "in which it appears [Niemann] cheated," and noting that, "in 25 of these games," Niemann was "streaming."  (Report at 4-5.) Vaguely alleging that Rensch made a contradictory statement at some undefined "previous[]" time does not show that Chess.com's statement in the Report is false.  (SAC ¶ 173.)  Nor does Niemann's allegation about the visibility of his "face and computer screen" (*id.*); indeed, the Report itself discusses non-visible cheating in online games.  (*See* Report at 10-11 & n.19.)

*Second*, Niemann vaguely points out that the Report counts games in which he "lost or played . . . poorly" among those in which he likely cheated.  (SAC ¶ 174.)  Although he declares this is "false," he provides no facts to support that conclusory assertion.[4]

*Third*, Niemann challenges the statement "that Niemann purportedly 'confessed' to these so-called 'cheating offenses' during a call with Rensch in 2020." (SAC ¶ 176.)  But Niemann fails to allege any facts demonstrating how or why it is false; he clings to the timing of the Report, noting that "Chess.com only claims to have learned about" Niemann's "supposed cheating" "in 2022." (*Id.*)  But nowhere did Chess.com represent that it lacked evidence of Niemann's cheating prior to 2022.  Instead, the Report states—and Niemann concedes—that Chess.com did a "deeper dive" into data already known to Chess.com.  (*Id.*; *see* Report at 5.)

---

[4] To the extent Niemann is suggesting that he could not have cheated when he played poorly, the Report itself debunks this theory.  (*See* Report at 8 (explaining "selective cheating").)

***OTB Analysis***.   Niemann also plucks out various statements in the Report analyzing his OTB play and contends that they represent a "slanted and inaccurate analysis" that "bolster[s] the false narrative that Niemann did cheat over the board."  (SAC ¶ 177.)  These allegations fail for several reasons.

For starters, Niemann does not allege facts showing that the supposedly "slanted" statements are false.  "[A]rticle[s] concerning a public figure composed of true or substantially true statements [are] not defamatory regardless of the tone or innuendo evident."  *Strada v. Ct. Newspapers, Inc.*, 477 A.2d 1005, 1010 (Conn. 1984); *see Smith v. Humane Soc'y of U.S.*, 519 S.W.3d 789, 801 (Mo. 2017) ("[A] negative connotation alone . . . [is not] actionable.").  Niemann thus cannot "claim[] that the 'slant' of the [statements] gives rise to allegedly false and defamatory implications" when he fails to allege how they are actually false.  *Strada*, 477 A.2d at 1010.

Moreover, these statements, like others in the Report, are statements of opinion based on Chess.com's assessment of objective data.  (*See* pp. 18-19, *supra*.)  Each challenged statement reflects Chess.com's subjective assessment of Niemann's OTB play, which followed detailed analysis of objectively verifiable data identified in the Report itself.  (*See* SAC ¶ 177; Report at 11-17.)  And the words used in Chess.com's assessment of that data—that Niemann's results are comparatively "extraordinary," "unusual," and "erratic" (SAC ¶ 177)—are quintessential words of opinion.  *Cf. Hogan v. Winder*, 2012 WL 4356326, at *8 (D. Utah Sept. 24, 2012) ("statements about . . . erratic behavior are mere opinion"), *aff'd*, 762 F.3d 1096 (10th Cir. 2014).

In any event, the implication that Niemann attempts to draw from the challenged statements—*i.e.*, that they "bolster" the "narrative that Niemann did cheat over the board" (SAC ¶ 177)—totally collapses when they are read "in the context of the [Report] as a whole."  *Others First*, 829 F.3d at 581; *see id.* at 580 ("To determine if the statement is defamatory, the challenged words . . . 'must be considered in context[.]'"); *NetScout*, 223 A.3d at 49 (same).  As Niemann admits, the Report makes clear "there is no 'concrete evidence proving that Hans is cheating over

20

the board'" and "does not 'advocate' for that conclusion."  (SAC ¶ 177.)  Chess.com was emphatic

on this point, stressing again and again that "there is nothing in our statistical investigation to raise

any red flags regarding [Niemann's] OTB play and rise."  (Report at 17; *see also id.* at 1, 3, 19

(repeating point).)  Niemann's allegation that the Report somehow implicitly bolsters a narrative

that is directly contrary to its express statements is not plausible.

> ***Sinquefield Cup***.  Finally, Niemann attempts to challenge statements in the Report about

the Sinquefield Cup incident.  (SAC ¶ 179.)  These allegations are also unavailing.  Niemann first

alleges that the Report "[f]alsely claims that [his] explanation of his preparation [for the

Sinquefield Cup] was not supported by records of Carlsen's prior games."  ( ¶ 179(a).)  But

Niemann does not allege *facts* showing how this statement was false.  Nor could he—Niemann

claimed he "prepared specifically for the opening that [Carlsen] played" by reviewing Carlsen's

prior games, and the Report analyzed that contention in light of Carlsen's prior games.  (Report at

18.)  Niemann's "conclusory" assertion of falsity plainly "fails to meet federal pleading standards."

*King v. Union Station Holdings, LLC*, 2012 WL 5351598, at *4 (E.D. Mo. Oct. 30, 2012).

> Niemann also asserts that the Report "[d]emeans" his "post-game analysis" at the

Sinquefield Cup by concluding that it "'seem[ed] to be at odds with the level of preparation that

[Niemann] claimed was at play in the game and the level of analysis needed to defeat the World

Chess Champion.'"  (SAC ¶ 179(b); *see* Report at 18.)  But this statement is Chess.com's *opinion*

of Niemann's post-game analysis, which is confirmed by the language:  Niemann's post-game

analysis "*seems to be* at odds" with the circumstances.  (SAC ¶ 179(b) (emphasis added).)  Such a

statement, "couched in equivocal language," is plainly "presented as opinion."  *Others First*, 829

F.3d at 582; *see, e.g., id.* ("'appears'" is "equivocal language").  That Niemann found this opinion

to be "demeaning" does not make it defamatory.  *See, e.g., NetScout*, 223 A.3d at 47 ("[A] writer

cannot be sued for simply expressing his opinion of another person, however unreasonable the

opinion or vituperous the expressing of it may be.").

The same is true of the statement that "the 'game and the surrounding behaviors and explanations are bizarre.'"  (SAC ¶ 179(e).)  The SAC omits the first part of the statement:  "*In our view*, this game and the surrounding behaviors and explanations are bizarre."  (Report at 19 (emphasis added).)  And as the omitted language confirms, the statement that Niemann's behavior was "bizarre" was merely Chess.com's "view"—*i.e.*, its opinion.  *Cf., e.g.*, *Schuler v. McGraw-Hill Cos., Inc.*, 989 F. Supp. 1377, 1385 (D.N.M. 1997) (statement that "the Printron case is 'bizarre'" is a "protected opinion[]"), *aff'd*, 145 F.3d 1346 (10th Cir. 1998).  The Report specified the reasons underlying that opinion, including Niemann's description of his pre-game preparation as well as his behavior both during and after the game.  (Report at 18-19.)

Finally, the remaining allegations concern statements that merely "[r]eport[]" what Carlsen "shared in a private conversation" regarding Niemann's behavior and compare it to that of other "notable players who have beaten [Carslen]" with linked videos.  (SAC ¶ 179(c)-(d).)  Niemann does not allege that these statements are false, and there would be no basis to do so, as they are just reporting others' reactions to Niemann's behavior.

### c.  *The Challenged News Articles Are Not Actionable.*

Seeking to salvage his defamation claims, Niemann's SAC now identifies new purported defamatory quotes contained in news article from The Guardian (SAC ¶ 114) and the New York Times (*id.* ¶ 185).  These new allegations are just as meritless as the others.

Niemann claims Rensch "made clear" in The Guardian article "that he and Chess.com were accusing Niemann of cheating against Carlsen at the Sinquefield Cup."  (*Id.* ¶ 114.)  But the article quotes Rensch as saying precisely the opposite: "I'm *not* going on the record on anything that I think about the over-the-board scandal with [Niemann] or [Carlsen]."  (*Id.* (emphasis added).)  Instead, Rensch discussed "anomalies" in chess more generally, which he followed with an analogy to a claim of a one-armed fridge lift, and from that, readers could "imply what [they]

want." (*Id.*)  Far from making any accusations against Niemann in connection to the Sinquefield Cup, Rensch explicitly "declined to" do so.  (Guardian Article at 3.)

As for the New York Times article, Niemann challenges Chess.com's statement that "it wanted to keep its findings private but had to 'defend [them]selves' after Niemann went public." (SAC ¶ 185.)  Niemann alleges that this statement is "false" because his "public statements were a direct response to the false accusations leveled by Nakamura." (*Id.*)  This assertion of falsity is inscrutable; Niemann's reason for his own public statements has no bearing on Chess.com's statement, which concerns Chess.com's decision to publicly defend itself.  Nor does Niemann explain how this allegedly "false" statement about Chess.com's decision-making is defamatory.

### 2. Niemann Fails To Adequately Allege Actual Malice.

Niemann's defamation claims fail for another obvious reason:  he fails to plausibly allege actual malice.  The First Amendment prohibits "public figures" from asserting defamation claims unless they can demonstrate that the defendant made the allegedly defamatory statement "with 'actual malice.'" *Nelson Auto*, 951 F.3d at 956 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).  This dooms Niemann's defamation claims:  Niemann is a "public figure," and he fails to adequately allege that Chess.com acted with "actual malice."

#### a. *Niemann Is A Public Figure.*

The SAC leaves no doubt that Niemann is a public figure.  As the Supreme Court has explained, a public figure is a person who either (a) "achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts"; or (b) "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).  In both cases, public figures must satisfy the heightened actual malice standard. *Id.*

Courts have consistently held that professional sports figures "generally assume a position of public prominence" by virtue of their careers and are thus "public figures." *Miljas v. Greg*

*Cohen Promotions, LLC*, 536 F. Supp. 3d 409, 421 (S.D. Iowa 2021) (citations omitted).[5]   That conclusion recognizes that "a career in sports . . . 'invites attention and comment' regarding [the] job performance," *Barry*, 584 F. Supp. at 1119, particularly for players who participate in public interviews and appear in "high-profile" competitions, *Chapman v. J. Concepts, Inc.*, 528 F. Supp. 2d 1081, 1093-94 (D. Haw. 2007), *aff'd on other grounds*, 401 F. App'x 243 (9th Cir. 2010).

Niemann is plainly a public figure.  A self-described "chess prodigy," Niemann rose through the ranks after becoming "the youngest-ever winner" of "the Tuesday Night Marathon" at the oldest chess club in the United States.  (SAC ¶¶ 1-2, 62-63.)  Since then, he claims his career has skyrocketed, launching him to be ranked the "40th best chess player in the world."  (*Id.* ¶ 2.)  He has regularly appeared in high-stakes and publicly watched chess tournaments, including the Sinquefield Cup—a "prestigious, high-profile professional chess tournament" where he played Carlsen.  (*Id.* ¶ 90.)  He not only "travel[ed] the world to compete" in these tournaments but was paid to do so, raking in thousands of dollars in "appearance fees."  (*Id.* ¶¶ 3, 196.)  And Niemann alleges that he live-streamed chess games online, "during which top players play chess live and/or offer commentary regarding topics of interest to chess fans."  (*Id.* ¶¶ 39, 75, 172-173.)

Moreover, even aside from Niemann's general notoriety in the chess community, he "voluntarily inject[ed] himself . . . into [the] particular public controversy" at issue.  *Nelson Auto*, 951 F.3d at 956.  Niemann is at the "center" of what he describes as the "single biggest chess scandal in history."  (SAC ¶ 11.)  This scandal has been covered by chess-specific news outlets and well-known global news organizations, including The Wall Street Journal, BBC, The Guardian, and VICE News.  (*Id.* ¶¶ 96-97, 114, 131, 151, 169.)  And Niemann has responded to this coverage in the press.  (*See id.* ¶ 109; *see also* Report at 4.)

---

[5] *See, e.g.*, *Miljas*, 536 F. Supp. 3d at 421 (boxer); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 263, 274 n.11 (D.D.C. 2017) (K.B. Jackson, J.) (baseball player); *see also Barry v. Time, Inc.*, 584 F. Supp. 1110, 1119 (N.D. Cal. 1984) (collecting a "long line of cases" holding that "professional and collegiate athletes . . . [are] public figures").

In fact, Niemann's public responses only fanned the flames of the controversy and increased its publicity. Chess.com followed its typical approach of handling concerns with users "privately" when it removed Niemann from the platform for six months in 2020, and again in September 2022. (Report at 4-7.) But Niemann chose to turn this into "a public conversation" by "publicly address[ing] his ban" and making "several comments to the press about alleged instances of prior cheating." (*Id.* at 2, 4.) That, in turn, "compelled" Chess.com to respond "publicly." (*Id.* at 4.) Niemann thus has thrust himself into the forefront of a public controversy and is a public figure. *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) (football coach "inserted himself into the controversy" by involving himself with "national news" coverage).

### b. *Niemann Fails To Satisfy The Actual Malice Standard.*

Because Niemann is a public figure, his claim can survive only if he adequately alleges that Chess.com made the allegedly defamatory statements "with 'actual malice'—that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *Nelson Auto*, 951 F.3d at 956. The "concept of 'reckless disregard'" requires that the defendant "made the false publication with a 'high degree of awareness of probable falsity'" or "'entertained serious doubts as to [its] truth.'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (internal citations and alterations omitted). The actual malice "standard is, therefore, a 'daunting one.'" *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 569 (8th Cir. 2001). Conclusory allegations of actual malice are insufficient; the complaint must "'lay out enough facts'" that "support a plausible finding of actual malice" to survive dismissal. *Nelson Auto*, 951 F.3d at 956, 958 (quoting *Schatz v. Rep. State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012)).

Even after two opportunities to amend, Niemann's allegations do not come close to satisfying that standard. As for Chess.com's Twitter post, Niemann does not allege any knowledge or reckless disregard of falsity at all. Instead, he baldly claims that this "statement is false." (SAC ¶¶ 111-12.) This is insufficient to plead falsity (*see* p. 17, *supra*), and Niemann's failure to allege

any facts demonstrating actual malice independently dooms his claim that this statement defamed him.  The same is true of the two news articles—Niemann does not even attempt to allege facts that either statement was made with actual malice.  (*See* SAC ¶¶ 114, 185.)

Niemann fares no better with respect to his challenges to the Chess.com Report.  The most he can muster is the assertion that "Chess.com and Rensch knew" of the supposed falsity with respect to the statement in the Report that Niemann was "cheating in games while live streaming" because "Rensch previously admitted to Niemann that he knew Niemann had never cheated in any games he played while streaming."  (*Id.* ¶ 173.)  But the Report followed a "deeper dive" by Chess.com into the "aggregate historical evidence of [Niemann's] play."  (Report at 4.)  Thus, whatever Rensch might have "previously" told Niemann (SAC ¶ 173), it would not show that Chess.com or Rensch knew *when the Report was published—i.e.*, following this deeper review— that the statement was false.  *See Stockley*, 2019 WL 630049, at *12 (plaintiff must plead "that [the defendant] acted with 'actual malice' at the time of publication").

Beyond that, the SAC does not contain any factual allegations showing that Chess.com made any of the challenged statements with actual malice.  Instead, Niemann simply declares that the statements are "false[]" (SAC ¶¶ 172-74, 179(a)), that the Report was "designed" with "malicious intent" (*id.* ¶ 175), and that "Defendants made the defamatory statements with full knowledge that such statements were false, or with reckless disregard as to whether such statements were false" (*id.* ¶¶ 211, 217).  This "[t]hreadbare recital[] of the elements" of the actual malice standard is insufficient.  *Iqbal*, 556 U.S. at 678; *see, e.g.*, *Schatz*, 669 F.3d at 56 (plaintiff cannot survive dismissal by merely "us[ing] actual-malice buzzwords").

### B.    Niemann's Tortious Interference Claim Fails.

Niemann's tortious interference claim (SAC ¶¶ 234-40) also fails.  Niemann alleges Defendants' actions in "defaming" and "blacklist[ing]" him resulted in (1) Vincent Keymer refusing to play a game against him, and (2) the Tata Steel Chess Tournament halting negotiations

regarding his participation in the tournament.[6]  (SAC ¶ 237.)  This claim fails at the outset because it is derivative of his other claims and thus fails alongside them.  *See, e.g.*, *Castle Rock Rem., LLC v. Better Bus. Bur. of Greater St. Louis, Inc.*, 354 S.W.3d 234, 245 (Mo. Ct. App. 2011) ("[W]here a tortious interference claim is based upon an alleged defamation, if a plaintiff's defamation claim fails, the tortious interference claim must also fail."); *LEGO A/S v. ZURU, Inc*., 2020 WL 13145135, at *10 (D. Conn. Apr. 22, 2020) (same for failed antitrust claim); *Nitro Distrib., Inc. v. Alticor, Inc*., 2008 WL 11384211, at *12 (W.D. Mo. Feb. 8, 2008) (same).

Even on its own, the claim should be dismissed.  In order to state a claim for tortious interference with business expectancies, Niemann must allege "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."  *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1273 (Conn. 2000); *accord Castle Rock*, 354 S.W.3d at 245.  Niemann fails to allege facts satisfying these elements.

*First*, he fails to allege any facts regarding Chess.com's knowledge of his negotiations with the Tata Steel Chess Tournament or a planned game with Keymer.  Instead, he relies on a conclusory allegation that all Defendants were aware of these relationships "[a]s fellow members of the Competitive Chess Market."  (SAC ¶ 236.)  This assertion, devoid of facts showing knowledge, is insufficient.  *See, e.g.*, *Butler Am., LLC v. Ciocca*, 2020 WL 6781488, at *3-4 (Conn. Super. Ct. Mar. 12, 2020) (dismissing interference claim for failure to plead knowledge).

*Second*, Niemann does not allege that any interference was "intentional"—*i.e.*, perpetrated with "improper motive or improper means."  *Butler*, 2020 WL 6781488, at *3; *accord Envtl. Energy Ptnrs., Inc. v. Siemens Bldg. Techs., Inc*., 178 S.W.3d 691, 703 (Mo. Ct. App. 2005).  This

---

[6] Niemann also alleges that interference caused Chess.com to revoke his invitation to the CGC, but his claim against Chess.com (and Rensch) cannot be based on alleged interference with his business relationship *with Chess.com*.  *See Zipper v. Health Midwest*, 978 S.W.2d 398, 419 (Mo. Ct. App. 1998); *Wellington Sys. v. Redding Grp.*, 714 A.2d 21, 31 (Conn. App. Ct. 1998).

element requires alleging "malice on the part of the defendant, not in the sense of ill will, but 'intentional interference without justification.'" *Daley v. Aetna Life & Casualty Co.*, 734 A.2d 112, 135 (Conn. 1999). But beyond a conclusory reference to "improper means" and overheated rhetoric (SAC ¶ 237), the SAC contains no facts showing that Chess.com acted maliciously and without justification. *See Southridge Partners II Ltd. P'ship v. SND Auto Grp., Inc.*, 2019 WL 6936727, at *8 (D. Conn. Dec. 19, 2019) (plaintiff "fail[ed] to provide any particularized allegations to support" contention that defendant acted with improper motive); *Castle Rock*, 354 S.W.3d at 246 ("[C]onclusory allegations that [defendant] was carrying out a personal vendetta to destroy [plaintiff] are insufficient.").[7]

*Third*, Niemann fails to allege facts showing that Chess.com's actions actually "caused" him to lose opportunities with Keymer or the Tata Steel Chess Tournament. *See Zupa v. Zupa*, 2018 WL 3518552, at *3 (Conn. Super. Ct. June 20, 2018); *accord Am. Cable Techs. Servs., Inc. v. AT&T Corp.*, 140 F. Supp. 2d 1026, 1032 (W.D. Mo. 2001). Nowhere does Niemann allege that Keymer's or Tata Steel's decisions resulted from Chess.com's conduct, rather than from their independent decision-making or Niemann's own public statements.

## C.   Niemann's Derivative Civil Conspiracy Claim Fails.

Niemann's standalone claim for civil conspiracy (SAC ¶¶ 241-45) fails for two reasons. First, it is derivative of his other failed claims. *See, e.g.*, *Litchfield Asset Mgmt. v. Howell*, 799 A.2d 298, 306 (Conn. App. Ct. 2002) (civil conspiracy claim is "insufficient unless based on [a valid] underlying cause of action"); *accord Park Ridge Assocs. v. U.M.B. Bank*, 613 S.W.3d 456, 464 (Mo. Ct. App. 2020). And second, Niemann does not plausibly allege any agreement among Defendants. *See Litchfield*, 799 A.2d at 305-06 (conspiracy requires agreement of two or more

---

[7] Chess.com's actions demonstrate a *lack of* malicious intent. Chess.com *privately* informed Niemann of its decision to close his account—only publicly disclosing the details after Niemann made the matter public. (*See* Report at 1-2.)

persons "to do [an] unlawful act"); *accord Park Ridge*, 613 S.W.3d at 463.  The claim should be dismissed.

## IV.    **NIEMANN'S NEW BREACH OF CONTRACT CLAIM FAILS**

Seeing the writing on the wall for his tort claims, Niemann makes a last-ditch effort to add a new contract claim predicated on Chess.com's decision to rescind Niemann's invitation to Chess.com's own tournament, the CGC.  (SAC ¶¶ 246-51.)  This claim also fails.  Not only does Niemann's assertion of a breach contradict the express terms of the CGC Agreement, but his decision to bring this claim flouts the ADR provision of CGC Agreement.  Either way, the claim has no place in this action.

A breach of contract claim obviously requires a breach.  *See Am. W. Bank Members, L.C. v. State*, 342 P.3d 224, 230 (Utah 2014).[8]  Here, Niemann frivolously claims that Chess.com breached the CGC Agreement by "revoking his invitation to play in the [CGC]."  (SAC ¶ 248.)  In agreeing to the CGC Agreement and the incorporated CGC Rules (*see* p. 3, *supra*), Niemann expressly agreed that "Chess.com may remove any Player from the [CGC] at its ***sole discretion***."  (CGC Rules § 4 (emphasis added); *see also id.* § 1 ("Each Player unconditionally accepts and agrees to . . . abide by . . . the decisions that Chess.com . . . make[s] about the [CGC], including without limitation decisions about how to interpret or implement these Rules and administer the [CGC].").)  Thus, far from breaching the contract, Chess.com exercised a right granted by the contract.  *See, e.g.*, *100 Mount Holly Bypass v. Axos Bank*, 2021 WL 3172024, at *14 (D. Utah July 27, 2021) (no breach where defendant had "sole discretion" to exercise option).

Moreover, Niemann does not adequately plead he suffered damages from the breach, another element of a contract claim.  *See Am. W. Bank*, 342 P.3d at 230-31.  In revoking his invitation, Chess.com still offered him "full compensation of $5,000.00 US dollars for the qualified

---

[8] The CGC Agreement is governed by Utah law.  (CGC Agreement § 11.10.)

spot in the CGC" and provided him with a link to collect it. (Report, Ex. A.) Niemann admits, as he must, that $5,000 is the amount he was contractually guaranteed to receive by attending the event. (SAC ¶ 100; *see* CGC Rules § 10.2 (setting forth the prize award amounts).) Chess.com thus satisfied any purported monetary obligations under the agreement.

Finally, Niemann's decision to bring this claim in federal court violates the CGC Agreement's ADR provision, which makes clear that "[i]n the event of any controversy or claim arising out of or relating to this agreement, *or a breach thereof*, the parties hereto shall first attempt to settle the dispute by mediation" and, if that fails, "by binding arbitration." (CGC Agreement § 10.1.) This clear, unambiguous language plainly reflects "a valid agreement to arbitrate," and the "specific dispute" at issue here—Niemann's claim for breach of that very agreement—plainly "falls within [its] scope." *Rosemann v. Sigillito*, 877 F. Supp. 2d 763, 776 (E.D. Mo. 2012) (quoting *Houlihan v. Offerman & Co.*, 31 F.3d 692, 694-95 (8th Cir. 1994)). Thus, to the extent the Court believes that this claim might have any traction (it absolutely does not), Chess.com respectfully requests that the Court enforce the ADR provision.

Although the common remedy for enforcing an arbitration provision is a stay of the arbitrable claim, dismissal is appropriate when "no purpose would be served by staying the case" and "the entire controversy between the parties will be resolved by arbitration." *Rosemann*, 877 F. Supp. 2d at 777. That is true here: Because Niemann's other claims should be dismissed, the only remaining claim would be his contract claim. The Court should dismiss it as well "so that the parties may proceed with arbitration" as to that claim. *Id.* Alternatively, the Court should issue a stay pending arbitration limited to the contract claim. *See, e.g.*, *Restored Images Consulting, LLC v. Dr. Vinyl & Assocs., Ltd.*, 2015 WL 13729924, at *2 (W.D. Mo. Mar. 10, 2015).

## <u>CONCLUSION</u>

Chess.com thus respectfully requests that the Court dismiss Niemann's claims with prejudice and award it fees and costs. Conn. Gen. Stat. § 52-196a(f)(1).

DATED:  January 24, 2023

Respectfully submitted,

*/s/ Nima H. Mohebbi*
Nima H. Mohebbi (# 275453CA)
Sarah F. Mitchell (# 308467CA)
Michael A. Hale (# 319056CA)
**LATHAM & WATKINS LLP**
355 S. Grand Ave., Suite 100
Los Angeles, CA 90071
Tel: (213) 485-1234
*nima.mohebbi@lw.com*
*sarah.mitchell@lw.com*
*michael.hale@lw.com*

*/s/ Jamie L. Wine*
Jamie L. Wine (# 4529251NY)
Blake E. Stafford (# 888324775DC)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
*jamie.wine@lw.com*
*blake.stafford@lw.com*

*/s/ Jeffrey B. Jensen*
Jeffrey B. Jensen (# 46745MO)
Kate Ledden (# 66026MO)
**HUSCH BLACKWELL LLP**
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel: (314) 480 1500
*jeff.jensen@huschblackwell.com*
*kate.ledden@huschblackwell.com*

Derek Teeter (# 59031MO)
Spencer Tolson (# 74467MO)
**HUSCH BLACKWELL LLP**
4801 Main, Suite 1000
Kansas City, MO 64112
Tel: (816) 983-8000
*derek.teeter@huschblackwell.com*
*spencer.tolson@huschblackwell.com*

*Counsel for Defendant Chess.com, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 24, 2023, the foregoing document was served on all counsel of record by ECF.

DATED:        January 24, 2023        */s/ Nima H. Mohebbi*
Nima H. Mohebbi (# 275453CA)
Attorney for Defendant Chess.com, LLC
**LATHAM & WATKINS LLP**
355 S. Grand Ave., Suite 100
Los Angeles, CA 90071
Tel: (213) 485-1234