UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI: EASTERN DIVISION

| | | |
|---|---|---|
| HANS MOKE NIEMANN, | ) | |
| | ) | |
| *Plaintiff,* | ) | CIVIL ACTION NO. 4:22-CV-01110 |
| | ) | |
| v. | ) | |
| | ) | |
| SVEN MAGNUS ØEN CARLSEN A/K/A | ) | |
| MAGNUS CARLSEN, PLAY MAGNUS | ) | |
| AS D/B/A PLAY MAGNUS GROUP, | ) | |
| CHESS.COM, LLC, DANIEL RENSCH | ) | |
| A/K/A "DANNY" RENSCH, AND | ) | |
| HIKARU NAKAMURA, | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS SVEN MAGNUS ØEN CARLSEN, CHESS.COM, LLC,
<u>DANIEL RENSCH, AND HIKARU NAKAMURA'S MOTIONS TO DISMISS</u>**

OVED & OVED LLP
*Attorneys for Plaintiff*
401 Greenwich Street
New York, New York 10013
Tel.: (212) 226-2700

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT .....................................................................................1

SUMMARY OF THE COMPLAINT ..............................................................................4

ARGUMENT .................................................................................................................6

I.      CONNECTICUT'S ANTI-SLAPP STATUTE IS INAPPLICABLE ...............................6

        A.      The Connecticut Anti-SLAPP Statute is a
                Procedural Rule that Does Not Apply in Federal Court ..........................7

        B.      Even if Connecticut's Anti-SLAPP Statute Were Not Procedural,
                Missouri, Not Connecticut, Law Applies ................................................9

        C.      Even If Connecticut's Anti-SLAPP Statute Applied,
                It Would Not Bar Niemann's Defamation Claims..................................15

                (i)      Connecticut's Anti-SLAPP Statute
                         Would Not Protect Defendants' Statements ................................15

                (ii)     There Is Probable Cause that Niemann Will Prevail ...................19

II.     DEFENDANTS' MOTIONS TO DISMISS
        PURSUANT TO RULE 12(B)(6) FAIL.....................................................................19

        A.      Legal Standard .......................................................................................19

        B.      Niemann Pleads Defamation Against All Defendants............................20

                (i)      Pleading Defamatory Statements with the Requisite Degree of Fault.......20

                (ii)     Niemann Alleges that Each Defendant Made Defamatory Statements .....23

                         (a)      Carlsen's Defamatory Statements................................23

                         (b)      Chess.com and Rensch's Defamatory Statements .........29

                         (c)      Nakamura's Defamatory Statements ............................37

                (iii)    Niemann Alleges Damages from Defendants' Defamation......................41

C.    Niemann Sufficiently Alleges Antitrust Claims Against Each Defendant ...........42

    (i)    Niemann States a Claim for
Violation of Section 1 of the Sherman Act ...............................................42

        (a)    Niemann Has Pleaded an Agreement Among the Defendants ......43

        (b)    Niemann Has Pleaded that Defendants' Concerted
Actions Resulted in a Per Se Restraint of Trade ...........................47

        (c)    Even if Niemann Had Not Pleaded a *Per Se*
Restraint of Trade, Which He Has, He Also Pleads an
Unreasonable Restraint of Trade Under the "Rule of Reason" .....50

        (d)    Niemann Pleaded Antitrust Standing ............................................53

    (ii)    Niemann States a Claim for
Violation of Section 2 of the Sherman Act ...............................................54

        (a)    Niemann Pleaded Defendants'
Specific Intent to Eliminate Competition ......................................54

        (b)    Niemann Pleaded Predatory and Anticompetitive Conduct ..........56

        (c)    Niemann Pleaded Defendants' "Dangerous Probability
of Success" of Unlawfully Eliminating Competition ...................58

D.    Niemann Pleads Tortious Interference .................................................................60

E.    Niemann Pleads Civil Conspiracy ........................................................................65

F.    Niemann Pleads Breach of Contract Against Chess.com ......................................67

III.    THE COURT HAS JURISDICTION OVER RENSCH AND NAKAMURA ..................69

IV.    WHILE NONE OF NIEMANN'S CLAIMS ARE DEFICIENT, HE SHOULD BE
ALLOWED TO REPLEAD WERE THE COURT TO CONCLUDE OTHERWISE .......74

CONCLUSION ...................................................................................................................75

**TABLE OF AUTHORITIES**

**Cases**                                                                                                       **Page(s)**

*ACT, Inc. v. Sylvan Learning Sys.*,
    104 F. Supp. 2d 1096 (N.D. Iowa 1999)........................................................................58

*Adelson v. Harris*,
    973 F. Supp. 2d 467 (S.D.N.Y. 2013)...............................................................................15

*Aguilar v. PNC Bank, N.A.*,
    2014 U.S. Dist. LEXIS 197363 (E.D. Mo. Nov. 19, 2014)..............................................15

*Alexander v. Nat'l Farmers Org.*,
    687 F.2d 1173 (8th Cir. 1982) ..........................................................................................56

*Allen v. ASRC Commun.*,
    2010 U.S. Dist. LEXIS 34661 (E.D. Mo. Apr. 8, 2010).......................................22, 28, 35

*Altimore v. Mount Mercy College*,
    420 F.3d 763 (8th Cir. 2005) ............................................................................................11

*Am. Cable Techs. Servs. v. AT&T Corp.*,
    140 F. Supp. 2d 1026 (W.D. Mo. 2001) ...........................................................................64

*Am. Guar. & Lab. Ins. Co. v. United States Fid. & Guar. Co.*,
    668 F.3d 991 (8th Cir. 2012) ............................................................................................14

*Am. W. Bank Members, L.C. v. State*,
    342 P.3d 224 (Utah 2014)..................................................................................................68

*Angelico v. Lehigh Valley Hosp., Inc.*,
    184 F.3d 268 (3d Cir. 1999)..............................................................................................54

*Arias-Zeballos v. Tan*,
    2008 U.S. Dist. LEXIS 25852 (S.D.N.Y. 2008)...............................................................18

*Ariel Preferred Retail Group, LLC v. CWCapital Asset Mgmt.*,
    2011 U.S. Dist. LEXIS 110505 (E.D. Mo. Sept. 28, 2011)..............................................62

*Aviation Charter, Inc. v. Aviation Research Grp./US*,
    416 F.3d 864 (8th Cir. 2005) ............................................................................................36

*Barry v. Time, Inc.*,
    584 F. Supp. 1110 (N.D. Cal. 1984) .................................................................................18

*Bender v. Boyreau*,
2021 U.S. Dist. LEXIS 227256 (E.D. Mo. Mar. 30, 2021) ............................................70

*Bigfoot on the Strip, LLC v. Winchester*,
2018 U.S. Dist. LEXIS 129674 (W.D. Mo. Aug. 2, 2018)..............................................73

*Blalock v. Ladies Prof'l Golf Ass'n*,
359 F. Supp. 1260 (N.D. Ga. 1973) ....................................................... 47-48, 49

*Blessing v. Chandrasekhar*,
988 F.3d 889 (6th Cir. 2021) ...........................................................................71

*Boggs v. Am. Optical Co.*,
2015 U.S. Dist. LEXIS 7537 (E.D. Mo. Jan. 22, 2015)....................................................39

*Brandenburg v. Life & Health Ins. Co.*,
2004 U.S. Dist. LEXIS 30754 (E.D. Mo. 2004) ............................................................10

*Brandon v. City of Moline Acres*,
2010 U.S. Dist. LEXIS 112204 (E.D. Mo. Oct. 21, 2010) ..............................................66

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007)......................................................................................60

*Brookins v. Int'l Motor Contest Ass'n.*,
219 F.3d 849 (8th Cir. 2000) .................................................................................49

*Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*,
42 F.4th 948 (8th Cir. 2022) .....................................................................................71

*Brovont v. KS-I Med. Servs., P.A.*,
622 S.W.3d 671 (Mo. Ct. App. 2020)...............................................................................9

*Butler Am., LLC v. Ciocca*,
2020 Conn. Super. LEXIS 1292 (Conn. Super. Ct. Mar. 12, 2020) ...............................63

*C. Pepper Logistics, LLC v. Lanter Delivery Sys., LLC*,
2021 U.S. Dist. LEXIS 158736 (E.D. Mo. Aug. 23, 2021)..............................................71

*California Motor Transp. Co. v. Trucking Unlim.*,
404 U.S. 508 (1972)......................................................................................................57

*Campbell v. Citizens for an Honest Gov't, Inc.*,
255 F.3d 560 (8th Cir. 2001) .......................................................................................37

*Campbell v. Porter*,
275 A.3d 684 (Conn. App. 2022) ...................................................................................66

*Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*,
354 S.W.3d 234 (E.D. Mo. 2011) ........................................................................64

*Chapman v. Journal Concepts, Inc.*,
528 F. Supp. 2d 1081 (D. Haw. 2007) ...............................................................18

*Chastain v. Cypress Media, LLC*,
2019 U.S. Dist. LEXIS 243739 (W.D. Mo. July 22, 2019)........................ 40-41

*Cheeks v. Belmar*,
2020 U.S. Dist. LEXIS 170149 (E.D. Mo. Sept. 17, 2020)...............................66

*Chiaravallo v. Middletown Transit Dist.*,
561 F. Supp. 3d 257 (D. Conn. 2021) ...............................................................40

*Cicle v. Chase Bank USA*,
583 F.3d 549 (8th Cir. 2009) .............................................................................9

*CitiMortgage, Inc. v. Mt. W. Fin., Inc.*,
2016 U.S. Dist. LEXIS 55266 (E.D. Mo. Apr. 26, 2016)..................................74

*Clement v. Carter-Young Inc.*,
2018 U.S. Dist. LEXIS 85490 (E.D. Mo. May 22, 2018)..................................71

*Clune v. Alimak AB*,
233 F.3d 538 (8th Cir. 2000) .............................................................................69

*Cockram v. Genesco, Inc.*,
680 F.3d 1046 (8th Cir. 2012) .....................................................17, 21, 22, 41

*Colon v. Town of W. Hartford*,
2001 U.S. Dist. LEXIS 484 (D. Conn. Jan. 5, 2001)........................................29

*Concord Boat Corp. v. Brunswick Corp.*,
1998 U.S. Dist. LEXIS 14570 (E.D. Ark. Mar. 6, 1998)..................................60

*Control Tech. & Sols., LLC v. Omni Energy Partners, LLC*,
2021 U.S. Dist. LEXIS 243084 (E.D. Mo. Dec. 21, 2021) ...............19, 63, 65

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
491 F.3d 380 (8th Cir. 2007) ...........................................................................51

*Cronin v. Pelletier*,
2018 Conn. Super. LEXIS 1667 (Conn. Super. Ct. July 26, 2018)..................28

*Cuba's United Ready Mix, Inc. v. Bock Concrete Founds., Inc.*,
785 S.W.2d 649 (Mo. Ct. App. 1990)..........................................22, 27, 31, 40

*Cweklinsky v. Mobil Chem. Co.*,
    837 A.2d 759 (Conn. 2004) ........................................................................28

*Daley v. Aetna Life & Cas. Co.*,
    734 A.2d 112 (Conn. 1999) ........................................................................64

*Doctor's Hosp. of Jefferson v. S.E. Med. Alliance*,
    123 F.3d 301 (5th Cir. 1997) ......................................................................54

*Dorman v. Emerson Elec. Co.*,
    23 F.3d 1354 (8th Cir. 1994) ......................................................................15

*Double D Spotting Serv. v. Supervalu, Inc.*,
    136 F.3d 554 (8th Cir. 1998) ................................................................42, 47

*Elmore v. Owens-Illinois, Inc.*,
    673 S.W.2d 434 (Mo. 1984) .......................................................................14

*Emerson v. Capital One*,
    2021 U.S. Dist. LEXIS 53758 (E.D. Mo. Mar. 22, 2021) ..............................62

*Envirotech, Inc. v. Thomas*,
    259 S.W.3d 577 (Mo. App. E.D. 2008) ................................................. *passim*

*Envt'l. Energy Ptnrs., Inc. v. Siemens Bldg. Techs.*,
    178 S.W.3d 691 (Mo. Ct. App. 2005) ........................................................64

*ES Dev., Inc. v. RWM Enters., Inc.*,
    939 F.2d 547 (8th Cir. 1991) ......................................................................43

*Estate of Gomez v. Larson*,
    1999 Conn. Super. LEXIS 1535 (Conn. Super. Ct. June 8, 1999) ..................29

*Favaloro v. BJC Healthcare*,
    2015 U.S. Dist. LEXIS 145995 (E.D. Mo. Oct. 28, 2015) ............................66

*Ferguson Med. Grp., L.P.O. v. Mo. Delta Med. Ctr.*,
    2006 U.S. Dist. LEXIS 53493 (E.D. Mo. Aug. 2, 2006) ...............................52

*Fisher v. Wal-Mart Stores, Inc.*,
    619 F.3d 811 (8th Cir. 2010) ......................................................................22

*Flamm v. Am. Ass'n of Univ. Women*,
    201 F.3d 144 (2d Cir. 2000) .......................................................................18

*Flood v. Clearone Communs.*,
    618 F.3d 1110 (10th Cir. 2010) ..................................................................67

*Flood v. Kuhn*,
    407 U.S. 258 (1972)..................................................................................................49

*Flotech, Inc. v. E. I. Du Pont de Nemours Co.*,
    627 F. Supp. 358 (D. Mass. 1985) .........................................................................15

*Foam Supplies, Inc. v. Dow Chem. Co.*,
    2006 U.S. Dist. LEXIS 53497 (E.D. Mo. Aug. 2, 2006)...........................51, 53

*Fuqua Homes, Inc. v. Beattie*,
    388 F.3d 618 (8th Cir. 2004) ........................................................................ 12-13

*Gasperini v. Ctr. for Humanities*,
    518 U.S. 415 (1996)....................................................................................................7

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
    810 F.2d 795 (8th Cir. 1987) ......................................................54, 55, 57, 59

*Gertz v. Robert Welch*,
    418 U.S. 323 (1974)..................................................................................................16

*Gettings v. Farr*,
    41 S.W.3d 539 (Mo. Ct. App. 2001).....................................................................65

*Gifford v. Taunton Press, Inc.*,
    2019 Conn. Super. LEXIS 1922 (Conn. Super. Ct. July 11, 2019)............8, 19

*Gleason v. Smolinski*,
    125 A.3d 920 (Conn. 2015) ....................................................................................37

*Goodrich v. Waterbury Republican-American, Inc.*,
    448 A.2d 1317 (Conn. 1982) ..................................................................................28

*Gottwald v. Sebert*,
    193 A.D.3d 573 (1st Dep't 2021) ..........................................................................16

*Graves v. Chronicle Printing Co.*,
    2018 Conn. Super. LEXIS 3795 (Conn. Super. Ct. Nov. 7, 2018).......................8

*Harold Friedman, Inc. v. Kroger Co.*,
    581 F.2d 1068 (3d Cir. 1978)...............................................................................59

*Harte-Hanks Commc'ns v. Connaughton*,
    491 U.S. 657 (1989)..................................................................................................37

*Haynes v. Dep't of Pub. Safety*,
    460 P.3d 565 (Utah Ct. App. 2020) ......................................................................67

*Hester v. Barnett*,
    723 S.W.2d 544 (Mo. Ct. App. 1987)................................................................24

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*,
    761 A.2d 1268 (Conn. 2000) .........................................................................64

*HM Compounding Servs. v. Express Scripts, Inc.*,
    2015 U.S. Dist. LEXIS 89062 (E.D. Mo. July 9, 2015) ........................... *passim*

*Hogan v. Winder*,
    2012 U.S. Dist. LEXIS 137399 (D. Utah Sept. 24, 2012).................................36

*Hohmann v. GTECH Corp.*,
    910 F. Supp. 2d 400 (D. Conn. 2012)..............................................................28

*Hutchinson v. Proxmire*,
    443 U.S. 111 (1979)........................................................................................17

*In re Trilegiant Corp.*,
    11 F. Supp. 3d 132 (D. Conn. 2014)................................................................66

*In re Westfall*,
    808 S.W.2d 829 (Mo. 1991) ......................................................................26, 40

*Ins. & Consulting Assocs. v. ITT Hartford Ins. Grp.*,
    48 F. Supp. 2d 1181 (W.D. Mo. 1999) ............................................................15

*Insignia Sys. v. News Am. Mktg. In-Store, Inc.*,
    2006 U.S. Dist. LEXIS 47015 (D. Minn. June 30, 2006)..........................49-50

*Inst. Food Mktg. Assocs., Ltd. v. Golden State Strawberries, Inc.*,
    747 F.2d 448 (8th Cir. 1984) .........................................................................15

*Irons v. Neske*,
    2021 U.S. Dist. LEXIS 175391 (E.D. Mo. Sept. 15, 2021)..............................39

*J H v. Kawasaki Motors Corp.*,
    2020 U.S. Dist. LEXIS 253186 (W.D. Mo. Dec. 4, 2020)...............................74

*J.Y.C.C. v. Doe Run Res., Corp.*,
    370 F. Supp. 3d 1047 (E.D. Mo. 2019)............................................................72

*Janzen v. Goos*,
    302 F.2d 421 (8th Cir. 1962) .........................................................................11

*Johnson v. Chesebrough-Pond's USA Co.*,
    918 F. Supp. 543 (D. Conn. 1996)...................................................................29

*Johnson v. Gawker Media, LLC*,
    2016 U.S. Dist. LEXIS 5088 (E.D. Mo. 2016)..............................................................73

*JRI Holdings v. York Innovators Grp., LLC*,
    2017 U.S. Dist. LEXIS 200313 (W.D. Mo. Dec. 6, 2017) .............................................74

*Kaliannan v. Hoong Liang*,
    2 F.4th 727 (8th Cir. 2021) ......................................................................................72, 74

*Kesner v. Buhl*,
    590 F. Supp. 3d 680 (S.D.N.Y. 2022)............................................................................7

*King v. Hubbard*,
    217 Conn. App. 191 (2023) ...........................................................................................7

*King v. Union Station Holdings, LLC*,
    2012 U.S. Dist. LEXIS 155158 (E.D. Mo. Oct. 30, 2012) ............................................36

*Kirkwood v. Union Elec. Co.*,
    671 F.2d 1173 (8th Cir. 1982) ..................................................................................55, 57

*Kopperl v. Bain*,
    23 F. Supp. 3d 97 (D. Conn. 2014)...........................................................................64, 66

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020).............................................................................................7

*Laxalt v. McClatchy*,
    116 F.R.D. 438 (D. Nev. 1987).....................................................................................12

*LeGgett v. Bed*,
    2020 U.S. Dist. LEXIS 267648 (W.D. Mo. May 15, 2020) ...........................................60

*Leitner v. Morsovillo*,
    2021 U.S. Dist. LEXIS 121228 (W.D. Mo. June 29, 2021) ....................................*passim*

*Mahaska Bottling, Co. v. PepsiCo Inc.*,
    271 F. Supp. 3d 1054 (S.D. Iowa 2017) ...................................................................56, 60

*Martin v. Griffin*,
    2000 Conn. Super. LEXIS 1537 (Conn. Super. Ct. June 13, 2000) ...........................17, 29

*McCoy v. Walmart, Inc.*,
    13 F.4th 702 (8th Cir. 2021) .........................................................................................68

*McNamee v. Clemens*,
    762 F. Supp. 2d 584 (E.D.N.Y. 2011) ...........................................................................18

*Mercer v. Cosley*,
   110 Conn. App. 283 (Conn. 2008).................................................................29

*Metcoff v. Lebovics*,
   2 A.3d 942 (Conn. App. Ct. 2010)...............................................................63

*Midwest Comms., Inc. v. Minnesota Twins, Inc.*,
   779 F.2d 444 (8th Cir. 1985) ...............................................................42, 53

*Miljas v. Promotions*,
   536 F. Supp. 3d 409 (S.D. Iowa 2021) .........................................................18

*Minn. Made Hockey, Inc. v. Minn. Hokey, Inc.*,
   761 F. Supp. 2d 848 (D. Minn. 2011).......................................................58, 60

*Mitchell v. Twin Galaxies, LLC*,
   70 Cal. App. 5th 207 (2021) ...............................................................23, 41

*Modzelewski's Towing & Storage v. Gov't Emples. Ins. Co.*,
   2022 Conn. Super. LEXIS 626 (Conn. Super. Ct. May 23, 2022) ....................................8

*Mongler v. Knight*,
   2017 U.S. Dist. LEXIS 105847 (E.D. Mo. July 10, 2017) ..............................................71

*Mulvihill v. Spinnato*,
   2022 Conn. Super. LEXIS 2016 (Conn. Super. Ct. Sept. 2, 2022)...................................19

*Myers v. Casino Queen, Inc.*,
   689 F.3d 904 (8th Cir. 2012) ...............................................................72

*N.C.C. Motorsports, Inc. v. K-VA-T Food Stores, Inc.*,
   975 F. Supp. 2d 993 (E.D. Mo. 2013)...............................................................72

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
   951 F.3d 952 (8th Cir. 2020) ...............................................................37

*Nelson v. L.A. Weaver Co.*,
   2005 U.S. Dist. LEXIS 55199 (D. Minn. June 27, 2005)..............................................69

*Netscout Sys. v. Gartner, Inc.*,
   223 A.3d 37 (Conn. 2020) ...............................................................34, 36

*Noble & Assocs. v. Edwards*,
   2007 U.S. Dist. LEXIS 78014 (W.D. Mo. Oct. 19, 2007)..............................................62

*Noble v. Hennessey*,
   2021 Conn. Super. LEXIS 87 (Conn. Super. Ct. Jan. 12, 2021) ......................................29

*Noeninger v. Vogt,*
    88 Mo. 589 (1886) ..........................................................................................................24

*Nunes v. Lizza,*
    12 F.4th 890 (8th Cir. 2021) ................................................................ *passim*

*Nunes v. Lizza,*
    476 F. Supp. 3d 824 (N.D. Iowa 2020)..................................................................8

*Nunes v. NBCUniversal Media, LLC,*
    582 F. Supp. 3d 387 (E.D. Tex. 2022)..................................................................71

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,*
    472 U.S. 284 (1985)...............................................................................................47

*Osby v. A&E TV Networks,*
    1997 U.S. Dist. LEXIS 8656 (E.D. Pa. 1997) ...................................................13

*Others First, Inc. v. Better Bus. Bureau,*
    829 F.3d 576 (8th Cir. 2016) ...............................................................................36

*Palmisano v. News Syndicate Co.,*
    130 F. Supp. 17 (S.D.N.Y. 1955) .......................................................................13

*PharmacyChecker.com LLC v. Nat'l Ass'n of Bds. Of Pharm.,*
    530 F. Supp. 3d 301 (S.D.N.Y. 2021)........................................................... 49-50

*Precision Rx Compounding, LLC v. Express Scripts Holding Co.,*
    2016 U.S. Dist. LEXIS 112851 (E.D. Mo. Aug. 24, 2016)................................43

*Primrose Cos. v. McGee,*
    2022 Conn. Super. LEXIS 2002 (Conn. Super. Ct. Aug. 26, 2022)..............8, 17

*Process Controls Int'l, Inc. v. Emerson Process Mgmt.,*
    753 F. Supp. 2d 912 (E.D. Mo. 2010)..................................................................56

*Raptor v. Garlock Safety Sys.,*
    2015 U.S. Dist. LEXIS 196957 (W.D. Mo. June 18, 2015) ...............................69

*Res. Mgmt. Co. v. Weston Ranch & Livestock Co.,*
    706 P.2d 1028 (Utah 1985)...................................................................................67

*Revell v. Lidov,*
    317 F.3d 467 (5th Cir. 2002) ...............................................................................71

*Reyes v. Bridgeport Dentist, LLC,*
    2015 Conn. Super. LEXIS 1657 (Conn. Super. Ct. June 18, 2015) ...................27

*Riley v. Riley*,
    340 S.W.3d 334 (Mo. Ct. App. 2011)................................................................42

*Robinson v. Degray*,
    2021 Conn. Super. LEXIS 639 (Conn. Super. Ct. Apr. 14, 2021)....................15

*Rockwood Bank v. Gaia*,
    170 F.3d 833 (8th Cir. 1999) ....................................................................22, 24

*S. Home Care Servs. v. Visiting Nurse Servs.*,
    2015 U.S. Dist. LEXIS 96496 (D. Conn. July 22, 2015)................................63

*S. Tool & Supply, Inc. v. Beerman Precision, Inc.*,
    862 So. 2d 271 (4th Cir. 2003) ....................................................................53

*Schuler v. McGraw-Hill Cos.*,
    989 F. Supp. 1377 (D.N.M. 1997) ................................................................36

*Seele v. Pierce*,
    494 N.W.2d 634 (Sup. Ct. S.D. 1993) ..........................................................13

*Sentementes v. Lamont*,
    2021 U.S. Dist. LEXIS 224609 (D. Conn. 2021) ............................................7

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010)........................................................................................7

*Smith v. Humane Soc'y of United States*,
    519 S.W.3d 789 (Mo. 2017) ........................................................................36

*Smith v. Truman Rd. Dev., LLC*,
    414 F. Supp. 3d 1205 (W.D. Mo. 2019) ......................................................70

*Southern Tool & Supply, Inc. v. Beerman Precision, Inc.*,
    862 So. 2d 271 (4th Cir. 2003) ....................................................................49

*Southridge Partners II, Ltd. P'ship v. SND Auto Grp., Inc.*,
    2019 U.S. Dist. LEXIS 218003 (D. Conn. Dec. 19, 2019)............................63

*St. Jude Medical, Inc. v. Intermedics, Inc.*,
    623 F. Supp. 1294 (D. Minn. 1985)........................................................58-59

*State ex rel. Caine v. Richardson*,
    600 S.W.2d 82 (Mo. Ct. App. 1980)............................................................72

*Stefanoni v. Darien Little League, Inc.*,
    2014 Conn. Super. LEXIS 1297 (Conn. Super. Ct. May 22, 2014) ...............28

*Steinberg v. Good Samaritan Hosp.*,
    2013 U.S. Dist. LEXIS 151504 (D.C. Neb. 2013)....................................................... 13-14

*Stevens v. Helming*,
    163 Conn. App. 241 (Mo. Ct. App. 2016) ..................................................................27, 28

*Stockley v. Joyce*,
    2019 U.S. Dist. LEXIS 23854 (E.D. Mo. Feb. 14, 2019).................................................37

*Stockley v. Joyce*,
    963 F.3d 809 (8th Cir. 2020) .........................................................................................31

*Strada v. Conn. Newspapers, Inc.*,
    477 A.2d 1005 (Conn. 1984) .........................................................................................36

*Suggs v. Stanley*,
    324 F.3d 672 (8th Cir. 2003) .........................................................................................21

*Tanisha Sys. v. Chandra*,
    2015 U.S. Dist. LEXIS 177164 (N.D. Ga. Dec. 4, 2015)................................................21

*Tension Envelope Corp. v. JBM Envelope Co.*,
    2015 U.S. Dist. LEXIS 25348 (W.D. Mo. Mar. 3, 2015).................................................60

*Tholen v. Assist Am., Inc.*,
    970 F.3d 979 (8th Cir. 2020) .....................................................................................22, 37

*TLC Vision (USA) Corp. v. Freeman*,
    2013 U.S. Dist. LEXIS 8353 (E.D. Mo. Jan. 22, 2013)..................................................73

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)...........................................................................................51

*Top Gun Ammo Sales, LLC v. COF Techs., LLC*,
    2022 U.S. Dist. LEXIS 48452 (E.D. Mo. Mar. 18, 2022) ...............................................72

*Trace X Chemical, Inc. v. Canadian Indus., Ltd.*,
    738 F.2d 261 (8th Cir. 1984) .........................................................................................56

*Trans-Western Petroleum, Inc. v. United States Gypsum Co.*,
    379 P.3d 1200 (Utah 2016)............................................................................................68

*Tumey L.L.P. v. Mycroft AI Inc.*,
    2021 U.S. Dist. LEXIS 197995 (W.D. Mo. Oct. 14, 2021)..............................................62

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018) .....................................................................................18

*Turntine v. Peterson*,
    959 F.3d 873 (8th Cir. 2020) .................................................................... 20-21, 31

*U.S. v. Empire Gas Corp.*,
    537 F.2d 296 (8th Cir. 1976) ............................................................................59

*Unity Healthcare, Inc. v. County of Hennepin*,
    308 F.R.D. 537 (D. Minn. 2015).........................................................................8

*US Polymers-Accurez, LLC v. Kane Int'l Corp.*,
    2018 U.S. Dist. LEXIS 159878 (E.D. Mo. Sept. 19, 2018).............................65

*Vitti v. Vockrodt*,
    2016 U.S. Dist. LEXIS 112831 (W.D. Mo. Aug. 24, 2016).......................... 26, 35-36, 42

*W. Oil, Inc. v. Garda CL Sw., Inc.*,
    2014 U.S. Dist. LEXIS 112004 (E.D. Mo. Aug. 13, 2014).............................68

*White v. Walsh*,
    649 F.2d 560 (8th Cir. 1981) ............................................................................66

*Williams v. LG Chem., Ltd.*,
    2021 U.S. Dist. LEXIS 244872 (E.D. Mo. Dec. 23, 2021) .............................74

*Willis Elec. Co. v. Polygroup Macau Ltd.*,
    437 F. Supp. 3d 693 (D. Minn. 2020).............................................................55

*Wolfley v. Solectron USA, Inc.*,
    541 F.3d 819 (8th Cir. 2008) ............................................................................14

*Woodcock v. Journal Publ'g Co.*,
    646 A.2d 92 (Conn. 1994) .................................................................................28

*Youngman v. Robert Bosch LLC*,
    923 F. Supp. 2d 411 (E.D.N.Y. 2013) .............................................................15

*Zeebaas, LLC v. Koelewyn*,
    2012 U.S. Dist. LEXIS 84665 (D. Conn. June 19, 2012)........................... 63-64

*Zimmerman v. Al Jazeera Am., LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017) .................................................................18

**Other Sources**

*2022 Sinquefield Cup*, CHESS.COM, https://www.chess.com/events/2022-sinquefield-cup ..........71

*Community Update On Recent Events*, CHESS.COM (Oct. 14, 2022),
https://www.chess.com/blog/CHESScom/community-update-on-recent-events ........................35

Conn. Gen. Stat. § 52-196a ....................................................................................8, 15, 19

*Nakamura to Relocate to Saint Louis*, ST. LOUIS CHESS CLUB (Apr. 27, 2010),
https://saintlouischessclub.org/blog/nakamura-relocate-saint-louis ..............................................70

Proficient Market Insights, *Global Chess Market 2022 Demand Insights, Industry Size, Share,
On-Going Trends, End Users, Key Manufacturer, Geographical Segmentation, Business
Challenges and Opportunity Analysis till 2027*, YAHOO (Oct. 11, 2022),
https://www.yahoo.com/now/global-chess-market-2022-demand-095900285.html....................18

Plaintiff Hans Moke Niemann ("Niemann") respectfully submits this memorandum of law in opposition to the motions to dismiss the Second Amended Complaint (the "Complaint" or "SAC") filed by Defendants Sven Magnus Øen Carlsen ("Carlsen"), Chess.com, LLC ("Chess.com"), Daniel Rensch ("Rensch"), and Hikaru Nakamura ("Nakamura").

## PRELIMINARY STATEMENT

This case is about holding bullies accountable when they cross the line.  Niemann is a 19-year old who devoted his life to mastering chess.  On his own, Niemann steadily propelled himself to the top echelons of the global chess world, and when given the opportunity to face off against the highest-ranked chess player in history, he rose to the occasion and soundly defeated him.  Niemann's remarkable underdog victory should have been celebrated, but Defendants would do whatever it took to prevent that from happening.

Carlsen is not just the highest-ranked Chess player in history.  He has become the face of the chess industry.  His company, Play Magnus, is one of the most dominant organizations in the Competitive Chess Market, second only to Chess.com, which recently acquired Play Magnus for $90 million, made Carlsen its brand ambassador, and formed a monopoly over competitive chess.[1] Accordingly, when Carlsen maliciously defamed Niemann by baselessly accusing Niemann of cheating against him, demanded that Niemann be eliminated from competition, and then unprecedently withdrew from the Sinquefield Cup when he did not get his way, his tantrum became a major brand management problem.

Sadly, however, rather than seek to rehabilitate Carlsen, Defendants scapegoated Niemann by unleashing a defamatory campaign designed to eviscerate Niemann's reputation and destroy his incredibly promising career in its infancy.  Despite unbiased professionals debunking Carlsen's

---

[1] Unless otherwise noted, capitalized terms have the same meaning as in the Complaint and all emphasis is added.

defamatory accusations, Defendants disseminated Carlsen's lies and other defamatory statements about Niemann on social media, in person, at major chess events, and by feeding false information to media outlets. They then used these lies and exploited their market dominance to effectively eliminate Niemann from the Competitive Chess Market.

This lawsuit is not a publicity stunt, despite Defendants' repeated refrain. Niemann has not offered a single interview or made a single public appearance in the wake of this lawsuit. Defendants are the ones with the media campaign, issuing press releases and leaking a 72-page defamatory "report" to the Wall Street Journal as a scoop. Niemann, however, came to the federal courthouse in the city where these wrongs occurred to reveal the truth in a court of law and obtain a judicial determination on the merits.

For their four separate motions to dismiss, Defendants hired a combined 20 lawyers, including one of the world's largest law firms, to prevent that from happening. Together, Defendants attempt to duck behind irrelevant procedural rules from other states, mischaracterize the Complaint beyond all recognition, blatantly ignore Niemann's allegations while asking the Court to adopt their own self-serving narrative, or try to escape this Court's jurisdiction knowing full well that Missouri is the only state tying these parties together.

As detailed in Point I, Defendants' attempt to invoke Connecticut's anti-SLAPP statute is wholly misguided because:

    (1)    it is well-settled law that Connecticut's anti-SLAPP statute is a state *procedural* rule that does not apply in federal court;

    (2)    even if Connecticut's anti-SLAPP statute constituted substantive law, Missouri law applies to Niemann's claims because Niemann does not live in Connecticut, and Missouri is where Defendants' wrongs and Niemann's injuries occurred, where Niemann's reputation matters most, the only state that ties all the parties together, and Niemann's chosen forum; and

(3)   even if Connecticut's anti-SLAPP statute were substantive law and Connecticut law applied, that statute would not protect Defendants' defamatory statements.

As detailed in Point II.B, Niemann easily pleads libel and slander against all Defendants by identifying false factual statements that each of them made with the requisite degree of fault and that severely damaged Niemann's reputation and career.  Niemann is not a general or limited public figure because his notoriety came from being involuntarily thrust into a public controversy by Defendants' defamation.  In other words, Niemann is only famous because Defendants falsely accused him of cheating.  Before that, Niemann was virtually unknown outside of small professional circles and far from a celebrity or household name.  Regardless, Niemann's sudden notoriety is irrelevant because the Complaint amply pleads that Defendants acted with malice when they repeatedly and unrelentingly defamed him.

As detailed in Point II.C, the Complaint alleges that Defendants violated the Sherman Act by (1) orchestrating an unlawful group boycott against Niemann participating in the Competitive Chess Market; and (2) attempting to unlawfully monopolize the Competitive Chess Market.  As discussed below, all of Defendants' arguments seeking to dismiss these claims misconstrue the Complaint or misapply the law.

As detailed in Points II.D-E, Defendants' coordinated efforts to falsely brand Niemann as a cheater and a liar in order to blacklist him from the Competitive Chess Market also support plausible claims for tortious interference and civil conspiracy.

Finally, as detailed in Point III, this Court has personal jurisdiction over Rensch and Nakamura based on their extensive contacts with Missouri.

## <u>SUMMARY OF THE COMPLAINT</u>

The Complaint contains 251 paragraphs of detailed allegations, which are addressed more specifically in the argument sections to which they apply.  Niemann summarizes only some of the Complaint's pertinent allegations in this section.

On September 4, 2022, Niemann defeated Carlsen at the Sinquefield Cup, a FIDE-rated Tournament.[2]  SAC ¶¶ 74-82.  Prior to that game, Niemann was a brand ambassador of Carlsen's company, Play Magnus, and a welcome participant on Chess.com.  *Id.* ¶¶ 4, 99.  After Niemann's victory against Carlsen, Carlsen maliciously defamed Niemann by accusing him of cheating against him and, later, of lying about cheating in the past.  *Id.* ¶¶ 83-91, 142-48.  Carlsen defamed Niemann in person to chess officials and other chess players, and to the public at large through a series of written and spoken statements disseminated around the world.  *Id.*; *id.* ¶¶ 134-36.  Carlsen bribed another chess Grandmaster to help him disseminate these defamatory statements.  *Id.* ¶ 125.  As detailed below, Carlsen's accusations were false and malicious.  When leading cheat detection experts uniformly confirmed that Carlsen had no basis to accuse Niemann of cheating, Carlsen continued to accuse Niemann of cheating against him, and boycotted playing Niemann in the future.  *Id.* ¶¶ 142-48, 156-64.  Given Carlsen's unparalleled stature in the Competitive Chess Market, he knew that he could abuse his influence to force professional tournament organizers to exclude Niemann from future events and destroy his career.  *Id.* ¶¶ 85, 92, 145-47, 195-99.

As these events unfolded, Carlsen was finalizing the Merger between his company Play Magnus and Chess.com, the two most dominant organizations in the Competitive Chess Market.  *Id.* ¶¶ 67-71.  Under this Merger that was completed on December 16, 2022, Carlsen became

---

[2] Section A(i)-(ii) of the Complaint explains the difference between competing in an official FIDE-rated event, which is played in secured settings "over-the-board," versus playing online chess on Chess.com, which is purely recreational and has no bearing on a player's professional rating or standing.  SAC ¶¶ 29-47.

Chess.com's brand ambassador, and Chess.com solidified its monopoly over the Competitive Chess Market. *Id.* ¶¶ 72-73. As the primary sponsor of practically every major FIDE-rated chess tournament, Chess.com also has incredible influence to decide who is invited to compete in those events and who is excluded. *Id.* ¶¶ 45-46. As detailed below, Chess.com, Carlsen, and the other defendants conspired to blacklist Niemann from the Competitive Chess Market.

Almost immediately after Carlsen decided to defame and boycott Niemann, Chess.com banned Niemann from competing in Chess.com events and playing recreational chess on Chess.com. *Id.* ¶ 99. Its thinly-veiled pretext for this sudden ban was its allegations that, years earlier, Niemann cheated in recreational online games on Chess.com; allegations it had already resolved with Niemann years ago. *Id.* ¶¶ 101, 118. After the Merger, Chess.com extended its ban to formerly-Play Magnus tournaments, which are now being hosted by Chess.com. *Id.* ¶¶ 16, 146, 198. Practically simultaneously with Chess.com's sudden ban, Nakamura, Chess.com's primary streaming partner, took to his channels and falsely accused Niemann of cheating against Carlsen, and being a serial online cheater who was banned twice from Chess.com for cheating and a liar. *Id.* ¶¶ 103-08. As detailed below, Chess.com provided these defamatory allegations regarding Niemann's alleged cheating in online recreational games to Nakamura and Carlsen for their dissemination worldwide to support the pretext for their boycott of Niemann and to bolster the defamatory accusation that Niemann cheated against Carlsen at the Sinquefield Cup and other defamatory statements.

Nakamura's false accusations forced Niemann to clarify in his post-Sinquefield Cup interview that he only experimented with using a chess engine in a handful of recreational online games as child. *Id.* ¶ 109. As result of Niemann's statements, Chess.com saw the opportunity to publish its own defamatory statements against Niemann under the pretext of somehow "defending

themselves." *Id.* ¶ 185.  To that end, Chess.com issued a press release falsely accusing Niemann of lying about the amount and seriousness of his supposed cheating online, and then fed to the Wall Street Journal a 72-page Defamatory Report that was rife with even more defamatory statements. *Id.* ¶¶ 111-12, 168-80.[3]

Defendants also coordinated to concoct and disseminate additional defamatory allegations against Niemann.  As one example, Play Magnus and Chess.com developed a conspiracy theory that Niemann's mentor was Max Dlugy, another chess Grandmaster who Chess.com accused of cheating, and that Dlugy helped Niemann cheat against Carlsen. *Id.* ¶¶ 134-41, 149-55.  Play Magnus and Chess.com privately fed this conspiracy theory to Carlsen and Nakamura to disseminate and amplify it. *Id.*

As explained below, Defendants' conduct had the intended effects of: (1) destroying Niemann's reputation, career, and life by branding him a cheater and a liar; (2) eliminating Niemann from the Competitive Chess Market; and (3) stifling competition in the Competitive Chess Market.

## ARGUMENT

## I.     CONNECTICUT'S ANTI-SLAPP STATUTE IS INAPPLICABLE

Defendants' attempt to invoke Connecticut's anti-SLAPP statute is entirely misguided. **Section A** below demonstrates that, based on settled precedent, Connecticut's anti-SLAPP statute is a state procedural rule that is wholly inapplicable in federal court.  **Section B** below demonstrates that even if Connecticut's anti-SLAPP statute were substantive law, the substantive law of Missouri, not Connecticut, applies to Niemann's claims.  **Section C** below demonstrates that even if Connecticut's anti-SLAPP statute applied, it would not bar Niemann's defamation claims.

---

[3] The defamatory allegations published by Play Magnus, which has yet to respond to the Complaint, are not addressed.

### A.    The Connecticut Anti-SLAPP Statute is a Procedural Rule that Does Not Apply in Federal Court

Defendants' attempt to invoke Connecticut's anti-SLAPP statute is dead on arrival because that statute is a state *procedural* rule, not a *substantive* law.  Under the longstanding *Erie* doctrine, federal courts may apply a state's substantive law, but shall not adopt its procedural rules.  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996).

Federal courts sitting in Connecticut have definitively established that Connecticut's anti-SLAPP statute is procedural, not substantive, for purposes of applying the *Erie* doctrine because it provides for a different standard for deciding a motion to dismiss.  *Sentementes v. Lamont*, 2021 U.S. Dist. LEXIS 224609 (D. Conn. 2021) (Connecticut's anti-SLAPP statute answers the same question as Rules 12 and 56 – whether a claim should be dismissed pre-trial – but does so in a manner different from either rule. Thus, per the Second Circuit's ruling in *La Liberte*, the Federal Rules govern).  Indeed, "[u]nder the familiar *Erie* doctrine,… the federal court cannot apply the anti-SLAPP statute if that statute makes it easier for a defendant to obtain dismissal of a case before trial 'than the more plaintiff-friendly' Federal Rules of Civil Procedure 12 and 56.'"  *Kesner v. Buhl*, 590 F. Supp. 3d 680, 700 (S.D.N.Y. 2022); *La Liberte v. Reid*, 966 F.3d 79, 87 (2d Cir. 2020) ("[T]he special motion to strike in <u>California's anti-SLAPP statute answers the same question as Federal Rules 12 and 56</u> [because it] establishes the circumstances under which a court must dismiss a plaintiff's claim before trial") (citing *Shady Grove*, 559 U.S. at 398-99)).

Connecticut state courts have uniformly agreed that Connecticut's anti-SLAPP statute is a procedural, not substantive, law.  In *King v. Hubbard*, 217 Conn. App. 191, 194 n.1 (2023), Connecticut's Court of Appeals held that the Connecticut anti-SLAPP statute "***does not create a substantive right***," but rather establishes a "***procedural mechanism*** to dismiss meritless claims."

*See also Modzelewski's Towing & Storage v. Gov't Emples. Ins. Co.*, 2022 Conn. Super. LEXIS 626, at \*29 (Conn. Super. Ct. May 23, 2022) ("The anti-SLAPP statute is a newly created ***procedural*** act"); *Graves v. Chronicle Printing Co.*, 2018 Conn. Super. LEXIS 3795, at \*18 (Conn. Super. Ct. Nov. 7, 2018) ("The statute does not shield such defendants from liability. It just provides them with a ***procedural*** advantage…."); *Primrose Cos. v. McGee*, 2022 Conn. Super. LEXIS 2002, at \*10 (Conn. Super. Ct. Aug. 26, 2022) ("The idea behind so-called 'anti-SLAPP' laws was that there should be a ***procedural*** mechanism in place….").

These findings are not controversial because Connecticut's anti-SLAPP statute is procedural on its face.  The statute expressly provides a procedural right to "file a special motion to dismiss" while expressly clarifying that "[t]he provisions of this section ***shall not...affect the substantive law*** governing any asserted claim."  Conn. Gen. Stat. § 52-196a(b) & (h).

Unsurprisingly, the Eighth Circuit has not had the occasion to opine as to the nature of Connecticut's anti-SLAPP statute.  However, district courts in this circuit have consistently held that anti-SLAPP statutes are procedural, not substantive.  *Nunes v. Lizza*, 476 F. Supp. 3d 824, 845 (N.D. Iowa 2020) ("The procedural mechanisms created by Rules 12 and 56…answer the same question as the California anti-SLAPP statute about 'the circumstances under which a court must dismiss a plaintiff's claim before trial.'"); *Unity Healthcare, Inc. v. County of Hennepin*, 308 F.R.D. 537, 542 (D. Minn. 2015) ("Because Rule 56 and Minnesota's anti-SLAPP law cannot be brought into harmony, the Court cannot apply the anti-SLAPP law").

Even the case law that Defendants rely upon supports this conclusion.  In *Gifford v. Taunton Press, Inc.*, 2019 Conn. Super. LEXIS 1922, at \*9 (Conn. Super. Ct. July 11, 2019) (Carlsen Mot. pp. 14, 17), the court recognized that "the anti-SLAPP statute…provides ***a***

*procedural mechanism* to dismiss meritless claims."[4]  Accordingly, Defendants' attempt to invoke Connecticut's anti-SLAPP statute to escape liability for Niemann's claims is spurious.

### B.    Even if Connecticut's Anti-SLAPP Statute Were Not Procedural, Missouri, Not Connecticut, Law Applies

Even if Connecticut's anti-SLAPP statute was a substantive law, which it plainly is not, it would not matter because the substantive law of Missouri applies to Niemann's claims. Connecticut law is inapplicable because Niemann does not live in Connecticut, and Missouri is where Defendants' wrongs and Niemann's injuries occurred, where Niemann's reputation matters most, the only state that ties all the parties together, and Niemann's chosen forum.

Federal courts follow the forum state's choice-of-law rules.  *Cicle v. Chase Bank USA*, 583 F.3d 549, 553 (8th Cir. 2009).   For tort claims, Missouri employs the "most significant relationship" test, which considers the following four factors: (1) where the injury occurred; (2) where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and business of the parties; and (4) where the relationship between the parties, if any, is centered.  *Brovont v. KS-I Med. Servs., P.A.*, 622 S.W.3d 671, 691 (Mo. Ct. App. 2020). Each factor weighs decisively in favor of applying Missouri law, not Connecticut law.

*First*, Niemann's injuries occurred in Missouri, not Connecticut.   As alleged in the Complaint,

> Other than being the location of his parents' home ... Niemann has virtually no connection to Connecticut.  He has not lived in Connecticut since 2019. He does not hold a job or keep a residence in Connecticut. He has spent only five days in Connecticut in the past year. Moreover, no major chess tournaments or organizations are located in Connecticut and, therefore, Niemann's reputation in Connecticut has no particular impact on his professional chess career or life. By contrast, St. Louis, Missouri is well-known as the nation's top chess hub; is home to the St. Louis Chess Club and the World Chess Hall of Fame; has hosted some of the most prestigious

---

[4] Defendants' reliance on out-of-circuit cases construing other states' anti-SLAPP statutes is unavailing because federal courts in Connecticut and Connecticut state courts have repeatedly confirmed that Connecticut's anti-SLAPP statute is procedural, not substantive.

chess competitions in the history of the game; and was declared the "Chess Capital of the United States" in 2014 by the U.S. Senate. Missouri is where Niemann's reputation and the esteem of his competitors and associates is most critical.  In 2022, Niemann spent approximately 97 days in St. Louis, Missouri, which is more time than he spent in any other single location. Niemann was in St. Louis, Missouri at the time that the acts giving rise to this Complaint occurred.

SAC ¶ 20.  In other words, Niemann's injuries cannot have occurred in Connecticut because his professional reputation in Connecticut is irrelevant.  He was not deprived of business opportunities in Connecticut and was not invited or disinvited to tournaments in Connecticut because such business opportunities and tournaments do not exist there.

By contrast, the harm that Niemann has suffered is most felt in Missouri because his reputation matters more so in Missouri than any other state, which is why he spent more time in Missouri than in any other location in the year prior to his filing of the Complaint.  As the "Chess Capital of the United States," Missouri hosts practically every major chess tournament in the United States.  Thus, the damage that Defendants caused to Niemann's reputation with the St. Louis Chess Club is particularly devastating because it impacts whether he is invited to compete in tournaments necessary to maintain and advance in his profession.  Prior to Defendants' defamation and blacklisting, Niemann was invited to compete in many such tournaments but has not since received a single such invitation.[5]  SAC ¶¶ 195-97.

*Second*, much of Defendants' misconduct occurred in Missouri.  "In defamation cases, Missouri law favors the substantive law of the state where the defamatory statement was published."  *Brandenburg v. Life & Health Ins. Co.*, 2004 U.S. Dist. LEXIS 30754, at *10-11 (E.D. Mo. 2004) (although plaintiffs were Missouri citizens, Illinois law applied because the statements were made there).  Here, Defendants' defamatory statements were first made by Carlsen while he

---

[5] For the same reasons, Niemann's injury from Defendants' tortious interference and civil conspiracy also occurred in Missouri.

was in Missouri (SAC ¶¶ 21, 83), and this action arises from events in Missouri at the Sinquefield Cup.  By contrast, none of the facts giving rise to this action occurred in Connecticut.

*Third*, while no party is domiciled or incorporated in Missouri, no party is domiciled or incorporated in Connecticut either.  Niemann is a Connecticut citizen only because he moved there with his family in 2015 and never established citizenship elsewhere, even though he left Connecticut a few years later.  *Altimore v. Mount Mercy College*, 420 F.3d 763, 768-69 (8th Cir. 2005) ("Once an individual has established his state of citizenship, he remains a citizen of that state until he legally acquires a new state of citizenship.").  Contrary to Defendants' contention, the Eighth Circuit has held that citizenship for diversity jurisdiction purposes is not the equivalent of residence or domicile for the purposes of a conflict-of-law analysis.  *Janzen v. Goos*, 302 F.2d 421, 426 (8th Cir. 1962) ("residence does not equate with citizenship").  Moreover, as explained below, all of the parties conduct business in Missouri.

*Fourth*, Missouri is the only state that ties the parties together.  As alleged in the Complaint:

(i)     Carlsen engages in extensive commercial activities in St. Louis, Missouri, including regularly competing in and commentating on chess tournaments and events.  Carlsen routinely travels to St. Louis, Missouri for these events.  Carlsen was in St. Louis, Missouri at the time that the acts giving rise to this Complaint occurred.  SAC ¶ 21.

(ii)    Chess.com, which owns Play Magnus, is a major corporate sponsor of almost every important and prestigious professional chess tournament around the world, including those in Missouri.  *Id.* ¶¶ 16, 22, 45, 201.

(iii)   As Chess.com's "Chief Chess Officer," Rensch engages in extensive commercial activities in St. Louis, Missouri, including regularly attending chess tournaments and other events.  Rensch routinely travels to St. Louis, Missouri for these events and was in St. Louis, Missouri during the Sinquefield Cup.  *Id.* ¶ 24.

(iv)    While Nakamura maintains that he was not in Missouri during the time period relevant to this Complaint, he conspired and coordinated with Carlsen and the other Defendants to commit tortious acts against Niemann when both Niemann and Carlsen were in Missouri.  Nakamura engages in extensive commercial activities in St. Louis, Missouri, including regularly competing in and commentating on chess

tournaments and events.  Nakamura routinely travels to St. Louis, Missouri for these events.  *Id.* ¶ 25.

By contrast, none of the parties' acts giving rise to this action have any connection to Connecticut.

*Finally*, the balance of the factors also tips in favor of applying Missouri law because it is Niemann's choice of forum.  *See, e.g.*, *Laxalt v. McClatchy*, 116 F.R.D. 438, 451 (D. Nev. 1987) ("When the evidence before the Court is such that it is impossible to reach a conclusion regarding a choice of law matter, the Court normally presumes that the forum's law should apply.").

In his motion, Carlsen dedicates much of his oversized brief to misguidedly griping about the fact that Niemann identified himself as a Connecticut resident in his original (now superseded) complaint, before clarifying in his First Amended Complaint why he was merely a Connecticut citizen.  Although Carlsen does not and cannot dispute Niemann's *de minimis* connections to Connecticut, he absurdly claims that this clarification was somehow made to "manipulate the judicial process," "change the applicable law," and "distort reality."  That is nonsense.  Niemann clarified his citizenship in response to the Court's order of November 16, 2022, well before Defendants filed their motions to dismiss erroneously claiming that Connecticut law applies based on inapplicable case law.  Further, as his original complaint explains, Niemann left Connecticut at the age of 16 to teach chess and attend Columbia Grammar & Preparatory School in New York and "prior to the events giving rise to this Complaint, Niemann lived out of a suitcase, traveling the world to compete in chess tournaments."  Dkt. 1 ¶¶ 3, 62.  That Carlsen resorts to attacking a single word, taken out of context, in a prior version of the Complaint only highlights the baselessness of his motion.

*Next*, Defendants misguidedly argue that merely because Niemann is a Connecticut citizen, all four choice of law factors weigh in favor of applying Connecticut law, including "the place where the injury occurred."  In doing so, Defendants misguidedly rely on *Fuqua Homes, Inc. v.*

*Beattie*, 388 F.3d 618, 622 (8th Cir. 2004), where the court concluded that a plaintiff's *residence* was the most critical factor for choosing the applicable law for defamation because defamatory injuries typically have their "principal effect among one's friends, acquaintances, neighbors and business associates," which are usually located where the plaintiff lives.  Here, because Niemann's reputation matters in Missouri, not Connecticut, and Niemann has no neighbors or business associates in Connecticut, *Fuqua Homes* is totally inapposite.

The holdings *Palmisano v. News Syndicate Co.*, 130 F. Supp. 17 (S.D.N.Y. 1955), *Osby v. A&E TV Networks*, 1997 U.S. Dist. LEXIS 8656 (E.D. Pa. 1997), and *Seele v. Pierce*, 494 N.W.2d 634 (Sup. Ct. S.D. 1993), further solidify precisely why Defendants' reliance on *Fuqua Homes* is misplaced.  In *Palmisano*, the court held that "[i]f the state of plaintiff's principal reputation is different from the state of his technical domicile…then the assumption implicit in the concept of domicile should give way to the facts."  Likewise, the court in *Osby* held that "[a] state, which is not the state of the plaintiff's domicil, may be that of most significant relationship if it is the state where the defamatory communication caused the plaintiff the greatest injury to his reputation."  There, the court applied Pennsylvania law to New Jersey residents' claims because they conducted business in Philadelphia and had friends and business associates in Philadelphia, and thus their reputations damaged by defendants' defamation were "based more in Philadelphia than in the New Jersey community where they live."  In *Seele*, the court clarified that "[t]he assumption that a plaintiff's domicile is also the place of his principal reputation should not be transformed into a rigid rule," and applied instead the law where the dispute was centered.

Equally fatal to Defendants' reliance on *Fuqua Homes* is that, there, the plaintiff alleging defamation was affirmatively seeking the protections of his home state, unlike here, where Niemann is not seeking to invoke Connecticut law.  The holding in *Steinberg v. Good Samaritan*

*Hosp.*, 2013 U.S. Dist. LEXIS 151504, at *11-12 (D.C. Neb. 2013), distinguished *Fuqua Homes* on this very ground.  *Steinberg* involved a New Jersey resident alleging defamation in a Nebraska court under Nebraska law.  The court noted the general proposition that the state with the most significant relationship will usually be the state where the defamed person was domiciled, yet held that Nebraska was the place where the conduct causing the injury occurred, and the only place where there was any relationship between the parties.  In deciding to apply Nebraska law, the court held that "[w]hile New Jersey may have an interest in protecting its residents from defamation, and providing them with a forum when they perceive they have been defamed, Steinberg is not seeking that protection or that forum."

That is exactly what happened here.  Niemann, although a citizen of Connecticut, filed his action in Missouri, where the underlying events occurred and which is the only state tying all the parties together.  While Connecticut may have an interest in protecting its citizens, Niemann chose not to avail himself of those protections.  *Fuqua Homes* is inapplicable for that reason as well.

The remaining cases upon which Defendants rely are even more inapplicable.  In *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434, 437 (Mo. 1984), the Supreme Court of Missouri held that because plaintiff's injury was suffering from disease, his residence had no overriding significance because the disease "goes with the victim wherever he goes."  In *Wolfley v. Solectron USA, Inc.*, 541 F.3d 819 (8th Cir. 2008), and *Am. Guar. & Lab. Ins. Co. v. United States Fid. & Guar. Co.*, 668 F.3d 991 (8th Cir. 2012), the Eighth Circuit Court of Appeals applied the law where the injury occurred, which was not where plaintiffs were domiciled.

Accordingly, even if Connecticut's anti-SLAPP statute was a substantive law, Missouri law applies to Niemann's claims.[6]

### C.     Even If Connecticut's Anti-SLAPP Statute Applied, It Would Not Bar Niemann's Defamation Claims

Even if Connecticut's anti-SLAPP statute were applicable, which it is not, that statute would not bar Niemann's defamation claims.  Connecticut's anti-SLAPP statute only applies to statements that were made (i) in furtherance of the defendant's constitutional free speech rights; **and** (ii) "in connection with a matter of public concern," which the statute defines as "an issue related to…[a] public figure."  Conn. Gen. Stat. § 52-196a; *Robinson v. Degray*, 2021 Conn. Super. LEXIS 639, at \*5 (Conn. Super. Ct. Apr. 14, 2021).  If the defendants demonstrate that their statements are protected by Connecticut's anti-SLAPP statute, the plaintiff must demonstrate probable cause that it will prevail on the merits.  Here, Defendants' defamatory statements would not implicate Connecticut's anti-SLAPP statute, and even if they did, Niemann has probable cause.

### (i)     Connecticut's Anti-SLAPP Statute Would Not Protect Defendants' Statements

Defendants' false cheating accusations and other defamatory statements would not be protected by Connecticut's anti-SLAPP statute for two reasons.

---

[6] In Defendants' remaining cases, choice-of-law was either not disputed or the state of a party's domicile also had the most significant relationship.  *See Aguilar v. PNC Bank, N.A.*, 2014 U.S. Dist. LEXIS 197363 (E.D. Mo. Nov. 19, 2014) ("The parties do not dispute that Missouri law governs the state-law claims."); *Ins. & Consulting Assocs. v. ITT Hartford Ins. Grp.*, 48 F. Supp. 2d 1181 (W.D. Mo. 1999) ("The parties do not specifically address the choice of law issues in their pleadings, but defendant clearly has relied on Missouri law and plaintiff has not objected."); *Youngman v. Robert Bosch LLC*, 923 F. Supp. 2d 411 (E.D.N.Y. 2013) (site of the accident was plaintiff's residence); *Dorman v. Emerson Elec. Co.*, 23 F.3d 1354 (8th Cir. 1994) (same); *Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013) ("Adelson is a Nevada citizen, and the Adelson business empire is based in Nevada."); *Flotech, Inc. v. E. I. Du Pont de Nemours Co.*, 627 F. Supp. 358 (D. Mass. 1985) (defamation allegedly injured plaintiff's business located in Massachusetts).  Moreover, Defendants mischaracterize *Inst. Food Mktg. Assocs., Ltd. v. Golden State Strawberries, Inc.*, 747 F.2d 448, 454 n.5 (8th Cir. 1984), as applying Missouri law "to a tortious interference claim brought by a plaintiff residing in Missouri."  Carlsen Mot. p. 8.  The court did not actually consider the plaintiff's domicile in that decision.  Rather, it held that it would apply "the substantive law of the place where the tort occurred."

*First*, Niemann is not a public figure.  A plaintiff can be considered a "public figure" in one of two ways.  A plaintiff can be a "general-purpose" public figure, meaning that he or she has "achieved such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts."  Alternatively, a plaintiff can be a "limited-purpose" public figure, meaning that the plaintiff "*voluntarily injects himself*" into a particular public controversy and "thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch*, 418 U.S. 323, 351 (1974).

"A person can only be a general-purpose public figure if 'he [or she] is a 'celebrity'; his [or her] name [is] a 'household word' whose ideas and actions the public in fact follows with great interest and invite[s] attention and comment." *Gottwald v. Sebert*, 193 A.D.3d 573, 577 (1st Dep't 2021) (although plaintiff "is an acclaimed music producer and well known in the entertainment industry, he is not a household name.  His success in a high-profile career, without more, does not warrant a finding that he is a general-purpose public figure.").  "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Gertz*, 418 U.S. at 351-52 (plaintiff was a private figure despite being a former mayoral appointee, prominent lawyer to noteworthy clients, author, lecturer, and guest on radio and television shows, because he was not in a position of "such pervasive fame or notoriety that he [became] a public figure for all purposes and in all contexts," and did not "thrust himself into the vortex of ***this*** public issue").

Here, Niemann is far from a celebrity or household name who occupies a position of "such pervasive fame or notoriety that he [became] a public figure for all purposes and in all contexts." *Id*. at 351.  Before Carlsen accused Niemann of cheating against him, Niemann was virtually unknown to the public.  Nor did Niemann "voluntarily inject" himself into a preexisting controversy.  "[T]hose charged with defamation cannot, by their own conduct, create their own

defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 134-35 (1979).  The Eighth Circuit's decision in *Cockram v. Genesco, Inc.*, 680 F.3d 1046 (8th Cir. 2012), supports this conclusion.  It held that the plaintiff did not voluntarily inject herself into a "preexisting controversy, nor did she knowingly produce the [occurrence] that initiated the controversy" because it was only after the controversy arose that the plaintiff "responded to media inquiries in an attempt to salvage her reputation."  *Id.* at 1053.

Here, the parties agree that the public controversy at issue is the Sinquefield Cup cheating scandal.  Carlsen Mot. p. 13 n.4 & Chess.com Mot. p. 24 (arguing Niemann is a public figure because he is "at the 'center' of what he describes as the 'single biggest chess scandal in history'") (citing SAC ¶ 11, which states "Carlsen's unprecedented actions, coupled with his unfounded accusations, sent shock waves through the chess world").  Niemann is only involved in this controversy because Carlsen accused Niemann of cheating against him.  Moreover, as Carlsen concedes, Niemann only entered the fray to defend himself *after* Carlsen publicly accused Niemann of cheating against him and Nakamura publicly accused Niemann of being a serial online cheater.  Carlsen Mot. p. 6 n.2, p. 13.[7]

Defendants' attempt to compare Niemann to indisputably famous professional sports figures in, for example, the MLB and NFL, also misses the mark.  A previously unknown 40th ranked chess player is a far cry from famous figures in multi-billion dollar sports industries that have major influences all over the world.  The viewership of these sports is in the tens of millions and they are reported widely on major media networks and outlets around the world.  Chess is

---

[7] None of the cases that Defendants rely upon suggest otherwise.  In *Martin v. Griffin*, 2000 Conn. Super. LEXIS 1537, at *21-24 (Conn. Super. Ct. June 13, 2000), the plaintiff was a "public official" who "thrust himself into an election dispute by undertaking certain political activities."  Likewise, in *Primrose Cos. v. McGee*, 2022 Conn. Super. LEXIS 2002 (Conn. Super. Ct. Aug. 26, 2022), the plaintiff invited public attention by working on redevelopment projects to revitalize the downtown area of a city, all of which, according to the plaintiff's complaint, "required collaboration with local and state officials, for the benefit of the local community."

reportedly a $152 million industry with a fraction of the media attention.[8]  Moreover, the public figure status of the plaintiffs in the cases cited by Defendants were either not disputed or based on more than the plaintiffs' mere involvement in major sports.  *Miljas v. Promotions*, 536 F. Supp. 3d 409, 421 (S.D. Iowa 2021) ("Plaintiff does not provide a basis for why he should not be considered a public figure"); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 274 n.11 (D.D.C. 2017) (plaintiffs "do not contest that they are public figures"); *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1119 (N.D. Cal. 1984) (plaintiff voluntarily accepted coaching position at USF, which was already being investigated by the NCAA for recruiting violations, which defendant reported on); *Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018) (plaintiff's coaching philosophy was already subject of HBO television program and several articles, which defendant reported on); *Chapman v. Journal Concepts, Inc.*, 528 F. Supp. 2d 1081 (D. Haw. 2007) (on summary judgment, there was evidence that plaintiff was, *inter alia*, already featured in several magazine articles, including the defendant-magazine, and appeared in movies and documentaries about his surfing skills and notoriety, which defendant reported on).

*Second*, Defendants' statements are not constitutionally protected.  It is well settled that the First Amendment does not protect false statements of purported fact.  *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 146 (2d Cir. 2000).  As demonstrated in Point II.B below, Defendants' defamatory statements are all false statements of purported fact, as opposed to constitutionally protected opinion.  *Arias-Zeballos v. Tan*, 2008 U.S. Dist. LEXIS 25852, at *34-35 (S.D.N.Y. 2008) (statement that plaintiff "cheated" and "is a liar" were capable of being characterized as true or false); *McNamee v. Clemens*, 762 F. Supp. 2d 584, 601-02 (E.D.N.Y. 2011) (statements that

---

[8] Proficient Market Insights, *Global Chess Market 2022 Demand Insights, Industry Size, Share, On-Going Trends, End Users, Key Manufacturer, Geographical Segmentation, Business Challenges and Opportunity Analysis till 2027*, YAHOO (Oct. 11, 2022), https://www.yahoo.com/now/global-chess-market-2022-demand-095900285.html.

plaintiff "is a liar" not constitutionally protected; "An attack on a person's integrity by impugning his character as dishonest or immoral may form the basis of a defamation if an ordinary listener would tend to credit the statements as true.").

### (ii)   There Is Probable Cause that Niemann Will Prevail

Even if Defendants' statements were protected by Connecticut's anti-SLAPP statute, Niemann has probable cause for filing suit.  Conn. Gen. Stat. § 52-196a(e)(3).  Probable cause "is merely 'an analysis of probabilities'" and "constitutes a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it."  *Gifford*, 2019 Conn. Super. LEXIS 1922, at *17.  "No part of the anti-SLAPP statute requires this court to resolve disputed issues of fact," but instead requires the Court only to determine "if there is any likelihood a reasonable juror could find in favor of the plaintiff."  *Id.* at *17-18.

Where a plaintiff alleges "an objective statement of fact which leads to allegation of unethical conduct at the least" and thus "rise[s] to the level of an objective, defamatory statement," he "has met his burden of establishing with probable cause that he will succeed on the merits of his defamation claim."  *Mulvihill v. Spinnato*, 2022 Conn. Super. LEXIS 2016, at *9 (Conn. Super. Ct. Sept. 2, 2022).  As set forth below, Niemann has done so here.

## II.   DEFENDANTS' MOTIONS TO DISMISS PURSUANT TO RULE 12(B)(6) FAIL

### A.   Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only "contain sufficient factual matter to 'state a claim to relief that is plausible on its face.'"  *Control Tech. & Sols., LLC v. Omni Energy Partners, LLC*, 2021 U.S. Dist. LEXIS 243084, *5 (E.D. Mo. Dec. 21, 2021).  The Court "must assume all of [plaintiff's] averments are true and give the plaintiff the benefit of every

reasonable inference therefrom.  No attempt is made to weigh the facts as to whether they are credible or persuasive."  *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 585 (Mo. App. E.D. 2008).

**B.**     **Niemann Pleads Defamation Against All Defendants**

To plead defamation, a plaintiff must allege the "(1) publication (2) of a defamatory statement (3) that identifies the plaintiff, (4) that is false, (5) that is published with the requisite degree of fault, and (6) that damages the plaintiff's reputation."  *Turntine v. Peterson*, 959 F.3d 873, 882 (8th Cir. 2020).[9]

Here, Defendants do not contest that they each published statements identifying Niemann. **Section (i)** below sets forth the standards for pleading a defamatory statement and requisite degree of fault.  **Sections (ii)(a)** through **(c)** below demonstrate that Niemann alleges that each of Defendants made actionable defamatory statements with the requisite degree of fault.  **Section (iii)** below demonstrates that Niemann alleges damages.

**(i)**     **Pleading Defamatory Statements with the Requisite Degree of Fault**

To determine whether a statement is "defamatory," courts analyze whether it is "capable of defamatory meaning," which "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  *Turntine*, 959 F.3d at 882.  "Words that impute 'fraud, want of integrity, or misconduct in the line of one's calling" are capable of defamatory meaning.  *Id.* at 886.

When conducting this analysis, a defendant's statement must be considered "in context" and under the "totality of the circumstances."  *Id.* at 882.  Statements need not be defamatory on their face, but rather can be defamatory "by implication" when a defendant either "juxtaposes a

---

[9] While Defendants' motions erroneously rely upon Connecticut law, Chess.com concedes that the elements of defamation "are substantially similar under Connecticut and Missouri law."  Chess.com Mot. 16.

series of facts so as to imply a defamatory connection between them," or "creates a defamatory implication by omitting facts." *Nunes v. Lizza*, 12 F.4th 890, 895-96 (8th Cir. 2021). Thus, when a reader or listener who "'connect[s] the dots,' could reasonably arrive at the [defamatory] implication, the author may be accountable." *Id.* at 897. For example, in *Cockram*, the Eighth Circuit rejected the argument that a statement was technically true because it implied that plaintiff intentionally communicated a racial slur, when, in fact, the plaintiff unknowingly printed a receipt containing a racial slur. 680 F.3d at 1051-52. Likewise, in *Nunes*, a magazine article asserted that Congressman Nunes and his family hid the fact that they moved their farm to Iowa, and that the farm uses undocumented labor. The Eighth Circuit held that, considering the theme and context of the article, it was plausible that a reader would draw the *implication* that "Nunes conspired to hide the farm's use of undocumented labor," which may be defamatory. 12 F.4th at 897.

Moreover, if multiple defendants acted in concert by amplifying each other's statements, they cannot escape liability merely because their individual actions, viewed in isolation, would not necessarily constitute defamation. *See, e.g.*, *Suggs v. Stanley*, 324 F.3d 672, 679-81 (8th Cir. 2003) (sufficient evidence to conclude defendants conspired to defame plaintiff where, *inter alia*, one defendant provided attachment for the other's letter, where the letter implied plaintiff was guilty of crime and the attachment implied plaintiff had a motive); *Tanisha Sys. v. Chandra*, 2015 U.S. Dist. LEXIS 177164, at *8, 15-19, 24-25 (N.D. Ga. Dec. 4, 2015) (denying motion to dismiss defamation and conspiracy to defame claims where defendant helped Jayaprakash create a blog post and then "extended the reach of the allegedly defamatory blog post by both disseminating it and by posing as an independent commenter who verified what Jayaprakash had written.").

While there is a privilege that protects statements constituting pure opinion, that privilege does not protect statements that "'impl[y] an assertion of objective facts,' even if couched as an

opinion." *Turntine*, 959 F.3d at 882.  On a motion to dismiss, "the test for whether this privilege applies is 'whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact.'"  *Id.*  Likewise, where speakers imply that they know "undisclosed defamatory facts," their statements are not protected, even if presented as an opinion.  *Cuba's United Ready Mix, Inc. v. Bock Concrete Founds., Inc.*, 785 S.W.2d 649, 651 (Mo. Ct. App. 1990).

The "requisite degree of fault" depends on whether the plaintiff is a public or private figure. As demonstrated above, Niemann is not a public figure.  Accordingly, he need only show that Defendants acted with negligence.  *Cockram*, 680 F.3d at 1052.  If Niemann was a public figure, he would need to allege "actual malice," meaning that Defendants knew their statements were false when made, or made the statements with "reckless disregard for their truthfulness at a time when [Defendants] had serious doubts as to whether they were true."  *Rockwood Bank v. Gaia*, 170 F.3d 833, 841 (8th Cir. 1999).  However, "[o]rdinarily, a determination of actual malice is a fact question for the jury.  'Whether the defendant acted with malice in making the defamatory statement or whether the statement made exceeded the exigencies of the situation are questions of fact for the jury[.]'"  *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 821 (8th Cir. 2010). Accordingly, to survive a motion to dismiss, a complaint need only allege "facts sufficient to give rise to a reasonable inference of actual malice."  *Nunes*, 12 F.4th at 899.

Inaccuracies in a defendant's statement present a reasonable inference of malice to survive a motion to dismiss.  *Tholen v. Assist Am., Inc.*, 970 F.3d 979, 984-85 (8th Cir. 2020).  "The rules of procedure do not impose 'a probability requirement' at the pleading stage."  *Nunes*, 12 F.4th at 901; *see also Allen v. ASRC Commun.*, 2010 U.S. Dist. LEXIS 34661, *7-8 (E.D. Mo. Apr. 8, 2010) (denying motion to dismiss where plaintiff alleged defendant's actions were "purposely calculated" to cause injury).  "A speaker who repeats a defamatory statement or implication after

being informed of its falsity 'does so at the peril of generating an inference of actual malice.'" *Nunes*, 12 F.4th at 900; *accord Mitchell v. Twin Galaxies, LLC*, 70 Cal. App. 5th 207, 221-23 (2021) (denying anti-SLAPP motion because "decision to avoid facts that might confirm the probable falsity of the challenged statement" and reliance "on biased sources to reach its conclusion" may support finding of malice).

  **(ii)**  **Niemann Alleges that Each Defendant Made Defamatory Statements**

  **(a)**  **Carlsen's Defamatory Statements**

Carlsen's defamation of Niemann falls into two separate and independent categories: (1) falsely accusing Niemann of cheating "over-the-board," including at the Sinquefield Cup; and (2) falsely accusing Niemann of lying about cheating in online recreational chess games in the past.  Carlsen:

(i)  verbally told Khodarkovsky, the Executive Director of the Grand Chess Tour, that Niemann cheated against him at the Sinquefield Cup and demanded his immediate disqualification (SAC ¶ 83), and when Niemann was not disqualified because there was no evidence of him cheating, Carlsen demanded that Sinquefield Cup organizers enhance its anti-cheating measures, to publicly raise the specter that someone had cheated (*id.* ¶ 87);

(ii)  after raising the specter that someone cheated, tweeted that he withdrew from the Sinquefield Cup after his loss to Niemann with a video in which soccer coach Jose Mourinho infamously reacted to controversial referee decisions that went against his team during a game he lost by saying "If I speak, I am in big trouble," in order to ensure that the public knew he was accusing Niemann of cheating (*id.* ¶¶ 88-91);

(iii)  verbally told other chess players, including Norwegian Grandmaster Aryan Tari, that Niemann cheated at the Sinquefield Cup and supported that false accusation with the additional false statement that Chess.com had definitive proof of Niemann cheating "over the board" (*id.* ¶ 123);

(iv)  paid Aryan Tari to scream "Cheater Hans" in Norwegian during the European Club Cup and then chanted "Cheater Hans" with the Norwegian chess team in bars and the streets of the Austrian town where the European Club Cup was held (*id.* ¶¶ 125-26);

(v)     after the public at large drew the intended conclusion that Carlsen was accusing Niemann of cheating at the Sinquefield Cup, Carlsen resigned from the Julius Baer Cup after one move during his game with Niemann and when asked about the meaning behind his resignation during an interview, explained that "people can draw their own conclusions, and they certainly, certainly have" – effectively endorsing the swirling conspiracy theories that Defendants created by accusing Niemann of cheating against Carlsen and lying about cheating in the past (*id.* ¶¶ 129-32);

(vi)    verbally stated in an interview that "I think [Niemann's] mentor Maxim Dlugy must be doing a great job," knowing that falsely identifying Dlugy as Niemann's mentor was another means of accusing Niemann of cheating because Dlugy was accused of cheating in the past and this implied that Dlugy helped Niemann to cheat (*id.* ¶¶ 134-36, 140); and

(vii)   stated in a written Twitter press release, "I believe that Niemann has cheated more – and more recently – than he has publicly admitted," including at the Sinquefield Cup, and "Unfortunately, at this time I am limited in what I can say without explicit permission from Niemann to speak openly" (*id.* ¶¶ 142-44).[10]

These statements contain direct accusations of cheating that are plainly defamatory, including in statements (i), (iii), (iv), and (vii).  Accusing a person of cheating is not only a factual assertion, not an opinion, but it is one of the oldest, quintessential examples of defamation *per se*. *See, e.g.*, *Noeninger v. Vogt*, 88 Mo. 589, 591-92 (1886) (statement that plaintiff is "a defrauder," "intending thereby to charge plaintiff with cheating," is actionable); *Hester v. Barnett*, 723 S.W.2d 544, 556-57 (Mo. Ct. App. 1987) (statements that plaintiff "will cheat anyone out of anything" and "cheats the Government" are actionable); *Rockwood*, 170 F.3d at 842 ("Comments that tend to harm a person in his business or profession are one of the traditional categories of slander per se.").

To bolster his plainly defamatory cheating accusations, Carlsen published additional lies, such as (i) telling Aryan Tari that Chess.com had definitive proof of Niemann cheating "over the board" (SAC ¶ 123), which was proven false when Chess.com was later forced to admit that it did not, and (ii) stating in an interview that Dlugy was Niemann's mentor (¶¶ 134-36), when he was

---

[10] Statements (i), (iii), (iv), (v), and (vi) are slanderous because spoken.  Statements (ii) and (vii) are libelous because written.

not.  Because these are also objectively false statements designed to accuse Niemann of cheating against him, they are defamatory as well.

Separately, Carlsen engaged in defamation by implication by (i) demanding that Sinquefield Cup organizers enhance its anti-cheating measures after his loss to Niemann to raise the specter that someone cheated publicly (¶ 87); (ii) resigning from Sinquefield with his provocative tweet to ensure that the public knew he was accusing Niemann of cheating (¶¶ 88-91); and (iii) resigning from his next game against Niemann after playing one move and endorsing the then-swirling controversy he ignited over his obvious cheating allegations (¶¶ 129, 132).

This is exactly the type of situation where a reader or listener who "'connect[s] the dots,' could reasonably arrive at the [defamatory] implication."  In fact, that is exactly what happened. As Carlsen intended, the chess world and the public at large received Carlsen's defamatory message loud and clear.  For example, on September 6, 2022, worldchess.com posted an article titled "Did Hans Niemann Actually Cheat? All the Info So Far," which stated

> Yesterday, Magnus Carlsen withdrew from the Sinquefield Cup 2022 after his loss to Hans Niemann in Round 3. Multiple tweets, streams, comments, and security checks later, the accusation of Niemann cheating is pretty obvious!

*Id.* ¶ 92.  On September 7, 2022, ABC News Australia released an article stating that

> Carlsen announced his withdrawal via a cryptic tweet on Tuesday morning (AEST) which was interpreted by many commentators – including leading American grandmaster Hikaru Nakamura – as alluding to foul play.

*Id.* ¶ 94.  On September 8, 2022, Chessbase.com posted an article stating

> In the last few days the chess world has been in enormous upheaval after the World Champion Magnus Carlsen withdrew from the Sinquefield Cup in protest after three rounds, with an unspoken accusation of cheating of the player who had defeated him, US rising star Hans Niemann.

*Id.* ¶ 95.  On September 9, 2022, The Guardian published an article noting that Carlsen's "only explanation" for why he withdrew from the Sinquefield Cup

was a cryptic video clip of the football manager José Mourinho saying "If I speak I am in big trouble," during a press conference about referees. This was widely interpreted as raising suspicions of cheating.

*Id.* ¶ 96.  Also on September 9, 2022, Vice News published an article explaining that the public "took [Carlsen's] cryptic tweet to mean that the only reason why Niemann won was because he cheated." *Id.* ¶ 97.

Moreover, Carlsen's seventh defamatory statement that "I believe that Niemann has cheated more – and more recently – than he has publicly admitted," including over-the-board and at the Sinquefield Cup, is not rendered pure opinion merely because it starts with "I believe." Carlsen Mot. p. 25.  The Supreme Court of Missouri has rejected this "artificial dichotomy" between opinion and fact:

> If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.  Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.  *Simply couching such statements in terms of opinion does not dispel these implications*; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'

*In re Westfall*, 808 S.W.2d 829, 833 (Mo. 1991); *see also Vitti v. Vockrodt*, 2016 U.S. Dist. LEXIS 112831, at *21 (W.D. Mo. Aug. 24, 2016) ("At this stage of the litigation, the Court cannot find that the use of the word 'probably' makes this a statement of opinion.").

That is exactly what Carlsen did here.  Despite being "couched as opinion," this statement "implies the assertion of objective facts," namely, that Niemann lied about cheating in the past and cheated "over-the-board," including at the Sinquefield Cup.  Moreover, by falsely claiming that he cannot say more without Niemann's permission, Carlsen implies that he has knowledge of

"undisclosed defamatory facts," which precludes Carlsen from relying upon the opinion privilege.[11]  *Cuba's United*, 785 S.W.2d at 651.

In his motion, Carlsen attempts to recast his first defamatory statement as merely "expressing concerns about Niemann's cheating to Khodorkovsky" (Carlsen Mot. p. 23) to somehow convert his blatant cheating accusations into an opinion.  That is not what the Complaint alleges.  Carlsen accused Niemann of cheating to Khodorkovsky.  The fact that Carlsen needs to mischaracterize the Complaint to argue otherwise is an implicit admission of defamation.[12]

Next, Carlsen argues that his accusations were not malicious because he actually believed them.  However, as demonstrated above, Niemann need not plead malice.  Yet, even if he did, the Complaint pleads malice and supports that allegation with specific facts demonstrating that Carlsen knew his accusations were false and acted with reckless disregard for the truth.  SAC ¶¶ 84, 98, 121-26, 129, 133-36, 148, 156-64.

For example, the Complaint alleges that every conceivable independent and unbiased source, including the Sinquefield Cup's organizers and arbiters, FIDE, and the world's foremost cheat detection experts, uniformly confirmed that there is no evidence that Niemann cheated.  SAC ¶¶ 156-64.  Rather, the consensus is that Niemann did not play particularly well, and that Carlsen played poorly.  *Id.*  As the world's highest-ranked chess player, it simply is not credible for Carlsen

---

[11] For this reason, Carlsen's statement that he believes that Niemann cheated at the Sinquefield Cup is yet another defamatory accusation.

[12] Carlsen also argues that Niemann did not allege who heard his defamatory chanting of "Cheater Hans" after the European Club Cup (Carlsen Mot. p. 19), but the Complaint expressly alleges that Carlsen chanted "Cheater Hans" with the Norwegian chess team and Aryan Tari in public streets and bars (SAC ¶¶ 125-26).  Unlike the cases cited by Carlsen, in which the plaintiff either failed to allege a defamatory statement entirely or merely alleged that defendant made the statements to "diverse persons," Niemann has sufficiently identified the context of Carlsen's defamatory statements so the listeners may be inferred.  Carlsen Mot p. 19 (citing *Stevens v. Helming*, 163 Conn. App. 241 (Mo. Ct. App. 2016) (refusing to consider defamatory statement not alleged in the complaint); *Reyes v. Bridgeport Dentist, LLC*, 2015 Conn. Super. LEXIS 1657, at *21 (Conn. Super. Ct. June 18, 2015)).

to claim that he does not know when he loses a game due to his own mistakes.[13]

The Complaint alleges that Carlsen is notoriously unable to cope with defeat and that he snapped because Niemann dashed his chances of achieving his two remaining statistical ambitions and taunted Carlsen after the match. *Id.* ¶ 82. These allegations show Carlsen's motive to trump up false cheating accusations.

The Complaint also alleges that (i) prior to their match, Carlsen made Niemann a brand ambassador of his company Play Magnus (*id.* ¶ 4); (ii) Niemann previously beat Carlsen in a non-FIDE-rated game, after which Carlsen played Niemann again (¶ 7); and (iii) Carlsen ignored legitimate sources confirming his accusations were baseless (¶¶ 87, 156-64). These allegations further undercut Carlsen's contention that he truly believed Niemann to be a cheater. *See Nunes*, 12 F.4th at 901 (plaintiff alleged malice because defendant republished defamatory statement "after Nunes filed this lawsuit and denied the article's implication").

Moreover, as set forth above, falsity of the accusation alone is sufficient at the pleading stage to support a reasonable inference of malice. *Allen*, 2010 U.S. Dist. LEXIS 34661, at *7-8 (whether the statement was made with knowledge that it was false and whether the statement was true cannot be resolved on a motion to dismiss). Further supporting this conclusion is that Carlsen's argument to the contrary relies almost entirely on decisions rendered after the plaintiff had the benefit of discovery.[14] And in the lone opinion decided on a motion to dismiss, the

---

[13] This situation is distinct from the cases cited by Carlsen, where the plaintiff failed to allege that defendant knew his statements were false or made with reckless disregard for the truth. *Hohmann v. GTECH Corp.*, 910 F. Supp. 2d 400, 407 (D. Conn. 2012) (plaintiff merely alleged that the defendant "engaged in a negligent misstatement of fact"); *Cronin v. Pelletier*, 2018 Conn. Super. LEXIS 1667, at *9 (Conn. Super. Ct. July 26, 2018) (plaintiff alleged intent to harm plaintiff, but not knowledge of falsity); *see also Stefanoni v. Darien Little League, Inc.*, 2014 Conn. Super. LEXIS 1297, at *29 (Conn. Super. Ct. May 22, 2014) (finding after trial no evidence of malice).

[14] *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759 (Conn. 2004) (after trial, declining to recognize compelled self-publication defamation); *Woodcock v. Journal Publ'g Co.*, 646 A.2d 92, 98-101 (Conn. 1994) (after trial, holding testimony fails to demonstrate by clear and convincing evidence that defendants knew statements were false); *Stefanoni*, 2014 Conn. Super. LEXIS 1297, at *19-20 (same); *Goodrich v. Waterbury Republican-American, Inc.*, 448

*footnote continued on next page…*

*Page 28*

defamatory statement contained an "Opinion & Comment" with no language indicating "that the remarks were going beyond opinion into the realm of fact." *Colon v. Town of W. Hartford*, 2001 U.S. Dist. LEXIS 484, at *14-15 (D. Conn. Jan. 5, 2001).

Carlsen's remaining argument is equally unavailing.  He argues that his non-verbal conduct, such as resigning from competition, cannot be defamation.  Carlsen Mot. p. 23.  Yet Niemann is not arguing that Carlsen's non-verbal conduct alone constitutes defamation.  Rather, as set forth above, Carlsen's non-verbal conduct is part of the overall "totality of circumstances" demonstrating how some of his statements were defamatory.

### (b)    Chess.com and Rensch's Defamatory Statements

Chess.com and Rensch's defamation of Niemann consists of (1) falsely accusing Niemann of lying about cheating in the past in online recreational games when he was a child; (2) falsely accusing Niemann of cheating against Carlsen at the Sinquefield Cup; (3) and falsely accusing Niemann of cheating in 100+ online games in order to support the false conclusion that Niemann is a serial cheater; and (4) making other false statements designed to bolster Carlsen's defamatory statements discussed above. In support of their false accusations:

(i)    Rensch, individually and on behalf of Chess.com, falsely stated in a written September 8, 2022 Twitter press release that Chess.com "shared detailed evidence with [Niemann]" that "contradicts his statements regarding the amount and seriousness of his cheating on Chess.com," implying that Niemann lied (SAC ¶¶ 111-12);

(ii)    Rensch, individually and on behalf of Chess.com, stated to The Guardian, for an article published on September 23, 2022 about Niemann, that "Once in a while anomalies do happen.  But if you have a lot of smoke, a lot of evidence, and a lot of

---

A.2d 1317, 1322, 1326 (Conn. 1982) (same); *Estate of Gomez v. Larson*, 1999 Conn. Super. LEXIS 1535, at *16-19 (Conn. Super. Ct. June 8, 1999) (summary judgment, holding statements were true or opinion); *Mercer v. Cosley*, 110 Conn. App. 283, 301 (Conn. 2008) (same); *Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 551 (D. Conn. 1996) (same); *Stevens*, 163 Conn. App. 241 (summary judgment); *Martin*, 2000 Conn. Super. LEXIS 1537 (decision on application for prejudgment remedy after "evidentiary hearings"); *Noble v. Hennessey*, 2021 Conn. Super. LEXIS 87, at *22-27 (Conn. Super. Ct. Jan. 12, 2021) (holding on "special motion to dismiss" permitting evidentiary record that plaintiff failed to "provide[] any evidence" that statements were false or defendant knew they were false).

reason to believe in the DNA of who someone is, and you walk into the room and they just say, 'I just lifted that fridge with one arm', you're like, 'Fu\*\*ing bullsh\*t, motherf\*\*\*er.'"  In that same article, Rensch followed by saying, "I'm not going on the record on anything that I think about the over-the-board scandal with Hans or Magnus, *but you can imply what you want based on what I'm saying*." (*id.* ¶ 114);

(iii)   Chess.com leaked to the Wall Street Journal and then subsequently published a "report" on October 4, 2022 (the "Defamatory Report"), which included the false statement that Niemann "cheated much more than he has publicly admitted to, including in many prize events, at least 25 streamed games, and 100+ rated games on Chess.com, as recently as when he was 17 years old;" and that Niemann "confessed" to these so-called cheating offenses (*id.* ¶¶ 171-76); and

(iv)   Despite admittedly having no "concrete evidence" that Niemann has cheated over the board based on its analyses, including its Defamatory Report numerous false statements to create the impression that he did, including by falsely stating that Niemann's explanation of his preparation for the Sinquefield Cup was not supported by records of Carlsen's prior games, and is "at odds with the level of preparation that Niemann claimed was at play in the game and the level of analysis needed to defeat the World Chess Champion" (*id.* ¶ 177).[15]

Rensch and Chess.com's first statement above is false because Niemann did not lie about the "amount and seriousness of his cheating on Chess.com."  In addition, Chess.com had not shared any evidence with Niemann, let alone "detailed evidence" that "contradict[ed] [Niemann's] statements regarding the amount and seriousness of his cheating on Chess.com."  These were false statements, specifically designed to further injure and defame Niemann by accusing him of not only being a serial online cheater, but also a liar. *Id.* ¶ 112.  In fact, the very first public comment to this tweet was "Ha! Hans is a liar!" *Id.* ¶ 113.  The following day, on September 9, 2022, GINX Esports TV wrote in an article that "Chess.com banned [Niemann] after finding 'evidence' supporting the[] striking allegations" by Carlsen and Chess.com.  *Id.* ¶ 116.  Rensch and Chess.com's first statement above is not only reasonably susceptible to a defamatory meaning, but these real-time reactions prove that the public interpreted these statements in a defamatory way.

---

[15] Statements (i), (iii), and (iv) are libelous because written.  Statement (ii) is slanderous because spoken.

In opposition, Chess.com's only argument is that the word "detailed" in its September 8, 2022 statement was only meant to describe the information it provided to Niemann regarding its decision to ban him from Chess.com, not the evidence that allegedly "contradicts his statements regarding the amount and seriousness of his cheating on Chess.com."  Chess.com Mot. p. 17. Regardless of what Chess.com meant, its statement was plainly susceptible to Niemann's reasonable interpretation, which is all he must show to survive a motion to dismiss.  In any event, Chess.com did not share any "evidence" with Niemann; only its accusations.  SAC ¶ 112.

Moreover, Chess.com's argument misses the point.  Chess.com plainly stated that it had evidence contradicting Niemann's statements, meaning that Niemann was not telling the truth.  *See Turntine*, 959 F.3d at 885-87 (implying a knowledge of facts leading to the conclusion that someone told an untruth is defamatory); *Stockley v. Joyce*, 963 F.3d 809, 819 (8th Cir. 2020) (Chess.com Mot. p. 16) (statements that defendant uncovered "new evidence" and that such new evidence proved plaintiff was guilty of murder are capable of defamatory meaning).

Rensch and Chess.com's second statement above is another defamatory accusation merely couched as opinion in an attempt to avoid liability.  Like Carlsen's written Twitter statement discussed above, this expletive-laced rant "implies the assertion of objective facts," namely, that Niemann cheated against Carlsen at the Sinquefield Cup.  In fact, Rensch plainly knew exactly what he was implying by stating "I'm not going on the record on anything that I think about the over-the-board scandal with Hans or Magnus, *but you can imply what you want based on what I'm saying*."  Moreover, by referring to "a lot of smoke" and "a lot of reasons," but not identifying them, Rensch implied he knew "undisclosed defamatory facts," which precludes Rensch from relying upon the opinion privilege.  *Cuba's United*, 785 S.W.2d at 651.  Accordingly, Chess.com's argument that Rensch fell short of outright accusing Niemann of cheating is unavailing.

Next, the Defamatory Report is rife with false and defamatory statements. Niemann has not "cheated much more than he has publicly admitted to, including in many prize events, at least 25 streamed games, and 100+ rated games on Chess.com, as recently as when he was 17 years old." SAC ¶¶ 172-76. Demonstrating the falsity of this accusation is that, among other things,

(i) it accuses Niemann of cheating in games while live streaming, while Rensch previously admitted to Niemann that he knew Niemann had never cheated in any games he played while streaming (*id.* ¶ 173);

(ii) both Niemann's face and his computer screen are visible to the public in real time during those games, and plainly show that he was not cheating (*id.* ¶ 173); and

(iii) Chess.com accuses Niemann of cheating in games where he lost or played so poorly that no reasonable person with knowledge of chess could possibly conclude that he cheated (*id.* ¶ 174).[16]

The Defamatory Report also falsely states that Niemann purportedly "confessed" to these so-called "cheating offenses" during a call with Rensch in 2020. Chess.com knows full well that this accusation is false, as demonstrated by the fact that Chess.com claims it was not fully aware of the extent of Niemann's supposed cheating until after it recently conducted a "deeper dive" into his online chess games following Carlsen's accusations. Niemann could not have "confessed" in 2020 to cheating in games that Chess.com only allegedly learned about in 2022. *Id.* ¶ 176.

In its motion, Chess.com and Rensch claim that none of these statements in the Defamatory Report are actionable because Chess.com was merely reporting the findings of its investigation, which constitutes protected "opinion."[17] This argument fails for numerous reasons.

First, as alleged in the Complaint, the Defamatory Report does not reveal the findings of a bona-fide investigation. Rather, this so-called "investigation" was a sham in the first instance,

---

[16] The Defamatory Report quotes Niemann as stating that Chess.com has "the best cheat detection in the world," but that is only what Chess.com told Niemann at the time. Niemann has since learned that this is entirely false. SAC ¶ 188 n.4.

[17] Rensch's motion incorporates the arguments made by Chess.com. Rensch Mot. p. 12.

created as part of a coordinated effort with other Defendants to destroy Niemann's reputation, protect Chess.com's soon-to-be-acquired asset, Play Magnus, and blacklist Niemann from the Competitive Chess Market. *Id.* ¶ 175. In other words, the Complaint alleges that not even Chess.com believes Niemann cheated in the 100+ online games listed in the Defamatory Report. Supporting this allegation is that Chess.com's self-serving "findings" are directly refuted by exhaustive analysis from Professor Ken Regan, the world's foremost expert on cheating in chess. *Id.* ¶ 180. Indeed, after Chess.com published the Defamatory Report, Professor Regan directly discredited the false accusations made against Niemann in that document. *Id.* ¶ 181.

The context under which the Defamatory Report was published further supports this conclusion. It was suddenly published only four weeks after Carlsen's accusations that Niemann cheated against him over-the-board at the Sinquefield Cup, yet Chess.com's last accusation of Niemann's online cheating in the Defamatory Report was two years earlier in August 2020. In the interceding two-year period, Chess.com had no objection to Niemann competing or appearing at its sponsored events. The timing of the Defamatory Report's publication alone raises legitimate questions of fact regarding the bone fides of Chess.com's so-called investigation.

As chess Grandmaster Ben Finegold stated to the New York Times, "It just seems like they want to back up what Magnus is saying for business reasons." Chess.com published the Defamatory Report, Finegold and other critics say, "to protect its recent $82 million investment in Play Magnus, which is very closely tied to Carlsen's personal reputation and success." *Id.* at ¶ 186. "There's no evidence in the report that Hans cheated recently, so it's very strange," said Finegold. Putting to rest any notion that Finegold might be biased in favor of Niemann, Finegold made clear that "I really don't like Hans at all, and I've not liked him for a long time." *Id.*

Likewise, contrary to Chess.com's self-serving contention that it merely wanted to ensure the integrity of the 2022 Chess.com Global Championship tournament, Chess.com allowed several players who had previously been banned from online chess for cheating in high profile events to participate in that tournament. *Id.* ¶ 182. In fact, Sebastien Feller, a European Grandmaster who was caught cheating at the 2010 Chess Olympiad and subsequently banned from participating in FIDE-sanctioned events for nearly three years, was currently playing in the same tournament as Carlsen – the 2022 European Club Cup – with no objection whatsoever from Chess.com or Carlsen. Carlsen also recently played a FIDE-sanctioned game with Parham Maghsoodloo, who was banned from Lichess.org for cheating. Likewise, chess Grandmaster Teimour Radjabov has been repeatedly boycotted by players for allegedly cheating, and Rensch has claimed that Chess.com algorithms confirmed that he cheated. Yet, to this day, Radjabov is allowed to compete in prize-money events on Chess.com, including the Global Chess Championship from which Niemann was uninvited. *Id.* ¶ 183. These glaring inconsistencies further support the plausible inference that the Defamatory Report is a complete and utter sham. *Id.* ¶ 184.[18]

Moreover, regardless of whether Chess.com labels its report an "investigation," the statements in the Defamatory Report are actionable because the Defamatory Report presented those statements as "facts" which, together with other so-called facts, "reasonably implies a connection among those asserted facts." *Nunes*, 12 F.4th at 897. Even the Connecticut case relied upon by Chess.com, *Netscout Sys. v. Gartner, Inc.*, 223 A.3d 37, 53 (Conn. 2020), recognized that a speaker is not "at liberty to make false statements of fact merely by labelling them 'opinions.'"

---

[18] Equally false is Chess.com's recent statement to the New York Times, reported in an article dated December 4, 2022, claiming that it wanted to keep its findings private but had to "defend [them]selves" after Niemann went public about his use of a chess engine in a handful of recreational games when he was a child. As the Complaint alleges, Niemann's public statements were a direct response to the false accusations leveled by Nakamura, Chess.com's top streaming partner, claiming that Niemann was banned twice on Chess.com for cheating and that Niemann was a rampant online cheater. *Id.* ¶ 185.

The Defamatory Report asserts as purported fact that Niemann is a serial online cheater and that he lied about it.  These are not opinions that are susceptible to reasonable disagreement as Chess.com contends.  These are objective factual accusations capable of being proven true or false and that must be decided by a jury.  *Allen*, 2010 U.S. Dist. LEXIS 34661, at *8 ("Defendant urges dismissal based on truth.  Once again, this argument is based on a determination of fact.  While Defendant attempts to resolve this factual issue in its Motion to Dismiss, such a determination is premature.").  Likewise, as with Carlsen's defamatory press release, Chess.com cannot couch Niemann's alleged online cheating as "likely" to avoid defamation.  *Vitti*, 2016 U.S. Dist. LEXIS 112831, at *21 ("At this stage of the litigation, the Court cannot find that the use of the word 'probably' makes this a statement of opinion.").[19]

Finally, Chess.com's false factual allegations regarding Niemann's over-the-board play, including at the Sinquefield Cup, are defamatory by implication and further support a reasonable inference of Chess.com's overall malicious intent.  For example, Chess.com's statement that Niemann's explanation of his preparation at the Sinquefield Cup was not supported by records of Carlsen's prior games is both false and designed to imply that Niemann cheated.  Without citing any authority, Chess.com's only argument is that Niemann does not explain how this statement is false.  Yet it is well settled that to plead defamation, a plaintiff need only allege that the defendant's

---

[19] Further demonstrating that Chess.com intended to present its Defamatory Report as fact is the "Q&A" that it posted on its website about the Defamatory Report.  In response to the question, "Why do you use the word 'likely cheated' in your report? Are you not confident in your findings?," Chess.com responded "Yeah lawyers, why did we have to use the word 'likely'?!," implying that lawyers made Chess.com use that word, and then wrote that "In the world of statistics, even something that is considered 99.99% sure is called 'likely,'" implying that Chess.com's accusations were effectively fact.  *Community Update On Recent Events*, CHESS.COM (Oct. 14, 2022), https://www.chess.com/blog/CHESScom/community-update-on-recent-events.

statement is false; he need not explain how.  *Id.* at *19-22 (rejecting argument that plaintiff "fails to show how" statement was false where "the necessary elements have been pled").[20]

The cases cited by Chess.com are plainly inapposite.  In *Smith v. Humane Soc'y of United States*, 519 S.W.3d 789 (Mo. 2017), the court held that calling plaintiff's kennel a "puppy mill" was not false, but merely had a negative connotation.  Here, Chess.com made objective statements of fact.  In *Hogan v. Winder*, 2012 U.S. Dist. LEXIS 137399 (D. Utah Sept. 24, 2012), the Utah District Court merely held that a news article reporting an employer's stated reasons for terminating an employee could not be defamatory.  Here, Chess.com is publishing its own statements, not reporting on someone else's.  In *Schuler v. McGraw-Hill Cos.*, 989 F. Supp. 1377, 1385 (D.N.M. 1997), the article merely used the word "bizarre" and not even to describe the plaintiff.  In *King v. Union Station Holdings, LLC*, 2012 U.S. Dist. LEXIS 155158 (E.D. Mo. Oct. 30, 2012), the plaintiff failed to plead the manner in which the alleged statements were made.[21]

Like Carlsen, Chess.com asserts the fallback argument that Niemann is a public figure and fails to allege actual malice.  Yet, also like with Carlsen, while Niemann need not plead malice because he is not a public figure, Niemann did so anyway because Chess.com acted with malice.  As set forth above, the timing of the Defamatory Report coinciding with Carlsen's defamatory statements, the fact that its dubious findings have been refuted by legitimate and unbiased experts,

---

[20] Chess.com's factual assertions designed to cast doubt on Niemann's success "over the board" were also false. According to Kenneth Regan, the world's foremost expert in detecting cheating in chess, the notion that Niemann's rise was faster than all of his contemporaries is "just wrong," and the accusations that Niemann cheated in over-the-board FIDE-sanctioned events are "completely unfair."  SAC ¶ 178.

[21] Chess.com's remaining cases were decided on summary judgment after plaintiff was afforded discovery. *Others First, Inc. v. Better Bus. Bureau*, 829 F.3d 576, 580 (8th Cir. 2016) ("the record contains no evidence supporting these allegations"); *Aviation Charter, Inc. v. Aviation Research Grp./US*, 416 F.3d 864, 866-70 (8th Cir. 2005) (based on defendant's "description of its process" in rating carriers, the statement was subjective); *Netscout*, 223 A.3d at 45, 53, 56-57 (based on expert reports and internal communications, vendor ratings that applied to multiple vendors, not just plaintiff, were opinion); *Strada v. Conn. Newspapers, Inc.*, 477 A.2d 1005, 1007 (Conn. 1984) ("The affidavits, depositions, and exhibits submitted by both parties showed that the statements of fact and quotations in the article were true or substantially true").  Niemann should be afforded the same opportunity.

the sheer number of Chess.com and Rensch's blatantly false statements about Niemann since Carlsen's accusation, and their obvious financial incentive to protect, and eliminate any threats to, Chess.com's recently acquired Carlsen brand, all support a reasonable inference that Chess.com and Rensch acted with malice. *Tholen*, 970 F.3d at 984-85 (case study containing inaccuracies, such as that a medical director told plaintiff it was inadvisable to travel when plaintiff never talked to a medical director, "present a reasonable inference" of malice).

At a minimum, whether Chess.com acted with malice is a question of fact that can only be resolved with discovery, as in the cases that Chess.com relies upon. *See Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 56 (8th Cir. 2001) (resolved post-trial); *Gleason v. Smolinski*, 125 A.3d 920, 927 (Conn. 2015) (same); *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657 (1989) (same).[22]

### (c)      Nakamura's Defamatory Statements

As Chess.com's top streaming partner and Carlsen's close ally, Nakamura's role in this controversy was to republish, widely disseminate, and amplify both Carlsen and Chess.com's defamatory statements to drown out the legitimate, unbiased experts who understood the baselessness of Defendants' accusations.  Nakamura was perfect for this role given his expertise as a chess Grandmaster, his millions of followers on Chess.com, Twitch, YouTube, and Twitter, and his long, well-documented history of abusing his leverage with Chess.com to blacklist competitors, accuse players of cheating, and damage their careers.  SAC ¶¶ 53-61.

While some of Nakamura's statements in his many hours of video content regarding this matter constitute protected, albeit extremely biased, opinion in favor of Carlsen, he crossed the

---

[22] *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952 (8th Cir. 2020), is distinguishable because the court found no malice only because defendant "promptly corrected the mistake" in the allegedly false statement on its website.  Likewise, in *Stockley v. Joyce*, 2019 U.S. Dist. LEXIS 23854 (E.D. Mo. Feb. 14, 2019), the plaintiff merely alleged that the defendant "disliked and bore ill will toward" the plaintiff.  Niemann has alleged far more than that.

line into defamation when he (a) made false factual assertions capable of being proven false; (b) couched statements as opinion but implied that he had knowledge of undisclosed facts to support those opinions; and/or (c) otherwise implied objective facts.[23]

Specifically, Nakamura slandered Niemann by:

(i)     Falsely stating that, based on undisclosed facts, Niemann was "not being completely clean about what's going on" with respect to Niemann's past with cheating, which statements were further bolstered by Nakamura's claim that he had access to undisclosed inside information at Chess.com (SAC ¶¶ 152-53);

(ii)    Republishing a tweet from an account named "Unsubstantiated Chess Rumors" falsely stating that top players know that Niemann had been banned twice on Chess.com for cheating, which statement Nakamura falsely presented as fact, claiming "this is a legitimate tweet" (*id.* ¶ 106);

(iii)   Falsely stating in his YouTube video that Niemann's explanation of how he beat Carlsen at the Sinquefield Cup was "complete nonsense," "just not possible," and "not 2700 level analysis," knowing that his viewers would believe that statement was based on his superior knowledge of chess to formulate that conclusion (*id.* ¶ 105);

(iv)    In specific reliance on undisclosed facts, falsely stating that "a lot of different chess players," without disclosing whom, believe Niemann cheated "over-the-board," including a chess player at the Sinquefield Cup who was "basically certain that Hans has done something," and that "amongst grandmasters," Niemann is known as a cheater (*id.* ¶¶ 105, 107);

(v)     Falsely stating that top players know that Niemann had been banned twice on Chess.com for cheating, when he was not (*id.* ¶ 106); and

(vi)    To support Carlsen's defamatory accusation that Dlugy helped Niemann cheat, falsely stating that Niemann "did go to Max Dlugy's academy in NYC for a short while" and then implied that Niemann also helped Dlugy cheat by stating that "the million dollar question is: who is the student" who suggested chess moves to Dlugy that came from a chess engine (*id.* ¶¶ 139, 154).

---

[23] Many of Nakamura's statements included in the Complaint also demonstrate his overt coordination with the other Defendants in defaming and blacklisting Niemann. These include his statements (i) revealing he had knowledge of the accusations in the Defamatory Report before it was released to the public and when Chess.com was allegedly keeping its so-called "findings" private (*id.* ¶¶ 105-07, 179, 187), (ii) connecting the dots for his viewers as to why Carlsen name-dropped Dlugy and resigned from his game against Niemann, so it was clear that Carlsen was accusing Niemann of cheating and using the help of Dlugy to cheat (*id.* ¶¶ 137-39); and (iii) falsely implying that Niemann was a student of Dlugy who helped Dlugy cheat on Chess.com (*id.*).

Other than relying on the other Defendants' faulty Connecticut anti-SLAPP argument, Nakamura only makes two arguments to support the summary dismissal of Niemann's defamation claims against him.

Curiously, Nakamura's first argument is that the Complaint engages in impermissible group pleading. Nakamura Mot. p. 15. This argument plainly fails because each of Nakamura's defamatory statements are directly attributed to him alone. Moreover, it is well settled that "[a] plaintiff may refer to defendants collectively in a complaint if the complaint provides the defendants with adequate notice of the claims against them. When, as in this case, a complaint contains specific allegations of misconduct by the named defendants, differentiating between a defendant, group of defendants, and all defendants satisfies Rule 8(a)." *Irons v. Neske*, 2021 U.S. Dist. LEXIS 175391, at *5-6 (E.D. Mo. Sept. 15, 2021). Indeed, the case that Nakamura relies upon, *Boggs v. Am. Optical Co.*, 2015 U.S. Dist. LEXIS 7537 (E.D. Mo. Jan. 22, 2015), illustrates why his argument is meritless. There, the court considered a complaint alleging that all thirty-two defendants caused the plaintiff to be exposed to asbestos by selling two-dozen different products, in five different alleged locations, over a twenty-seven year period. That is a far cry from the Complaint here, which quotes the specific defamatory statements at issue and distinguishes between the words of each Defendant.

Nakamura then baselessly labels his defamatory statements as "opinion" and "belief," despite having stated them as fact and/or based on undisclosed facts, as set forth above. For example, Nakamura did not express a "belief that Plaintiff was a student of Maxim Dlugy" as he now contends (Nakamura Mot. p. 18), but stated that Niemann "did go to Max Dlugy's academy." Nakamura did not merely retweet from an "Unsubstantiated Chess Rumors" account, but confirmed the rumor as true by calling it "legitimate." And Nakamura did not merely express an

opinion on Niemann's play during the Sinquefield Cup (*id.* p. 17), but stated as a matter of fact that Niemann's explanation was "just not possible" and "not 2700 level analysis," knowing that his viewers would believe that, as a chess Grandmaster, Nakamura relied on undisclosed knowledge of the players' strategies to support that statement.  Missouri law does not permit a defendant to rewrite his unequivocal statements post-hoc into uncertain opinion.  *See, e.g.*, *Westfall*, 808 S.W.2d at 833 (rejecting defendant's "after-the-fact characterization" of what he meant).  Likewise, Nakamura's statements that Niemann was not being "completely clean" about cheating in the past and was known for being a cheater are factual allegations, not opinions.

Nakamura also did not "simply comment" on articles and Chess.com's statements (Nakamura Mot. p. 18), but stated that based on inside information, he knew that Niemann was "not being completely clean" about his alleged cheating and that there was "no way that Chess.com is bluffing."  Like with the other Defendants, Nakamura's statements are not protected because he implied a knowledge of "undisclosed defamatory facts."  *Cuba's United*, 785 S.W.2d at 651 (denying motion to dismiss because the "statement indicates that Bock knew facts establishing that the material of plaintiff was inferior and plaintiff knew it and concealed it.  As such, it may constitute actionable defamation.").

The case relied upon by Nakamura, *Chiaravallo v. Middletown Transit Dist.*, 561 F. Supp. 3d 257 (D. Conn. 2021), actually contradicts Nakamura's argument because it held the statements that plaintiff's actions "may have violated federal law, that he had withheld information regarding MAT's financial circumstances from the City and had engaged in financial mismanagement" were "sufficiently defamatory."  Here, Nakamura's statements were even more unequivocal.

Finally, Nakamura baldly argues that Niemann did not allege actual malice.  Nakamura Mot. p. 17.  He cites to *Chastain v. Cypress Media, LLC*, 2019 U.S. Dist. LEXIS 243739, at *7

(W.D. Mo. July 22, 2019), in which the statement that plaintiff was placed on a watchlist was admittedly true.  Here, Nakamura and the other Defendants' statements were not true and leading authorities confirmed they were baseless.  Yet, Nakamura continued to defame Niemann and amplify Defendants' accusations anyway.  *Mitchell*, 70 Cal. App. 5th at 221-23 ("decision to avoid facts that might confirm the probable falsity of the challenged statement" and reliance "on biased sources to reach its conclusion" may support finding of malice).  Further, as demonstrated below, the Complaint states in elaborate detail how Nakamura's allegations were part of a coordinated scheme to defame and blacklist Niemann, as Nakamura has done with other chess players in the past.  Based on the foregoing, Niemann amply pleads allegations that support the reasonable inference that Nakamura acted with malice.

### (iii)     Niemann Alleges Damages from Defendants' Defamation

Lastly, Niemann easily pleads damages as a result of Defendants' defamatory statements. "[T]he question of whether a plaintiff's damages were caused by the defamatory statement is for the jury to decide."  *Cockram*, 680 F.3d at 1054.  Here, Niemann amply alleges how being branded by Defendants as a cheater and a liar has caused and continues to cause him harm, including by (i) causing chess players and tournament organizations to disinvite him from events (SAC ¶¶ 193-194) preventing him from obtaining lucrative endorsements, sponsorships, business and marketing opportunities (*id.* ¶¶ 195-98); (ii) preventing him from obtaining employment as a chess teacher at a reputable school (*id.* ¶ 199); and (iii) forcing him to incur significant costs, expenses and fees, including but not limited to attorneys' fees, to try to remedy or mitigate the damage caused by Defendants' misconduct (*id.* ¶¶ 212, 218).  In fact, since the filing of the Complaint, Defendants' blacklisting of Niemann has continued, resulting in him not receiving invitations or even responses from tournament organizers for events that he qualifies for and was invited to in the past.

Accordingly, Niemann has amply pleaded damages as a result of Defendants' defamatory statements. *See Vitti*, 2016 U.S. Dist. LEXIS 112831 (denying motion to dismiss where plaintiff "alleges that as a result, he suffered emotional distress, anxiety, his reputation is damaged, lost income, and his potential future earning suffered because of his reputation since the article was published"); *Riley v. Riley*, 340 S.W.3d 334, 338 (Mo. Ct. App. 2011) (same, "[b]ecause Ms. Sless alleged that her reputation in the community was damaged, she sufficiently pleaded damages").

### C.    Niemann Sufficiently Alleges Antitrust Claims Against Each Defendant

The Complaint alleges that Defendants violated the Sherman Act in two distinct ways. Defendants violated Section 1 of the Sherman Act ("Section 1") by orchestrating an unlawful group boycott against Niemann participating in the Competitive Chess Market.  Independently, Defendants also violated Section 2 of the Sherman Act ("Section 2") by attempting to unlawfully monopolize the Competitive Chess Market.[24]  As discussed below, all of Defendants' arguments seeking to dismiss these claims are unavailing.

### (i)    Niemann States a Claim for Violation of Section 1 of the Sherman Act

To plead a Section 1 claim, a plaintiff must allege (1) an agreement, contract, combination, or conspiracy between the defendants that (2) results in an unreasonable restraint of trade.  *Double D Spotting Serv. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir. 1998); *see also HM Compounding Servs. v. Express Scripts, Inc.*, 2015 U.S. Dist. LEXIS 89062, at *8 (E.D. Mo. July 9, 2015).  In addition, a plaintiff asserting a Section 1 claim must allege "antitrust standing" – *i.e.*, that he suffered an injury of the type that antitrust laws are designed to prevent.  *See Midwest Comms., Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444, 450-51 (8th Cir. 1985).

---

[24] The Complaint defines the "Competitive Chess Market" as encompassing "[p]rofessional chess tournaments and online recreational chess platforms."  SAC ¶ 47.

Here, as detailed below, Niemann has sufficiently pleaded each element of his Section 1 claim, and each of Defendants' contentions to the contrary is devoid of merit.

### (a)      Niemann Has Pleaded an Agreement Among the Defendants

To plead the first element of a Section 1 claim – an agreement, contract, combination, or conspiracy – a plaintiff need not allege the existence of any "formal agreement" among defendants. *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553 (8th Cir. 1991).  Rather, a plaintiff may allege merely "that the conspirators had a unity of purpose **or** common design and understanding, **or** a meeting of the minds in an unlawful arrangement."  *Id.* at 553-54; *see also Precision Rx Compounding, LLC v. Express Scripts Holding Co.*, 2016 U.S. Dist. LEXIS 112851, at *7 (E.D. Mo. Aug. 24, 2016) ("[I]t is axiomatic that the typical conspiracy is 'rarely evidence[d] by explicit agreements,' but must also always be proved by 'inferences that may be drawn from the behavior of the alleged conspirators.'").  That is, courts may *infer* an agreement or conspiracy among defendants based on circumstantial allegations, such as "parallel conduct" by defendants combined with "a common motive to conspire" or a "high level" of communications between defendants. *ES Dev.*, 939 F.2d at 553-54; *HM Compounding*, 2015 U.S. Dist. LEXIS 89062, at *11-17 (rejecting argument that complaint alleged "merely parallel conduct" and inferring agreement based on defendants' domination of relevant market and timing/similarity of their actions).  As the Eighth Circuit has made clear, it is proper to infer an agreement for the purposes of Section 1 even where defendants "exercise[d] their individual legal rights," but did so "in a concerted manner designed to" harm plaintiff.  *ES Dev.*, 939 F.2d at 554.

Here, Niemann's allegations are more than sufficient for the Court to infer an agreement and/or conspiracy among the Defendants.  Specifically, the Complaint details how Chess.com and its officer Rensch, along with their new business partner Carlsen and their longtime streaming

partner Nakamura, had a "common motive to conspire" to smear Niemann's reputation and exclude him from the Competitive Chess Market in order to protect Chess.com's nascent investment in Play Magnus and the Carlsen brand, and thus benefit themselves financially.  SAC ¶¶ 82, 98-105, 110-12, 118, 140-41, 146, 149-55, 168, 186-88.

*First*, the Complaint alleges that after Carlsen defamed Niemann and sought to blacklist him from competitive chess, Carlsen enlisted Chess.com and Rensch to bolster his accusations by portraying Niemann as a cheat and liar.  To aid Carlsen in that endeavor, Chess.com immediately banned Niemann from its website and forbade him from participating in its events, then issued a public statement accusing Niemann of lying about cheating in the distant past.  SAC ¶¶ 99-100, 192.  As Chess.com admits, the *only* reason for Chess.com's sudden ban of Niemann and the revocation of his tournament invitation was Carlsen's accusation.  *Id.* ¶¶ 101-02, 118, 182-83, 188, 192.  Underscoring that admission, for a full two years prior, Chess.com had no objection to Niemann competing on its platform or in its sponsored events, and Chess.com did not ban any of the other players referenced in the Complaint who had been accused of cheating.  *See id.* ¶¶ 182-84.  Contemporaneously with Chess.com's ban, Carlsen announced his decision to boycott Niemann, which he falsely presented as his contribution to the fight against cheaters.  *Id.* ¶ 144.

*Second*, Chess.com disseminated its supposedly private accusations in its Defamatory Report to the other Defendants <u>before</u> it was released to the public so they could immediately disseminate those accusations.  Indeed, as demonstrated by Nakamura's own statements, he was made aware of those accusations long before they were made publicly on October 4, 2022.  *See id.* ¶¶ 105-08, 111, 153.  Chess.com apparently leaked this information to Play Magnus as well.  Indeed, Play Magnus commentator Lawrence Trent alluded to having that information during a live stream on September 19, 2022.  *Id.* ¶ 120.  Both Nakamura and Play Magnus used these false

accusations to defame Niemann as part of Defendants' common scheme to defame and discredit him.   Rensch and Chess.com then leaked the Defamatory Report containing the so-called "evidence" to the media *the day before* Niemann was slated to play in the U.S. Chess Championship Tournament.   *Id.* ¶¶ 168-70.   The Defamatory Report repeats Nakamura's defamatory statements verbatim, further confirming that Nakamura obtained his "inside information" from Chess.com.   *Id.* ¶¶ 107 n.3, 187.   Moreover, in that Defamatory Report, Chess.com *specifically cites assistance from Carlsen* to bolster its so-called conclusions, stating:

> *[Carlsen] shared in a private conversation* that his experience in playing Hans was 'unlike a game he's ever had.' He emphasized that he has competed against numerous prodigies and players who 'exert' themselves and show great effort throughout a long, difficult fight like this game. He described Hans' level of exertion as 'effortless' and felt he never had a chance to get back in the game, which was extremely unusual for Magnus who is known for his resourcefulness.

*Id.* ¶ 179.   Thus, Carlsen's argument that Niemann does not allege any of the Defendants were in communication about their statements "at all" is simply false.   Furthermore, the only reason why Chess.com, which is exclusively an online chess platform and admittedly has <u>no</u> expertise in detecting cheating in over-the-board chess matches, would even include purported "findings" in the Defamatory Report regarding Niemann's over-the-board chess matches is that it was working hand-in-hand with Carlsen in an attempt to lend credence to Carlsen's false accusation that Niemann had cheated in their game at the Sinquefield Cup.   *See id.* ¶¶ 175, 177-79.

*Third*, the Complaint explains how all of the Defendants worked together to concoct the entirely false narrative that Dlugy was Niemann's mentor and helped him cheat.   Indeed, approximately one week after the Sinquefield Cup tournament, Richard Kahn, a known affiliate of Play Magnus and former lawyer at Latham & Watkins, Chess.com's attorneys in this action, reached out to Dlugy, fishing for information about Niemann's past that could be used against Niemann, finding nothing.   *Id.* ¶ 141.   Nonetheless, on September 21, 2022, Carlsen made his false

accusation that Dlugy was Niemann's mentor and helped him cheat. *Id.* ¶¶ 132-36. Thereafter, Nakamura immediately took to his streaming channels to further fuel this defamatory accusation, adding the false allegation that "as we know now, Hans Niemann did go to Max Dlugy's academy in NYC for a short while." *Id.* ¶¶ 137-139. Then, as Chess.com later revealed, the source of the suspicion surrounding Dlugy was a series of confidential interactions that Dlugy had with Chess.com in 2017. Thus, the only way the other Defendants could have known about these confidential interactions is if Chess.com shared this information with them before it was published in media articles at the end of September 2022. *Id.* ¶ 140.

In addition to the foregoing allegations, the Complaint explains at length how the <u>timing</u> of Defendants' actions evidences their agreement to blacklist Niemann from the Competitive Chess Market. For example, despite Chess.com purportedly knowing about Niemann's cheating on its platform for years, it was not until Carlsen accused Niemann of cheating at the Sinquefield Cup that Chess.com decided to publicly and indefinitely ban Niemann from its platform. *Id.* ¶¶ 100-02. Likewise, while Carlsen purported to base his refusal to play against Niemann on Niemann's supposed prior use of a chess engine when he was a child, Carlsen both (i) claims that he knew about such allegations well before the Sinquefield Cup began, and (ii) continued to play in tournaments with other individuals who were accused of cheating in FIDE-sanctioned events or on online platforms, such as Sebastien Feller and Parham Maghsoodloo. *Id.* ¶¶ 142, 183-84.

In its Motion, Chess.com argues that despite the Complaint's extensive allegations from which the Court can infer an agreement, it should find that such an agreement is implausible because (i) Chess.com banned Niemann solely because it "had evidence that [he] cheated on its platform"; and (ii) Chess.com had no reason to "boycott" Niemann because it "does not compete with [him]." Chess.com Mot. p. 9. Both arguments fail. First, Chess.com's claim that it only

banned Niemann because it had purported "evidence" of Niemann cheating online is a disputed factual allegation that is not in the Complaint and thus cannot be considered on this motion. Further, Niemann's allegations are more than plausible given that whatever "evidence" Chess.com allegedly had arose and was resolved over two years ago, and that Chess.com gratuitously defamed Niemann in its unprecedented 72-page Defamatory Report in which Chess.com went out of its way to cast doubt on Niemann's performance against Carlsen and over-the-board play generally. Second, although Chess.com may not "compete" with Niemann in the sense that Chess.com is an online chess company and Niemann is an individual chess player, it nevertheless had strong financial incentives to ensure that Niemann was blacklisted from the Competitive Chess Market, including, as explained above, to protect its newly acquired Play Magnus brand and newly retained brand ambassador Carlsen, who Niemann had just defeated and embarrassed.

Accordingly, the Complaint's detailed allegations are more than sufficient for the Court to infer the requisite coordination among all Defendants to support Niemann's Section 1 claim.

### (b)     Niemann Has Pleaded that Defendants' Concerted Actions Resulted in a *Per Se* Restraint of Trade

With respect to the second element of a Section 1 claim, if a plaintiff alleges a restraint of trade "of a type that the law finds to be inherently unreasonable" – *i.e.*, a "*per se* violation" – the claim must be upheld "without inquiry into the reasonableness of the restraint or the harm caused." *Double D*, 136 F.3d at 556-58  One well-recognized type of *per se* violation is a group boycott, in which defendants aim to exclude the plaintiff from participating in a given market or attempt to persuade or coerce others to exclude plaintiff from that market.  *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985); *see also Double D*, 136 F.3d at 558.

In the context of group boycotts in individual sports, such as chess, *Blalock v. Ladies Prof'l Golf Ass'n*, 359 F. Supp. 1260 (N.D. Ga. 1973), is instructive.  There, the plaintiff was a

professional golfer in the Ladies Professional Golf Association ("LPGA") whom tournament officials accused of cheating during a golf tournament.  *Id.* at 1262.  The defendants – the LPGA and certain of plaintiff's competitors who also served on the LPGA's executive committee and stood "to gain financially from plaintiff's exclusion from the market" – banned the plaintiff from professional golf for one year purportedly based on these cheating allegations.  *Id.* at 1265. Plaintiff challenged her ban under Section 1.  The court granted plaintiff partial summary judgment, holding, *inter alia*, that this ban "exclude[d] plaintiff from the market" and thus constituted an illegal group boycott, a *per se* violation under Section 1.  *Id.* at 1268.

Here, Niemann has more than adequately pleaded that Defendants have engaged in a group boycott against him participating in competitive chess.  Specifically, the Complaint explains that Defendants "blacklist[ed] Niemann from future top-tier professional chess tournaments and events" based on their false cheating accusations, including by banning Niemann from any events hosted or sponsored by Chess.com or Play Magnus, which constitute the vast majority of chess events.  SAC ¶¶ 144-47, 221, 242.  In addition, Carlsen publicly confirmed that he is "not willing to play chess with Niemann" and that he would not play in any tournaments to which Niemann was invited.  *Id.* ¶¶ 144-47.  As the Complaint alleges, Carlsen knew full well that "no tournament organizer would choose to invite Niemann if it meant that Carlsen, the world's number one player, would not attend the event."  *Id.* ¶ 147.  The Complaint further details how, as a direct result of Defendants' unlawful group boycott, Niemann has <u>already</u> been disinvited from several tournaments and events in which he was scheduled to play, including the Chess.com Global Championship, the Tata Steel Chess Tournament, and an exhibition match with fellow Grandmaster Vincent Keymer.  *Id.* ¶¶ 192-94.

Unable to escape the fact that Niemann has amply pleaded a *per se* Section 1 violation, Defendants resort to various mischaracterizations of the law and the Complaint, all of which fail. First, Chess.com broadly contends that the "*per se* rule" does not apply at all in the sporting context.  Chess.com Mot. 10.  This is simply false, as courts including the U.S. Supreme Court have expressly recognized.[25]  *Flood v. Kuhn*, 407 U.S. 258 (1972) ("professional sports operating interstate – football, boxing, basketball, and, presumably hockey and golf – are not [] exempt" from antitrust laws); *see also Blalock*, 359 F. Supp. at 1267-68 (granting plaintiff partial summary judgment based on a group boycott against her participation in women's professional golf).

Next, Chess.com asserts that it cannot be liable for a group boycott because it is not a "direct competitor" of Niemann.[26]  Regardless, courts routinely reject this exact argument, holding that even where a company is not a plaintiff's direct competitor, it can be held liable for a group boycott if it acts on behalf of a member or affiliate who *is* a direct competitor.  *See PharmacyChecker.com LLC v. Nat'l Ass'n of Bds. Of Pharm.*, 530 F. Supp. 3d 301, 344-46 (S.D.N.Y. 2021); *Insignia Sys. v. News Am. Mktg. In-Store, Inc.*, 2006 U.S. Dist. LEXIS 47015, at *11-13 (D. Minn. June 30, 2006) (plaintiff sufficiently alleged an illegal group boycott where a non-competing defendant conspired with plaintiff's direct competitors to eliminate plaintiff from the market); *Southern Tool & Supply, Inc. v. Beerman Precision, Inc.*, 862 So. 2d 271, 281 (4th Cir. 2003) ("horizontal element" of a group boycott "justifies applying a rule of per se illegality").

---

[25] The sole case Defendants cite, *Brookins v. Int'l Motor Contest Ass'n.*, is entirely inapposite.  There, the court merely held that a sporting organization setting and enforcing its own game-defining rules, such as what technology race cars could use in competition, did not constitute an antitrust violation.  219 F.3d 849, 854 (8th Cir. 2000).  However, the court specifically noted that even such basic "rules decisions" could constitute an antitrust violation if they "are corrupted by coercion from competitors of the disadvantaged [plaintiff]," which, as the court expressly recognized, the plaintiff did not allege.  *Id.* at 854 n.3 (plaintiff was not alleging that "defendants' conduct amounted to a *per se* unlawful group boycott").  Here, by contrast, Niemann is alleging the exact type of unlawful group boycott that was <u>not</u> at issue in *Brookins*.  *Id.*

[26] While Carlsen and Nakamura purport to incorporate this argument by reference, it plainly has no application to them given that it is undisputed that they are direct competitors with Niemann.

For example, in *PharmacyChecker.com*, the plaintiff's direct competitor and another entity implemented a group boycott of the plaintiff.  The court rejected the non-competing entity's argument that it was not a direct competitor and therefore could not be liable, holding that because one of its members *was* a direct competitor, it could not escape liability.  530 F. Supp. 3d at 344-46 ("Plaintiff has sufficiently alleged that the group boycott is a result of competitive animus" where "a direct competitor [i]s the driving force behind the concerted refusal" to deal).

Here, there is no dispute that Carlsen, Nakamura, and Niemann are direct competitors, given that they literally compete against one another, including in head-to-head chess matches, in tournaments, standings, and FIDE rankings.  While Chess.com may not itself directly compete against Niemann in the same manner, the Complaint's allegations are clear that Chess.com was working on behalf of its undisputed affiliate Carlsen when it joined in Carlsen's defamation campaign against Niemann during the critical time period when Chess.com's merger with Play Magnus was being finalized.  *See PharmacyChecker.com*, 530 F. Supp. 3d at 344-46; *Insignia Sys.*, 2006 U.S. Dist. LEXIS 47015, at *11-13.

Accordingly, Niemann has sufficiently pleaded that Defendants engaged in a group boycott against him, which is a *per se* violation of Section 1.

> **(c)    Even if Niemann Had Not Pleaded a *Per Se*
> Restraint of Trade, Which He Has, He Also Pleads an
> Unreasonable Restraint of Trade Under the "Rule of Reason"**

Even if a plaintiff cannot plead a *per se* restraint of trade, he can still establish that defendants' conduct resulted in an unreasonable restraint of trade by virtue of its impact on a particular market, as defined by the geographic scope and the product at issue.  Courts analyze such restraints under the "rule of reason," under which courts analyze whether the challenged

conduct "created an unreasonable restraint on competition" within the relevant market.  *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 385 (8th Cir. 2007).

Under the "rule of reason" analysis, a plaintiff need only allege that the challenged conduct improperly suppresses or destroys competition within an identifiable market.  *HM Compounding*, 2015 U.S. Dist. LEXIS 89062, at *9, 20 (citing *Cost Mgmt. Servs. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996)).   A plaintiff need not allege the contours of the market with specificity; rather, courts routinely acknowledge that market definition is an inherently factual issue that generally cannot be resolved without discovery.  *Id.*; *see also Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) ("market definition is a deeply fact-intensive inquiry" and courts should thus "hesitate to grant motions to dismiss for failure to plead" a relevant market) (Sotomayor, J.).  A plaintiff thus need only allege "sufficient facts to permit the court to reasonably infer that" the proposed geographic market is not too narrowly defined and that the products market "includes all 'market alternatives that buyers may readily use for their purposes.'"  *Foam Supplies, Inc. v. Dow Chem. Co.*, 2006 U.S. Dist. LEXIS 53497, at *12 (E.D. Mo. Aug. 2, 2006) (complaint need only allege sufficient facts to permit the court to reasonably infer the proposed market).

Here, in addition to detailing the unreasonable restraints on trade resulting from Defendants' conduct discussed above, the Complaint also sufficiently pleads the relevant market, both in terms of geographical scope and products.  With respect to geographical scope, the Complaint explains that the Competitive Chess Market is global, *i.e.*, professional chess tournaments take place all over the world and online recreational chess platforms are accessible on the internet worldwide.  SAC ¶¶ 29-47, 222.  This is patently sufficient to plead the geographic scope of the relevant market, and Defendants' meritless argument that Niemann failed to "describe the relevant geographic market" simply ignores the Complaint's plain allegations.  *See HM*

*Compounding*, 2015 U.S. Dist. LEXIS 89062, at *18 (generally defining geographic market as "the Eastern United States" was sufficient to survive motion to dismiss).[27]

As for the relevant products market, Defendants argue that Niemann failed to allege "a detailed description of the products making up the alleged market" and failed to address potential "market alternatives." Chess.com Mot. p. 11. Both of these contentions are false. The Complaint explains that the relevant products are (i) professional chess tournaments, and (ii) online recreational chess platforms. SAC ¶ 47. The Complaint further explains that "professional chess tournaments" consist of international chess competitions overseen by FIDE, and that "online recreational chess platforms" consist of "websites and online applications … on which people of any skill level – novices, enthusiasts, and professionals alike – can play recreational chess." SAC ¶ 36. The Complaint then identifies each of the many websites and online platforms, and then explains how Chess.com has amassed control over all but one of them after the Merger. SAC ¶¶ 29-30, 36-38, 51-52, 67-73, 201 (alleging that the Merger left "no meaningful alternative for engaging or promoting oneself in competitive chess," whether in-person or online, because Defendants "collectively dominate nearly every major online chess website" and sponsor most in-person tournaments).

Likewise, the Complaint explains that there are no market alternatives for professional chess tournaments because such tournaments are governed exclusively by FIDE, the governing body of chess made up of organizations from more than 200 countries, recognized by the International Olympic Committee as an official Global Sporting Organization. *Id.* ¶ 29. Nor could

---

[27] The one case Chess.com cites is inapposite because the plaintiff defined the market too *narrowly* to deliberately and artificially inflate the defendants' market share. *Ferguson Med. Grp., L.P.O. v. Mo. Delta Med. Ctr.*, 2006 U.S. Dist. LEXIS 53493, at *10 (E.D. Mo. Aug. 2, 2006) ("This arrangement makes sense only if one were attempting to artificially boost MDMC's market power. The law, however, does not permit such gerrymandering."). Here, as is evident, Niemann is not artificially narrowing the geographic scope of the alleged market, which spans the globe.

have Niemann failed to consider alternative markets for recreational online chess in defining the

relevant market because Niemann's definition includes all alternative online chess platforms.[28]

### (d)     Niemann Pleaded Antitrust Standing

To have standing to bring an antitrust claim, a plaintiff must plead an "antitrust injury" –

*i.e.*, that he or she suffered an injury "directly related to the harm the antitrust laws were designed

to protect." *Midwest Comms.*, 779 F.2d at 451.   To plead such an injury, a plaintiff need only

allege facts showing that it is "the target of the anticompetitive activity, 'not one who has merely

suffered indirect, secondary, or remote injury.'" *Id.*  This Court has expressly held that a plaintiff

alleges a valid antitrust injury by alleging that defendants arranged a group boycott to "exclude"

the plaintiff "as a competitor from the marketplace," which, as detailed above, is exactly what

Niemann has alleged.   *HM Compounding*, 2015 U.S. Dist. LEXIS 89062, at *25; *see also S. Tool

& Supply, Inc. v. Beerman Precision, Inc.*, 862 So. 2d 271, 282 (4th Cir. 2003) ("a plaintiff who

had suffered loss as a result of an anticompetitive aspect of a *per se* restraint of trade agreement

would have suffered antitrust injury, without demonstrating that the challenged practice had an

actual, adverse economic effect on a relevant market").   Niemann also explained how Chess.com's

misconduct chills competition against Carlsen and Chess.com's other affiliate players out of fear

of being similarly blacklisted and defamed if they beat them (SAC ¶¶ 200-07).   Indeed, as the

Defamatory Report confirms, Chess.com keeps a list of chess Grandmasters whom Chess.com

claims to have cheated on its platform, which Chess.com has shown it will use to eliminate a

---

[28] Likewise, contrary to Defendants' contention otherwise, Niemann was under no obligation to specifically describe the "interchangeability" of these products or the "cross-elasticity of demand." Chess.com Mot. p. 11. To the contrary, "interchangeability and cross-elasticity of demand … are not 'magic words' that must appear in a complaint to withstand a motion to dismiss," particularly where, as here, there are no actual market alternatives in the Competitive Chess Market. *Foam Supplies, Inc.*, 2006 U.S. Dist. LEXIS 53497, at *12. Nor could Defendants plausibly contend that other ways to play chess, such as in-person games or "correspondence chess," which involves opponents mailing letters to one another, are viable market alternatives for online platforms that allow millions of players to instantly play with opponents around the globe with the click of a button. SAC ¶¶ 36-37.

challenger to its affiliate players.  *Id.* ¶¶ 205-06.

Chess.com's only argument on this point is that Niemann lacks antitrust standing because its decision to blacklist him purportedly only harms Niemann as an individual, rather than the Competitive Chess Market as a whole.  This argument misconstrues the law and has been repeatedly and expressly rejected by courts holding that a plaintiff need not allege "a market-wide injury to competition" to establish antitrust standing.  *Doctor's Hosp. of Jefferson v. S.E. Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997); *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 n.2 (3d Cir. 1999) ("The District Court erred by incorporating the issue of anticompetitive market effect into its standing analysis").  Yet even if Chess.com's misstatement of law were correct, the Complaint alleges that Defendants harmed <u>competition in general</u> as set forth above.

Accordingly, Niemann amply pleads each element of his Section 1 claim.

### (ii) Niemann States a Claim for Violation of Section 2 of the Sherman Act

To state a Section 2 claim, a plaintiff must allege that defendant (i) specifically intended to control prices or eliminate competition; (ii) undertook "predatory or anticompetitive conduct" directed at accomplishing such unlawful purpose; and (iii) has a "dangerous probability of success."  *See Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir. 1987).  As detailed below, Niemann has more than sufficiently pleaded each of these elements, and once again, all of Defendants' contentions to the contrary are meritless.

### (a) Niemann Pleaded Defendants' Specific Intent to Eliminate Competition

To plead the first element of a Section 2 claim, specific intent, a plaintiff need only allege anticompetitive practices or other unlawful conduct by defendant from which the court can "infer" that defendant intended to gain monopolistic power or eliminate competition.  *Id.* at 802.  Even conduct that a party otherwise has a lawful right to engage in can support an inference of specific

intent if it tends to show that the defendant was seeking to improperly leverage monopolistic power. *See Kirkwood v. Union Elec. Co.*, 671 F.2d 1173 (8th Cir. 1982) (legitimate rights "may not be used as a pretext to achieve otherwise unlawful results").

Here, the Complaint alleges numerous instances of conduct from which the Court can infer that Chess.com acted with the specific intent to eliminate competition and achieve monopoly power over the Competitive Chess Market, including, *inter alia*:

(i)   attempting to gain a "monopoly over nearly all major competitive chess platforms" by acquiring Play Magnus, the world's second largest chess company, when Chess.com was already by far the world's largest chess company (SAC ¶¶ 67-73, 206);

(ii)   hiking its prices in advance of the Merger, knowing that it would be drawing in a huge influx of users from Play Magnus and Chess24 (*id.* ¶ 71);

(iii)   using its "monopolistic power" to "control who plays" in the Competitive Chess Market and ensure its control "over who participates in competitive chess online and which players are invited to play in professional chess tournaments" (*id.* ¶¶ 203, 230); and

(iv)   precluding a player who challenged Chess.com's sponsored players and business interests (*id.*).

Contrary to Chess.com's arguments, these are precisely the sort of allegations that courts routinely hold sufficient to plead a specific intent to monopolize. *See Gen. Indus. Corp.*, 810 F.2d at 807 (defendant engaged in anticompetitive conduct by "attempting to and in actually preventing customers from dealing with" plaintiff); *Willis Elec. Co. v. Polygroup Macau Ltd.,* 437 F. Supp. 3d 693, 708 (D. Minn. 2020) (allegations that defendant "leverage[d]" its market power in order to remove" plaintiff from defendant's market was sufficient to withstand a motion to dismiss).

Finally, in yet another improper attempt to insert its own factual narrative, Defendants claim that Chess.com was actually <u>weakening</u> its market power by banning Niemann from its platforms.   Yet Niemann amply explained Defendants' financial motives for Chess.com's

misconduct, and even if Chess.com lost some short-term benefits, caselaw it relies upon acknowledges that a defendant can engage in anticompetitive conduct by "sacrific[ing] short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *Mahaska Bottling, Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1070 (S.D. Iowa 2017).[29]

Accordingly, Niemann has sufficiently pleaded a specific intent by Defendants to harness their monopoly power to eliminate competition.

### (b)    Niemann Pleaded Predatory and Anticompetitive Conduct

To plead the second element, predatory or anticompetitive conduct, a plaintiff must allege that a defendant engaged in conduct designed to eliminate competition "and thereby enhance the firm's long term ability to reap the benefits of monopoly power." *Trace X Chemical, Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1182-83 (8th Cir. 1982) (anticompetitive or predatory conduct includes "attempts to restrain competition through," *inter alia*, "predatory harassment," and "illegal boycotts," and "even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act").

Here, the Complaint more than sufficiently meets that burden by alleging that Defendants sought to eliminate competition within the Competitive Chess Market by abusing their market power with defamation and threats of blacklisting in order to coerce tournament organizers and other individuals in the Competitive Chess Market into excluding a competitor that could potentially threaten Defendants' interests.  SAC ¶¶ 144-47, 200-07, 221, 242.  The Complaint

---

[29] The one case Defendants cite for this proposition, *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912 (E.D. Mo. 2010), fails to support their position.  There, the court dismissed the Section 2 claim not because the "defendant did not compete with plaintiff in the proposed market," as Defendants incorrectly claim, but rather because the defendant **did not compete in that market at all**.  *Id.* at 924 ("No one can attempt to monopolize a market without attempting to compete in that market.").  In contrast, Defendants do not, because they cannot, dispute that they compete in the Competitive Chess Market, whether directly (as in the case of Chess.com and Play Magnus), or as agents of market participants (such as Carlsen, Nakamura, and Rensch).

details how, in that effort, Defendants implemented an unlawful group boycott of Niemann, which has already resulted in Niemann being disinvited from several tournaments and events in which he was scheduled to play, including the Chess.com Global Championship, the Tata Steel Chess Tournament, and an exhibition match with fellow Grandmaster Vincent Keymer.  *Id.* ¶¶ 192-94.

Defendants' sole argument on this element is their own self-serving allegation that their conduct was justified because they purportedly have a "legitimate business purpose" in policing cheating.  Chess.com Mot. p. 14.  Yet this argument fails because it is well settled that a defendant cannot rely on a purportedly legitimate justification for behavior "as a pretext to achieve otherwise unlawful results," which is exactly what is alleged in the Complaint.  *Kirkwood*, 671 F.2d at 1173-81; *California Motor Transp. Co. v. Trucking Unlim.*, 404 U.S. 508, 515 (1972) (reversing decision granting pre-answer motion to dismiss antitrust claim, holding that if the defendants' "end result is unlawful, it matters not that the means used in violation may be lawful"); *Gen. Indus. Corp.*, 810 F.2d at 802-04 (legitimate business justification did not excuse anticompetitive conduct where it was a pretext for the defendant's "unlawful intent" and "desire to achieve an unlawful goal").  As the Complaint alleges, any interest that Defendants purport to have in curtailing cheating is purely a pretext for their improper intent to monopolize the Competitive Chess Market, which is highlighted by Defendants' disparate treatment of Niemann as compared to other players the Defendants allegedly believe to have cheated.  SAC ¶¶ 118, 182-84, 205.

Similarly, while Chess.com now repeatedly claims that it only banned Niemann once he claimed that he had only ever cheated twice in his youth, this is refuted by the Complaint's allegation that "Chess.com banned Niemann *before* Niemann made any statements regarding his past use of chess engines in games he played on Chess.com when he was 12 and 16 years old."  *Id.* ¶ 101.  To bolster their pretext, Chess.com then went out of its way in the Defamatory Report

to cast aspersions over Niemann's over-the-board play despite admittedly having no expertise regarding over-the-board chess.  This is only further reinforced by the fact that Chess.com admittedly maintains a "list of over 25 presently anonymous top chess Grandmasters, from whom Chess.com purportedly obtained confessions to using a chess engine" on its platform without publicly decrying those Grandmasters the way it did Niemann.  *Id.* ¶ 205.

Likewise, and as noted above, while Carlsen claimed to refuse to play against Niemann based on Niemann's prior alleged cheating, Carlsen both (1) admittedly knew about such allegations before the Sinquefield Cup ever began and (2) continued to play in tournaments with other individuals known to have cheated, such as Sebastien Feller and Parham Maghsoodloo. Thus, any purported "legitimate interest" that Defendants claim to have been exercising when they put the full force of their monopolistic power behind their campaign against Niemann is a mere pretext, and cannot negate the predatory and anticompetitive nature of their conduct.  *See Minn. Made Hockey, Inc. v. Minn. Hokey, Inc.*, 761 F. Supp. 2d 848, 860 (D. Minn. 2011) (where defendant only selectively applied its purported "valid justification" for anticompetitive conduct, "the inference of an anti-trust violation is not overcome" by the purported justification).

Accordingly, Niemann has more than sufficiently pleaded Defendants' predatory and anticompetitive conduct.[30]

### (c)  Niemann Pleaded Defendants' "Dangerous Probability of Success" of Unlawfully Eliminating Competition

To plead the third and final element of a Section 2 claim, "dangerous probability of success," a plaintiff need only allege that defendants "control a substantial share of the relevant

---

[30] At a minimum, whether Defendants engaged in predatory or anticompetitive behavior is a question of fact that cannot be decided prior to discovery.  *See ACT, Inc. v. Sylvan Learning Sys.*, 104 F. Supp. 2d 1096, 1111 (N.D. Iowa 1999) (given defendant's dominant market position, whether the defendant engaged in anticompetitive conduct was a question of fact).

market" such that defendants may feasibly achieve their anticompetitive goal.  *St. Jude Medical, Inc. v. Intermedics, Inc.*, 623 F. Supp. 1294, 1299 (D. Minn. 1985); *see also U.S. v. Empire Gas Corp.*, 537 F.2d 296, 302-03 (8th Cir. 1976); *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1079 (3d Cir. 1978) (complaint must allege defendant has sufficient "market power" in a relevant market to make achieving its anticompetitive goals possible).

Here, the Complaint details how Defendants' unparalleled power in the Competitive Chess Market creates a "dangerous probability" that they will succeed in their efforts to eliminate and otherwise stifle competition in that market.  Specifically, the Complaint alleges, *inter alia*, that:

(i)   The Merger between Chess.com and Play Magnus, the "second most dominant commercial enterprise in chess," has "solidified Chess.com's monopoly over the Competitive Chess Market by, among other things, providing it total control over Chess24, one of the last few alternatives to Chess.com" (SAC ¶¶ 51-52, 73);

(ii)  Chess.com's users play "more than three times the number of games hosted by the next largest chess website, Lichess.org" (*id.* ¶ 38);

(iii) Chess.com is the "dominant force in the professional chess market by virtue of its enormous revenues and influence as the world's dominant online chess site" (*id.* ¶ 45);

(iv)  Chess.com is also "the dominant source of chess-related news and events," and thus has "a major influence on top chess players' image and public exposure" (*id.* ¶ 47); and

(v)   "Chess.com is a major corporate sponsor of almost every important and prestigious professional chess tournament around the world, including FIDE-sanctioned, in-person chess tournaments and events" and can use such influence "to determine which players will succeed or fail by controlling who is, and who is not, invited to the events and tournaments it sponsors, and who can use its leading online Chess.com platform" (*id.* ¶¶ 45-46).

*See Gen. Indus. Corp.*, 810 F.2d at 807 (defendant's "actions, coupled with its large market presence, created a dangerous probability that [its] conduct was capable of success").

In fact, the Complaint goes even further than what the case law requires by describing how Defendants have ***already*** successfully exerted their dominance over the Competitive Chess Market

to eliminate competition by inducing other competitors to refuse to deal with Niemann, including Vincent Keymer, who refused to play a previously scheduled match with Niemann "specifically based on Defendants' defamatory accusations against Niemann."  *See* SAC ¶ 193; *Minn. Made Hockey, Inc.*, 761 F. Supp. 2d at 860 ("a dangerous probability of success is evidenced by" market participants taking action while "citing" the defendant's conduct as a basis).

Chess.com's sole argument with respect to this element is that Niemann fails to identify the <u>exact</u> percentage of the Competitive Chess Market that Chess.com controls.  Chess.com Mot. p. 14.  Yet as even the cases upon which Defendants rely confirm, a plaintiff need not "affix a precise number to a defendant's market share to allege a dangerous probability of monopolization … if the pleading otherwise provides grounds to infer a sufficient share in the relevant market." *Mahaska Bottling*, 271 F. Supp. 3d at 1076-77; *see also Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 319 (3d Cir. 2007) (failure to allege specific "market share" percentage not fatal to plaintiff's claim).  Here, as discussed above, the Complaint's allegations are more than enough for the Court to infer Defendants' sufficient share in the Competitive Chess Market.[31]

Accordingly, Niemann has adequately pleaded his Section 2 claim as well.

### D.    Niemann Pleads Tortious Interference

To state a claim for tortious interference with a contract or business expectancy, a plaintiff must allege: "(1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct." *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 590 (Mo. Ct. App. 2008); *see also Tension*

---

[31] At a minimum, Defendants' argument merely raises a question of fact requiring discovery.  *See Broadcom Corp.*, 501 F.3d at 319 ("whether a defendant has a 'dangerous probability' of successful monopolization is a fact-sensitive inquiry"); *Concord Boat Corp. v. Brunswick Corp.*, 1998 U.S. Dist. LEXIS 14570, at *6 (E.D. Ark. Mar. 6, 1998) (whether defendant had sufficient market power for its anticompetitive conduct to succeed was a question of fact).

*Envelope Corp. v. JBM Envelope Co.*, 2015 U.S. Dist. LEXIS 25348, at *13 (W.D. Mo. Mar. 3, 2015); *LeGgett v. Bed*, 2020 U.S. Dist. LEXIS 267648, at *8, 13 (W.D. Mo. May 15, 2020).

Here, Niemann sufficiently pleads his tortious interference claim by alleging that (1) Niemann had contracts and business expectancies with the Chess.com Global Championship, Vincent Keymer, the Tata Steel Chess Tournament, and other future chess tournaments (SAC ¶¶ 192-99, 235); (2) Defendants knew about those expectancies as fellow members of the Competitive Chess Market (*id.* ¶¶ 4-5, 12, 36-61, 71, 73, 195, 198, 236); (3) Defendants intentionally interfered by defaming Niemann, restraining trade to blacklist him from the chess community, and "coercing" the Chess.com Global Championship, Vincent Keymer, and the Tata Steel Chess Tournament to terminate their relationship with Niemann (*id.* ¶¶ 8-17, 83-155, 165-198, 237); (4) Defendants did so without justification, and merely to harm Niemann's reputation (*id.*; *id.* ¶ 238); and (5) Defendants caused Niemann damages in the form of, among other things, appearance fees, prize funds, endorsements, and sponsorships (*id.* ¶¶ 191-99, 239).

Courts routinely uphold tortious interference claims based on similar allegations.  For example, in *Envirotech*, the Eastern District Court of Appeals denied a motion to dismiss the plaintiff's complaint alleging that defendants conspired to interfere with the plaintiff's subcontractor work on a state construction project.  Specifically, the plaintiff alleged that the defendants "caused and induced" the general contractor to force plaintiff to be unable to perform and then terminate its contract with the plaintiff, as part of a scheme to funnel money to a new subcontractor.  259 S.W.3d at 583-84.  The court rejected the argument that the plaintiff "provided only bare bones conclusions" because it alleged a scheme to induce the breach of contract and interfere with plaintiff's business to "further a conspiracy" to defraud the State.  *Id.* at 590-91, 589 ("Envirotech *alleged* that Defendants caused its damages by inducing DKW to take certain actions,

in pursuance of an illegal conspiracy. Our inquiry into the facts must end there.") (emphasis in original).  The court also held there was proximate cause because "the allegation of 'inducement' is indeed an allegation of causation," as "induce" means "to move and lead" and "bring about by influence." *Id.* at 591 ("The concept of causation is inherent within the meaning of inducement.").

In their motions, Defendants concede that Niemann alleged valid business expectancies and damages.  They instead argue that Niemann failed to allege knowledge, intent, and proximate cause, and that the claim is derivative.  Defendants are incorrect on each count.

*First*, Defendants' factual contention that they were unaware of Niemann's business expectancies fails as a matter of law, especially where Niemann grounded the plausible allegation in the undeniable fact that Defendants are fellow members of the Competitive Chess Market, and its most dominant and deeply involved participants.  A plaintiff need only allege that the defendant "was aware" of the business expectancies. *Emerson v. Capital One*, 2021 U.S. Dist. LEXIS 53758, at *9 (E.D. Mo. Mar. 22, 2021).  In *Tumey L.L.P. v. Mycroft AI Inc.*, 2021 U.S. Dist. LEXIS 197995, at *38 (W.D. Mo. Oct. 14, 2021), the court denied a motion to dismiss plaintiff's tortious interference claim where plaintiff alleged that the defendants "were aware of the nature of Plaintiffs' business, their relationships, and valid business expectancies." *See also Noble & Assocs. v. Edwards*, 2007 U.S. Dist. LEXIS 78014, at *8 (W.D. Mo. Oct. 19, 2007) (denying motion to dismiss where plaintiff "alleged that Edwards was aware of Noble's relationships with its customers and potential customers").  Further, allegations of knowledge can be inferred by virtue of the defendant's relationship to the plaintiff. *Emerson*, 2021 U.S. Dist. LEXIS 53758, at *9.  Here, it can be reasonably inferred that Defendants were aware of Niemann's relationships

with upcoming chess events by virtue of their relationship to Niemann and the other leading players, commentators, and businesses in the tightly-knit Competitive Chess Market.[32]

*Second*, Carlsen and Chess.com make the factual assertion that they had no improper intent. Yet, as set forth in Point II.B, Defendants' malicious defamatory motives are pleaded in ample detail throughout the Complaint. In the face of these specific factual allegations, Carlsen contends that he could not have had an improper motivation because Niemann merely "won a single game against him at the Sinquefield Cup." Yet, this "single game" dashed Carlsen's two remaining statistical ambitions and prompted Carlsen to (i) defame Niemann in press releases, on Twitter, in interviews, in the streets, at bars, and by bribing another chess player, (ii) refuse to play against Niemann ever again, and (iii) abuse his power to eliminate Niemann from the Competitive Chess Market. The fact that Carlsen reacted this way says more about Carlsen than the Complaint.

Likewise, as explained above, Chess.com, to protect its newly acquired Carlsen brand and Play Magnus platform, trumped up a multitude of its own false and defamatory accusations against Niemann to bolster Carlsen's defamation, create the pretext for its ban of Niemann from Chess.com, and blacklist Niemann from its sponsored in-person tournaments. *Id.* ¶¶ 98-102; *Envirotech* 259 S.W.3d at 591 (defendants used improper means by depriving plaintiff of business opportunities); *see also Control Tech. & Sols.*, 2021 U.S. Dist. LEXIS 243084, at *10, 23 (denying motion to dismiss allegations that defendants, with an "evil motive," "disparaged Plaintiff's

---

[32] The cases Defendants rely upon are inapposite. In *Ariel Preferred Retail Group, LLC v. CWCapital Asset Mgmt.*, 2011 U.S. Dist. LEXIS 110505 (E.D. Mo. Sept. 28, 2011), plaintiff admitted that the identities of third parties and the basis for defendants' knowledge could only be ascertained in discovery, not in the complaint, which is obviously not the case here. In *Butler Am., LLC v. Ciocca*, 2020 Conn. Super. LEXIS 1292 (Conn. Super. Ct. Mar. 12, 2020), the court found that while it *could* infer certain defendants knew of a contract by virtue of their relationship to the plaintiff, it could not do the same for the movant-defendant because there was no alleged reason why it would know of a contract between two private parties. The court in *S. Home Care Servs. v. Visiting Nurse Servs.*, 2015 U.S. Dist. LEXIS 96496, at *33 (D. Conn. July 22, 2015), determined on summary judgment that a party did not in fact have knowledge.

business and reputation with false statements in order 'to harm the business interests of [Plaintiff] and drive customers and clients to Defendants'").[33]

*Third*, Defendants assert the hypothetical argument that there "may be" other reasons for the rescinded tournament invitations. Yet, this ignores the Complaint's express allegations that the reasons these third parties have refused to deal with Niemann is "specifically based on Defendants' defamatory accusations" and blacklisting. SAC ¶¶ 192-99. This argument also ignores reality because it was only after Defendants engaged in their unlawful scheme to blacklist Niemann and spread their defamatory accusations across the Competitive Chess Market that Niemann's previously promising career came to a grinding halt. This is also exactly like *Envirotech*, where defendants were alleged to have "caused" and "coerced" the loss of business expectancies. 259 S.W.3d at 591. There, the court held that even where a plaintiff "does not use the words 'but for'…causation can be reasonably inferred." *Id.* At most, Defendants' argument that there are other possible causes of Niemann's loss "is a *factual* determination that has no place in the review of a motion to dismiss." *Id.*[34]

---

[33] To argue otherwise, Defendants once again rely upon entirely inapplicable cases. *Metcoff v. Lebovics*, 2 A.3d 942 (Conn. App. Ct. 2010), and *Southridge Partners II, Ltd. P'ship v. SND Auto Grp., Inc.*, 2019 U.S. Dist. LEXIS 218003 (D. Conn. Dec. 19, 2019), considered the doctrine that an agent may not be charged with having interfered with a contract of the agent's principal, holding there were no allegations that the agents acted outside the scope of their duties. That doctrine is not at issue here. In *Zeebaas, LLC v. Koelewyn*, 2012 U.S. Dist. LEXIS 84665, at *16 (D. Conn. June 19, 2012), plaintiff alleged only a legitimate intent to gain a competitive advantage, which is a proper motive. *Envt'l. Energy Ptnrs., Inc. v. Siemens Bldg. Techs.*, 178 S.W.3d 691 (Mo. Ct. App. 2005), held post-trial that defendant's actions were legally improper because they failed to comply with contract requirements. Here, Defendants did not interfere by breaching a contract. *Daley v. Aetna Life & Cas. Co.*, 734 A.2d 112, 135 (Conn. 1999), was also post-trial, and held that the plaintiff's own testimony undermined any inference that her employment discharge was unjustified. Here, there is no such testimony to consider. Likewise, in *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 246 (E.D. Mo. 2011), the plaintiff's allegation that the Better Business Bureau had a "personal vendetta" against him was belied by his own admissions.

[34] Defendants cite *Kopperl v. Bain*, 23 F. Supp. 3d 97 (D. Conn. 2014), which actually supports the conclusion that their motions should be denied. There, the court found that defendants' decision to "denigrat[e]" plaintiff's performance and character to his employer and induce his termination were sufficient to withstand defendant's motion to dismiss. In doing so, the court observed that that "[t]he speed with which Kopperl fell from grace seems somewhat surprising, given that according to the complaint's allegations, Kopperl had been steadily employed." *Id.* at 115-18. Similarly, here, Niemann was only denied opportunities to participate in tournaments and matches after Defendants denigrated Niemann and conditioned Carlsen's participation in tournaments on Niemann's exclusion. *See* SAC

*footnote continued on next page…*

*Finally*, Defendants' argument that this claim should be dismissed as derivative of Niemann's other claims also fails. Unlike the cases cited by Defendants, almost all of which were decided post-discovery, Plaintiff's tortious interference claim is a separate, independent well pleaded claim that is not merely derivative of his other claims. For example, while "improper means" may include defamation and restraints of trade, it also includes simple misrepresentations of fact and "any other wrongful act recognized by statute or the common law." *Control Tech. & Sols.*, 2021 U.S. Dist. LEXIS 243084, at *22. As such, Defendants' conduct does not have to rise to the level of defamation or violation of the Sherman Act to be improper.

Accordingly, Defendants' motions must be denied with respect to tortious interference.

### E.   Niemann Pleads Civil Conspiracy

Defendants' coordinated effort to falsely brand Niemann as a cheater and a liar in order to blacklist him from the Competitive Chess Market also forms the basis of his civil conspiracy claim. The elements of civil conspiracy are: "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) the plaintiff was thereby damaged." *Gettings v. Farr*, 41 S.W.3d 539, 542 (Mo. Ct. App. 2001).

Defendants naturally concede that they constitute two or more persons, who allegedly committed acts in furtherance of an unlawful objective that injured Niemann. Accordingly, Defendants dispute only whether Plaintiff sufficiently pleaded "a meeting of the minds."[35] Yet again, however, this argument ignores well-settled law and the Complaint's plain allegations.

---

¶¶ 192-99 ("the only thing that changed between August 31, 2022 and September 5, 2022 was that Niemann defeated Carlsen at the Sinquefield Cup"). Defendants' remaining cases are distinguishable because they were decided after discovery, and there is no evidentiary record here. *Am. Cable Techs. Servs. v. AT&T Corp.*, 140 F. Supp. 2d 1026, 1031 (W.D. Mo. 2001) (on summary judgment, "the record to date indicates a lack of causation"); *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268 (Conn. 2000) (post-trial).

[35] Defendants contend that Niemann's civil conspiracy claim will fail if the Court finds that Niemann failed to plead any underlying torts. However, as explained above, all of Niemann's other claims are sufficiently pleaded.

At the pleading stage, to satisfy the "meeting of the minds" element, the plaintiff need not allege an express agreement, only that "the parties worked together" towards a common objective. *US Polymers-Accurez, LLC v. Kane Int'l Corp.*, 2018 U.S. Dist. LEXIS 159878, at *17 (E.D. Mo. Sept. 19, 2018).  This is because "it is a rare case in which the plaintiff will be able to provide direct evidence of a conspiratorial agreement," especially without the benefit of discovery.  *Cheeks v. Belmar*, 2020 U.S. Dist. LEXIS 170149, at *47-48 (E.D. Mo. Sept. 17, 2020).

Here, as detailed in Part II.C above, the Complaint demonstrates how each Defendant "worked together" toward their common objective of defaming and blacklisting Niemann. Moreover, even if Niemann had not made these factual allegations specifically demonstrating Defendants "working together" to defame and blacklist him, the timing of their actions alone would be enough to imply a meeting of the minds at the pleading stage.  Indeed, it is well settled that allegations that "create a reasonable inference that defendants … achieved a meeting of the minds on the object or course of action" are sufficient.  *Favaloro v. BJC Healthcare*, 2015 U.S. Dist. LEXIS 145995, at *12 (E.D. Mo. Oct. 28, 2015); *see also White v. Walsh*, 649 F.2d 560, 562 (8th Cir. 1981) ("Obviously, White was never in a position to adduce or allege firsthand knowledge of the necessary meeting of the minds. White did, however, state sufficient facts to give rise to the inference that there was such a meeting of the minds.").  For example, in *Brandon v. City of Moline Acres*, 2010 U.S. Dist. LEXIS 112204, at *9 (E.D. Mo. Oct. 21, 2010), the court refused to dismiss allegations that defendants terminated or suspended plaintiffs after plaintiffs expressed displeasure with certain actions, because "[t]he timing of the adverse employment actions" implied an agreement to retaliate.  Similarly, here, Defendants' use of the same exact tactics, based on the same information, at the same time implies a "meeting of the minds."

The cases Defendants cite do not support a different conclusion.  *Kopperl*, 23 F. Supp. 3d

at 119, involved only the second element of civil conspiracy, "a criminal or unlawful act," which is indisputably alleged in the Complaint.  *Campbell v. Porter*, 275 A.3d 684, 699 (Conn. App. 2022), decided after a trial, merely noted that the word "agreement" was "not mentioned once in the entire complaint."  Likewise, in *In re Trilegiant Corp.*, 11 F. Supp. 3d 132 (D. Conn. 2014), the plaintiff alleged only the defendants' knowledge of a conspiracy's actions, not an agreement amongst defendants.  Here, by contrast, the Complaint specifically alleges an "agreement."

Accordingly, Niemann has adequately alleged a civil conspiracy claim and Defendants' motions should be denied.

### F.    Niemann Pleads Breach of Contract Against Chess.com

Under Utah law, which governs Niemann's agreement with Chess.com to compete in the 2022 Chess.com Global Championship (the "Agreement"), the elements of a breach of contract claim are "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."  *Haynes v. Dep't of Pub. Safety*, 460 P.3d 565, 567 (Utah Ct. App. 2020).  Here, the Complaint alleges that Chess.com breached the Agreement by unilaterally revoking Niemann's invitation to play in the Global Championship; Niemann performed all of his obligations and was ready, willing, and able to participate in the Global Championship; and Niemann suffered damages in the form of his appearance fees and loss of the opportunity for the Global Championship prizes.  SAC ¶¶ 192, 247-49.  Thus, Niemann has alleged each element.

Chess.com only disputes its breach and Niemann's damages, and moves to compel or stay this claim pending arbitration.  Chess.com Mot. pp. 29-30.  Each of its arguments is meritless.

Chess.com argues that it did not breach by unilaterally revoking Niemann's invitation, because the event's Official Rules provide that Chess.com may remove any player from the event "at its sole discretion."  It is well settled, however, that where an express term establishes a right

to be exercised in a party's sole discretion, in Utah that right must be exercised in good faith. *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1038 (Utah 1985); *Flood v. Clearone Communs.*, 618 F.3d 1110, 1122 (10th Cir. 2010). Here, the Complaint alleges that Chess.com had no good-faith reason for exercising its discretion to remove Niemann. Rather, Chess.com only revoked his invitation as part of its unlawful boycott and scheme to defame Niemann discussed above. SAC ¶¶ 101-02, 118, 182-83, 188, 192, 248. As such, the Complaint amply alleges that Chess.com failed to exercise its discretion in good faith.

Chess.com's next argument, that Niemann has not alleged damages because Chess.com purportedly offered his appearance fee, also fails. Chess.com Mot. pp. 29-30. Chess.com ignores that Niemann at a minimum lost the opportunity to compete for $1 million in prize money, which is the true benefit of the bargain. Rensch Dec. Ex. 2 § 7 ("Participant is eligible to win prizes in connection with their performance").[36] As such, Niemann has alleged damages. *See Trans-Western Petroleum, Inc. v. United States Gypsum Co.*, 379 P.3d 1200 (Utah 2016) (plaintiffs may recover expectation damages and consequential damages measured "by the gains [the promised] performance could produce").[37] Accordingly, Chess.com's motion to dismiss this claim should be denied.[38]

---

[36] Chess.com also plainly violated the Agreement's non-disparagement clause, which provides that Chess.com "shall not disparage, criticize or defame Participant." *Id.* § 9.

[37] The sole case that Chess.com cites in support of this argument is entirely inapposite because there, unlike here, the plaintiff failed to allege that the contract in question even existed. *Am. W. Bank Members, L.C. v. State*, 342 P.3d 224, 231 (Utah 2014).

[38] Niemann brought this claim to resolve all disputes against Chess.com in one forum. Chess.com has not sought to enforce the arbitration clause of the Agreement with respect to any of Niemann's other claims. Moreover, even with Niemann's breach of contract claim, Chess.com's desire to arbitrate is unclear, given that it simultaneously seeks a dismissal of this claim on the merits. Accordingly, Niemann respectfully submits that Chess.com waived the arbitration provision and that the Court should decide this claim on the merits. *McCoy v. Walmart, Inc.*, 13 F.4th 702, 703-04 (8th Cir. 2021) (when a party "act[s] inconsistently" with the right to arbitrate, such as by seeking to dismiss a case "in its entirety," waiver occurs). Alternatively, because the Agreement "anticipates that judgment upon any arbitration award issued in this matter may be entered in any court having jurisdiction," a stay of the claim "pending mediation and, if appliable, arbitration, [would be] warranted in the interests of the parties and judicial efficiency," as

*footnote continued on next page…*

## III.     THE COURT HAS JURISDICTION OVER RENSCH AND NAKAMURA

To plead the Court's personal jurisdiction over a defendant, a plaintiff need only allege "sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *Leitner v. Morsovillo*, 2021 U.S. Dist. LEXIS 121228, at *5-6 (W.D. Mo. June 29, 2021).   In determining whether a complaint has sufficiently pleaded personal jurisdiction, the "central concern" is "the relationship among the defendant, the forum, and the litigation." *Raptor v. Garlock Safety Sys.*, 2015 U.S. Dist. LEXIS 196957, at *4-5 (W.D. Mo. June 18, 2015).   Missouri's longarm statute extends to the fullest extent permitted by the Due Process Clause, and therefore the pertinent analysis is whether the defendant has sufficient "minimum contacts" with Missouri so as to satisfy due process and not offend traditional notions of fair play and justice. *Clune v. Alimak AB*, 233 F.3d 538, 541-42 (8th Cir. 2000).

The Eighth Circuit has established the following factors for analyzing a defendant's "minimum contacts": (1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *Nelson v. L.A. Weaver Co.*, 2005 U.S. Dist. LEXIS 55199, at *7 (D. Minn. June 27, 2005).   In analyzing these factors, courts must view the allegations "in the light most favorable to the plaintiff and resolve all factual conflicts in its favor." *Leitner*, 2021 U.S. Dist. LEXIS, *5-6.

Here, the balance of these factors weighs in favor of the Court exercising personal jurisdiction over both Rensch and Nakamura.   The first and second factors – *i.e.*, the nature, quality, and quantity of Rensch and Nakamura's contacts with Missouri – both support exercising personal jurisdiction.   The Complaint explains how Rensch and Nakamura, two of the best-known and most

---

opposed to dismissal. *W. Oil, Inc. v. Garda CL Sw., Inc.*, 2014 U.S. Dist. LEXIS 112004, at *6 (E.D. Mo. Aug. 13, 2014); Rensch Dec. Ex. 2 § 10.1.

prominent participants in all of professional chess and both close affiliates of Chess.com, have substantial connections with St. Louis, Missouri, which is widely regarded as the epicenter of competitive chess.  SAC ¶ 20.

Specifically, Rensch has engaged in extensive commercial activities in Missouri, both as an "international master" chess player and as Chess.com's Chief Chess Officer, including regularly travelling to and attending tournaments and other chess events in St. Louis, such as the Sinquefield Cup and other Chess.com-sponsored tournaments.  *Id.* ¶¶ 24, 48.  Likewise, Nakamura engages in extensive commercial activities in Missouri by regularly competing in and commentating on chess tournaments and events in St. Louis, including commentating on the Sinquefield Cup for Chess.com.[39]  *Id.* ¶¶ 25, 54-57.  In fact, Nakamura previously resided in St. Louis, Missouri to advance his chess career.  As he explained, "what's happening in St. Louis, both at the top level and the scholastic, grassroots level, is something I want to be a part of, and I feel like this is the one area of the country where things are really happening…all of the events that are being held here are organized so professionally, and I'm really excited about being a part of it."  *Nakamura to Relocate to Saint Louis*, Sᴛ. Lᴏᴜɪs Cʜᴇss Cʟᴜʙ (Apr. 27, 2010), https://saintlouischessclub.org/blog/nakamura-relocate-saint-louis.

Thus, the Complaint more than adequately alleges that Rensch and Nakamura solicited business in and purposefully directed business towards Missouri, which "contacts are not random or fortuitous but purposeful and directed at" Missouri.  *Smith v. Truman Rd. Dev., LLC*, 414 F. Supp. 3d 1205, 1218 (W.D. Mo. 2019).  Further amplifying the impact of Rensch and Nakamura's contacts with Missouri is the fact that many of those contacts are a direct result of their affiliations

---

[39] The case Nakamura cites in arguing that his contacts with Missouri are insufficient, *Bender v. Boyreau*, 2021 U.S. Dist. LEXIS 227256 (E.D. Mo. Mar. 30, 2021), is plainly distinguishable.  In *Bender*, the plaintiff did not "contend Defendants visited, sent products to, or advertised within Missouri," whereas here, by contrast, the Complaint alleges that Nakamura routinely visits Missouri and conducts business in and directed to Missouri.

with Chess.com, which plainly has extensive contacts with Missouri and does not challenge the Court's personal jurisdiction. *Leitner*, 2021 U.S. Dist. LEXIS 121228, at *9 ("Although each defendant's contacts with the forum State must be assessed individually, naturally the parties' relationships with each other may be significant in evaluating their ties to the forum.").[40]

The third factor, the relation of Niemann's claims to the defendants' contacts, also favors the Court's exercise of personal jurisdiction over Rensch and Nakamura because every meaningful act by Rensch and Nakamura alleged in the Complaint concerns Missouri. As set forth in Point I.B above, the injuries that Niemann has suffered as a result of Rensch and Nakamura's conduct was primarily felt in Missouri. Rensch and Nakamura, among other things, defamed Niemann by accusing him of cheating at the Sinquefield Cup in Missouri and interfered with Niemann's business expectancies in Missouri. Rensch was even physically present in St. Louis, Missouri during the Sinquefield Cup (SAC ¶ 24) and Nakamura streamed it on Twitch with commentary.[41]

Missouri courts have found that similar allegations of relatedness between a plaintiff's claims and the defendants' contacts support the exercise of personal jurisdiction. For example, in *Leitner*, the court considered claims of defamation and tortious interference with business expectancies brought by an Ohio citizen against two defendants residing in Indiana. There, the

---

[40] Many of the cases Rensch and Nakamura cite involved *de minimis* contacts, or no contacts, with the forum state. *See, e.g.*, *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 953 (8th Cir. 2022) (plaintiff alleged "single suit-related contact with Missouri" of one t-shirt sale); *Clement v. Carter-Young Inc.*, 2018 U.S. Dist. LEXIS 85490 (E.D. Mo. May 22, 2018) (only alleged contacts were phone calls from defendant that plaintiff did not answer); *Mongler v. Knight*, 2017 U.S. Dist. LEXIS 105847, at *16 (E.D. Mo. July 10, 2017) (only two contacts with Missouri were a phone call and a letter from defendant); *C. Pepper Logistics, LLC v. Lanter Delivery Sys., LLC*, 2021 U.S. Dist. LEXIS 158736, at *11 (E.D. Mo. Aug. 23, 2021) (single communication to Missouri alleged). Other of Rensch and Nakamura's cases are readily distinguishable because they involved a defendant's defamatory statements not related to the forum state. *See, e.g.*, *Nunes v. NBCUniversal Media, LLC*, 582 F. Supp. 3d 387 (E.D. Tex. 2022) (alleged defamatory statements concerned plaintiff's activities in a *different* forum); *Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002) (same); *Blessing v. Chandrasekhar*, 988 F.3d 889, 906 (6th Cir. 2021) (same).

[41] Moreover, Chess.com promoted Nakamura's Twitch stream coverage of the Sinquefield Cup. *2022 Sinquefield Cup*, CHESS.COM, https://www.chess.com/events/2022-sinquefield-cup ("GM Hikaru Hosts...Sinquefield Cup Saint Louis, Missouri").

plaintiff alleged that during a seminar held in Missouri, defendants "discussed and hatched the alleged conspiracy." 2021 U.S. Dist. LEXIS 121228, at *14.  The court exercised jurisdiction over the defendants because their "visit, along with their repeated post-visit communications and actions, form[ed] the factual basis for Plaintiff's tort-based claims."  Similarly, the Complaint alleges that Rensch attended and Nakamura streamed commentary of the Sinquefield Cup, and coordinated with Carlsen and the other Defendants to commit tortious acts against Niemann when both Niemann and Carlsen were physically present in Missouri.  SAC ¶¶ 21, 24-25.[42]

Rensch and Nakamura argue that there is no relation between their Missouri contacts and Niemann's claims because they purportedly were not physically present in Missouri when they committed their tortious acts.  This argument is meritless for multiple reasons.  First, as Defendants' own cases demonstrate, a defendant who commits a tortious act outside of Missouri is nevertheless considered to have committed that act "in Missouri" if the act produces actionable consequences in Missouri.  *See Myers v. Casino Queen, Inc.*, 689 F.3d 904 (8th Cir. 2012) (given defendant's marketing to Missouri, defendant "could reasonably foresee being haled into a Missouri court for actions related to that marketing"); *State ex rel. Caine v. Richardson*, 600 S.W.2d 82, 85 (Mo. Ct. App. 1980) (same); *Kaliannan v. Hoong Liang*, 2 F.4th 727, 734 (8th Cir. 2021) ("That the communications occurred elsewhere does not undermine a finding that Defendant's North Dakota contacts 'relate to' Plaintiffs' claims."); *N.C.C. Motorsports, Inc. v. K-VA-T Food Stores, Inc.*, 975 F. Supp. 2d 993, 1002 (E.D. Mo. 2013) (exercising personal

---

[42] Rensch contends that all allegations involve him "acting in his official capacity as an officer of Chess.com." Yet it is well settled that a corporate officer is personally liable for tortious conduct if he had actual or constructive knowledge of, and participated in, the actionable wrong. *J.Y.C.C. v. Doe Run Res., Corp.*, 370 F. Supp. 3d 1047, 1056-57 (E.D. Mo. 2019) (denying motion to dismiss for lack of personal jurisdiction over corporate officer). Here, as demonstrated in Point II.B(ii)(b), Rensch knew that Chess.com's defamatory statements were false, yet still caused Chess.com to make them in furtherance of Defendants' coordinated scheme to defame Niemann. For this same reason, the case Rensch cites in his brief on this point, *Top Gun Ammo Sales, LLC v. COF Techs., LLC*, 2022 U.S. Dist. LEXIS 48452 (E.D. Mo. Mar. 18, 2022), is wholly distinguishable because there, unlike here, plaintiffs failed to attribute any of the corporate defendants' acts to any specific individual defendant.

jurisdiction because "use of the infringing product damaged Plaintiff in Missouri").

Further, "if a defendant can reasonably foresee his or her negligent actions having consequences felt in Missouri, jurisdiction is authorized." *Johnson v. Gawker Media, LLC*, 2016 U.S. Dist. LEXIS 5088 (E.D. Mo. 2016) (Nakamura Mot. p. 10; Rensch Mot. p. 10). In *Johnson*, "allegedly defamatory articles were published on the internet and therefore viewable anywhere in the world," one of which discussed plaintiff's "reporting on the killing of Michael Brown, Jr. in Ferguson, Missouri." *Id.* at *17. Even though plaintiffs did "not allege that they are Missouri residents or have specific business or personal interests in Missouri" or that they "suffered damage in Missouri," the court held that "the defendants could have reasonably foreseen their publication of the articles could have consequences felt in Missouri." *Id.* at *17-18; *see also Bigfoot on the Strip, LLC v. Winchester*, 2018 U.S. Dist. LEXIS 129674 (W.D. Mo. Aug. 2, 2018) (sufficient minimum contacts existed because defendants made defamatory review about services provided by plaintiff in Missouri and "knew that any harm from their false statements would be suffered in Missouri"). Here, Rensch and Nakamura could have reasonably foreseen that their statements about Niemann's performance in Missouri, which were published online, would have consequences in Missouri.

Likewise, Rensch and Nakamura's acts relate to Niemann's claims under the Eighth Circuit's "effects test," under which a defendant's extraterritorial tortious acts can support personal jurisdiction where those acts (i) were intentional; (ii) were uniquely or expressly aimed at the forum state; and (iii) caused harm, the brunt of which was suffered, and which the defendant knew was likely to be suffered, in the forum state. *TLC Vision (USA) Corp. v. Freeman*, 2013 U.S. Dist. LEXIS 8353, at *42 (E.D. Mo. Jan. 22, 2013). Here, the "effects test" is met because, as the Complaint alleges, Rensch and Nakamura intentionally targeted Missouri by commenting on

events that took place there, interfered with Niemann's business expectancies in Missouri, and intended to destroy Niemann's access to professional chess tournaments in Missouri.[43]

Lastly, the remaining two factors – Missouri's interest in providing a forum for its residents and the convenience or inconvenience to the parties – are neutral.  No party is a Missouri resident, and no party claims any inconvenience of litigating in Missouri, nor could they given their frequent travel to Missouri.  Based on the totality of the circumstances, these two neutral factors cannot outweigh the first three "primary" factors, all of which weigh in favor of exercising personal jurisdiction.  *Kaliannan*, 2 F.4th at 735 (exercising personal jurisdiction because last two factors do "not undermine the propriety of jurisdiction here").

Accordingly, the Court has personal jurisdiction over both Rensch and Nakamura.[44]

## IV.   WHILE NONE OF NIEMANN'S CLAIMS ARE DEFICIENT, HE SHOULD BE ALLOWED TO REPLEAD WERE THE COURT TO CONCLUDE OTHERWISE

In the event that the Court determines that the Complaint fails to allege certain facts related to any of Niemann's claims, Niemann should be allowed to amend the Complaint.  Defendants will not be prejudiced by allowing Niemann to amend.  *See, e.g.*, *CitiMortgage, Inc. v. Mt. W. Fin., Inc.*, 2016 U.S. Dist. LEXIS 55266 (E.D. Mo. Apr. 26, 2016) (dismissing counterclaim without prejudice, "and per Defendant's request," granting leave to amend to "cure the defect" of insufficiently pleaded damages) (Fleissig, J.).

---

[43] The case that Nakamura relies upon in arguing that there is no "relation" between their alleged contacts with Missouri and Niemann's claims, *Williams v. LG Chem., Ltd.*, is wholly distinguishable because there, it was indisputable that defendant's contacts had no relation to plaintiff's claims.  2021 U.S. Dist. LEXIS 244872, at *8 (E.D. Mo. Dec. 23, 2021) (defendant's "contacts with Missouri only involve the sale of petrochemical products, and [plaintiff] makes no argument that his claims involve sales of petrochemical products").

[44] At a minimum, Niemann is entitled to jurisdictional discovery because he has made a "colorable or prima facie showing of personal jurisdiction" over Rensch and Nakamura given their extensive contacts with Missouri.  *J H v. Kawasaki Motors Corp.*, 2020 U.S. Dist. LEXIS 253186, at *18 (W.D. Mo. Dec. 4, 2020); *JRI Holdings v. York Innovators Grp., LLC*, 2017 U.S. Dist. LEXIS 200313, at *5 (W.D. Mo. Dec. 6, 2017) ("In light of the early stage of the case, the Court determines the appropriate course is to grant JRI's request for" jurisdictional discovery).

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Carlsen,

Chess.com, Rensch, and Nakamura's motions to dismiss in their entirety.

Dated: New York, New York
          March 2, 2023

                                                      /s/ Andrew J. Urgenson
                                                    Terrence A. Oved, Esq.
                                                    Darren Oved, Esq.
                                                    Andrew J. Urgenson, Esq.
                                                    Jennifer R. Pierce, Esq.
                                                    OVED & OVED LLP
                                                    *Attorneys for Plaintiff*
                                                    401 Greenwich Street
                                                    New York, New York 10013
                                                    Tel.: 212.226.2700

                                                    Matthew Gartner, Esq. (#64320)
                                                    THE GARTNER LAW FIRM
                                                    *Attorneys for Plaintiff*
                                                    220 Salt Lick Road
                                                    St. Peters, Missouri 63376
                                                    Tel: 636.397.2111
                                                    matthew@gartnerlawfirm.com

## <u>CERTIFCATE OF SERVICE</u>

I hereby certify that all counsel of record are being served on March 2, 2023, with a copy of this document via the Court's CM/ECF system.

<u>/s/ Andrew J. Urgenson</u>
Andrew J. Urgenson