# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

HANS MOKE NIEMANN,

     Plaintiff,

  vs.

SVEN MAGNUS ØEN CARLSEN A/K/A
MAGNUS CARLSEN; PLAY MAGNUS AS,
D/B/A PLAY MAGNUS GROUP;
CHESS.COM, LLC; DANIEL RENSCH A/K/A
"DANNY" RENSCH; AND HIKARU
NAKAMURA,

     Defendants.

Case No: 4:22-cv-01110-AGF

Hon. Audrey G. Fleissig

---

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT MAGNUS CARLSEN'S MOTION TO DISMISS THE
## SECOND AMENDED COMPLAINT UNDER CONNECTICUT GENERAL
## STATUTES SECTION 52-196A AND FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

J. Nicci Warr
Jacob R. Schlueter
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105

Craig M. Reiser*
Denise L. Plunkett*
Eva H. Yung*
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, New York 10036

John M. Tanski*
Caroline P. Boisvert*
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, Connecticut 06103

* admitted *pro hac vice*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................... 1

I.    The Opposition Confirms That Connecticut's Anti-SLAPP
      Statute Bars All of Niemann's State-Law Claims (Counts I, II, V, and VI) ..................... 2

      A.    Connecticut's Anti-SLAPP Statute Is Substantive Under *Erie* ............................. 3

      B.    Missouri's Choice-Of-Law Rules Require
            Application Of Connecticut Substantive Law ........................................................ 5

      C.    Niemann Cannot Escape His Own
            Allegations of Grandeur By Arguing That
            He Is Not A Public Or Limited-Purpose Public Figure ......................................... 8

II.   The Opposition Confirms That Niemann's
      Defamation Claims Should Also Be Dismissed Because
      Niemann Cannot Plausibly Allege Them (Counts I and II) ................................................ 9

      A.    The Opposition Underscores
            Niemann's Failure to Plead Actual Malice ........................................................ 10

      B.    The Opposition Demonstrates That the
            Allegedly Defamatory Statements Are Not Actionable ....................................... 11

III.  The Opposition Confirms That Niemann Cannot
      Allege A Plausible Claim for Tortious Interference (Count V) ......................................... 12

IV.   The Opposition Confirms That Niemann Cannot
      Allege A Plausible Claim For Civil Conspiracy (Count VI) ............................................. 14

V.    The Opposition Confirms That Niemann
      Cannot Allege Any Plausible Antitrust Claims (Counts III and IV) ................................. 15

CONCLUSION ..................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ............................................................................................. 10, 14

*Brandon v. City of Moline Acres*,
　2010 WL 4287545 (E.D. Mo. Oct. 21, 2010) ........................................................... 14

*Cevetillo v. Lang*,
　2019 WL 7597451 (Conn. Super. Ct. Dec. 13, 2019) .................................................. 5

*Corizon, Inc. v. Wexford Health Sources, Inc.*,
　2013 WL 791788 (E.D. Mo. Mar. 4, 2013) ................................................................. 6

*Erie R. Co. v. Tompkins*,
　304 U.S. 64 (1938) ......................................................................................................... 3

*Favaloro v. BJC Healthcare*,
　2015 WL 6531867 (E.D. Mo. Oct. 28, 2015) ............................................................. 14

*Fuqua Homes, Inc. v. Beattie*,
　388 F.3d 618 (8th Cir. 2004) ..................................................................................... 5, 7

*Gertz v. Robert Welch, Inc.*,
　418 U.S. 323 (1974) ....................................................................................................... 8

*Gottwald v. Sebert*,
　193 A.D.3d 573 (N.Y. App. Div. 2021) .................................................................... 8–9

*Guaranty Tr. Co. v. York*,
　326 U.S. 99 (1945) ......................................................................................................... 4

*Janzen v. Goos*,
　302 F.2d 421 (8th Cir. 1962) ......................................................................................... 7

*Klossner v. IADU Table Mound MHP, LLC*,
　565 F. Supp. 3d 1118 (N.D. Iowa 2021) ...................................................................... 8

*Liberty Synergistics Inc. v. Microflo Ltd.*,
　718 F.3d 138 (2d Cir. 2013) ........................................................................................... 4

*Miljas v. Greg Cohen Promotions, LLC*,
　536 F. Supp. 3d 409 (S.D. Iowa 2021) .......................................................................... 9

*Moldex Metric, Inc. v. 3M Co.*,
  2015 WL 520722 (D. Minn. Feb. 9, 2015) ...........................................................4

*Nesladek v. Ford Motor Co.*,
  46 F.3d 734 (8th Cir. 1995) ...............................................................................7

*Newsham v. Lockheed Missiles & Space Co.*,
  190 F.3d 963 (9th Cir. 1999) ..............................................................................5

*Osby v. A&E Television Networks*,
  1997 WL 338855 (E.D. Pa. June 17, 1997) ..........................................................7

*Pacheco Quevedo v. Hearst Corp.*,
  2019 WL 7900036 (Conn. Super. Ct. Dec. 19, 2019) ............................................5

*Palmisano v. News Syndicate Co.*
  130 F. Supp. 17 (S.D.N.Y. 1955) .......................................................................7

*Rivas v. Pepi*,
  2018 WL 4199211 (Conn. Super. Ct. Aug. 16, 2018) ............................................4

*Selle v. Pierce*
  494 N.W.2d 634 (S.D. 1993) ..............................................................................7

*Smith v. Planned Parenthood of St. Louis Region*,
  225 F.R.D. 233 (E.D. Mo. 2004) .....................................................................3, 4

*State Bank of Bellingham v. BancInsure, Inc.*,
  2014 WL 4829184 (D. Minn. Sept. 29, 2014) ......................................................4

*Steinberg v. Good Samaritan Hosp.*,
  2013 WL 5729531 (D. Neb. Oct. 22, 2013) ..........................................................7

*Tumey L.L.P. v. Mycroft AI Inc.*,
  2021 WL 4806734 (W.D. Mo. Oct. 14, 2021).......................................................13

*White v. Walsh*,
  649 F.2d 560 (8th Cir. 1981) ............................................................................14

**Other Authorities**

2d Rest. Conflict of Laws § 6 ..............................................................................7

## PRELIMINARY STATEMENT

Plaintiff Hans Niemann's Opposition confirms that this lawsuit is nothing more than an attempt to silence legitimate discussion of his admitted history of cheating.[1]  Unable to shoehorn his grievances into legally cognizable claims, Niemann resorts to rewriting his Second Amended Complaint.  He argues, for example, that Connecticut's anti-SLAPP statute does not bar his claims because he is not a "public figure," despite seeking damages of at least $100 million for reputational injury in what he now claims is merely a "$152 million" chess industry.  Opp. 17–18.  Likewise, although he casts himself in his Second Amended Complaint as a chess prodigy who could make a fortune streaming chess games and serving as a brand ambassador, he claims in his Opposition that he was "virtually unknown" before the Sinquefield Cup.  *Id*. at 3.

Niemann has already tried to state claims against Carlsen three times.  These attempts all fail because Niemann's self-aggrandizing theory that Carlsen was so upset about losing a single game that he embarked on an elaborate scheme to ruin him is as implausible as it is unfounded:

*First*, Niemann's admitted Connecticut citizenship requires application of Connecticut law—including Connecticut's anti-SLAPP statute, which Niemann tries desperately to avoid because he knows it dooms all of his state-law claims.  Unable to rebut Carlsen's showing that Connecticut's anti-SLAPP statute is substantive, Opening Mem. 14–17, Niemann asks the Court to disregard binding Supreme Court precedent in favor of a few cherry-picked quotes from state-court decisions.  Opp. 7–8.  Contrary to his argument, Niemann cannot evade Connecticut law and its anti-SLAPP statute because he chose to bring his baseless claims in Missouri.  *Id.* at 12.

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in Carlsen's Opening Memorandum of Law in Support of his Motion to Dismiss, ECF No. 82 (the "Opening Memorandum" or "Opening Mem.").  Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss, ECF No. 108, is referred to as the "Opposition" or "Opp."  The Reply in Support of Defendant Chess.com, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint and/or to Compel Arbitration is referred to as the "Chess.com Reply."

*Second*, the Opposition confirms that Niemann has failed to, and cannot, plausibly plead a defamation claim against Carlsen.  Niemann makes Houdini-worthy attempts to avoid black-letter pleading requirements, such as declaring he is not a public figure to avoid having to plead actual malice and to try—yet again—to avoid Connecticut's anti-SLAPP statute.  These efforts do nothing to rebut the fatal deficiencies discussed in Carlsen's Opening Memorandum.

*Third*, the Opposition demonstrates Niemann's failure to plausibly allege the essential elements of his claims for tortious interference and civil conspiracy.  Among other deficiencies, Niemann cannot credibly allege that Carlsen knew of his claimed business expectancies, and his conclusory assertion of an agreement among the parties fails to cross the plausibility threshold.

*Fourth*, the Opposition highlights Niemann's failure to allege the requisite elements of a federal antitrust claim.  Niemann fails to explain how he has alleged a plausible relevant market, let alone an agreement among the defendants to exclude him.  Nor does he demonstrate plausible allegations of harm to competition or antitrust injury, continuing to conflate the concepts of market competitors and individual chess game participants.  *See* Opening Mem. 29–30.

Despite repeated attempts, Niemann has failed to state claims against Carlsen.  Enough is enough.  The Court should dismiss all of Niemann's claims against Carlsen with prejudice, and award Carlsen his attorneys' fees and costs as required under Connecticut's anti-SLAPP statute.

## ARGUMENT

### I.      The Opposition Confirms That Connecticut's Anti-SLAPP Statute Bars All of Niemann's State-Law Claims (Counts I, II, V, and VI)

Niemann's state-law claims fail under both Connecticut and Missouri law.  Opening Mem. 6–7.  However, there is a conflict between Connecticut and Missouri law because Connecticut—unlike Missouri—affords Carlsen an anti-SLAPP defense to all of Niemann's state-law claims.  *Id.* at 6–17.  As Carlsen demonstrated, the Court should apply Connecticut's

anti-SLAPP statute to dismiss those claims in their entirety because Niemann is a Connecticut

citizen and resident, *id.* at 7–11; Connecticut's anti-SLAPP law would have applied to

Niemann's claims if he had not tried to evade its reach by suing in this Court, *id.* at 12–14; and

its provisions are substantive under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) and do not

squarely conflict with the Federal Rules of Civil Procedure.  Opening Mem. 14–17.

Niemann admits that this Court must apply Missouri's choice-of-law analysis, Opp. 9,

and that Connecticut law would bar all of his state-law claims unless he can meet Connecticut's

"probable cause" standard.  *See id.* at 19.  But rather than attempting to demonstrate his

compliance with that rigorous standard, Niemann asks the Court to disregard it on three grounds:

- First, Niemann argues that Connecticut's anti-SLAPP law is not substantive but instead sets forth a rule of procedure, *id.* at 7–9;

- Second, Niemann contends that Missouri law applies to his state-law claims because he has a closer connection to Missouri than Connecticut, *id.* at 9–15; and

- Finally, Niemann asserts he does not qualify as either a public or limited-purpose public figure to whom Connecticut's anti-SLAPP statute applies.  *Id.* at 15–18.

These arguments, like Niemann's attempts to undo his Connecticut citizenship, are unavailing.

### A.    Connecticut's Anti-SLAPP Statute Is Substantive Under *Erie*

Niemann acknowledges that Connecticut's anti-SLAPP law applies in this forum if it

qualifies as "substantive" under "the longstanding *Erie* doctrine," but claims it is merely a

procedural rule.  Opp. 7.  Niemann is mistaken.

As Carlsen's Opening Memorandum explained, this Court previously held that a

Missouri statute that served to cull "meritless suits" at "an early stage of litigation" was

substantive under *Erie* because it was "outcome determinative on its face, and failure to apply it

could lead to forum shopping and the inequitable administration of the law."  *Smith v. Planned

Parenthood of St. Louis Region*, 225 F.R.D. 233, 241 (E.D. Mo. 2004).  The same is true of

Connecticut's anti-SLAPP statute.  Niemann ignores this authority in favor of cherry-picked snippets from state-court cases describing certain aspects of Connecticut's anti-SLAPP law as "procedural."  Opp. 7–8.  But even if those cases established that Connecticut's anti-SLAPP statute is procedural—which they do not—they do not establish that it is procedural under *Erie*.

Indeed, binding Supreme Court precedent—which Niemann fails to mention, much less distinguish—expressly holds that "[i]t is . . . immaterial [for purposes of *Erie*] whether [state laws] are characterized either as 'substantive' or 'procedural' in State court opinions."  *Guaranty Tr. Co. v. York*, 326 U.S. 99, 109 (1945); *see Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 143–44 (2d Cir. 2013) ("State rules that are considered 'procedural' under *state law* may still apply in [federal court] if those rules are considered 'substantive' under *federal law* pursuant to *Erie*.").  As Carlsen demonstrated, numerous federal courts examining anti-SLAPP laws like Connecticut's through this lens have held that they are substantive.  Opening Mem. 14–16.  And, contrary to Niemann's assertion, *see* Opp. 8, this includes district courts in the Eighth Circuit. *See Moldex Metric, Inc. v. 3M Co.*, 2015 WL 520722, at *11 (D. Minn. Feb. 9, 2015) (applying Minnesota's anti-SLAPP statute in federal court); *State Bank of Bellingham v. BancInsure, Inc.*, 2014 WL 4829184, at *12 (D. Minn. Sept. 29, 2014) (same), *aff'd*, 823 F.3d 456 (8th Cir. 2016).

There can be no serious dispute that Connecticut's anti-SLAPP law is likewise substantive under *Erie*.  Its purpose confirms that it is substantive because it "bears on a State-created right vitally and not merely formally or negligibly."  *Guaranty Tr.*, 326 U.S. at 110; *see Smith*, 225 F.R.D. at 241.  Indeed, far from simply prescribing deadlines or the like, Connecticut's anti-SLAPP statute was enacted to afford defendants like Carlsen a defense to "quickly get rid of frivolous lawsuits" like this one.  *Rivas v. Pepi*, 2018 WL 4199211, at *2 (Conn. Super. Ct. Aug. 16, 2018) (quoting Connecticut House and Senate debates).

Courts in the Ninth Circuit have consistently concluded that California's anti-SLAPP statute protects "important, substantive state interests" such as "encourag[ing] continued participation in matters of public significance."  *Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 971, 973 (9th Cir. 1999); *see* Opening Mem. 15.  The same is true of Connecticut's anti-SLAPP statute, which Connecticut courts have recognized is substantially similar to California's anti-SLAPP law.  *See Cevetillo v. Lang*, 2019 WL 7597451, at *5 n.7 (Conn. Super. Ct. Dec. 13, 2019) ("California's anti-SLAPP statute is extremely similar to Connecticut's anti-SLAPP statute."); *Pacheco Quevedo v. Hearst Corp.*, 2019 WL 7900036, at *4 n.2 (Conn. Super. Ct. Dec. 19, 2019) (explaining that California has a "similar law[]" to "Connecticut's newly enacted anti-SLAPP statute").  This Court should reject Niemann's attempt to avoid Connecticut's anti-SLAPP law by claiming it is a mere matter of procedure.

## B. Missouri's Choice-Of-Law Rules Require Application Of Connecticut Substantive Law

Niemann's next gambit to avoid having his claims dismissed under Connecticut's anti-SLAPP statute is further embellishment—and rewriting—of the allegations he added to his Second Amended Complaint to downplay his Connecticut citizenship and residence.  *See* Opening Mem. 9–10.  This effort remains unavailing.

As Carlsen showed, in defamation cases predicated on widespread dissemination of allegedly defamatory material, courts applying Missouri's choice-of-law rules look to the residency of the aggrieved party.  *Id.* at 8.  Indeed, Niemann acknowledges that under binding precedent, a plaintiff's "residence [is] the most critical factor" in a choice-of-law analysis because "defamatory injuries typically have their 'principal effect among one's friends, acquaintances, neighbors and business associates.'"  Opp. 12–13 (quoting *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 622 (8th Cir. 2004)).  Desperate to avoid this black-letter law, Niemann

advances a litany of irrelevant and misleading arguments.

Niemann argues, for example, that his professional reputation in Missouri, not Connecticut, is what matters because he "was not invited or disinvited to tournaments in Connecticut because such business opportunities and tournaments do not exist there." *Id*. at 10. But he has not pled these facts in any of his three complaints, nor has he alleged any "business opportunities and tournaments" in Missouri to which he has been disinvited or for which he seeks damages.  Niemann also argues that Missouri law should apply because "Missouri law favors the substantive law of the state where the defamatory statement was published," *id.*, failing to acknowledge that his actual allegations challenge statements that were published online or across the world and that he is seeking damages based on opportunities that were purportedly lost online and abroad, *see* Opening Mem. 11; *see, e.g.*, SAC ¶¶ 123–29.  Niemann further contends that the parties' relationships are centered in Missouri, Opp. 11–12, ignoring that he nowhere alleges that any party—even himself—is based in Missouri or that the bulk of the parties' interactions occurred in Missouri.[2]  Finally, Niemann asserts that his prior admissions that he is a Connecticut "resident" and "citizen" are irrelevant because Niemann's evolution from being a Connecticut "resident" (in his Original Complaint) and "citizen" (in his First Amended Complaint) to "citizen solely by virtue of the fact that he moved to Connecticut" (in his Second Amended Complaint) is a mere "clarif[ication]."  Opp. 12.

What is missing from this parade of sophistry is any claim that Niemann is a citizen or resident of any jurisdiction other than Connecticut.  Niemann does not argue—much less

---

[2] Moreover, such an assertion is belied by Niemann's equally baseless claim that there is a global "Competitive Chess Market" from which he was allegedly excluded, as well as by his allegations regarding the location and asserted diversity of citizenship of all parties.  Opp. 51; *see Corizon, Inc. v. Wexford Health Sources, Inc.*, 2013 WL 791788 at *4 (E.D. Mo. Mar. 4, 2013) (concluding the "center of the relationship cannot be readily ascertained" because "the parties compete . . . in several states"); SAC ¶¶ 20–25, 27.

allege—that he has ever resided in Missouri or anywhere other than Connecticut.  Nor can he credibly claim that he is not a Connecticut resident.  As Carlsen demonstrated, Niemann's continued (albeit reluctant) admission that he is a Connecticut "citizen" means he is a Connecticut resident as well.  Opening Mem. 10; *Janzen v. Goos*, 302 F.2d 421, 424–25 (8th Cir. 1962) (cited in Opp. 11) (stating that while residence alone does not confer citizenship, the establishment of citizenship does require residence).  The Court should apply the law of the state in which Niemann is a citizen to his state-law claims.  *See* Opening Mem. 10–11.

Niemann's last-ditch effort to avoid Connecticut law is an appeal to the Court to disregard the rule in *Fuqua* because "there, the plaintiff . . . was affirmatively seeking the protections of his home state" whereas "Niemann is not seeking to invoke Connecticut law." Opp. 13.[3]  This type of brazen forum shopping is exactly what courts applying choice-of-law rules aim to prevent.  *See* 2d Rest. Conflict of Laws § 6 (instructing that the choice of law principles of predictability and uniformity serve to discourage forum shopping); *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 739 (8th Cir. 1995) (explaining that minimizing forum shopping is an important consideration in choice of law).  Nor can Niemann seek refuge in the cases he cites to avoid *Fuqua*, as those cases neither apply Missouri choice-of-law rules nor contradict *Fuqua*'s teaching that the law of the state where Niemann resides should apply to his claims.[4]

---

[3] The sole case Niemann cites in support of this assertion—*Steinberg v. Good Samaritan Hosp.*, 2013 WL 5729531 (D. Neb. Oct. 22, 2013)—does not apply Missouri law and stands only for the proposition that the most significant relationship analysis will sometimes result in application of a state's laws other than that of the plaintiff's residence.

[4] The single case that applied the law of somewhere other than that of plaintiff's residence applied the law of the state both parties "assumed without argument" applied.  *See Osby v. A&E Television Networks*, 1997 WL 338855 at *3 (E.D. Pa. June 17, 1997) (cited in Opp. 13).  The court in *Palmisano v. News Syndicate Co.* did not reach a choice-of-law conclusion at the motion-to-dismiss stage, 130 F. Supp. 17, 20 (S.D.N.Y. 1955) (cited in Opp. 13), and in *Selle v. Pierce* the court determined that the state of plaintiff's domicile and residence had the most significant relationship.  494 N.W.2d 634, 637 (S.D. 1993) (cited in Opp. 13).

### C.   Niemann Cannot Escape His Own Allegations of Grandeur By Arguing That He Is Not A Public Or Limited-Purpose Public Figure

Despite having repeatedly cast himself as a superstar in "the top echelons of the global chess world" who purportedly lost "lucrative endorsements, sponsorships, business and marketing opportunities" worth at least $100 million due to defendants' alleged misconduct, Opp. 1, 41, Niemann now claims in his Opposition that he is not a public figure or even a limited-purpose public figure. *Id.* at 16. Niemann's attempt to avoid Connecticut's anti-SLAPP law by arguing that he was "virtually unknown" before the Sinquefield Cup is frivolous. *Id.*

Niemann's Second Amended Complaint alleges that Niemann (i) has long participated in events worldwide, (ii) has a "lucrative streaming career," and (iii) previously served as a brand ambassador for "lucrative global brand" Play Magnus. SAC ¶¶ 3, 4, 196, 198; *see* Niemann Interview at 17:40–17:56. Far from being "virtually unknown" before the Sinquefield Cup, moreover, Niemann appeared in popular national and international media.[5] Niemann's attempts to liken himself to the attorney who merely "participat[ed] in community and professional affairs," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974) (cited in Opp. 16), or to the music producer who "used his efforts . . . to obtain publicity not for himself, but for the artists that he represents" are accordingly nonsensical. *Gottwald v. Sebert*, 193 A.D.3d 573, 576 (N.Y. App.

---

[5] Although the Court need look no further than Niemann's own allegations to conclude he is a public or limited-purpose public figure, it may "take judicial notice of newspapers and other publications as evidence of what was in the public realm at the time" predating the Sinquefield Cup. *Klossner v. IADU Table Mound MHP, LLC*, 565 F. Supp. 3d 1118, 1123 (N.D. Iowa 2021); *see, e.g.*, *Check Out Chess Max Academy If Your Kids Are Interested in Learning Chess*, WEST SIDE RAG (May 27, 2022), https://www.westsiderag.com/2022/05/27/check-out-chess-max-academy-if-your-kids-are-interested-in-learning-chess (describing Niemann as the "most famous student" of Maxim Dlugy's "Chess Max Academy"); Carly Stern, *The KING'S Gambit! Teen chess player draws comparisons to hit Netflix show after becoming a Grandmaster at AGE 17 – having taught himself the game when he was just eight years old*, DAILY MAIL (Aug. 30, 2021), https://www.dailymail.co.uk/femail/article-9940055/Teenager-chess-Grandmaster-age-17-teaching-game-age-eight.html (discussing Niemann's chess career); *Grandmaster Hans Niemann*, CHESS LIFE MAGAZINE (April 2021), https://www.uscfsales.com/chess-life-magazine-april-2021-issue.html (Niemann on the cover) (last visited Mar. 13, 2023).

8

Div. 2021) (cited in Opp. 16).  As the 40th ranked chess player in the world, SAC ¶ 2, Niemann

is as much a public figure as the "forty-first [ranked heavyweight boxer] in the world." *Miljas v.*

*Greg Cohen Promotions, LLC*, 536 F. Supp. 3d 409, 421−22 (S.D. Iowa 2021) (explaining that

the "Complaint support[ed] the contention that [the plaintiff] is a public figure for libel purposes"

based on this allegation).  At an absolute minimum, Niemann qualifies as a limited-purpose

public figure because he thrust himself into the controversy on which his claims are based.  *See*

Opening Mem. 13 n.4; *see also* Chess.com Reply, Section III.A.2.

      Because Niemann qualifies as a public or limited-purpose public figure, he must show

"probable cause" that when the allegedly defamatory statements were made, Carlsen knew they

were false or entertained serious doubts as to their truth.  As demonstrated in Carlsen's Opening

Memorandum and discussed further below, Niemann cannot come close to meeting this standard.

## II.    The Opposition Confirms That Niemann's Defamation Claims Should Also Be Dismissed Because Niemann Cannot Plausibly Allege Them (Counts I and II)

      Carlsen has shown that the morass of purported statements and conduct Niemann alleges

falls far short of satisfying his burden to plead the required elements of a defamation claim

for each challenged statement.  Opening Mem. 18–20.  Niemann pays lip service to his pleading

burden, but attempts to paper over his failure to satisfy it by cobbling together a new list of

grievances that still fails to specifically identify what defamatory statements were made by

whom and to whom.  Opp. 23–24.

      Illustrating his failure to plead a claim, Niemann attempts in his Opposition to rewrite his

allegations.  He claims, for example, that Carlsen "falsely accus[ed] Niemann of lying about

cheating in online recreational chess games in the past," *id.* at 23, despite making no such

allegation or even describing it in his newly minted list of statements and conduct.  Niemann also

invokes in his Opposition a new legal theory of "defamation by implication."  *Id.* at 25.

9

Niemann's unavailing attempt to revise his Second Amended Complaint in his Opposition demonstrates its failure to state a claim.  His failure—on the third try—to specifically plead the elements of his claim for each allegedly defamatory statement is reason enough to dismiss his defamation claims.  But as discussed below, those claims also fail for the separate reasons that Niemann cannot allege actual malice and is suing Carlsen for conduct that, as a matter of law, cannot be defamatory.

### A.      The Opposition Underscores Niemann's Failure to Plead Actual Malice

Niemann concedes that a public or limited-purpose public figure must plead actual malice—i.e., that when Carlsen made each allegedly defamatory statement, he knew what he was saying was false or he was reckless as to its truth or falsity.  Opp. 22.  Recognizing that he has failed to—and cannot—plausibly allege that any of Carlsen's allegedly defamatory statements was insincere when it was made, Niemann repeatedly insists he is not a public or limited-purpose public figure.  As discussed above, he is wrong.  *See supra* Part I.C.

Niemann also tries to surmount his inability to plead actual malice by pointing to his conclusory allegations that Carlsen acted "maliciously" and is "notoriously unable to cope with defeat."  Opp. 1, 28.  Not only are these unadorned allegations entitled to no weight, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), but they are belied by Niemann's own allegations that Carlsen has lost many chess games before—including to Niemann.  SAC ¶¶ 7, 44.  Put simply, Niemann's conclusory assertions that Carlsen was acting "maliciously" say nothing about what Carlsen subjectively believed at the time of his alleged statements.  Opening Mem. 22.

Recognizing as much, Niemann tries to argue that the Court should infer actual malice because Carlsen made his purportedly defamatory statements "after being informed of [their] falsity."  Opp. 22–23.  But Niemann cannot point to any allegation that Carlsen ever received

any such information; instead, he relies on third-party sources who allegedly concluded they could not find evidence that Niemann cheated in the Sinquefield Cup.  *Id.* at 27–28.  As Carlsen explained, these sources do not prove that Niemann did not cheat.  Opening Mem. 22.  But even accepting Niemann's own misguided logic that they proved Carlsen's beliefs were wrong, they would not support an inference of actual malice.

Indeed, according to Niemann's own allegations, the earliest third-party statement that could have informed Carlsen's view was made on September 10, 2022.  SAC ¶ 157.  Consequently, even if Niemann were correct that the post hoc sources on which he relies vindicate him, Niemann cannot rely on them to establish actual malice as to any alleged statements predating September 10, 2022.  Furthermore, Niemann admits in his Second Amended Complaint that he publicly acknowledged a history of cheating on September 6, 2022, *id.* ¶ 109, and that he and Carlsen had played each other in the past.  *Id.* ¶ 7.  Thus, the remainder of Carlsen's alleged statements—which occurred in "approximately September 2022," *id.* ¶ 123; on October 9 and "[s]hortly thereafter," *id.* ¶¶ 125–26; on September 19 and 21, *id.* ¶¶ 129–36; or on September 26 or on some other unspecified date, *id.* ¶¶ 142–44—all postdate Niemann's own admission that he has cheated in chess and his prior interactions with Carlsen.[6]  Niemann's failure to plead actual malice is fatal to his defamation claims.

## B.    The Opposition Demonstrates That the Allegedly Defamatory Statements Are Not Actionable

Even if Niemann's defamation claims could survive the many pleading defects discussed above, they are nonactionable for other reasons.  Niemann's Opposition demonstrates as much:

---

[6] Similarly, Niemann fails to allege, precisely or at all, the timing of many of the purported third-party assertions that Niemann had not cheated.  *See* SAC ¶¶ 158, 160–63.  Accordingly, these statements also may not support an inference of actual malice.

- The Opening Memorandum established that none of Carlsen's challenged conduct (as opposed to statements) is actionable, and Niemann concedes this point.  Opening Mem. 23; Opp. 29.

- Niemann never addresses, and thus concedes, that qualified privilege applies to all statements allegedly made to tournament officials.  Accordingly, all such challenged statements are nonactionable.  Opening Mem. 23–24.

- Niemann also does not dispute that truth and opinion, even if negative or harmful, cannot form the basis of a defamation claim.  The remaining alleged statements by Carlsen are all either truth or opinion, and thus nonactionable too.  *Id*. at 24–25.

Finally, Niemann does not dispute that phrases which "leave[] open the interpretation to the listener or reader's imagination cannot, as required by the law of defamation, charge a verifiably false fact." *Id*. at 21 n.9.  Thus, the Court has an additional basis for dismissing Niemann's claims that Carlsen somehow accused him of cheating in the Sinquefield Cup by allegedly (1) chanting "Ukse Hans," Opp. 23; (2) referencing Dlugy as being Niemann's "mentor" and "doing a great job," *id*. at 24; and (3) saying that "people can draw their own conclusions" about his resignation from the Julius Baer Generation Cup game.  *Id*.

## III. The Opposition Confirms That Niemann Cannot Allege A Plausible Claim for Tortious Interference (Count V)

As Carlsen demonstrated, Niemann's tortious interference claim fails because it is derivative of his baseless defamation and antitrust claims, and fails to adequately allege the required elements.  Opening Mem. 25–28.

Unable to contend otherwise, Niemann resorts to mischaracterizing Carlsen's Opening Memorandum and his own Second Amended Complaint.  He incorrectly claims, for example, that his allegations of "valid business expectancies and damages" were somehow conceded.  Opp. 62.  He likewise asserts that these expectancies include "tournaments and events in which *he was scheduled to play*, including . . . the Tata Steel Tournament," *id.* at 57 (emphasis added), when his Second Amended Complaint actually alleges that he had "been in extensive

12

negotiations" about the *possibility* of playing in that tournament.  *See* SAC ¶ 194.  And in a transparent effort to persuade the Court that his claim is not derivative of his inadequately alleged defamation claims, Niemann asserts that he is in fact relying on unspecified and unalleged "misrepresentations of fact" and "other wrongful act[s]."  Opp. 65.  Niemann's eleventh-hour attempt to rewrite his complaint yet again does not—and cannot—salvage his claims.

First, Niemann's Opposition confirms he cannot allege that Carlsen had knowledge of his supposed business expectancies.  The most Niemann can muster is the speculation that Carlsen must have had knowledge of Niemann's business negotiations with third parties because he is a "fellow member[]" of the so-called market for "[p]rofessional chess tournaments and online recreational chess platforms."  *Id*. at 62–63; *see* SAC ¶ 47.  But none of Niemann's cases supports his assertion that everyone who has played chess in a tournament or online knows about his private dealings; to the contrary, they demonstrate that Niemann must do more than provide an unsupported assertion of knowledge.  *See, e.g.*, *Tumey L.L.P. v. Mycroft AI Inc.*, 2021 WL 4806734, at *13 (W.D. Mo. Oct. 14, 2021) (cited in Opp. 62) (concluding defendants had reason to know of business expectancies because plaintiffs alleged having "repeat customers").

Second, Niemann's Opposition also shows that he has not alleged an "improper motive." Niemann tries to fill this gap in his pleading by baldly asserting that his victory in a single game against Carlsen "dashed Carlsen's two remaining statistical ambitions."  Opp. 63.  But as discussed earlier and in the Opening Memorandum, Niemann's own allegations contradict his theory.  Indeed, Niemann's Second Amended Complaint alleges that Carlsen has lost "20% of his online chess games . . . in the past month alone" and previously lost to Niemann, SAC ¶¶ 7, 44, without any allegation that Carlsen ever schemed to destroy other opponents who beat him.

Furthermore, Niemann has not satisfied—and cannot satisfy—the requirement to plead causation with only the conclusory allegation that third parties purportedly refused to deal with Niemann "'specifically based on Defendants' defamatory accusations' and blacklisting." Opp. 64. As Carlsen demonstrated, there is an obvious and more plausible explanation for what Niemann claims has transpired: his own admitted history of cheating. Opening Mem. 28.

## IV.   The Opposition Confirms That Niemann Cannot Allege A Plausible Claim For Civil Conspiracy (Count VI)

Niemann concedes that he cannot state a claim for civil conspiracy against Carlsen unless he can adequately plead an underlying tort. Opp. at 65 n.35. For this reason alone, his civil conspiracy claim fails. *See* Opening Mem. 28. His Opposition confirms that this claim fails for the additional reason that he has not alleged and cannot plausibly allege an agreement among the defendants. *Id*. at 28–29; *see* Opp. 65 (conceding that "meeting of the minds" is one of the elements). As shown in Section I.B of the Chess.com Reply, Niemann's allegations of an agreement among the defendants amount to nothing more than boilerplate legal conclusions that this Court need not and should not accept. *See Iqbal*, 556 U.S. at 680 (explaining that an "assertion of an unlawful agreement [is] a 'legal conclusion' and, as such, [is] not entitled to the assumption of truth" (internal citations omitted)). Niemann can only try to claim otherwise by stretching his factual allegations beyond recognition and invoking inapposite legal authority.[7]

---

[7] For example, Niemann relies on *Favaloro v. BJC Healthcare*, 2015 WL 6531867 (E.D. Mo. Oct. 28, 2015), a wrongful termination case predicated on retaliation for reporting Title VII and other statutory violations. Here, Niemann provided his own reason for the conduct he complains must have been part of an agreement to blacklist him: he is an admitted cheater. In *White v. Walsh*, 649 F.2d 560, 561 (8th Cir. 1981), which Niemann also invokes, the court read a pro se complaint "with great liberality" to find an agreement—a situation not applicable to Niemann, who has at least six lawyers. And Niemann omits how the combination of timing of the wrongful acts *and* failures to comply with state law together nudged the allegation of a conspiracy from "the possible to the plausible," as the court in *Brandon v. City of Moline Acres*, 2010 WL 4287545, at *3 (E.D. Mo. Oct. 21, 2010) found.

**V.    The Opposition Confirms That Niemann Cannot**
**Allege Any Plausible Antitrust Claims (Counts III and IV)**

Niemann's Opposition further demonstrates that his antitrust claims lack legal basis.

Opening Mem. 29–30.  As discussed in Section I of the Chess.com Reply, which is incorporated

by reference, Niemann's Opposition confirms his failure to plead the requisite elements of his

claims, and highlights a fundamental misunderstanding of his own legal theories.

For example, Niemann's Opposition describes the "products" in the alleged "Competitive

Chess Market" as "(i) professional chess tournaments, and (ii) online recreational chess

platforms," Opp. 52, but there are no allegations that Carlsen or Niemann as individual chess

players offer either "product," even if they "literally compete against one another" in chess

games.  *Id*. at 50.  Niemann therefore cannot overcome the pleading deficiencies identified in the

Opening Memorandum, and his Section 1 claim fails.

Niemann's Section 2 claim is equally flawed, and Niemann's Opposition fails to

address—much less explain—how it applies to an individual player like Carlsen, who does not

have any share in the "Competitive Chess Market" Niemann alleges, let alone market power or a

plausible intent to monopolize.  *See* Opening Mem. 30.  Niemann cannot assert a Section 2 claim

against Carlsen that does not exist by claiming for the first time in his Opposition that Carlsen is

an "agent[] of market participants."  Opp. 56 n.29.

## CONCLUSION

For the foregoing reasons and for the reasons in the Opening Memorandum, the Court

should dismiss each of Niemann's six claims against Carlsen.  Niemann has amended his

complaint multiple times, and his Opposition confirms that no matter how much additional

latitude he is given, he cannot state valid legal claims.  The Court should dismiss Niemann's

claims with prejudice and award Carlsen his attorneys' fees and costs.

Dated: March 13, 2023

**STINSON LLP**

J. Nicci Warr (State Bar No. 59975)
Jacob R. Schlueter (State Bar No. 73929)
7700 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105
Office: 314.259.4570
Email: nicci.warr@stinson.com
        jacob.schlueter@stinson.com

Respectfully submitted,

**AXINN, VELTROP & HARKRIDER LLP**

By:   /s/ Craig M. Reiser
Craig M. Reiser, admitted *pro hac vice*
Denise L. Plunkett, admitted *pro hac vice*
Eva H. Yung, admitted *pro hac vice*
114 West 47th Street
New York, New York 10036
Office: 212.728.2200
Fax: 212.728.2201
Email: creiser@axinn.com
        dplunkett@axinn.com
        eyung@axinn.com

John M. Tanski, admitted *pro hac vice*
Caroline P. Boisvert, admitted *pro hac vice*
90 State House Square
Hartford, Connecticut 06103
Office: 860.275.8100
Fax: 860.275.8101
Email: jtanski@axinn.com
        cboisvert@axinn.com

*Counsel for Defendant Magnus Carlsen*

16

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2023, the foregoing was filed electronically using the CM/ECF system which will automatically provide notice to all attorneys of record by electronic means.

Dated: March 13, 2023                              Respectfully submitted,

**AXINN, VELTROP & HARKRIDER LLP**

By: /s/ Craig M. Reiser
Craig M. Reiser, admitted *pro hac vice*
114 West 47th Street
New York, New York 10036
Office: 212.728.2200
Fax: 212.728.2201
Email: creiser@axinn.com

*Counsel for Defendant Magnus Carlsen*