## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |
|---|---|
| HANS MOKE NIEMANN,<br><br>          Plaintiff,<br><br>     v.<br><br>SVEN MAGNUS ØEN CARLSEN A/K/A MAGNUS CARLSEN, PLAY MAGNUS AS D/B/A PLAY MAGNUS GROUP, CHESS.COM, LLC, DANIEL RENSCH A/K/A "DANNY" RENSCH, AND HIKARU NAKAMURA,<br><br>          Defendants. | Case No. 4:22-cv-01110-AGF<br><br>Hon. Audrey G. Fleissig |

## REPLY IN SUPPORT OF DEFENDANT CHESS.COM, LLC'S
## MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT
## AND/OR TO COMPEL ARBITRATION

Nima H. Mohebbi (# 275453CA)
Sarah F. Mitchell (# 308467CA)
Michael A. Hale (# 319056CA)
**LATHAM & WATKINS LLP**
355 S. Grand Ave., Suite 100
Los Angeles, CA 90071
Tel: (213) 485-1234
*nima.mohebbi@lw.com*
*sarah.mitchell@lw.com*
*michael.hale@lw.com*

Jeffrey B. Jensen (# 46745MO)
Kate Ledden (# 66026MO)
**HUSCH BLACKWELL LLP**
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel: (314) 480 1500
*jeff.jensen@huschblackwell.com*
*kate.ledden@huschblackwell.com*

Jamie L. Wine (# 4529251NY)
Blake E. Stafford (# 888324775DC)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
*jamie.wine@lw.com*
*blake.stafford@lw.com*

Derek Teeter (# 59031MO)
Spencer Tolson (# 74467MO)
**HUSCH BLACKWELL LLP**
4801 Main, Suite 1000
Kansas City, MO 64112
Tel: (816) 983-8000
*derek.teeter@huschblackwell.com*
*spencer.tolson@huschblackwell.com*

*Counsel for Defendant Chess.com, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................1

I.      NIEMANN'S ANTITRUST CLAIMS FAIL ACROSS THE BOARD ............................1

      A.    Niemann's Opposition Confirms That He Lacks A Cognizable Antitrust Injury. ...................................................................................................................1

      B.    Niemann Fails To Allege The Elements Of A Section 1 Claim. ............................3

      C.    Niemann Fails To Allege The Elements Of A Section 2 Claim. ............................6

II.     CONNECTICUT'S ANTI-SLAPP STATUTE BARS NIEMANN'S TORT CLAIMS ........................................................................................................................8

III.    NIEMANN'S STATE LAW TORT CLAIMS FAIL ON THE MERITS ..........................8

      A.    Niemann's Opposition Confirms That His Defamation Claims Fail. ....................8

           1.    The Challenged Statements Are Not Actionable. ........................................8

           2.    Niemann Fails To Demonstrate Actual Malice. ........................................10

      B.    Niemann's Opposition Fails To Salvage His Tortious Interference Claim. ..........12

      C.    Niemann's Derivative Civil Conspiracy Claim Is Meritless. ...............................14

IV.    NIEMANN'S BREACH OF CONTRACT CLAIM FAILS ............................................14

CONCLUSION..............................................................................................................15

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Aviation Charter, Inc. v. Aviation Rsch. Grp./US*,
  416 F.3d 864 (8th Cir. 2005) .................................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................3, 4

*Blalock v. Ladies Professional Golf Association*,
  359 F. Supp. 1260 (N.D. Ga. 1973) ......................................................................5

*Blubaugh v. Am. Cont. Bridge League*,
  2004 WL 392930 (S.D. Ind. Feb. 18, 2004), *aff'd*, 117 F. App'x 475 (7th Cir. 2004) ............5

*Brant v. U.S. Polo Assoc.*,
  631 F. Supp. 71 (S.D. Fla. 1986) ..........................................................................5

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972)............................................................................................7

*Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*,
  354 S.W.3d 234 (Mo. Ct. App. 2011)................................................................9, 13

*Chapman v. J. Concepts, Inc.*,
  528 F. Supp. 2d 1081 (D. Haw. 2007), *aff'd*, 401 F. App'x 243 (9th Cir. 2010) .............10, 11

*Cheeks v. Belmar*,
  2020 WL 5569982 (E.D. Mo. Sep. 17, 2020).........................................................14

*Chuy v. Philadelphia Eagles Football Club*,
  595 F.2d 1265 (3d Cir. 1979)...............................................................................10

*City of Kirkwood v. Union Elec. Co.*,
  671 F.2d 1173 (8th Cir. 1982) ..............................................................................7

*Cockram v. Genesco, Inc.*,
  680 F.3d 1046 (8th Cir. 2012) .............................................................................11

*Cuba's United Ready Mix, Inc. v. Bock Concrete Foundations, Inc.*,
  785 S.W.2d 649 (Mo. Ct. App. 1990).....................................................................10

*E-Z Dock, Inc. v. Shoremaster, Inc.*,
  2006 WL 1153901 (W.D. Mo. Apr. 25, 2006) ..........................................................5

*Flood v. Clearone Communs.*,
  618 F.3d 1110 (10th Cir. 2010) ............................................................................15

*Flood v. Kuhn*,
    407 U.S. 258 (1972) ........................................................................................5

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
    810 F.2d 795 (8th Cir. 1987) ........................................................................6, 7

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ......................................................................................11

*Hampton v. Dillard Dep't Stores, Inc.*,
    247 F.3d 1091 (10th Cir. 2001) ....................................................................15

*HDC Med., Inc. v. Minntech Corp.*,
    474 F.3d 543 (8th Cir. 2007) ..........................................................................7

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
    351 F. Supp. 3d 1187 (D. Minn. 2018) ..........................................................2

*King v. Union Station Holdings, LLC*,
    2012 WL 5351598 (E.D. Mo. Oct. 30, 2012) ................................................8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................................................5

*Little Rock Cardiology Clinic PA v. Baptist Health*,
    591 F.3d 591 (8th Cir. 2009) ..........................................................................5

*Midwest Commc'ns v. Minn. Twins, Inc.*,
    779 F.2d 444 (8th Cir. 1985) ..........................................................................2

*Morgan v. Ponder*,
    892 F.3d 1355 (8th Cir. 1989) ........................................................................7

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
    951 F.3d 952 (8th Cir. 2020) ........................................................................12

*Nunes v. WP Co. LLC*,
    513 F. Supp. 3d 1 (D.D.C. 2020) ..................................................................12

*NuStar Farms, LLC v. Lizza*,
    2020 WL 2465263 (N.D. Iowa May 12, 2020) ..............................................8

*Nutreance LLC v. Primark*,
    2020 WL 3892995 (E.D. Mo. July 10, 2020) ..............................................13

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) ........................................................................................4

*Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*,
    2019 WL 1239705 (D. Minn. Jan. 24, 2019) ................................................4

*Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*,
  706 P.2d 1028 (Utah Ct. App. 1985) ...................................................................15

*Sackett v. Hall*,
  478 S.W.2d 381 (Mo. 1972) ...............................................................................14

*St. Louis Convention & Visitors Comm'n v. NFL*,
  154 F.3d 851 (8th Cir. 1998) ...............................................................................1

*Tholen v. Assist Am., Inc.*,
  970 F.3d 979 (8th Cir. 2020) ...............................................................................12

*Toscano v. PGA Tour, Inc.*,
  70 F. Supp. 2d 1109 (E.D. Cal. 1999) ...................................................................4

*Trans-W. Petroleum, Inc. v. U.S. Gypsum Co.*,
  379 P.3d 1200 (Utah 2016) ...................................................................................15

*Trone Health Servs., Inc. v. Express Scripts Holding Co.*,
  974 F.3d 845 (8th Cir. 2020) ............................................................................6, 7

*Turner v. Wells*,
  879 F.3d 1254 (11th Cir. 2018) ...........................................................................11

*Vilcek v. Uber USA, LLC*,
  2017 WL 3116155 (E.D. Mo. July 21, 2017) ...............................................13, 14

*Wayment v. Schneider Auto. Grp. LLC*,
  438 P.3d 1005 (Utah Ct. App. 2019) ...................................................................15

*Willis Elec. Co. v. Polygroup Macau Ltd.*,
  437 F. Supp. 3d 693 (D. Minn. 2020) ...................................................................6

## STATUTES

Conn. Gen. Stat. § 52-196a(f)(1) ...............................................................................15

## INTRODUCTION

Plaintiff Hans Niemann's opposition tries to salvage his deficient claims by misstating the law and distorting his allegations beyond recognition from the SAC.  Each of these maneuvers simply confirms that this lawsuit is meritless.  It should be dismissed.

Starting with his antitrust claims, the opposition reveals the lack of any cognizable antitrust injury from harm to market competition.  Indeed, Niemann displays a persistent confusion about competition under antitrust law, as he repeatedly calls himself and other chess players "competitors," despite alleging a market that consists of *chess tournaments and platforms*.  Chess players are not *competitors* in that market.  And absent harm to competition among platforms and tournaments—which Niemann fails to and cannot plausibly allege—he has no claim.  Beyond that fundamental error, he doubles down on his conclusory pleading of the elements underlying his Section 1 and 2 claims, while ignoring a mountain of precedent along the way.

The opposition also confirms that Niemann's remaining claims must be dismissed. Niemann tries to mask the deficiencies in his defamation claims through a revisionist account of the SAC.  But stripped of misdirection, he is left with nothing more than bare assertions of falsity and actual malice without *any* supporting factual allegations.  Likewise, Niemann's duplicative tortious interference and conspiracy claims falter under the governing legal standards.  And finally, Niemann's attempt to save his contract claim requires erasure of the plain text of the contract. These pleading deficiencies are not curable, and dismissal of this lawsuit with prejudice is warranted.  This Court is simply not the appropriate venue for Niemann to vent his grievances.

## ARGUMENT

## I.   NIEMANN'S ANTITRUST CLAIMS FAIL ACROSS THE BOARD

### A.   Niemann's Opposition Confirms That He Lacks A Cognizable Antitrust Injury.

To assert an antitrust claim, the plaintiff's alleged injury must be the result of "harm to competition" in the market.  *St. Louis Convention & Visitors Comm'n v. NFL*, 154 F.3d 851, 864

1

(8th Cir. 1998).  As Chess.com explained, Niemann fails to allege that his injuries resulted from any harm to competition in his so-called "Competitive Chess Market."  (Mot. 6-8.)

Niemann's principal response is that Defendants "arranged a group boycott to 'exclude' [him] 'as a competitor from the marketplace.'"  (Opp. 53.)  As explained below, the SAC is devoid of factual allegations showing such a conspiracy.  But more fundamentally, Niemann is *not* a "competitor" in his alleged "Competitive Chess Market," which consists of "[p]rofessional chess tournaments and online recreational chess platforms."  (SAC ¶ 47.)  He is neither a tournament nor a platform—he is an individual player.  Thus, as Niemann concedes, he does not "compete" in his own alleged market.  (Opp. 47.)

Yet despite this concession, Niemann repeatedly refers to individual chess players (including himself) as "competitors."  (*See, e.g.*, *id.* at 50, 53, 56.)  In doing so, Niemann appears to be using "competitor" in a colloquial sense, insofar as he "competes" against other chess players in chess matches.  But for purposes of his antitrust claims, the "competitors" are those competing for market share in his alleged market—again, tournaments and chess platforms.[1]

Accordingly, Niemann's theory that he was injured as a "competitor" (*id.* at 53) falls flat.  So too does his other theory of antitrust injury—that "Chess.com's misconduct chills competition against Carlsen and Chess.com's other affiliate players out of fear of being similarly blacklisted and defamed if they beat them."  (*Id.*)  This argument likewise mistakenly relies on "competition" among individual players.  And even on its own terms, Niemann fails to connect his injury to the supposed fears of other chess players.  Because his claimed injury does not flow from diminished competition, he cannot plead antitrust injury and his antitrust claims should be dismissed.[2]

---

[1] Because the antitrust laws protect "competition, not competitors," *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 450 (8th Cir. 1985), Niemann's failure to allege harm to competition requires dismissal even if he were a competitor.

[2] Contrary to Niemann's suggestion (Opp. 42), antitrust injury is a threshold requirement for his Section 1 and Section 2 claims.  *See Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 351 F. Supp. 3d 1187, 1212-13 (D. Minn. 2018).

**B.** **Niemann Fails To Allege The Elements Of A Section 1 Claim.**

Niemann also fails to allege the elements for his Section 1 claim:  (1) an agreement, and (2) an unreasonable restraint of trade in a well-defined market.  (Mot. 8-12.)

***No Agreement***.  Niemann's opposition reinforces his inability to plausibly allege an unlawful agreement among Defendants.  Allegations of conduct "merely consistent with[] agreement" or for which there is an "obvious alternative explanation"—such as "allegations of parallel conduct" among Defendants—are insufficient.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 567 (2007).  Although Niemann spends pages reciting alleged parallel conduct (*e.g.*, Opp. 43-47), he concedes he must allege more (*id.* at 43).  In that respect, he fails.

Niemann claims that Defendants had a "common motive to conspire." (*Id.* at 43-44.)  But under *Twombly*, a plaintiff cannot avoid dismissal by tacking on a "common motive" allegation.  Indeed, in *Twombly* itself, the complaint alleged that the defendants had a "compelling common motivatio[n] . . . to form a conspiracy," *550 U.S. at 550-51*, and the Supreme Court still found the allegations insufficient, *id.* at 565-67.  Even on its own terms, this theory is untenable.  According to Niemann, Chess.com had "strong financial incentives" to ban him and issue the Report "to protect Chess.com's nascent investment in Play Magnus and the Carlsen brand."  (Opp. 44, 47.)  But Niemann never explains how such conduct would "protect" Chess.com's investments.  Niemann's underdeveloped theory of motive becomes particularly absurd when viewed alongside the "obvious alternative explanation" for Chess.com's conduct against him:  Niemann cheated on its platform and then publicly downplayed it, prompting Chess.com to defend itself.  (Mot. 8-9.)

Niemann also suggests that a "high level of communications" between the Defendants permits an inference of agreement.  (Opp. 43.)  But this argument rests on distortions of the SAC.  For example, although Niemann suggests that Chess.com "disseminated" information about him to Nakamura and Play Magnus before it became public (Opp. 44), the cited paragraphs of the SAC merely allege that Nakamura repeated "[r]umors" he had heard from "different chess players"

3

(SAC ¶¶ 105-07), and that a chess player on Play Magnus's YouTube channel vaguely referenced "see[ing] things that were previously unavailable to [him]" (*id.* ¶ 120).  In other words, Niemann's allegations amount to speculation that Chess.com communicated with Nakamura and Play Magnus, and "speculati[on]" does not suffice.  *Twombly*, 550 U.S. at 555.  And while Niemann points out that Chess.com quoted Carlsen in the Report (Opp. 45), the Report summarized an investigation of Niemann's play following statements Niemann made after playing a game against Carlsen, so it is hardly surprising that Chess.com would ask Carlsen about it.  None of these allegations remotely suggests an agreement among Defendants to restrain trade.

**<u>No Anticompetitive Conduct</u>.**  Niemann likewise fails to allege an unreasonable restraint of trade in a well-defined market under the rule of reason.

Niemann's attempt to bypass the rule of reason and invoke the *per se* rule (Opp. 47-50) is foreclosed by "precedent [that] limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors."  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998).  Defendants are *not* direct competitors.  (Mot. 10.)  Niemann does not address this precedent at all, instead claiming that Chess.com need not be "a 'direct competitor' *of Niemann*." (Opp. 49 (emphasis added).)  This is not responsive; the problem is that Defendants are not direct competitors "*with one another*" and thus could not enter into an unlawful "horizontal agreement[]" to boycott Niemann.  *Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*, 2019 WL 1239705, at *4 (D. Minn. Jan. 24, 2019) (emphasis added); *see, e.g.*, *Toscano v. PGA Tour, Inc.*, 70 F. Supp. 2d 1109, 1114 (E.D. Cal. 1999) (applying this reasoning to reject *per se* rule).

Realizing this problem, Niemann insists that "Carlsen, Nakamura, and Niemann are direct competitors" and that "Chess.com was working on behalf of its undisputed affiliate Carlsen." (Opp. 50.)  But Carlsen, Nakamura, and Niemann are not competitors in the alleged "Competitive Chess Market" underlying Niemann's claim.  (*See supra* at 2.)  And in any event, Niemann's bald

assertion that "Chess.com was working on behalf of its undisputed affiliate Carlsen" (Opp. 50) is unsupported by a single plausible factual allegation in the SAC.

Moreover, because the *per se* rule is only applicable to a narrow subset of conduct that is so "manifestly anticompetitive" that it "lack[s] any redeeming virtue," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007), courts have long held that the *per se* rule is inappropriate in the sporting context, where restraints are crucial to the proper regulation of players.  (*See* Mot. 10-11.)  Niemann's only contrary authority is a 50-year-old district court case from Georgia, *Blalock v. Ladies Professional Golf Association*, 359 F. Supp. 1260 (N.D. Ga. 1973).[3]  But as several courts have recognized, "the *per se* rule stated in *Blalock*" has been eroded by decades of precedent stressing that the rule of reason applies in "cases involving restrictions in sports and other competitive leagues."  *Blubaugh v. Am. Cont. Bridge League*, 2004 WL 392930, at *15-16 (S.D. Ind. Feb. 18, 2004), *aff'd*, 117 F. App'x 475 (7th Cir. 2004); *see also, e.g.*, *Brant v. U.S. Polo Assoc.*, 631 F. Supp. 71, 77 (S.D. Fla. 1986) (same).[4]  Because a sports platform like Chess.com must be able to suspend or revoke privileges in order to address admitted cheating and thus preserve the integrity of its service, the *per se* rule is inapplicable.

Accordingly, Niemann's claim must satisfy the rule of reason, which requires a plaintiff to allege anticompetitive effects in a "well-defined relevant market."  *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009).  In that respect, Niemann has failed to allege—either in the SAC or now in the opposition—how the challenged actions produced harm to competition in his "Competitive Chess Market," as opposed to just *personal* harm to Niemann. (*See* Mot. 6-8, 11.)  And his market definition remains deficient.  Among other flaws, Niemann fails to "allege facts regarding substitute products" or "cross-elasticity of demand."  *E-Z Dock,*

---

[3] *Flood v. Kuhn*, 407 U.S. 258 (1972) (cited at Opp. 49), has nothing to do with the *per se* rule.

[4] *Blalock* also involved unique facts in which the plaintiff was excluded by an organization controlled entirely by direct competitors within the alleged market, all of whom stood to gain financially from the exclusion.  359 F. Supp. at 1262-65.  Nothing like that is alleged here.

*Inc. v. Shoremaster, Inc.*, 2006 WL 1153901, at *2 (W.D. Mo. Apr. 25, 2006).  Niemann dismisses this problem by claiming that "alternatives" like "in-person games" cannot substitute for "online platforms."  (Opp. 53 n.28.)  But this assertion—which is not in the SAC—ignores that his market definition includes "[p]rofessional chess tournaments," which are "conducted in-person."  (SAC ¶¶ 33, 47.)  Niemann's inability to address alternatives leaves his market inadequately alleged.

### C.   **Niemann Fails To Allege The Elements Of A Section 2 Claim.**

Niemann's attempted monopolization claim under Section 2 is meritless.  An attempted monopolization claim requires factual allegations showing anticompetitive conduct with the specific intent to monopolize a relevant market and with a dangerous probability of success.  *See Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 857 (8th Cir. 2020).  Niemann does not come close to stating such a claim, and his opposition cements that conclusion.

*First*, Niemann fails to allege that Chess.com acted with the "specific intent" to "control prices or destroy competition."  *Id.*  Like his SAC, Niemann's opposition wrongly focuses on actions taken against individual players.  (Opp. 55-56.)  But again, individual players are not competitors in the market Niemann alleges, and Niemann fails to explain how actions against players would reveal an intent by Chess.com to gain market share in his alleged market.  That disconnect also sets this case apart from the authorities cited by Niemann (Opp. 55), which involved defendants taking deliberate action against actual market competitors to unlawfully expand or protect their market share.[5]

If anything, Niemann's criticisms of Chess.com's actions towards individual players suggests the opposite intent—if Chess.com were as bad for chess players as Niemann claims, that would only weaken its market position among chess platforms.  And while Niemann speculates that Chess.com might be "'sacrific[ing] short-term benefits in order to obtain higher profits in the

---

[5] *See Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 807 (8th Cir. 1987) (defendant forced competitor out of business); *Willis Elec. Co. v. Polygroup Macau Ltd.*, 437 F. Supp. 3d 693, 710-11 (D. Minn. 2020) (defendant submitted below-cost bids to thwart competitor).

long run from the exclusion of competition'" (Opp. 56), that assertion makes no sense here given that *individual players are not in competition with Chess.com*.[6]

*Second*, Niemann fails to allege "predatory or anticompetitive conduct" by Chess.com, which is "conduct without legitimate business purpose that makes sense only because it eliminates competition." *HDC Med.*, 474 F.3d at 549 (citations omitted).  Once again, rather than demonstrate any elimination of competition among chess platforms, Niemann relies instead on his misguided view that he is a "competitor" in his alleged market.  (Opp. 56.)  And although he concedes that Chess.com has a "'legitimate business purpose' in policing cheating," he dismisses it by speculating that it might be "pretext for [an] improper intent to monopolize." (*Id.* at 57.)  In addition to reflecting a misunderstanding of monopolization—which requires eliminating competitors—Niemann's authority for his "pretext" argument has nothing to do with Section 2; it concerns the "*Noerr-Pennington* doctrine" of antitrust immunity.  *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1181 (8th Cir. 1982); *see Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515-16 (1972) (same).  Those cases are inapposite and do not disturb the well-settled rule that "[a]nticompetitive conduct" is "conduct *without* legitimate business purpose that makes sense *only* because it eliminates competition." *HDC Med.*, 474 F.3d at 549 (emphasis added) (quoting *Morgan v. Ponder*, 892 F.3d 1355, 1358 (8th Cir. 1989)); *see also Gen. Indus.*, 810 F.2d at 804 (cited at Opp. 57) (stating this rule and nowhere mentioning pretext).

*Third*, Niemann fails to allege that Chess.com had a "dangerous probability" of achieving monopoly power.  *Trone Health*, 974 F.3d at 857.  Indeed, he fails to allege any facts about the composition of his alleged market or Chess.com's share of it.  He follows the same path in his opposition, vaguely asserting that Chess.com's market share is "dominant" relative to a couple of other chess platforms and insists that he need not allege the "<u>exact</u> percentage" of Chess.com's

---

[6] Niemann also points to Chess.com's alleged price increases and lawful acquisition of Play Magnus (Opp. 55), but this conduct reflects "valid business [decisions]"; it "cannot support [a Section 2] violation." *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549-50 (8th Cir. 2007).

market share.  (Opp. 59-60.)  That is a strawman.  Although Niemann need not identify exact

percentages, he must do more than merely declare, in conclusory fashion, that Chess.com's market

share is "dominant."  (*See* Mot. 14-15.)  The antitrust claims must be dismissed.

## II.      **CONNECTICUT'S ANTI-SLAPP STATUTE BARS NIEMANN'S TORT CLAIMS**

Niemann's attempt to evade Connecticut's anti-SLAPP law fails for the reasons explained

by Carlsen.  (*See* Carlsen MTD Reply Part I.)  Chess.com joins those arguments here.

## III.     **NIEMANN'S STATE LAW TORT CLAIMS FAIL ON THE MERITS**

### A.      **Niemann's Opposition Confirms That His Defamation Claims Fail.**

Niemann's defamation claims reflect nothing more than a face-saving attempt to discredit

Chess.com's careful, thoroughly supported conclusions regarding Niemann's game play.  While

Niemann may not like those conclusions, that does not make them defamatory.  Niemann has failed

to allege that any of the challenged statements was actionable or made with actual malice.

#### 1.      The Challenged Statements Are Not Actionable.

Niemann does not dispute that, to be defamatory, a statement must convey an objectively

false fact about him.  And while he seems to believe that "a plaintiff need only allege that the

defendant's statement is false; he need not explain how" (Opp. 35-36), that flouts basic "federal

pleading standards" that forbid "conclusory" allegations.  *King v. Union Station Holdings, LLC*,

2012 WL 5351598, at *4-5 (E.D. Mo. Oct. 30, 2012); *see, e.g.*, *NuStar Farms, LLC v. Lizza*, 2020

WL 2465263, at *5 (N.D. Iowa May 12, 2020) ("not enough for plaintiffs to list a number of

statements and generally declare them to be false without alleging facts").  Niemann must allege

facts demonstrating that each challenged statement is actionable.  He has failed to do so.

***Chess.com Tweet.***  First, Niemann's distortion of Chess.com's September 8, 2022 post on

Twitter is unavailing.  (Mot. 17.)  Although Niemann claims that this post "impl[ied]" that he

"lie[d]" about his cheating on Chess.com's platform, his argument rests on a single "comment" by

an unidentified Twitter user (Opp. 29-30), and he offers no response to the fact that Chess.com's

8

post explicitly "invited [him] to provide an explanation and response" to the "information that contradict[ed] his statements," thereby undermining the implication he tries to draw.  (SAC ¶ 111; *see* Mot. 17.)  And while Niemann also quibbles over the word "evidence" used in the tweet (Opp. 31), he does not allege (or even argue in his opposition) how this word choice is defamatory.

> ***Chess.com Report***.  Niemann's various attacks on the Report are also unavailing.  With respect to Chess.com's statements regarding Niemann's cheating on Chess.com, Niemann cannot meaningfully contest that those statements reflected Chess.com's conclusions based on *objective data* analyzed in a thorough investigation, nor does he dispute his failure to allege facts showing how the challenged statements are actually false.  Instead, he argues that the investigation was a "sham" because a purported cheat-detection expert disagreed with certain *unidentified* "findings" in the Report.  (Opp. 32-33.)  Setting aside Niemann's failure to identify the point of disagreement (and thus the falsity of any particular statement in the Report), this argument at most shows that Niemann disagrees with the conclusions drawn by Chess.com in the Report.  Niemann is thus attempting to challenge Chess.com's "subjective assessment" of "'objective data points,'" *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 242 (Mo. Ct. App. 2011) (quoting *Aviation Charter, Inc. v. Aviation Rsch. Grp./US*, 416 F.3d 864, 871 (8th Cir. 2005)), and he cannot get around that by disparaging the assessment as a "sham."

> Equally unavailing are Niemann's challenges to the Report's conclusions regarding his over-the-board play and conduct at the Sinquefield Cup.  Niemann's opposition defends only one of those challenges—regarding the statement discussing Niemann's "preparation" for the Cup— but he openly admits that he "does not explain how this statement is false."  (Opp. 35-36.)  As noted, conclusory allegations of falsity are insufficient.  (*See supra* at 8.)

> ***News Articles***.  Niemann's challenge to Chess.com's statement to the New York Times fails; indeed, it is incoherent—the statement concerned Chess.com's decision to publicly "defend [it]self," but Niemann focuses on *his own reasons* for *his own public statements*.  (Mot. 23.)  In

opposition, Niemann merely repeats this incoherent allegation, verbatim, in a footnote.  (Opp. 34 n.18.)  And with respect to the article in The Guardian, Niemann focuses on certain phrases Rensch used when discussing cheating and anomalies in chess at a general level.  (Opp. 31; *see* Mot. 22-23.)  But as Niemann admits, "a defendant's statement must be considered 'in context'" (Opp. 20), and Niemann ignores that Rensch explicitly stated that he was "not going on the record on anything that I think about the over-the-board scandal with [Niemann] or [Carlsen]" and declined to answer questions about Niemann when prompted (SAC ¶ 114).[7]

### 2.   Niemann Fails To Demonstrate Actual Malice.

Niemann's defamation claims independently fail because he is a public figure and has not approached adequately alleging that the challenged statements were made with actual malice.

***Public Figure***.  Courts have consistently held that sports figures, including competitors like Niemann, are public figures, and Niemann does not disagree.  (Mot. 23-24); *see also, e.g.*, *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1280 (3d Cir. 1979) ("Professional athletes, at least as to their playing careers, generally assume a position of public prominence.").  He instead appears to contend that a sports figure is a public figure only if the sport meets some threshold of popularity, such as players in "the MLB and NFL."  (Opp. 17-18.)  Niemann cites no authority for that cramped view of the law.  None exists.  Indeed, courts have found public figures in sports far less publicized than baseball and football.  *See, e.g.*, *Chapman v. J. Concepts, Inc.*, 528 F. Supp. 2d 1081 (D. Haw. 2007) (surfing), *aff'd*, 401 F. App'x 243 (9th Cir. 2010).

Niemann's new argument that he was "virtually unknown" prior to the Sinquefield Cup (Opp. 3, 16) is nowhere in the SAC, is clearly designed to avoid the actual malice standard, and is preposterous given that he complains his reputation has been damaged to the tune of $100 million.

---

[7] The case Niemann cites (Opp. 31) applied the rule that "a statement in the form of an opinion" may be actionable when the statement "implies the allegation of undisclosed defamatory facts *as the basis for the opinion*."  *Cuba's United Ready Mix, Inc. v. Bock Concrete Foundations, Inc.*, 785 S.W.2d 649, 651 (Mo. Ct. App. 1990) (emphasis added).  But Rensch did not express an opinion on Niemann; he explicitly declined to do so.  So this rule is inapposite.

(SAC ¶ 19.)  The SAC even goes to pains to portray Niemann as a public figure.  Niemann claims he is an "American chess prodigy" who is the "40th best chess player in the world."  (*Id.* ¶¶ 62-66.)  He "make[s] a living" from playing professional chess; regularly appears in "high-profile" chess tournaments; claims to be positioned for "lucrative endorsements [and] sponsorships"; was "touted" as a "brand ambassador[]" for the "incredibly lucrative global brand and online chess company," Play Magnus; and streamed chess games and offered commentary online to the general public.  (*Id.* ¶¶ 4, 39, 58, 62, 90, 172-73, 212, 225; *see* Mot. 24.)

But even if Niemann is not a general purpose public figure for "all purposes," he is undoubtedly "a general purpose public figure within [the] limited sporting community" of chess.  *Chapman*, 528 F. Supp. 2d at 1090-91.  Like the surfer in *Chapman*, Niemann is a well-known figure in the chess community and has appeared in high-profile events and granted interviews.  *Id.* at 1093-94; (*see* SAC ¶¶ 2-3, 63-66, 74).  And "unlike a private individual," Niemann "has an effective opportunity for rebuttal and could counter criticism, correct falsehoods, and set right any fallacies" in the media, as evidenced by his immediate ability to speak his mind in interviews after the game with Carlsen.  *Chapman*, 528 F. Supp. 2d at 1093; (*see* SAC ¶ 109).

Finally, Niemann is at a minimum a limited purpose public figure—*i.e.*, a person who "voluntarily injects himself or is drawn into a particular public controversy."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).  Niemann himself agrees that he has been "drawn into" this public controversy—one that has been covered by international media outlets and prominent celebrities.  (*See* Opp. 17; Mot. 24-25.)  And he has also voluntarily fanned the flames of this controversy, and increased its scope, by making comments to the press about his prior instances of cheating on Chess.com.  (Mot. 24-25); *see, e.g.*, *Turner v. Wells*,[8] 879 F.3d 1254, 1273 (11th

---

[8] *Cockram v. Genesco, Inc.*, 680 F.3d 1046 (8th Cir. 2012) (Opp. 17), is inapposite.  There, the plaintiff gave an interview in which she attempted to maintain anonymity and "avoid[] any additional exposure among those unaware of her involvement in the incident."  *Id.* at 1053.  Here, by contrast, Niemann made several comments to the press about his prior instances of cheating.

Cir. 2018) (plaintiff's "commissioning a response to the Report show[ed] that [plaintiff] inserted himself into the controversy *even after it had made national news*").

**_Actual Malice_.**   The SAC also fails to sufficiently "lay out enough facts" that "support a plausible finding of actual malice" for each challenged statement.  *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956, 958 (8th Cir. 2020).  Instead, it either omits an allegation of malice or supplies a conclusory assertion of malice.

Faced with those pleading failures, Niemann's opposition cobbles together a generalized theory of "malice" untethered to any particular challenged statement.  (Opp. 36-37.)  He first repeats his falsity argument—that "experts" disagreed with unspecified "findings" in the Report. (*Id.* at 36.)  But even if those experts were correct, that after-the-fact assessment of Chess.com's findings does not remotely suggest that Chess.com had "knowledge" of or acted with "reckless disregard" for the falsity of the statements when they were issued.  *Nelson Auto*, 951 F.3d at 956; *cf. Tholen v. Assist Am., Inc.*, 970 F.3d 979, 984 (8th Cir. 2020) (cited at Opp. 37) (explaining that the complaint contained "sufficient facts to indicate [that the defendant] knew that . . . the claims made in the case study were not true").  Niemann is simply conflating falsity and actual malice in a way that would render the actual malice standard meaningless.

The rest of his points—the "timing" of the Report, the "number" of statements, and Chess.com's alleged motivations for making them (Opp. 36-37)—have zero relationship to Chess.com's knowledge of or reckless disregard for falsity, and Niemann does not seriously contend otherwise.  *See, e.g.*, *Nunes v. WP Co. LLC*, 513 F. Supp. 3d 1, 8 (D.D.C. 2020) ("[C]aselaw resoundingly rejects the proposition that a motive to disparage someone is evidence of actual malice.").  His claims must be dismissed for a *complete failure* to plead actual malice.

### B.   Niemann's Opposition Fails To Salvage His Tortious Interference Claim.

Niemann's claim for tortious interference fails because it is derivative of his other claims and thus falls alongside them.  Niemann tries to avoid that conclusion by claiming that his

interference claim is based on "misrepresentations of fact" (Opp. 65), but that is no different than his defamation claim, which requires him to plead false statements of fact.  In any event, Niemann fails to plausibly allege that Chess.com intentionally interfered with a business relationship between Niemann and another party with knowledge of the relationship.  *See Castle Rock*, 354 S.W.3d at 245.  None of the four business relationships cited by Niemann—the Chess.com Global Championship, a match with Vincent Keymer, the Tata Steel Chess Tournament, and "other future chess tournaments" (Opp. 61)—supports his claim.

Two of the alleged relationships fail out of the gate:  Niemann cannot assert a tortious interference claim against Chess.com based on a relationship *with Chess.com* regarding its own Global Championship (Mot. 27 n.6), a point he does not dispute.  And Niemann's vague reference to "other future chess tournaments" fails; considering Niemann does not specify the relationships, he has necessarily failed to allege that Chess.com had "knowledge" of them.  *Castle Rock*, 354 S.W.3d at 245; *see Vilcek v. Uber USA, LLC*, 2017 WL 3116155, at *4 (E.D. Mo. July 21, 2017) (plaintiff must plead the specific relationship interfered with).[9]

The other two are similarly unavailing.  As for the match against Keymer, Niemann alleges no facts showing that Chess.com had knowledge of this one-on-one match.  He argues rather that Chess.com's knowledge can be "inferred" because the "Competitive Chess Market" is "tightly-knit."  (Opp. 62-63.)  But this conclusory assertion is insufficient, particularly given his claims that the "Competitive Chess Market" is global, Chess.com operates a platform where over 100 million members play over ten million chess games a day, and Chess.com does not host in-person, over-the-board chess games.  (SAC ¶¶ 29, 38.)  Niemann's bald assertion that Chess.com must have had knowledge of a one-off, in-person game with Keymer is simply not plausible.  *See Nutreance LLC v. Primark*, 2020 WL 3892995, at *13 (E.D. Mo. July 10, 2020)  ("[A] mere

---

[9] Niemann's suggestion that he can allege that Chess.com was generally "aware" of his business relationships is not supported by the cases he cites, all of which involved knowledge of the particular relationships at issue.

assertion of interference with prospective customers fails to raise a right to relief above the speculative level."). And even if an inference of knowledge were warranted, he has certainly failed to allege that any interference was *intentional*. Niemann's only response is his theory that Chess.com sought to "blacklist Niemann from its sponsored in-person tournaments" (Opp. 63), but this one-off game that "[he] arranged" was not such a tournament (SAC ¶ 193).

Equally unavailing is his claim concerning the Tata Steel Chess Tournament. Even taking as true that this is a prestigious tournament, Niemann alleges only that he was in "negotiations" to participate in the tournament. (SAC ¶ 194); *see Vilcek*, 2017 WL 3116155, at *4 ("mere hope of establishing a business relationship" insufficient). He does not allege that the Tata Steel Tournament ever disclosed to the chess community that Niemann would participate nor that it was in negotiations with Niemann to do so, such that Chess.com would know of this relationship, let alone that it would have enough knowledge to intentionally interfere with it.

### C.   Niemann's Derivative Civil Conspiracy Claim Is Meritless.

Niemann concedes (Opp. 65 n.35) that his civil conspiracy claim rises or falls with his other claims. Because those claims fail, his civil conspiracy claim fails as well. Moreover, while Niemann need not allege an "express agreement" (Opp. 66), he must still allege facts showing "that the defendants reached an agreement," *Cheeks v. Belmar*, 2020 WL 5569982, at *17, at *47-48 (E.D. Mo. Sep. 17, 2020), which he fails to do. (*See supra* at 3-4.) The "timing of [Defendants'] actions" (Opp. 66) is, at most, a speculative "suspicion" of agreement that cannot sustain this claim. *Sackett v. Hall*, 478 S.W.2d 381, 385 (Mo. 1972).

### IV.   NIEMANN'S BREACH OF CONTRACT CLAIM FAILS

Niemann's new contract claim fails because he cannot plausibly allege either a breach or damages, and regardless, it belongs in arbitration. Niemann does not dispute that Chess.com had the contractual right to revoke his invitation; rather, he argues only that Chess.com exercised its right in bad faith. Niemann's cited case law merely stands for the proposition that a party with

sole contractual discretion to terminate a contract may not do so arbitrarily.  *See Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1038 (Utah Ct. App. 1985).[10]  Here, Chess.com had a legitimate and articulated reason:  to protect the integrity of the CGC from real or perceived cheating while investigating new allegations of cheating relating to an admitted cheater.

Moreover, because Chess.com offered Niemann full compensation for his qualification to attend the CGC, he also cannot plausibly plead damages.  Niemann's only response is that he *could* have won more prize money had he not been disinvited. The Court need not entertain such speculation because Niemann was only guaranteed $5,000 (which was offered him), and thus he has no more damages.[11]  To the extent he argues that he had the right to receive more prize money, that is squarely a *unilateral contract* which could only be accepted by Niemann participating (and winning) in the CGC.  *See Wayment v. Schneider Auto. Grp. LLC*, 438 P.3d 1005, 1008  (Utah Ct. App. 2019) ("in 'prize-winning contests,'" contract binding only by performance of act); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1104 (10th Cir. 2001) (same).

Finally, Niemann apparently concedes that he agreed to ADR on his contract claim.  He only asserts, in a footnote, that Chess.com "waived" its right to ADR by also explaining the deficiencies in his contract claim.  (Opp. 68 n.38.)  But Chess.com asked the Court to dismiss this claim in connection with the parties proceeding to arbitration.  (*See* Mot. 30.)  And contrary to the one case Niemann cites, Chess.com moved to compel ADR at its first opportunity.

## <u>CONCLUSION</u>

The claims against Chess.com should be dismissed, and Chess.com should be awarded fees and costs under Connecticut's anti-SLAPP statute.  *See* Conn. Gen. Stat. § 52-196a(f)(1).

---

[10] In *Weston Ranch* and *Flood v. Clearone Communs.*, 618 F.3d 1110, 1122 (10th Cir. 2010) (Opp. 67-68), the issue was only whether a unilateral termination right made the contract unenforceable.

[11] *Contra Trans-W. Petroleum, Inc. v. U.S. Gypsum Co.*, 379 P.3d 1200, 1208-90 (Utah 2016) (Opp. 68) (in breach of oil and gas lease, consequential damages must be pleaded with "reasonable certainty").

DATED:  March 13, 2023

Respectfully submitted,

*/s/ Nima H. Mohebbi*
Nima H. Mohebbi (# 275453CA)
Sarah F. Mitchell (# 308467CA)
Michael A. Hale (# 319056CA)
**LATHAM & WATKINS LLP**
355 S. Grand Ave., Suite 100
Los Angeles, CA 90071
Tel: (213) 485-1234
*nima.mohebbi@lw.com*
*sarah.mitchell@lw.com*
*michael.hale@lw.com*

*/s/ Jeffrey B. Jensen*
Jeffrey B. Jensen (# 46745MO)
Kate Ledden (# 66026MO)
**HUSCH BLACKWELL LLP**
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel: (314) 480 1500
*jeff.jensen@huschblackwell.com*
*kate.ledden@huschblackwell.com*

*/s/ Jamie L. Wine*
Jamie L. Wine (# 4529251NY)
Blake E. Stafford (# 888324775DC)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
*jamie.wine@lw.com*
*blake.stafford@lw.com*

Derek Teeter (# 59031MO)
Spencer Tolson (# 74467MO)
**HUSCH BLACKWELL LLP**
4801 Main, Suite 1000
Kansas City, MO 64112
Tel: (816) 983-8000
*derek.teeter@huschblackwell.com*
*spencer.tolson@huschblackwell.com*

*Counsel for Defendant Chess.com, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 13, 2023, the foregoing document was served on all counsel of record by ECF.

*/s/ Nima H. Mohebbi*
Nima H. Mohebbi (# 275453CA)
Attorney for Defendant Chess.com, LLC
**LATHAM & WATKINS LLP**
355 S. Grand Ave., Suite 100
Los Angeles, CA 90071
Tel: (213) 485-1234