UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI: EASTERN DIVISION

| | | |
|---|---|---|
| HANS MOKE NIEMANN, | ) | |
| | ) | |
| *Plaintiff,* | ) | CIVIL ACTION NO. 4:22-CV-01110 |
| | ) | |
| v. | ) | |
| | ) | |
| SVEN MAGNUS ØEN CARLSEN A/K/A | ) | |
| MAGNUS CARLSEN, PLAY MAGNUS | ) | |
| AS D/B/A PLAY MAGNUS GROUP, | ) | |
| CHESS.COM, LLC, DANIEL RENSCH | ) | |
| A/K/A "DANNY" RENSCH, AND | ) | |
| HIKARU NAKAMURA, | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
PLAY MAGNUS AS D/B/A PLAY MAGNUS GROUP'S MOTION TO DISMISS**

OVED & OVED LLP
*Attorneys for Plaintiff*
401 Greenwich Street
New York, New York 10013
Tel.: (212) 226-2700

## **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ *ii*

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 1

    A.    CARLSEN'S RELATIONSHIP WITH PLAY MAGNUS ..................................... 1

    B.    PLAY MAGNUS' RELATIONSHIP WITH CHESS.COM ................................... 2

    C.    ALLEGATIONS IN THE COMPLAINT EXCLUSIVE TO PLAY MAGNUS ...... 2

ARGUMENT ....................................................................................................................... 3

    I.    THE COURT HAS PERSONAL JURISDICTION OVER PLAY MAGNUS ........ 3

    II.    NIEMANN HAS AMPLY STATED
        HIS CLAIMS AGAINST PLAY MAGNUS ........................................................ 8

        A.    Niemann Pleads Defamation Against Play Magnus ................................... 8

            i.    The Defamatory Livestream ................................................ 8

            ii.    The Defamatory Tweet ...................................................... 10

        B.    Niemann Pleads His Tortious Interference,
            Conspiracy, and Antitrust Claims ........................................... 14

    III.    AT A MINIMUM, NIEMANN SHOULD
        BE GRANTED LEAVE TO REPLEAD ............................................................. 15

CONCLUSION ................................................................................................................. 15

*i*

# **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Allen v. ASRC Commun.*,
    2010 U.S. Dist. LEXIS 34661 (E.D. Mo. Apr. 8, 2010)....................................................14

*Beu v. City of Vineland*,
    2021 U.S. Dist. LEXIS 42597 (D.N.J. Mar. 8, 2021).........................................................11

*Bigfoot on the Strip, LLC v. Winchester*,
    2018 U.S. Dist. LEXIS 129674 (W.D. Mo. Aug. 2, 2018)...................................................5

*Blessing v. Chandrasekhar*,
    988 F.3d 889 (6th Cir. 2021) ...............................................................................................6

*Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*,
    42 F.4th 948 (8th Cir. 2022) ...............................................................................................6

*Brown v. Dash*,
    2020 U.S. Dist. LEXIS 216442 (D. Mass. Nov. 18, 2020)...................................................6

*Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*,
    354 S.W.3d 234 (Mo. Ct. App. 2011).................................................................................12

*CitiMortgage, Inc. v. Mt. W. Fin., Inc.*,
    2016 U.S. Dist. LEXIS 55266 (E.D. Mo. Apr. 26, 2016)...................................................15

*Clune v. Alimak AB*,
    233 F.3d 538 (8th Cir. 2000) ...............................................................................................3

*Cuba's United Ready Mix, Inc. v. Bock Concrete Founds., Inc.*,
    785 S.W.2d 649 (Mo. Ct. App. 1990).................................................................................9

*Enter. Rent-A-Car Co. v. U-Haul Int'l*,
    327 F. Supp. 2d 1032 (E.D. Mo. 2004)...............................................................................5

*Glob. Media Grp., Inc. v. Express Tax Serv.*,
    2005 U.S. Dist. LEXIS 25128 (E.D. Mo. Oct. 4, 2005) ......................................................7

*Gray v. Hudson*,
    2015 U.S. Dist. LEXIS 95969 (E.D. Mo. July 23, 2015) ....................................................6

*Hampsey v. Nacello*,
    2007 U.S. Dist. LEXIS 108923 (E.D. Mo. Jan. 31, 2007)................................................10

*In re Westfall*,
 808 S.W.2d 829 (Mo. 1991) ..................................................................................9

*J H v. Kawasaki Motors Corp.*,
 2020 U.S. Dist. LEXIS 253186 (W.D. Mo. Dec. 4, 2020) ................................7

*Kaliannan v. Hoong Liang*,
 2 F.4th 727 (8th Cir. 2021) ..............................................................................6, 7

*Leitner v. Morsovillo*,
 2021 U.S. Dist. LEXIS 121228 (W.D. Mo. June 29, 2021) ............................3, 5

*Levine Hat Co. v. Innate Intelligence, LLC*,
 2017 U.S. Dist. LEXIS 110328 (E.D. Mo. July 17, 2017) ................................7

*Mitchell v. Twin Galaxies, LLC*,
 70 Cal. App. 5th 207, 221-23 (2021) ...............................................................14

*Moses v. YouTube, Inc.*,
 2013 U.S. Dist. LEXIS 185014 (W.D. Tenn. Sept. 23, 2013)...........................6

*Neelon v. Blair Krueger & Desert Eagle Res., Ltd.*,
 2013 U.S. Dist. LEXIS 75202 (D. Mass. May 29, 2013) ..................................5

*Nelson v. L.A. Weaver Co.*,
 2005 U.S. Dist. LEXIS 55199 (D. Minn. June 27, 2005)..................................3

*Nunes v. Lizza*,
 12 F.4th 890 (8th Cir. 2021) ...........................................................................13

*Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*,
 829 F.3d 576 (8th Cir. 2016) .............................................................................9

*Price v. Viking Penguin, Inc.*,
 881 F.2d 1426 (8th Cir. 1989) .........................................................................13

*Smith v. Humane Soc'y of United States*,
 519 S.W.3d 789 (Mo. 2017) ............................................................................13

*Smith v. Truman Rd. Dev., LLC*,
 414 F. Supp. 3d 1205 (W.D. Mo. 2019) ....................................................4, 5, 6

*Stockley v. Joyce*,
 963 F.3d 809 (8th Cir. 2020) .............................................................................9

*Tholen v. Assist Am., Inc.*,
    970 F.3d 979 (8th Cir. 2020) ...........................................................................12

*Turkish Coal. of Am., Inc. v. Bruininks*,
    678 F.3d 617 (8th Cir. 2012) ...............................................................................9

*Turntine v. Peterson*,
    959 F.3d 873 (8th Cir. 2020) ...............................................................................9

*Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*,
    646 F.3d 589 (8th Cir. 2011) ...............................................................................7

*Vitti v. Vockrodt*,
    2016 U.S. Dist. LEXIS 112831 (W.D. Mo. Aug. 24, 2016)...................................9

## Other Sources

*Carlsen, Magnus vs. Niemann, Hans More | Sinquefield Cup | 2022*, CHESS24,
    https://chess24.com/en/watch/live-tournaments/grand-chess-tour-sinquefield-cup-2022/10/1/3 ...4

*Chessable and chess24 enter historic partnership with FIDE*, PLAY MAGNUS (April 19, 2021),
    https://kommunikasjon.ntb.no/ir-files/16823864/464/593/Download%20announcement%20as%20PDF.pdf ...................................4

Leon Watson, *The new bad boy of chess: Hans Niemann, all the outrageous interviews*, CHESS24
(Aug. 21, 2022), https://new.chess24.com/wall/news/the-new-bad-boy-of-chess-hans-niemann-all-the-interviews ...............................................................................12

*Live Tournaments – Sinquefield Cup 2022*, CHESS24, https://chess24.com/en/watch/live-tournaments/grand-chess-tour-sinquefield-cup-2022 .....................................................................4

*Live Tournaments*, CHESS24, https://chess24.com/en/watch/live-tournaments ...............................4

*Magnus Carlsen*, PLAY MAGNUS GROUP AS, https://playmagnusgroup.com/magnus-carlsen .......2

*New Lesson // Saint Louis Rapid & Blitz 2020*, PLAY MAGNUS (Oct. 5, 2020),
    https://blog.playmagnus.com/new-lesson-saint-louis-rapid-and-blitz-2020...................................4

Peter Zhdanov, *The Biggest Cheating Scandals in Chess*, PLAY MAGNUS (Sept. 7, 2022),
    https://ibb.co/Z22byY9 .......................................................................................10

PLAY MAGNUS AS, ANNUAL REPORT 2021 (2021), https://playmagnusgroup.com/wp-content/uploads/sites/2/2022/06/Play-Magnus-Group-Annual-Report-2021.pdf..........................2

*St. Louis Welcomes the Chess Elite*, PLAY MAGNUS (Aug. 9, 2019),
    https://blog.playmagnus.com/st-louis-welcomes-the-chess-elite ...................................................4

Plaintiff Hans Moke Niemann ("Niemann") respectfully submits this memorandum of law in opposition to Defendant Play Magnus AS d/b/a Play Magnus Group ("Play Magnus")'s motion to dismiss the Second Amended Complaint (the "Complaint" or "SAC").

## PRELIMINARY STATEMENT

Despite Play Magnus' attempt to distance itself from the other Defendants, the Complaint amply alleges how Play Magnus widely disseminated its own defamatory statements against Niemann, while acting in concert with the other Defendants to destroy Niemann's reputation and blacklist him from competitive chess.  Further, the Court has personal jurisdiction over Play Magnus based on Play Magnus' extensive contacts with Missouri, the tortious acts of its agent Magnus Carlsen in Missouri, and its tortious acts purportedly outside of Missouri that caused Niemann harm in Missouri.

## BACKGROUND

Niemann respectfully incorporates by reference his consolidated opposition to the four separate motions to dismiss previously filed by Defendants Sven Magnus Øen Carlsen, Chess.com, LLC, Daniel Rensch, and Hikaru Nakamura (the "Primary Opposition").  Dkt. 108.[1]

### A.    Carlsen's Relationship with Play Magnus

In 2014, Carlsen founded Play Magnus, which, after Chess.com, has become the second most dominant commercial enterprise in chess.  SAC ¶ 51.  Like Chess.com, Play Magnus expanded its market presence by acquiring other chess websites and chess content creators, including chessable.com, ichess.com.net, and chess24.com.  *Id.* ¶ 52.  Chess24.com is one of the most popular chess websites worldwide, and hosts one of the two largest internet chess servers

---

[1] Unless otherwise indicated, all capitalized terms herein shall have the meanings in the Primary Opposition.

other than Chess.com.  In 2021, Play Magnus acquired the Dutch magazine *New in Chess* and the publisher Everyman Chess.  *Id.*

Carlsen "holds a unique role in the company" as a major shareholder, content creator, and "top, global ambassador," and is Play Magnus' "expert consultant" who "has special input on all major decisions."[2]

In its 2021 Annual Report, Play Magnus identified the following "Key Person Risk,"

[T]he Group is closely associated with Magnus Carlsen, the World Chess Champion and namesake of the Group. He is the cofounder, ambassador and a key participant in core activities of the Group. The Group may be affected by unilateral actions or behaviors taken by Magnus Carlsen or other chess personas that the Group is associated with. These actions may adversely affect the Group's reputation and competitive position and reduce acceptance of the Group's platforms within the online chess community, which could have a material adverse effect on the Group's performance.[3]

## B.     Play Magnus' Relationship with Chess.com

In August 2022, shortly before Niemann's victory against Carlsen at the Sinquefield Cup, Carlsen, on behalf of Play Magnus, and Rensch, on behalf Chess.com, jointly announced that Play Magnus accepted an offer to be acquired by Chess.com for approximately $83 million, with plans to merge the two companies and monopolize the Competitive Chess Market (the "Merger").  SAC ¶ 67.  At the time that Niemann defeated Carlsen at the Sinquefield Cup, Carlsen and Chess.com were in the midst of negotiating terms for Carlsen's sale of his Play Magnus brand.  *Id.* ¶ 70.  The Merger officially closed on December 16, 2022, after Niemann commenced this action.  *Id.* ¶ 72.

## C.     Allegations in the Complaint Exclusive to Play Magnus

Prior to Niemann's defeat of Carlsen, Niemann was Play Magnus' brand ambassador (SAC ¶ 4).  Following that defeat, Play Magnus:

---

[2] *Magnus Carlsen*, PLAY MAGNUS GROUP AS, https://playmagnusgroup.com/magnus-carlsen.

[3]     PLAY   MAGNUS   AS,   ANNUAL   REPORT   2021,   18   (2021),   https://playmagnusgroup.com/wp-content/uploads/sites/2/2022/06/Play-Magnus-Group-Annual-Report-2021.pdf.

(i)     published two defamatory statements directed at Niemann using information provided by Carlsen and Chess.com, as explained in detail below; and

(ii)    in collaboration with the other Defendants, fabricated the conspiracy theory that Maxim Dlugy helped Niemann cheat in over-the-board games, including against Carlsen at the Sinquefield Cup, which Carlsen republished during his September 21, 2022 interview, Chess.com and Rensch bolstered with more false information on September 28, 2022, and Hikaru Nakamura amplified during his September 22 and 28, 2022 streams (*id.* ¶¶ 132-41, 149-55).[4]

Once the Merger was completed on December 16, 2022, solidifying Chess.com's monopoly over the Competitive Chess Market, Chess.com's ban of Niemann was extended to formerly-Play Magnus tournaments.  *Id.* ¶¶ 16, 72, 146.  For example, Niemann could not participate in the "open qualifiers" for the formerly-Play Magnus, but now Chess.com run, $2 million Champions Chess Tour in 2023.  *Id.* ¶ 17.

## ARGUMENT

## I.      THE COURT HAS PERSONAL JURISDICTION OVER PLAY MAGNUS

As detailed in the Primary Opposition, Missouri's longarm statute extends to the fullest extent permitted by the Due Process Clause, and therefore the pertinent analysis is whether the defendant has sufficient "minimum contacts" with Missouri so as to satisfy due process and not offend traditional notions of fair play and justice.  *Clune v. Alimak AB*, 233 F.3d 538, 541-42 (8th Cir. 2000).  The Eighth Circuit has established the following factors for analyzing a defendant's "minimum contacts": (1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the

---

[4] While discovery is necessary to fully ascertain Play Magnus' involvement in manufacturing this conspiracy theory, the Complaint alleges how a known Play Magnus affiliate reached out to Dlugy only one week after these allegations surfaced, fishing for information about Niemann's past.  *Id.* ¶ 141.  Shortly thereafter, on September 28, 2022, Chess.com and Rensch leaked years-old emails between Dlugy and Rensch to VICE Media in an attempt to legitimize the narrative that Dlugy was a cheater and that by association, so was Niemann.  *Id.* ¶ 149.

parties. *Nelson v. L.A. Weaver Co.*, 2005 U.S. Dist. LEXIS 55199, *7 (D. Minn. June 27, 2005). In analyzing these factors, courts must view the allegations "in the light most favorable to the plaintiff and resolve all factual conflicts in its favor." *Leitner v. Morsovillo*, 2021 U.S. Dist. LEXIS 121228, *5-6 (W.D. Mo. June 29, 2021).

The first two factors weigh in Niemann's favor because Play Magnus engages in extensive commercial activities in Missouri, the nation's top chess hub. SAC ¶ 20. In 2021, Play Magnus entered into a 6-year agreement with FIDE for a Chessable sponsorship and for chess24 broadcast rights for major chess events.[5] As a result, the Play Magnus brand, chess24, regularly broadcasts and offers commentary for tournaments in Missouri.[6] In fact, chess24 broadcasted the Sinquefield Cup live,[7] and Play Magnus reported on the Sinquefield Cup along with other tournaments in Missouri on its blog.[8] These contacts are not "random or fortuitous" but purposeful and directed at Missouri. *Smith v. Truman Rd. Dev., LLC*, 414 F. Supp. 3d 1205, 1217-18 (W.D. Mo. 2019).

Moreover, Play Magnus has extensive contacts with Missouri through Carlsen, who regularly acts on Play Magnus' behalf as its founder, major shareholder, content creator, "top, global ambassador," and "expert consultant" who "has special input on all major decisions." In fact, it was Carlsen who represented Play Magnus in announcing its merger with Chess.com. SAC ¶ 68. Carlsen represents Play Magnus in Missouri by regularly competing in and commentating

---

[5] *See Chessable and chess24 enter historic partnership with FIDE*, PLAY MAGNUS (April 19, 2021), https://kommunikasjon.ntb.no/ir-files/16823864/464/593/Download%20announcement%20as%20PDF.pdf; SAC ¶ 52 ("In 2019, Play Magnus acquired the chess websites chess24.com and chessable.com.").

[6] *See, e.g.*, *Live Tournaments*, CHESS24, https://chess24.com/en/watch/live-tournaments.

[7] *See Live Tournaments – Sinquefield Cup 2022*, CHESS24, https://chess24.com/en/watch/live-tournaments/grand-chess-tour-sinquefield-cup-2022; *Carlsen, Magnus vs. Niemann, Hans More | Sinquefield Cup | 2022*, CHESS24, https://chess24.com/en/watch/live-tournaments/grand-chess-tour-sinquefield-cup-2022/10/1/3.

[8] *See St. Louis Welcomes the Chess Elite*, PLAY MAGNUS (Aug. 9, 2019), https://blog.playmagnus.com/st-louis-welcomes-the-chess-elite; *New Lesson // Saint Louis Rapid & Blitz 2020*, PLAY MAGNUS (Oct. 5, 2020), https://blog.playmagnus.com/new-lesson-saint-louis-rapid-and-blitz-2020.

on chess tournaments there.  SAC ¶ 21.  Play Magnus' sufficient contacts with Missouri are further established by its inextricable ties to Chess.com, which also has extensive contacts with Missouri and does not challenge the Court's personal jurisdiction over them.  *See Leitner*, 2021 U.S. Dist. LEXIS 121228, *9 ("Although each defendant's contacts with the forum State must be assessed individually, naturally the parties' relationships with each other may be significant in evaluating their ties to the forum."); *Smith*, 414 F. Supp. 3d at 1221 ("the nature of Plaintiffs' allegations about Cordish's organization indicate that 'the parties' relationships with each other may be significant in evaluating their ties to the forum.'").

The third factor weighs in favor of exercising jurisdiction because, as demonstrated below, Play Magnus' defamatory statements were directed at Niemann while he was in Missouri regarding events that occurred in Missouri.  SAC ¶¶ 119-120.  *See Bigfoot on the Strip, LLC v. Winchester*, 2018 U.S. Dist. LEXIS 129674, *8 (W.D. Mo. Aug. 2, 2018) (exercising personal jurisdiction because defendants made defamatory review about services provided by plaintiff in Missouri and "knew that any harm from their false statements would be suffered in Missouri"); *Neelon v. Blair Krueger & Desert Eagle Res., Ltd.*, 2013 U.S. Dist. LEXIS 75202, *19 (D. Mass. May 29, 2013) (same, where defendants published article about charges against plaintiff in Mongolia because statements "can fairly be inferred as demonstrating an intent to impugn plaintiff's reputation and career prospects" where plaintiff worked in Massachusetts).

Moreover, because Carlsen is Play Magnus' agent, it cannot separate itself from Carlsen's actions in Missouri for the purpose of avoiding this Court's jurisdiction.  *Enter. Rent-A-Car Co. v. U-Haul Int'l*, 327 F. Supp. 2d 1032, 1043 (E.D. Mo. 2004) (defendant is subject to personal jurisdiction if it committed the alleged torts through an agent).  As alleged in the Complaint, Carlsen was present in Missouri when he defamed Niemann, and does not challenge this Court's

jurisdiction over him.

In its motion, Play Magnus argues that the Court lacks jurisdiction over it because neither of its defamatory statements came *from* Missouri.  Mot. pp. 6-7.  Yet, this argument fails because a defendant who commits a tortious act outside of Missouri is nevertheless considered to have committed that act "in Missouri" if it produces actionable consequences in Missouri.  *See Kaliannan v. Hoong Liang*, 2 F.4th 727, 734 (8th Cir. 2021) ("That the communications occurred elsewhere does not undermine a finding that Defendant's North Dakota contacts 'relate to' Plaintiffs' claims."); *Smith*, 414 F. Supp. 3d at 1218-19 ("the Supreme Court has 'consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there'").  Here, as demonstrated in the Primary Opposition, Missouri is where Niemann's reputation was injured.  Dkt. 108 pp. 10-11, 71-74; SAC ¶ 20.

Highlighting this conclusion is that, unlike here, each of the cases that Play Magnus relies upon did not involve communications directed at actions that occurred in the forum state.  In *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 954 (8th Cir. 2022), merely selling a product on a nationally-accessible website did not target the state.  In *Blessing v. Chandrasekhar*, 988 F.3d 889, 902 (6th Cir. 2021), Tweets concerning plaintiffs' actions in Washington, D.C. did not confer jurisdiction in Kentucky.  In *Moses v. YouTube, Inc.*, 2013 U.S. Dist. LEXIS 185014, *15 (W.D. Tenn. Sept. 23, 2013), posting a YouTube video of song *not* about Tennessee or an event in Tennessee failed to confer jurisdiction in Tennessee.  In *Gray v. Hudson*, 2015 U.S. Dist. LEXIS 95969, *17-18 (E.D. Mo. July 23, 2015), posting a song on a website not about Missouri or an event in Missouri failed to confer jurisdiction in Missouri.  In *Brown v. Dash*, 2020 U.S. Dist. LEXIS 216442, *29 (D. Mass. Nov. 18, 2020), Instagram posts concerning plaintiff's actions in New York did not confer jurisdiction in Massachusetts.

Play Magnus then argues that one of its defamatory statements was made by Lawrence Trent who is not its officer or employee.  However, this argument fails because being an officer or employee is not the only capacity in which a party can serve as an agent.  The Complaint amply supports the conclusion that Trent acted as Play Magnus' agent by hosting a Play Magnus livestream where he claimed that he was given inside information by Play Magnus' founder, Carlsen.  SAC ¶ 120.  Further supporting this allegation is that Play Magnus admits in opposition that Trent was serving in the capacity as its "host" of this program, and the transcript of that program indicates that Trent provides those services on a regular basis.  Dkt. 126-2 ¶ 13; Dkt. 126-4 p. 1 ("I come on when they need me").  Moreover, Play Magus fails to disclose whether it compensates Trent for his hosting services.

Accordingly, at most, Play Magnus has raised disputed issues of fact concerning Trent's apparent agency with Play Magnus, which cannot be resolved at this early stage.  *J H v. Kawasaki Motors Corp.*, 2020 U.S. Dist. LEXIS 253186, *18 (W.D. Mo. Dec. 4, 2020); *Levine Hat Co. v. Innate Intelligence, LLC*, 2017 U.S. Dist. LEXIS 110328, *13 (E.D. Mo. July 17, 2017).[9]

The fourth factor, concerning Missouri's interest in providing a forum for its residents, is neutral because no party is a Missouri resident.  *Kaliannan*, 2 F.4th at 735 (exercising personal jurisdiction because last two factors do "not undermine the propriety of jurisdiction").

Lastly, the fifth factor, the inconvenience of litigating here, weighs in favor exercising jurisdiction.  After the filing of this action, Play Magnus was acquired by Chess.com, which is already litigating this dispute in Missouri, and Play Magnus is represented by the same attorneys as Chess.com.  Accordingly, it is convenient for Play Magnus to defend against these claims in the

---

[9] The cases relied upon by Play Magnus, *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 596 (8th Cir. 2011), and *Glob. Media Grp., Inc. v. Express Tax Serv.*, 2005 U.S. Dist. LEXIS 25128, *16 (E.D. Mo. Oct. 4, 2005), are inapposite because neither involved an agent acting on behalf of its principal.

same forum, rather than in a duplicative satellite litigation in a foreign jurisdiction.

Accordingly, the Court has personal jurisdiction over Play Magnus.

## II.      NIEMANN HAS AMPLY STATED HIS CLAIMS AGAINST PLAY MAGNUS

In his Primary Opposition, Niemann (i) established that Connecticut's anti-SLAPP statute is wholly inapplicable, (ii) set forth the applicable pleading requirements for each of his claims, (iii) and explained how the Complaint satisfies those requirements with respect to the each of the other Defendants.  Dkt. 108 pp. 6-67.  Niemann has also satisfied these requirements with respect to his claims against Play Magnus.

### A.      Niemann Pleads Defamation Against Play Magnus

In the Primary Opposition, Niemann demonstrated that a statement can be defamatory (i) if it is couched as opinion but purportedly based on undisclosed facts, or (ii) when, taken in context, it conveys a defamatory meaning, even though the defamatory words are not explicitly stated.  Dkt. 108 pp. 30-32.  As explained below, Play Magnus made both types of defamatory statements.

Niemann also demonstrated in the Primary Opposition that, because Niemann is not a public figure, he need only demonstrate that Defendants were negligent in making their defamatory statements.  *Id.* pp. 16-18, 22-23.  Nonetheless, as with the other Defendants, Niemann alleges that Play Magnus' statements were made with actual malice.

### i.      The Defamatory Livestream

Play Magus' first defamatory statement was made by Lawrence Trent during a livestream on Play Magnus' YouTube channel on September 19, 2022.  In response to Carlsen's cheating allegations against Niemann, Trent, on behalf of Play Magnus, stated that "I am not going to reveal what I've seen" but "I've seen things that were previously unavailable to me" and "Magnus's side is much more credible from what I have seen."  SAC ¶ 120.

This is a textbook example of a statement that is couched as opinion but implies the existence of undisclosed defamatory facts, which is actionable.  Dkt. 108 pp. 21-22 (citing *Turntine v. Peterson*, 959 F.3d 873, 882 (8th Cir. 2020); *Cuba's United Ready Mix, Inc. v. Bock Concrete Founds., Inc.*, 785 S.W.2d 649, 651 (Mo. Ct. App. 1990)), 26 (citing *In re Westfall*, 808 S.W.2d 829, 833 (Mo. 1991); *Vitti v. Vockrodt*, 2016 U.S. Dist. LEXIS 112831, *21 (W.D. Mo. Aug. 24, 2016)). Indeed, by making this statement, Play Magnus is misrepresenting to its audience that it has undisclosed evidence that Niemann cheated against Carlsen at the Sinquefield Cup.  This statement is defamatory both because it falsely accuses Niemann of cheating and falsely implies that there was evidence of such cheating, when there is not.  In its motion, Play Magnus tries to deconstruct and decontextualize this defamatory statement in order to give it a different meaning.  It argues that merely stating one has "seen" undisclosed information is not itself defamatory, and that merely stating that information in itself is "credible" is protected opinion.  However, these arguments fail because, as previously established, a statement must be taken as whole and considered in context.

The holding in *Stockley v. Joyce*, 963 F.3d 809, 819 (8th Cir. 2020), which Play Magnus relies upon, actually supports this conclusion.  There, the Court held that statements that defendant uncovered "new evidence" and that such new evidence proved plaintiff was guilty of murder were capable of defamatory meaning.  This is essentially the same as Play Magnus' statement.[10]

Next, as with its jurisdictional argument, Play Magnus claims that it is not liable for Trent's statements.  However, as set forth in Point I, the Complaint plainly alleges that Trent is Play Magnus' agent, Play Magnus admits that Trent was hosting Play Magnus' program, and Trent

---

[10] Play Magnus relies on other cases that are wholly inapplicable.  For example, in *Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 625 (8th Cir. 2012),the court merely held that an evaluation of the credibility of "historical sources" was an opinion because "different historians might well come to different conclusions."  Citing widely available historical sources is far different than saying undisclosed evidence exists proving that a person committed a wrongful act.  *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 581 (8th Cir. 2016), was decided on summary judgment after considering evidence.

stated that he regularly provided such services for Play Magnus and was fed inside information by Carlsen. *See, e.g.*, *Hampsey v. Nacello*, 2007 U.S. Dist. LEXIS 108923, *9 (E.D. Mo. Jan. 31, 2007) (denying motion to dismiss where plaintiff alleged that defendants "and their agents" defamed her). Accordingly, at a bare minimum, Trent's relationship with Play Magnus and his authority to speak on behalf of Play Magnus are questions of fact inappropriate for resolution at this early stage.

### ii.    The Defamatory Tweet

As alleged in the Complaint, Play Magnus' second defamatory statement was published on Twitter shortly after Carlsen accused Niemann of cheating against him at the Sinquefield Cup (the "Defamatory Tweet"). The Defamatory Tweet was captioned "Let's trip down the memory lane and relive the most outrageous cheating scandals in chess" with a link to a Play Magnus blog post reporting on the Sinquefield Cup.[11] In a series of graphic images, Niemann is portrayed as the villain from Marvel's Avenger series who has lost "everything," in pursuit of his evil agenda. The villain is asked "How did you beat Magnus Carlsen?" and responds with a quote from Niemann during his interview: "Chess speaks for itself!" The villain is then asked, "What did it cost you?" and responds "Everything!" SAC ¶ 119.

In its totality, this Twitter post is plainly another defamatory accusation that Niemann cheated against Carlsen at the Sinquefield Cup. For starters, the Defamatory Tweet is authored by Play Magnus, at a time when its founder and "expert consultant," who "has special input on all major decisions," was notoriously engaging in a barrage of other purposefully cryptic public statements that were obviously accusing Niemann of cheating against him at the Sinquefield Cup

---

[11] In the blog post, Play Magnus states that it is "more or less unheard of to transition from being a 2400+ player to hitting 2700 on the live rankings in two years," underscoring Play Magnus' intent to bolster the false accusation that Niemann cheated. Peter Zhdanov, *The Biggest Cheating Scandals in Chess*, PLAY MAGNUS (Sept. 7, 2022), https://ibb.co/Z22byY9.

and lying about cheating in the past.  *See id.* ¶¶ 87, 88-91, 129-32, 134-40, 142-44.  Accordingly, the notion that Carlsen's own company Play Magnus intended to convey something different about that scandal than its founder and owner is simply incredible.

Second, by portraying Hans as the villain, as opposed to the hero, the Defamatory Tweet conveys that Niemann committed a nefarious act in order to defeat Carlsen at the Sinquefield Cup. Leaving no doubt as to what that nefarious act might be, the Defamatory Tweet specifically describes itself as being about "outrageous *cheating* scandals in chess."

Third, the Defamatory Tweet conveys that Niemann had to sacrifice "everything" to defeat Carlsen at the Sinquefield Cup.  As a villain, and given that the Defamatory Tweet is about the cheating scandal initiated by Carlsen's accusation that Niemann cheated, it clearly conveys that Niemann sacrificed his morals and integrity, as opposed to the lofty sacrifices of a hero.

Accordingly, when taken in context, the Defamatory Tweet "implies the assertion of objective facts," namely, that Niemann cheated against Carlsen at the Sinquefield Cup.  *See, e.g.*, *Beu v. City of Vineland*, 2021 U.S. Dist. LEXIS 42597, *15 (D.N.J. Mar. 8, 2021) (denying motion to dismiss claim based on internet meme about rape, implying that plaintiff is a rapist, because it "can be independently verified whether an individual has in fact participated in acts that would render the individual" a rapist).

Moreover, because the source of this statement is Carlsen's company, it is just as damaging as the statements that Carlsen made himself.  As alleged in the Complaint, Carlsen knew that, given his unparalleled stature and the depth of his expertise in chess, the public would reasonably rely on that expertise and thus believe his defamatory accusations to be true, even though Carlsen knew his accusations were false.  SAC ¶¶ 12, 50-51, 84-92.  Likewise, because Play Magnus is an

extension of Carlsen, not some third-party source without special knowledge, Play Magus knew that the public would rely on its defamatory statements in the same way. *See id.* ¶¶ 51-53.

In its motion, Play Magnus argues that the Defamatory Tweet does not specifically "identify Niemann," which is simply absurd. The Defamatory Tweet includes a link directly to Play Magnus reporting on Niemann's performance at the Sinquefield Cup, and there is no other chess scandal involving Magnus Carlsen at the Sinquefield Cup. Further, as Play Magnus well knows, the quote "Chess speaks for itself" is a statement made by Niemann during an interview that Play Magnus' chess24 brand deems "part of chess folklore."[12]

In any event, there is no requirement that a defendant must specifically state someone's name in order to defame them. *Tholen v. Assist Am., Inc.*, 970 F.3d 979, 983 (8th Cir. 2020) (denying motion to dismiss because a "plaintiff does not have to be specifically named in the defamatory statement so long as a reader by fair implication would understand the statement to be directed at the plaintiff"). The case law that Play Magnus relies upon does not suggest otherwise. In *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 239-40 (Mo. Ct. App. 2011), the court merely held that the general statements at issue were not specific to the plaintiff. Here, Play Magnus' statement was plainly specific to Niemann.

Next, Play Magnus argues that the Defamatory Tweet "has nothing to do with cheating," which strains credulity. It is specifically captioned "outrageous *cheating* scandals in chess" and directly refers to Niemann's game against Carlsen at the Sinquefield Cup. For the reasons above, this was an obvious accusation of cheating. The fact that Play Magnus could construct another possible meaning for the Defamatory Tweet in response to a litigation does not negate its susceptibility to an obvious defamatory meaning. "When a reader, 'connecting the dots,' could

---

[12] Leon Watson, *The new bad boy of chess: Hans Niemann, all the outrageous interviews*, CHESS24 (Aug. 21, 2022), https://new.chess24.com/wall/news/the-new-bad-boy-of-chess-hans-niemann-all-the-interviews.

reasonably arrive at the [defamatory] implication, the author may be accountable." *Nunes v. Lizza*, 12 F.4th 890, 897 (8th Cir. 2021).

Once again, the cases cited by Play Magnus do say otherwise.  In *Smith v. Humane Soc'y of United States*, 519 S.W.3d 789, 801 (Mo. 2017), the court held that calling plaintiff's kennel a "puppy mill" was not false, but merely had a negative connotation  In *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1445 (8th Cir. 1989), calling an FBI agent "corrupt and vicious" without reference to any specific accusations constituted "protected criticisms of a public official's performance of his duties."  Here, Play Magnus' accusation of cheating against Carlsen at the Sinquefield Cup cannot be reduced to negative connotation or generalized opinion.[13]

Finally, although not required, Niemann pleads that both of Play Magnus' defamatory statements were made with malice by including specific factual allegations supporting the inference that Play Magnus knew its statements were false or acted with reckless disregard of the truth.  The Complaint alleges that (1) prior to the Sinquefield Cup, Carlsen made Niemann a brand ambassador of Play Magnus, which indicates that, that contrary to their revisionist history, neither Play Magnus nor Carlsen believed that Niemann was a cheater; (2) all non-biased and legitimate experts, including the Sinquefield Cup arbiters and eventually Chess.com, confirmed that there was no basis for Carlsen's cheating accusations, yet Play Magnus did not retract its defamatory statements; (3) Play Magnus was discovered digging into Niemann's past to find information to be used against him; and (4)  Play Magnus has deep-rooted financial ties, and admitted financial motives, to support Carlsen's defamatory campaign against Niemann to protect Carlsen's reputation.  *See* SAC ¶¶ 4, 51, 70-73, 98-99, 141, 156-64; *Nunes*, 12 F.4th at 900 ("A speaker who

---

[13] Play Magnus' argument in footnote 5, Mot. p. 11, that the Complaint does not allege when the Defamatory Tweet was posted is disingenuous because Play Magnus deleted the Tweet, making it so that only Play Magnus knows the precise date it was posted.

repeats a defamatory statement or implication after being informed of its falsity 'does so at the peril of generating an inference of actual malice.'"); *accord Mitchell v. Twin Galaxies, LLC*, 70 Cal. App. 5th 207, 221-23 (2021) ( "decision to avoid facts that might confirm the probable falsity of the challenged statement" and reliance "on biased sources to reach its conclusion" may support finding of malice).  Moreover, whether Play Magnus acted with malice is question of fact.  *See Allen v. ASRC Commun.*, 2010 U.S. Dist. LEXIS 34661, *7-8 (E.D. Mo. Apr. 8, 2010) (whether the statement was made with knowledge that it was false and whether the statement was true cannot be resolved on a motion to dismiss).

### B.      Niemann Pleads His Tortious Interference, Conspiracy, and Antitrust Claims

As Niemann demonstrated in the Primary Opposition, Niemann has also pleaded tortious interference, conspiracy, and antitrust claims against Defendants.  For Play Magnus' part, it disseminated its own defamatory statements and fabricated the fake rumor accusing Niemann of working with Maxim Dlugy to cheat against Carlsen, which Defendants republished and Chess.com bolstered with additional false statements.  Dkt. 108 pp. 42-67.  Further, as demonstrated in the Primary Opposition, the Complaint extensively details how each Defendant worked together toward their common objectives of defaming Niemann and blacklisting him from the Competitive Chess Market.  *Id.* pp. 65-67.

In the motion, Play Magnus' only argument that was not already addressed in the Primary Opposition is that Play Magnus has not banned Niemann from its tournaments.  However, this is a red herring because, as alleged in the Complaint, Chess.com's ban extended to formerly-Play Magnus tournaments in December 2022 when Chess.com acquired the company, and Carlsen refuses to compete against Niemann, which includes tournaments held by his Play Magnus brand. SAC ¶¶ 16, 72, 146.  Moreover, contrary to Play Magnus' contention, Niemann's prior complaints

did not allege that Play Magnus banned Niemann from its tournaments.  That being said, the consequence of Carlsen's refusal to compete against Niemann is that no tournament would invite Niemann to compete if Carlsen is competing.  *See* SAC ¶ 146.  Given that major chess tournaments are by invitation, Play Magnus' decision to not technically ban Niemann from its last remaining open tournaments is effectively meaningless.[14]

Accordingly, Play Magnus' motion to dismiss these claims should be denied.

## III.   AT A MINIMUM, NIEMANN SHOULD BE GRANTED LEAVE TO REPLEAD

To the extent the Court determines that any of Niemann's allegations are lacking, Niemann respectfully requests leave to amend the Complaint to cure the deficiencies.  Play Magnus would not be prejudiced by allowing Niemann to amend.  *See, e.g.*, *CitiMortgage, Inc. v. Mt. W. Fin., Inc.*, 2016 U.S. Dist. LEXIS 55266 (E.D. Mo. Apr. 26, 2016) (Fleissig, J.).

## <u>CONCLUSION</u>

For the foregoing reasons, Niemann respectfully requests that the Court deny Play Magnus' motion to dismiss in its entirety.

Dated:  New York, New York
May 2, 2023

                                           */s/ Andrew J. Urgenson*
                                           Terrence A. Oved, Esq.
                                           Darren Oved, Esq.
                                           Andrew J. Urgenson, Esq.
                                           Jennifer R. Pierce, Esq.
                                           OVED & OVED LLP
                                           *Attorneys for Plaintiff*
                                           401 Greenwich Street
                                           New York, New York 10013
                                           Tel.: 212.226.2700

                                           *and*

                                           Matthew Gartner, Esq. (#64320)

---

[14] Notably, of the two tournaments referenced by Play Magnus, both were "open" tournaments that did not require invitations, and Carlsen did not compete in one of them.

THE GARTNER LAW FIRM
*Attorneys for Plaintiff*
220 Salt Lick Road
St. Peters, Missouri 63376
Tel: 636.397.2111
matthew@gartnerlawfirm.com

## <u>CERTIFCATE OF SERVICE</u>

I hereby certify that all counsel of record are being served on May 2, 2023, with a copy of this document via the Court's CM/ECF system.

<u>*/s/ Andrew J. Urgenson*    </u>
Andrew J. Urgenson