# EXHIBIT A

346 Conn. 928
Supreme Court of Connecticut.

Gregory B. SMITH et al.
v.
Aaron SUPPLE et al.

(SC 20730)
|
May 2, 2023

**Synopsis**
**Background:** Professor at private university, his nonprofit organization, and student leader of associated club brought libel action against other students who posted flyers around campus about plaintiffs containing pictures and comments about "the new racism" in midst of campus controversy over club's application for formal recognition. The Superior Court, Judicial District of Hartford, James T. Graham, J., denied defendants' special motion to dismiss under anti-SLAPP statute. Defendants appealed, and appeal was transferred.

**Holdings:** The Supreme Court, Robinson, C.J., held that:

a denial of a colorable special motion to dismiss pursuant to anti-SLAPP statute is an appealable final judgment, and

defendants' appeal presented such a colorable claim.

Appeal transferred.

D'Auria, J., filed dissenting opinion in which Ecker and Alexander, JJ., joined.

**Procedural Posture(s):** Interlocutory Appeal; Motion to Dismiss.

Robinson, C. J., and McDonald, D'Auria, Mullins, Ecker, Alexander, Prescott Js. [*]

**Opinion**

ROBINSON, C. J.

**\*\*1 \*929** In this appeal, we must consider whether Connecticut's appellate courts have jurisdiction over an interlocutory appeal from a trial court's denial of a special motion to dismiss filed pursuant to our anti-SLAPP[1] statute, General Statutes § 52-196a.[2] The **\*930** defendants, Aaron Supple, Karen Montejo, Hendrick Xiong-Calmes, and Gianna Moreno, who were students at Trinity College in Hartford (Trinity), appealed to the Appellate Court from the trial court's denial of their special motion to dismiss the action brought against them by the plaintiffs, Gregory B. Smith, Nicholas Engstrom, and The Churchill Institute, Inc. (Churchill Institute).[3] Thereafter, this court transferred the appeal to itself and ordered the parties, sua sponte, to brief the issue of whether the trial court's denial of the special motion to dismiss constitutes a final judgment for the purpose of an appeal. On that limited issue, the defendants argue that the trial court's denial is immediately appealable under the second prong of State v. Curcio, 191 Conn. 27, 31, 463 A.2d 566 (1983). For the reasons that follow, we agree with the defendants and conclude that the denial of a special motion to dismiss based on a colorable claim of a right to avoid litigation under § 52-196a is an appealable final judgment under the second prong of Curcio. Because the defendants' appeal presents such a colorable claim, we transfer the appeal back to the Appellate Court for further proceedings according to law.

**\*\*2** The record reveals the following relevant facts and procedural history, which are undisputed for purposes of the present appeal. Smith is a professor of political science and philosophy at Trinity. Acting in his capacity as a professor at Trinity, Smith circulated a letter to his fellow faculty and colleagues entitled "Reflections on the 'Campus Climate.' " The letter criticized Trinity's **\*931** policies, which Smith believed constituted a "new segregation ...." Smith wrote in relevant part: "We are creating a new form of racism and classism at Trinity—with a new form of original sin being loaded on white, suburban students—and it is no accident that this occurs as the aftermath of transforming the center of the curriculum and hiring into a focus on the mantra of [r]ace, [c]lass and [g]ender as if there were nothing else of interest in the life of the mind." Smith went on to refer to Trinity's " 'cultural houses' " as "tribal enclaves," opining that "[h]ouses that integrate students by interest and academic subject matter would be far more promising than tribal enclaves that lead to division and hostility that need not exist. We are creating a climate of armed camps, not one of open, urbane and cosmopolitan civility. What happened to the premise in [Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954)] that separate is never equal? What happened to Martin Luther [King, Jr.'s]

'dream' of getting past the surface to treating each person as an individual and an equal rather than as members of groups?"[4] Although Smith sent his letter to his fellow faculty members, the defendants and other students received access to it in March, 2019.

In the spring of 2019, several undergraduate students at Trinity, including Engstrom, created the Churchill Club (club) and applied for formal recognition and funding from Trinity's Student Government Association (SGA). Smith served as the faculty advisor to the club. The **\*932** club was "inspired" in part by the Churchill Institute, which is a nonprofit corporation founded by Smith that "focuses on the study of Western civilization, philosophy, and tradition," and certain reading groups that Smith had organized. In connection with the club's application for formal recognition, the club's student representatives, led by Engstrom, appeared before the SGA on March 3, 2019, to answer questions. Student protestors also attended the hearing to protest against the club's formal recognition. The SGA continued the vote on whether to formally recognize the club and subsequently announced that a pair of " ' drop-in student town halls ' " would take place on April 10 and 11, 2019.

On April 1, 2019, a Trinity student newspaper published its annual satirical issue. The issue featured an article entitled "SGA Considers Fascist Society Approval," referencing the campus controversy over the club's application for recognition. Around April 10, 2019, the defendants posted flyers around campus, featuring the Churchill Institute's logo, a photograph of Smith, and a quote from a Facebook post authored by Smith: "the new racism is every bit as ugly as the old."[5] The defendants also posted nearly identical flyers featuring a photograph of Engstrom.

Thereafter, the plaintiffs brought the present action against the defendants, alleging libel per se, libel per quod, and negligent infliction of emotional distress. The defendants filed a special motion to dismiss under the anti-SLAPP statute, § 52-196a, arguing that the plaintiffs' claims were based on the defendants' exercise of their right of free speech and their right of association in connection with a matter of public concern under the first amendment to the United States constitution. The **\*933** plaintiffs objected to the defendants' special motion to dismiss.

 **\*\*3** The trial court denied the defendants' special motion to dismiss on November 16, 2021. The court noted that, in deciding a special motion to dismiss under § 52-196a

(e) (3), Connecticut courts must undertake a two-pronged, burden shifting analysis. See footnote 2 of this opinion. The court found that the defendants had failed to meet their burden under § 52-196a (e) (3) with respect to their claim of free speech because their communications at Trinity were not made in a "public forum," as required by § 52-196a (a) (2).[6] The court further concluded that a private college, like Trinity, was not a state actor for purposes of triggering first amendment protections under the United States constitution.[7]

As to the defendant's right of association claim,[8] the trial court noted that the "United States Supreme Court has afforded constitutional protection to freedom of association in two distinct senses. First, the [c]ourt has held that the [c]onstitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. **\*934** Second, the [c]ourt has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities." (Internal quotation marks omitted.) The trial court determined that the defendants' conduct, and the lawsuit that ensued, did "not involve any governmental interference with the defendants' choice to enter into and maintain intimate or private relationships." The court further determined that the defendants' conduct did not constitute engagement in protected speech under the first amendment because Trinity was not a public forum. Accordingly, the court concluded that the defendants had also failed to meet their initial burden under § 52-196a (e) (3) on the ground that the plaintiffs' complaint was based on their right of association.[9]

The defendants appealed from the trial court's denial of their special motion to dismiss to the Appellate Court. Shortly after the parties filed their preliminary statement of the issues, the Appellate Court sua sponte stayed the appeal pending this court's decision in *Pryor* v. *Brignole*, 346 Conn. 534, ——— A.3d ——— (2023). Thereafter, we transferred this appeal to our docket pursuant to Practice Book § 65-1 and instructed the parties, sua sponte, to brief "only the threshold jurisdictional issue of whether the denial of a special motion to dismiss filed pursuant to ... § 52-196a is an appealable final judgment ...."

 **\*\*4** Before this court, the defendants argue that an appealable final judgment exists under the general appellate jurisdiction statute, General Statutes § 52-263,[10] as explicated **\*935** by the second prong of *State* v.

Case: 4:22-cv-01110-AGF    Doc. #: 146-1    Filed: 06/09/23    Page: 4 of 35 PageID #: 1303

*Curcio*, supra, 191 Conn. at 31, 463 A.2d 566, because an interlocutory appeal is necessary to protect the statutory right to the dismissal of a SLAPP suit. The defendants first look to the text of § 52-196a (d), which provides in relevant part that any stay of discovery imposed upon the filing of a special motion to dismiss "shall remain in effect until the court grants or denies the special motion to dismiss *and any interlocutory appeal thereof....*" (Emphasis added.) Although the defendants concede that this language does not expressly create appellate jurisdiction, they argue that the reference to "interlocutory appeal[s]" suggests that the legislature understood that the right at issue in the statute would satisfy 🚩 *Curcio*. In further support of this claim, the defendants also rely on the purpose of the statute as explained in the legislative history, namely, to provide a rapid mechanism by which defendants could avert SLAPP suits— which are by definition frivolous lawsuits intended to punish or deter the otherwise legitimate exercise of first amendment rights. In emphasizing that Connecticut's anti-SLAPP statute provides a right to avoid litigation, the defendants likewise rely on a variety of federal and sister state cases in arguing that the protections afforded by the anti-SLAPP statute would be irrevocably lost by virtue of having to litigate a putative SLAPP suit to conclusion following a trial court's erroneous denial of a special motion to dismiss.

The plaintiffs contend in response that the denial of a special motion to dismiss is not an appealable final judgment. The plaintiffs argue that, had the legislature intended such denials to be immediately appealable, it **\*936** would have used specific language in the statute to bestow that right. The plaintiffs also argue that the reference in § 52-196a (d) to an "interlocutory appeal" was not intended to make the denial of a special motion to dismiss immediately appealable in and of itself but, instead, merely contemplated other forms of interlocutory appeals not requiring a final judgment, such as public interest appeals by application to the Chief Justice under General Statutes § 52-265a. They further posit that the legislative history of the anti-SLAPP statute is devoid of any reference to the provision of an interlocutory appeal. The plaintiffs also argue that anti-SLAPP protection is not subject to vindication by interlocutory appeal under the second prong of 🚩 *Curcio* because it is simply a procedure, akin to a motion for summary judgment, and not itself an independent substantive right. In particular, the plaintiffs contend that the anti-SLAPP statute was created to short-circuit litigation and that a statutory procedure to truncate litigation does not itself constitute an independent right. Finally, they argue that

allowing an appeal would open the floodgates to interlocutory appeals, which would be at odds with our final judgment jurisprudence. We, however, agree with the defendants and conclude that the denial of a special motion to dismiss based on a colorable claim of a right to avoid litigation under § 52-196a is an immediately appealable final judgment under the second prong of 🚩 *Curcio*.

"The lack of a final judgment implicates the subject matter jurisdiction of an appellate court to hear an appeal. A determination regarding ... subject matter jurisdiction is a question of law [over which we exercise plenary review]." (Internal quotation marks omitted.) *Brown & Brown, Inc.* v. *Blumenthal*, 288 Conn. 646, 651–52, 954 A.2d 816 (2008). "We commence the discussion of our appellate jurisdiction by recognizing that there is no constitutional right to an appeal. ... Article **\*937** fifth, § 1, of the Connecticut constitution provides for a Supreme Court, a Superior Court and such lower courts as the [G]eneral [A]ssembly shall ... ordain and establish, and that [t]he powers and jurisdiction of these courts *shall be defined by law.* ... To consider the [defendants'] claims, we must apply the law governing our appellate jurisdiction, which is statutory. ... The legislature has enacted ... § 52-263, which limits the right of appeal to those appeals filed by aggrieved parties on issues of law from final judgments. Unless a specific right to appeal otherwise has been provided by statute, we must always determine the threshold question of whether the appeal is taken from a final judgment before considering the merits of the claim. ... Further, we have recognized that limiting appeals to final judgments serves the important public policy of minimizing interference with and delay in the resolution of trial court proceedings." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *Id.*, at 652–53, 954 A.2d 816.

**\*\*5** Thus, "[a]s a general rule, an interlocutory ruling may not be appealed pending the final disposition of a case." (Internal quotation marks omitted.) *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 41, 213 A.3d 1110 (2019). In determining whether a judgment or a ruling is an immediately appealable final judgment, courts have routinely looked to a statute's text to see if the legislature has provided an express right to appeal. See General Statutes § 1-2z. In those instances that the legislature has not provided such an express right, our courts then continue to consider whether the right at issue implicates one of the two prongs set forth in 🚩 *State* v. *Curcio*, supra, 191 Conn. at 31, 463

Case: 4:22-cv-01110-AGF    Doc. #: 146-1    Filed: 06/09/23    Page: 5 of 35 PageID #: 1304

A.2d 566. See *Blakely v. Danbury Hospital*, 323 Conn. 741, 745, 150 A.3d 1109 (2016) ("[T]he subject matter jurisdiction of our appellate courts is limited by statute to appeals from final judgments .... [However], the **938** courts may deem interlocutory orders or rulings to have the attributes of a final judgment if they fit within either of the two prongs of the test set forth in [*Curcio*]." (Internal quotation marks omitted.)).

We begin by observing that § 52-196a does not expressly authorize an interlocutory appeal from a trial court's denial of a special motion to dismiss. The single subsection of that statute referencing interlocutory appeals, as we noted previously in this opinion, provides in relevant part: "The court shall stay all discovery upon the filing of a special motion to dismiss. The stay of discovery shall remain in effect *until the court grants or denies the special motion to dismiss and any interlocutory appeal thereof....*" (Emphasis added.) General Statutes § 52-196a (d). The defendants concede, and we agree, that this isolated reference to an interlocutory appeal does not rise to the level of specificity required for an independent grant of appellate jurisdiction. Cf. General Statutes § 31-118 ("[w]hen any court or a judge thereof issues or denies a temporary injunction in a case involving or growing out of a labor dispute and either party is aggrieved ... he may appeal from the final judgment of the court or of such judge to the Appellate Court at any time within two weeks of ... such judgment"); General Statutes § 42-110h (order granting or denying class certification for class actions brought under Connecticut Unfair Trade Practices Act "shall be immediately appealable by either party"); General Statutes § 52-278*l* (a) (1) ("[a]n order ... granting or denying a prejudgment remedy ... shall be deemed a final judgment for purposes of appeal"); General Statutes § 54-63g (aggrieved accused person or state "may petition the Appellate Court for review of [an] order [concerning release]").

The text and legislative history of § 52-196a, however, also do not in any way suggest that the legislature intended **939** to *preclude* interlocutory appeals from denials of special motions to dismiss. See, e.g., *In re Tyriq T.*, 313 Conn. 99, 112–14, 96 A.3d 494 (2014) (examining legislative history and genealogy of General Statutes § 46b-127, and concluding that "the intent of the legislature [was] to prohibit an immediate appeal of a discretionary transfer order" from juvenile matters docket to regular criminal docket). As the plaintiffs argue, on the one hand, the reference in § 52-196a (d) to an "interlocutory appeal" very well could be a reference to a public interest appeal by application to the

Chief Justice pursuant to § 52-265a, which does not require a final judgment. See, e.g., *Halladay v. Commissioner of Correction*, 340 Conn. 52, 67, 262 A.3d 823 (2021). The defendants suggest, on the other hand, that this language may also be an indirect reference to the availability of interlocutory review under *State v. Curcio*, supra, 191 Conn. at 31, 463 A.2d 566. Either way, the fact that the legislature expressly provided for a stay of discovery during the pendency of an interlocutory appeal provides us with good reason to believe that the legislature, at the very least, did not intend to foreclose such review.

**6** The absence of language expressly providing the defendants with a right to an interlocutory appeal does not, however, answer the question of whether a trial court's denial of a special motion to dismiss can nonetheless constitute an appealable final judgment. Indeed, it is well established that, "[a]lthough the legislature is free to make it clear in the language of a statute that an immediate appeal may be taken from an order of the court, the absence of such language is not determinative of whether such a right exists. ... Rather, we presume that the legislature is aware of our [long-standing] final judgment jurisprudence. ... Consequently, unless the legislature has made its intent clear regarding the appealability of an interlocutory order under a particular statute, our determination of whether that order **940** is immediately appealable hinges on whether the order meets the test articulated in *Curcio*." (Citations omitted.) *Hartford Accident & Indemnity Co. v. Ace American Reinsurance Co.*, 279 Conn. 220, 238, 901 A.2d 1164 (2006); cf. *In re Tyriq T.*, supra, 313 Conn. at 103 n.4, 96 A.3d 494 (declining to consider whether discretionary transfer orders are appealable final judgments under *Curcio* given that "the legislature has manifested a clear intent to prohibit interlocutory appeals" from such orders).

"We previously have determined ... that certain interlocutory orders have the attributes of a final judgment and consequently are appealable under ... § 52-263.... In *State v. Curcio*, [supra, 191 Conn. at 31, 463 A.2d 566], we explicated two situations in which a party can appeal an otherwise interlocutory order: (1) [when] the order or action terminates a separate and distinct proceeding, or (2) [when] the order or action so concludes the rights of the parties that further proceedings cannot affect them. ...

Case: 4:22-cv-01110-AGF    Doc. #: 146-1    Filed: 06/09/23    Page: 6 of 35 PageID #: 1305
Smith v. Supple, --- A.3d ---- (2023)

346 Conn. 928

"The second prong of the 🚩 *Curcio* test focuses on the nature of the right involved. It requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right already secured to them and that that right will be irretrievably lost and the [party] irreparably harmed unless they may immediately appeal. ... Thus, a bald assertion that the defendant will be irreparably harmed if appellate review is delayed until final adjudication ... is insufficient to make an otherwise interlocutory order a final judgment. One must make at least a colorable claim that some recognized statutory or constitutional right is at risk." (Footnote omitted; internal quotation marks omitted.) *Sena* v. *American Medical Response of Connecticut, Inc.*, supra, 333 Conn. at 41, 213 A.3d 1110.

Our case law establishes that "[t]he key to appellate jurisdiction under the second prong of 🚩 *Curcio* is not **\*941** so much that the right is already secured to a party; indeed, what is at issue in an appeal is the effect of the challenged order on the scope of the claimed right at issue. Rather, the second prong of 🚩 *Curcio* boils down to whether, as a practical and policy matter, not allowing an immediate appeal will create irreparable harm insofar as allowing the litigation to proceed before the trial court will—in and of itself—function to deprive a party of that right." *Halladay* v. *Commissioner of Correction*, supra, 340 Conn. at 62–63, 262 A.3d 823; see *Blakely* v. *Danbury Hospital*, supra, 323 Conn. at 746, 150 A.3d 1109 ("[t]he rationale for immediate appellate review is that the essence of the protection of immunity from suit is an entitlement not to stand trial or face the other burdens of litigation" (internal quotation marks omitted)).

Our recent decision in 🚩 *Halladay* surveyed our final judgment case law under the second prong of 🚩 *Curcio*. "Paradigmatic examples of such rights that require immediate vindication via an interlocutory appeal are double jeopardy violations resulting in successive prosecutions; see, e.g., 🚩 *State* v. *Crawford*, 257 Conn. 769, 777, 778 A.2d 947 (2001), cert. denied, 534 U.S. 1138, 122 S. Ct. 1086, 151 L. Ed. 2d 985 (2002); collateral estoppel and res judicata; see, e.g., 🚩 *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, 300 Conn. 325, 328 n.3, 15 A.3d 601 (2011); and various immunities from suit. See, e.g., 🚩 *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 787, 865

A.2d 1163 (2005) (absolute immunity for statements made in judicial and quasi-judicial proceedings); 🚩 *Shay* v. *Rossi*, 253 Conn. 134, 166, 749 A.2d 1147 (2000) (colorable claim to state's sovereign immunity is appealable final judgment because that 'doctrine protects against suit as well as liability —in effect, against having to litigate at all') , overruled in part on other grounds by 🚩 *Miller* v. *Egan*, 265 Conn. 301, 828 A.2d 549 (2003); see also **\*942** *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, [279 Conn.] at 233–34, 901 A.2d 1164 (denial of motion for prepleading security by unauthorized insurer pursuant to 🚩 General Statutes § 38a-27 (a) is appealable under second prong of 🚩 *Curcio* because, 'once the trial has concluded, the court will be unable to restore to the plaintiffs either their right to have the defendants post security or their right to obtain a default judgment against the defendants') ...." (Citation omitted.) *Halladay* v. *Commissioner of Correction*, supra, 340 Conn. at 63–64, 262 A.3d 823; see *Sena* v. *American Medical Response of Connecticut, Inc.*, supra, 333 Conn. at 52, 213 A.3d 1110 (legislature intended protections under state of emergency statute, General Statutes § 28-13, to provide political subdivisions of state with "immunity from suit and not just immunity from liability," thereby rendering denial of motion for summary judgment appealable final judgment).

**\*\*7** The defendants contend that § 52-196a confers a right independent of the first amendment itself, namely, a right to avoid the costly and onerous litigation process altogether as a consequence of the exercise of their first amendment rights. [11] In considering the nature of the right conferred by the anti-SLAPP statute for final judgment purposes, we find particularly instructive the legislative history of § 52-196a. See, e.g., *U.S. Bank National Assn.* v. *Crawford*, 333 Conn. 731, 733–34, 743, 219 A.3d 744 (2019) (considering whether issue was **\*943** matter of public importance in determining whether denial of foreclosure committee's motion for fees and expenses because of automatic bankruptcy stay was immediately appealable); see also 🚩 *Lafferty* v. *Jones*, 336 Conn. 332, 382 n.36, 246 A.3d 429 (2020) (purpose of § 52-196a is "instructive" in determining scope of trial court's discretion to order limited discovery in connection with special motion to dismiss), cert. denied, ––– U.S. ––––, 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021).

Smith v. Supple, --- A.3d ---- (2023)

346 Conn. 928

Then Representative William Tong, the sponsor of the bill in the House of Representatives that became § 52-196a, explained that the anti-SLAPP [12] statute was intended to address "situations in which people have spoken out on matters of public concern including the press and we've seen situations [in which] people file litigation. *There appears to be no basis to that litigation but it's designed to chill free speech and the expression of constitutional rights and so this* [*legislation*] *provides for a special motion to dismiss so that early in the process somebody who's speaking and exercis*[*ing*] [*his or her*] *constitutional rights can try to dismiss a frivolous or abusive claim that has no merit and* [*short-circuit*] *a litigation* [*when*] *it might otherwise* **\*944** *cost a great deal of money to continue to prosecute.* We think it's an important measure ... to promote free speech and reporting by our news organizations as well." [13] (Emphasis added.) 60 H.R. Proc., Pt. 16, 2017 Sess., pp. 6879–80; see id., p. 6884, remarks of Representative Tong (describing "a significant amount of resources" expended by local news organization to defend against frivolous defamation actions); id., pp. 6924–25, remarks of Representative Tong (describing anti-SLAPP statute as "focused on this phenomenon of fake news or alternative facts" and ensuring that "no person, no developer, no interest group, [and] no private party that has substantial resources [is] able to abuse the litigation process and leverage our court system to shut people down and to do so by accusing them of peddling fake news or ... [alternative] facts"). In explaining the reach of the anti-SLAPP statute beyond just news organizations, Representative Tong stated that real estate developers often filed false defamation claims to "bully" private citizens speaking out against proposed projects, in order "to spend down" the objector and to "try to use the litigation process to pressure them into standing down." [14] Id., p. 6901; see id., pp. 6901–6902, remarks of **\*945** Representative Richard A. Smith ("I ... would hate to see somebody's right to free speech and their right to contest a hearing—whatever it might be on a zoning level or anywhere else—to have that right stymied just because somebody else has a bigger pocket book").

**\*\*8** Most significant, in responding to a question from Representative Smith about how much time a trial court would have to rule on a special motion to dismiss under the anti-SLAPP statute, Representative Tong emphasized the nature of the statutory right. He observed that "[t]ime is of the essence" because the special motion to dismiss is "an extraordinary remedy and you want to make sure that it is dispatched as quickly as possible *to avoid ... undue litigation and abuse of the process* as ... the cost of litigation is ever more

expensive and at an hourly rate when the meter's running, it can get pretty high pretty quickly, particularly on early motion practice and particularly in civil practice, so ... we want to try to avoid that, particularly when you're dealing with an individual citizen who's just trying to speak on [a] matter of public concern. You don't want to run the bills up so that it becomes prohibitive for them to vindicate their rights." [15] (Emphasis added.) **\*946** Id., pp. 6921–22. Representative Tong went on to describe the nature of the special motion to dismiss proceeding under § 52-196a as a "substantial hearing" or a "[mini-trial] at the outset," akin to that for a prejudgment remedy. Id., p. 6945.

The purpose of the "extraordinary remedy" provided by the anti-SLAPP statute persuades us that its substantive benefit—a right to avoid costly and burdensome litigation on the merits—would be lost if defendants were required to litigate putative SLAPP cases to conclusion following the erroneous denial of a special motion to dismiss. [16] Id., p. 6921, remarks of Representative Tong. The statute's extensive legislative history indicates that the legislature was particularly concerned about defendants laboring under the burden of having to defend against SLAPP suits, which are by definition frivolous and oppressive, as a consequence of having exercised their first amendment rights. This renders the benefit conferred by the anti-SLAPP statute analogous to other statutory and common-law rights to avoid litigation on the merits—such as double jeopardy, collateral estoppel, res judicata, and absolute or sovereign immunity—which this court has deemed to qualify as final judgments under § 52-263 and *Curcio* because they cannot be vindicated by an appeal following the conclusion of trial before the trial court. See, e.g., *Halladay* v. *Commissioner of Correction*, supra, 340 Conn. at 63–64, 262 A.3d 823 (citing cases).

**\*947** Indeed, the right to speak freely without reprisal from frivolous and burdensome lawsuits, protected by § 52-196a, is particularly analogous to a trial court's denial of a claim of collateral estoppel; see, e.g., *Convalescent Center of Bloomfield, Inc.* v. *Dept. of Income Maintenance*, 208 Conn. 187, 195, 544 A.2d 604 (1988); and denials of summary judgment on the basis of the common-law absolute immunity accorded to participants in judicial and quasi-judicial proceedings; see *Chadha* v. *Charlotte Hungerford Hospital*, supra, 272 Conn. at 786–87, 865 A.2d 1163; both of which this court has held to be appealable under the second prong of *Curcio*. In *Convalescent Center of*

*Bloomfield, Inc.*, this court considered whether a trial court's order rejecting the defendant's claim of collateral estoppel and remanding the case for further administrative proceedings was ripe for appellate review. See *Convalescent Center of Bloomfield, Inc.* v. *Dept. of Income Maintenance*, supra, at 192, 544 A.2d 604. In concluding that the trial court's denial of a claim of collateral estoppel was appealable under the second prong of *Curcio*, we held that, "[i]f the defendant is correct that the plaintiffs are precluded from relitigating their entitlement to reimbursement, it would be *unfair to require the defendant to expend its resources to defeat the plaintiffs' claims on the merits*. We have held an interlocutory order to be final for purposes of appeal if it involves a claimed right the legal and practical value of which would be destroyed if it were not vindicated before trial. ... In this respect, the defense of collateral estoppel is a civil law analogue to the criminal law's defense of double jeopardy, *because both invoke the right not to have to go to trial on the merits*. Like the case of a denial of a criminal defendant's colorable double jeopardy claim, [when] immediate appealability is well established ... the ... judgment denying the **\*948** defendant's claim of collateral estoppel is a final judgment." (Citations omitted; emphasis added; internal quotation marks omitted.) *Id.*, at 194–95, 544 A.2d 604.

**\*\*9** Likewise, our holding in *Chadha* that there was an appealable judgment under *Curcio*'s second prong was "dictated by the underlying purpose of the immunity afforded at common law to those who provide information in connection with judicial and quasi-judicial proceedings, namely, that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements. ... Put simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings. *This objective would be thwarted if those persons whom the common-law doctrine was intended to protect nevertheless faced the threat of suit*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, supra, 272 Conn. at 786–87, 865 A.2d 1163; see, e.g., *Dayner* v. *Archdiocese of Hartford*, 301 Conn. 759, 770–72, 23 A.3d 1192 (2011) (concluding that denial of motion to dismiss employment discrimination action based on first amendment ministerial exception was appealable final judgment because "the very act of litigating

a dispute that is subject to the ministerial exception would result in the entanglement of the civil justice system with matters of religious policy, making the discovery and trial process itself a first amendment violation"). But cf. *Harger* v. *Odlum*, 153 Conn. App. 764, 770–71, 107 A.3d 430 (2014) (denial of motion to dismiss medical malpractice action based on failure to file proper opinion letter required by General Statutes § 52-190a was not appealable final judgment under second prong of *Curcio* because "the defendant [did] not [allege] that health care professionals have any statutory **\*949** or constitutional right already secured to them that *shields them from litigation* akin to the right against double jeopardy or the other types of immunity from suit in the civil context" (emphasis added)).

Put differently, the purpose of the special motion to dismiss under § 52-196a puts it squarely within the category of second prong *Curcio* cases, such as *Convalescent Center of Bloomfield, Inc.*, and *Chadha*, pursuant to which "a colorable claim to a right to be free from an action is protected from the immediate and irrevocable loss that would be occasioned by having to defend an action through the availability of an immediate interlocutory appeal from the denial of a motion to dismiss. ... The rationale for immediate appellate review is that the essence of the protection of immunity from suit is an *entitlement not to stand trial or face the other burdens of litigation*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Blakely* v. *Danbury Hospital*, supra, 323 Conn. at 746, 150 A.3d 1109. The anti-SLAPP statute affords a defendant a substantive right to avoid litigation on the merits that can be costly and burdensome, and this is undoubtedly a right that would be abrogated if not vindicated by an immediate appeal. [17]

**\*\*10** We are further persuaded that a denial of a special motion to dismiss under § 52-196a is an immediately **\*950** appealable final judgment because of the statute's provision on attorney's fees. The legislature has provided in subsection (f) (1) of the statute that, "[i]f the court grants a special motion to dismiss under this section, the court shall award the moving party costs and reasonable attorney's fees, including such costs and fees incurred in connection with the filing of the special motion to dismiss." General Statutes § 52-196a (f) (1). If a trial court improperly denies a special motion to dismiss, but the moving party cannot challenge that improper denial in an immediate appeal, a moving party will not be able to vindicate its entitlement to such an award until after

a resolution of the merits in its favor. It would be inefficient to require the defendant, after prevailing on the merits before the trial court, to then file an appeal, in which the sole claim would be that the trial court improperly denied a motion to dismiss at the very outset of the case.

We disagree with the plaintiffs' contention that permitting interlocutory appeals in this context will open the floodgates to endless appeals from denials of special motions to dismiss under § 52-196a. [18] First, a defendant who files a special motion to dismiss that is deemed "frivolous and solely intended to cause unnecessary **951** delay" risks liability for an award of attorney's fees and costs pursuant to § 52-196a (f) (2). This potential sanction provides a significant disincentive to a defendant to file an immediate appeal from the denial of a motion to dismiss because he or she may incur additional responsibility for attorney's fees and costs incurred by a plaintiff in defending that appeal. [19] Second, defendants who have failed to prevail on a special motion to dismiss already have an inherent interest in pursuing the most efficient resolution of the suit brought against them. Unfounded interlocutory appeals would, in most cases, only serve to increase the duration of the proceeding and the cost of the defense. Third, the existing rules of practice permit a court to "impos[e] sanctions" for the "[p]resentation of a frivolous appeal or frivolous issues on appeal." Practice Book § 85-2 (5). Courts are permitted to impose "appropriate discipline" on offenders, including a prohibition against appearing in court "for a reasonable and definite period of time" and "costs and payment of expenses, together with attorney's fees to the opposing party." Practice Book § 85-2. Accordingly, a party who loses a special motion to dismiss under § 52-196a in the trial court will risk the imposition of sanctions by the court if the party thereafter brings a frivolous and meritless appeal from the trial court's denial of a special motion to dismiss.

**11 *952** Our *Curcio* jurisprudence also renders a flood of frivolous interlocutory appeals unlikely. The dispositive inquiry into whether the denial of a special motion to dismiss under § 52-196a is an appealable final judgment under the second prong of *Curcio* is whether the defendant can assert a *colorable claim* of a right to avoid litigation under the anti-SLAPP statute. [20] An appellate court will first have to address "the jurisdictional threshold inquiry of whether the [defendant] has a colorable claim" of a right to avoid litigation under the statute. *In re Santiago G.*, 325 Conn. 221, 231, 157 A.3d 60 (2017). If colorability exists, then the inquiry will

focus on "whether the trial court's judgment ... was proper, namely, the merits of the ... claim ...." *Id.*; see *id.*, at 232, 157 A.3d 60 ("[O]n appeal, two separate inquiries must be made. First, the court must determine whether the trial court's decision ... is a final judgment for jurisdictional purposes; if it is not, then the appeal must be dismissed. ... If the court determines that the trial court's decision is a final judgment, then it properly has subject matter jurisdiction to analyze and render a decision as to the parties' claims ...." (Citation omitted.)). Noncolorable appeals from the denial of a special motion to dismiss, like other noncolorable appeals, will continue to be subject to dismissal for lack of a final judgment. See, e.g., *State v. Crawford*, supra, 257 Conn. at 776–77, 781, 778 A.2d 947 (dismissing appeal because defendant did not present colorable claim of double jeopardy to support availability of interlocutory appeal); *Clark v. Clark*, 115 Conn. App. 500, 510, 974 A.2d 33 (2009) (dismissing appeal for lack of final judgment because would-be intervenor did not make colorable claim to intervention **953** as matter of right). This colorability inquiry will serve to weed out frivolous appeals from being reviewed on the merits and to prevent the appellate floodgates from opening. [21]

Finally, our conclusion is consistent with a wealth of federal and sister state case law that applies a *Curcio*-esque analysis [22] in holding that an interlocutory appeal lies from the denial of a special motion to dismiss a SLAPP suit. [23] Most significant, our sister states have **954** found denials of motions to dismiss under their respective anti-SLAPP statutes to be appealable under jurisprudence that mirrors the second prong of *Curcio*, even in the absence of express language in the statute providing a right to an interlocutory appeal. In *Fabre v. Walton*, 436 Mass. 517, 781 N.E.2d 780 (2002), the Massachusetts Supreme Judicial Court held that the denial of a special motion to dismiss under the commonwealth's anti-SLAPP statute was appealable under the "doctrine of present execution," which is an exception to the commonwealth's common-law final judgment rule that mirrors the second prong of *Curcio*. [24] *Id.*, at 521, 781 N.E.2d 780; see *id.* (under exception for "the doctrine of present execution ... immediate appeal of an interlocutory order is allowed **955** if the order will interfere with rights in a way that cannot be remedied on appeal from the final judgment"). The court observed that the anti-SLAPP "statute provides broad protections for individuals who exercise their

right to petition from harassing litigation and the costs and burdens of defending against retaliatory lawsuits. ... In this regard, they are similar in purpose to the protections afforded public officials by the doctrine of governmental immunity." (Citation omitted; footnote omitted.) Id., at 520, 781 N.E.2d 780. Analogizing the anti-SLAPP statute's protections to the commonwealth's governmental immunity from suit, under which "[i]nterlocutory orders ... are appealable pursuant to the doctrine of present execution"; id., at 521, 781 N.E.2d 780; the court concluded that "the denial of a special motion to dismiss interferes with rights in a way that cannot be remedied on appeal from the final judgment. The protections afforded by the anti-SLAPP statute against the harassment and burdens of litigation are in large measure lost if the [defendant] is forced to litigate a case to its conclusion before obtaining a definitive judgment through the appellate process. Accordingly ... there is a right to interlocutory appellate review from the denial of a special motion to dismiss filed pursuant to the anti-SLAPP statute." Id., at 521–22, 781 N.E.2d 780; see Blanchard v. Steward Carney Hospital, Inc., 483 Mass. 200, 212–13, 130 N.E.3d 1242 (2019) (reaffirming Fabre and observing that "[t]he doctrine of present execution ... applies to anti-SLAPP cases in order to preserve a moving party's 'immunity' from being required to litigate a SLAPP suit"); see also Morse Bros., Inc. v. Webster, 772 A.2d 842, 848 (Me. 2001) (The court recognized the exception to the common-law final judgment rule in the case of a denial of a special motion to dismiss because "[p]recluding the moving party from appealing a decision on the motion would result in **956 continued litigation, which is the precise harm that the [anti-SLAPP] statute seeks to prevent. In these circumstances, the cost and delay of litigating the claim does constitute 'a loss of substantial rights or permanent foreclosure of relief.' ");[25] cf. Gundel v. AV Homes, Inc., 264 So. 3d 304, 310–11 (Fla. App. 2019) (granting discretionary certiorari review to allow interlocutory appeal from denial of special motion to dismiss because harm of improper denial could not be remedied on appeal after final judgment, insofar as "the [a]nti-SLAPP statute bears some similarity to statutes providing for immunity from suit [when] the statutory protection cannot be adequately restored once it is lost through litigation and trial").[26] But see Cedar Green Land Acquisition, L.L.C. v. Baker, 212 S.W.3d 225, 228 (Mo. App. 2007) (holding that denial of special motion to dismiss was not appealable because anti-SLAPP statute lacked "specific language" conferring right to interlocutory appeal).

**12 *957 Similarly, the majority of the United States courts of appeals have deemed denials of special motions to dismiss under state anti-SLAPP statutes to be appealable under the collateral order doctrine identified by the United States Supreme Court in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949), which permits—pursuant to the federal appellate statutes, 28 U.S.C. §§ 1291 and 1292—the appeal of a "small class" of nonfinal orders that implicate a "substantial public interest" and are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."[27] (Internal quotation marks omitted.) Will v. Hallock, 546 U.S. 345, 349, 353, 126 S. Ct. 952, 163 L. Ed. 2d 836 (2006). In so concluding, these courts have determined that the anti-SLAPP statutes at issue effectively created a substantive right to avoid litigation on the merits. See Franchini v. Investor's Business Daily, Inc., 981 F.3d 1, 7, 8 n.6 (1st Cir. 2020) (surveying federal courts of appeals in holding that collateral order doctrine conferred jurisdiction over interlocutory appeal from "a *958 substantive decision" under Maine's anti-SLAPP law because (1) decision presented question "distinct from the merits of the action" given unique statutory procedure, (2) decision "implicate[d] important societal interests in both [f]irst [a]mendment protections for media outlets, and the substantive statutory rights created under Maine law," and (3) denial of special motion to dismiss was "also effectively unreviewable on appeal from a final order" insofar as defendant would be "denied meaningful relief if it must go through the time and expense of fully litigating [the] matter before it [could] address the anti-SLAPP issue"); Los Lobos Renewable Power, LLC v. AmeriCulture, Inc., 885 F.3d 659, 666–67 (10th Cir.) (rejecting argument under Cohen that "the rights enshrined in New Mexico's anti-SLAPP statute could be protected after final judgment because they [did] not shield defendants from the burden of standing trial" because "the New Mexico anti-SLAPP statute aims to nip harassing litigation in the bud, thus protecting potential victims from the effort and expense of carrying on a frivolous lawsuit", cert. denied, ––– U.S. ––––, 139 S. Ct. 591, 202 L. Ed. 2d 427 (2018); NCDR, LLC v. Mauze & Bagby, P.L.L.C., 745 F.3d 742, 752 (5th Cir. 2014) (concluding that

denial of special motion to dismiss filed pursuant to Texas anti-SLAPP statute was interlocutory appeal under collateral order doctrine because "[a] legislatively approved immunity from trial, as opposed to a mere claim of a right not to be tried, is imbued with a significant public interest," and "[i]t would be difficult to find a value of a high[er] order than the [constitutionally protected] rights to free speech and petition that are at the heart of [an] anti-SLAPP statute" (internal quotation marks omitted)); **959 *Henry* v. *Lake Charles American Press, L.L.C.*, 566 F.3d 164, 178, 180–81 (5th Cir. 2009) (holding that denial of special motion to dismiss filed pursuant to Louisiana's anti-SLAPP statute was appealable under collateral order doctrine because it "provide[s] defendants the right not to bear the costs of fighting a meritless defamation claim," statute's "importance weigh[ed] profoundly in favor appealability" because such statutes "aim to curb the chilling effect of meritless tort suits [challenging] the exercise of [f]irst [a]mendment rights," and interlocutory appeals "are more freely allowed" in free speech cases (internal quotation marks omitted)); C. Barylak, Note, "Reducing Uncertainty in Anti-SLAPP Protection," 71 Ohio St. L.J. 845, 880–81 (2010) (supporting interlocutory appeals from denials of special motions to dismiss insofar as "SLAPPs differ from other types of litigation because victory and defeat lie not in final judgment, but in the ability of one party to entangle the other in burdensome, frivolous litigation," and "[the] [p]rovision for immediate appeal is consistent with both the objectives of the collateral order doctrine and anti-SLAPP laws"). But see *Ernst* v. *Carrigan*, 814 F.3d 116, 119–22 (2d Cir. 2016) (order passing on merits of special motion to strike filed pursuant to Vermont's anti-SLAPP statute was not appealable under collateral order doctrine because it did not "resolve an important issue *completely separate from the merits* of the action" given that analysis of motion was "entangled in the facts" and elements of claims, and rejecting analogy to qualified immunity as not requiring fact based analysis (emphasis in original; internal quotation marks omitted)); *Metabolic Research, Inc.* v. *Ferrell*, 693 F.3d 795, 801–802 (9th Cir. 2012) (concluding that then effective version of Nevada's anti-SLAPP statute was not immediately appealable under collateral order doctrine given statutory language suggesting that it provided " 'immunity **960 from civil liability,' " in comparison to California statute that provided interlocutory state court appeal and immunity from suit).[28]

**13 We deem these collateral order cases and scholarship particularly persuasive, insofar as § 52-196a renders the court's determination on a special motion to dismiss entirely independent of the merits of the case by providing that the "findings or determinations made" in connection with the hearing on that motion or the attorney's fee determination "shall not be admitted into evidence at any later stage of the proceeding or in any subsequent action." General Statutes § 52-196a (g). We conclude, therefore, that the denial of a special motion to dismiss based on a *colorable claim* of a right to avoid litigation under § 52-196a is an immediately appealable final judgment under the second prong of *Curcio*.

We next consider whether the defendants in the present case have asserted a colorable claim that they are entitled to protection under our anti-SLAPP statute, which is required to warrant a conclusion that the trial court's denial of their special motion to dismiss is appealable under *Curcio*. See *State* v. *Curcio*, supra, 191 Conn. at 34, 463 A.2d 566. The defendants argue that they have **961 asserted a colorable claim under both the statute's "right of free speech" and "right of association" categories.

It is well established that "[a] colorable claim is one that is superficially well founded but that may ultimately be deemed invalid .... For a claim to be colorable, the defendant need not convince the trial court that he necessarily will prevail; he must demonstrate simply that he *might* prevail." (Citation omitted; emphasis in original; internal quotation marks omitted.) *In re Santiago G.*, supra, 325 Conn. at 231, 157 A.3d 60; see id., at 233, 157 A.3d 60 ("our examination of whether a colorable claim exists focuses on the plausibility of the appellant's challenge to the denial of the motion to intervene when the pleadings and motion are viewed in light of the relevant legal principles"); *State* v. *Komisarjevsky*, 302 Conn. 162, 192–93, 25 A.3d 613 (2011) (*Zarella, J.*, concurring in part and dissenting in part) (trial court's granting of motion to vacate order sealing defendant's witness list was appealable final judgment because "[t]he facts in the record, all relied on by the majority in its analysis of the merits of the [claim]," established "a colorable claim that delay of appellate review threaten[ed] to abrogate his due process right to a fair trial"); *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. at 236–37 n.16, 901 A.2d 1164 ("[a]lthough we express no view regarding the ultimate merits of the plaintiffs' claim that they are entitled to prepleading security under § 38a-27 (a) ...

the plaintiffs have made a colorable claim that, contrary to the conclusion of the trial court, that statutory provision applies to their action against the defendants" (citations omitted));

📁 *State* v. *Curcio*, supra, 191 Conn. at 36, 463 A.2d 566 ("[u]ndoubtedly, [when] defendants make a colorable claim that a trial court proceeding subjects **\*962** them to double jeopardy, they are entitled to have this challenge heard on appeal before trial").

On the basis of our review of the record, we conclude that the defendants have asserted a colorable claim that the conduct alleged in the complaint falls within the meaning of the phrase "right of association," as it is used in our anti-SLAPP statute. That statute defines the phrase "right of association" broadly to include any "communication among individuals who join together to collectively express, promote, pursue or defend common interests ...." [29] General Statutes § 52-196a (a) (4). Subsection (b) further requires that an exercise of the right of association be in connection with a "matter of public concern"; General Statutes § 52-196a (b); which, in turn, is defined in relevant part as "an issue related to (A) health or safety, (B) environmental, economic or community well-being ... [or] (D) a public official or public figure ...." [30] General Statutes § 52-196a (a) (1). These categories are not further defined in the statute, but courts have generally held that speech on the topic of race relations or racial discrimination is "a matter inherently of public concern" under the first amendment. 📁 *Connick* v. *Myers*, 461 U.S. 138, 148 n.8, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); see, e.g., *Calvi* v. *Minneapolis Public Schools*, 122 F.3d 1112, 1117 (8th Cir. 1997) (criticism by employee of public **\*963** school's policy based on racial classification was matter of public concern under first amendment).

 **\*\*14** Before the trial court, the defendants argued that their conduct falls under the "community well-being" category because the statute's language warrants a broad reading of the term "community." In particular, they argued that the controversy concerning the club's recognition, on which the flyers commented, is a concern to, at the very least, both the Trinity community and the community surrounding it. [31]

Before this court, the defendants likewise argue that their claim under the right of association is colorable, and that the trial court erred with respect to the merits, because that category, as defined in § 52-196a (a) (4), does not require that the conduct take place in a public forum or impose a state action requirement. In support of this assertion, the

defendants note that there is no express language in that definition imposing those requirements, in contrast to the "public forum" language in § 52-196a (a) (2).

We conclude that the defendants have asserted a colorable claim that their conduct in posting the flyers around campus, after the protests against the club's recognition began, constituted a "communication among" and with other students on campus who were joining together to pursue a "common interest," namely, preventing the club from being recognized and funded by the SGA, on a "matter of public concern." Indeed, the defendants in the present case have asserted a colorable claim that their conduct relates to topics of race relations and racial discrimination, as the flyers contain references to Smith's previous remarks on race and protest the club's recognition because of its affiliation **\*964** with Smith's remarks and sentiments. In other words, the defendants have a superficially well founded claim that their conduct relates to "community well-being." [32] Although we recognize that the defendants' claim under the right of association may ultimately be deemed to lack merit, we conclude that the defendants have "demonstrate[d] simply that [they] *might* prevail" under § 52-196a. (Emphasis in original; internal quotation marks omitted.) 📁 *State* v. *Crawford*, supra, 257 Conn. at 776, 778 A.2d 947. Accordingly, we conclude that the defendants have asserted a colorable claim that they are entitled to a right to avoid litigation under the anti-SLAPP statute and, therefore, that the trial court's denial of their special motion to dismiss under § 52-196a constitutes an appealable final judgment under 📁 *Curcio*. [33]

 **\*\*15** The appeal is transferred to the Appellate Court for further proceedings according to law.


 **\*965** In this opinion McDONALD, MULLINS and PRESCOTT, Js., concurred.


D'AURIA, J., with whom ECKER and ALEXANDER, Js., join, dissenting.

Many states have passed what have come to be known as anti-SLAPP[1] statutes. Connecticut's legislature passed a version of this kind of statute in 2017. See General Statutes § 52-196a. A hallmark of these statutes is the availability of early court intervention to protect those who claim that a lawsuit has been filed against them in retaliation for their exercise of

protected constitutional rights.[2] On an expedited basis and on a quickly assembled record, a trial judge serves as a gatekeeper, promptly weeding out and dismissing lawsuits that plainly have been filed for this illegitimate purpose.

When the legislature passed the legislation that became § 52-196a, it was not writing on a blank slate. Many state legislatures had already passed these kinds of statutes, and the legislative history of § 52-196a notes that we borrowed generously from these models. Some **\*966** of these other states' statutes, including those the legislature most conspicuously borrowed from, explicitly provided for an interlocutory appeal from the denial of an early motion, in Connecticut called a "special motion to dismiss." Some do not provide explicitly for an appeal. Still other legislatures amended their states' statutes to provide for an interlocutory appeal after a court had ruled that no such appeal was authorized.

Connecticut's statute does not explicitly provide for an interlocutory appeal. The majority today, however, finds authority for such an appeal in what should be a narrow avenue, doing so based on the second prong of the test adopted in 🚩 *State v. Curcio*, 191 Conn. 27, 463 A.2d 566 (1983), which allows for an immediate appeal "[when] the order or action so concludes the rights of the parties that further proceedings cannot affect them." 🚩 *Id., at 31, 463 A.2d 566.* Even under the second prong of 🚩 *Curcio*, though, we are obliged pursuant to General Statutes § 1-2z to take our cues from what the legislature has said about the "nature of the statutory right" at issue, as the majority phrases it. In my view, based on the statutory language and the available evidence of legislative intent, the majority's analysis does not abide by § 1-2z. Rather, I conclude that the defendants, Aaron Supple, Karen Montejo, Hendrick Xiong-Calmes and Giana Moreno, who were students at Trinity College in Hartford, have failed to establish that a right already secured to them will be irretrievably lost absent an immediate appeal.

**\*\*16** We traditionally have "strictly construe[d]" the right to appeal; E. Prescott, Connecticut Appellate Practice & Procedure (5th Ed. 2016) § 2-1:1.2, p. 44; including the right to appellate review of interlocutory rulings. In my view, the legislature expects us to do exactly that. The legislature knows we will look for explicit statutory language authorizing an interlocutory appeal and for **\*967** "distinctive and unmistakable" language in defining a statutory right that

might meet the strictures of the second prong of 🚩 *Curcio*. *Trinity Christian School v. Commission on Human Rights & Opportunities*, 329 Conn. 684, 696, 189 A.3d 79 (2018). I do not believe that the defendants have established that, under § 1-2z and our case law, the legislature authorized us to hear appeals from these gatekeeper rulings. And I do not believe that, having opened the door to these appeals, they will be as easy to rule on and dispose of as the majority might expect. For all of the reasons that follow, I respectfully dissent.

I

I will assume familiarity with the details of the incidents that gave rise to this action, as aptly described in the majority opinion, and focus first on the trial court proceedings. Review of those proceedings provides an appropriate appreciation of the beneficial measures enacted in Connecticut's anti-SLAPP statute, § 52-196a, by which the legislature balanced the rights of plaintiffs who claim damages to pursue legal action in our courts; see Conn. Const., art. I, § 10;[3] and the rights of defendants who claim that the action is nothing more than retaliation for exercising their protected constitutional rights.

The plaintiffs, Gregory B. Smith, Nicholas Engstrom and The Churchill Institute, Inc., brought this action against the defendants on April 5, 2021, alleging libel per se, libel per quod, and negligent infliction of emotional distress. The defendants filed a "special motion to dismiss," arguing that, in the language of § 52-196a, the plaintiffs' claims were based on the defendants' exercise **\*968** of their rights of free speech or association in connection with a matter of public concern under the first amendment to the United States constitution. As required by § 52-196a (c), the defendants filed their motion within thirty days of the return date.

The defendants' special motion to dismiss gave rise to an expedited trial court procedure. Specifically, pursuant to § 52-196a (d), the filing of the motion prompted a stay of discovery, which applies unless the court finds "specified and limited discovery relevant to the special motion to dismiss" necessary.[4] On July 21, 2021, after a condensed briefing period, the trial court conducted an expedited hearing on the motion.[5] The court issued a decision denying the motion on November 16, 2021, within the time our rules of practice afford for rulings on short calendar matters. See Practice Book § 11-19 (a) (court "shall issue a decision on such matter not later than 120 days from the date of such submission"); see

346 Conn. 928

also General Statutes § 52-196a (e) (4) (directing court to rule on special motion "as soon as practicable").

**\*\*17** The trial court held that the defendants had failed to meet their burden under § 52-196a (e) (3) of demonstrating that the plaintiffs' complaint is based on the defendants' **\*969** right to free speech because their communications at Trinity College were not made in a "public forum," as required under § 52-196a (a) (2). [6] The trial court further held that a private college, like Trinity College, was not a state actor for purposes of triggering first amendment protections under the federal constitution.

The defendants filed an appeal, which the Appellate Court promptly stayed, awaiting a decision in *Pryor* v. *Brignole*, 336 Conn. 933, 248 A.3d 3 (2021), in which we had certified the issue of whether a denial of a special motion to dismiss is immediately appealable. We transferred the defendants' appeal to this court for consideration along with *Pryor* and *Robinson* v. *V. D.*, Docket No. SC 20731, an appeal that the Appellate Court had also stayed and that we had also transferred because it implicated the same threshold jurisdictional issue.

## II

It is well established that, ordinarily, the denial of a motion to dismiss—even on jurisdictional grounds, which was not the basis of the defendants' special motion—is an interlocutory ruling, not a final judgment for purposes of appeal. See, e.g., *In re Teagan K.-O.*, 335 Conn. 745, 754, 242 A.3d 59 (2020). Nor is the denial of a motion for summary judgment or a motion to strike ordinarily an appealable final judgment. See, e.g., *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, 300 Conn. 325, 328 n.3, 15 A.3d 601 (2011) (motion for summary judgment); *White* v. *White*, 42 Conn. App. 747, 749, 680 A.2d 1368 (1996) (motion to strike).

The constitutional nature of the defense the defendants have posed in the present case compels no different **\*970** result. This is because it is also well established that the right to free speech protected by the first amendment confers an immunity from liability, which may be raised as a defense; see, e.g., *Gleason* v. *Smolinski*, 319 Conn. 394, 406–407, 125 A.3d 920 (2015); see also *Snyder* v. *Phelps*, 562 U.S. 443, 451–52, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011); and, if unsuccessful, may be appealed upon the entry of an adverse final judgment. See, e.g., *Segni* v. *Commercial Office of Spain*, 816 F.2d 344, 345 (7th Cir. 1987) ("[i]t's quite a leap ... to say that anytime a motion to dismiss on [f]irst [a]mendment grounds is denied, the defendant can appeal the denial, on the theory that the failure to dismiss the suit at the earliest opportunity is itself an infringement of the defendant's [f]irst [a]mendment rights").

Therefore, the defendants do not dispute, and the majority concedes, that, prior to January 1, 2018, the effective date of No. 17-71, § 1, of the 2017 Public Acts (P.A. 17-71), codified at § 52-196a, the defendants' constitutional rights to free speech provided them not with immunity from suit but only with immunity from liability for claims premised on the exercise of those rights. It follows that, before the passage of § 52-196a and today's majority decision, a defendant's unsuccessful motion (to dismiss, to strike, or for summary judgment) based on a first amendment defense would not have been immediately appealable.

## III

In 2017, the legislature passed P.A. 17-71, § 1, which became effective on January 1, 2018, and permits those against whom lawsuits have been filed to pursue a special motion to dismiss early in the litigation, raising as a defense that the underlying action arose out of the exercise of their constitutional rights to free speech, to free association, or to petition the government. As described previously, the statute permits any defendant **\*971** filing a motion posing such a defense to require plaintiffs in short order to demonstrate that their case has merit, factually and legally. In particular, the statute directs the trial court to grant the special motion to dismiss if the defendants make "an initial showing, by a preponderance of the evidence, that the opposing party's complaint, counterclaim or cross claim is based on the moving party's exercise of" his constitutional rights "in connection with a matter of public concern ...." General Statutes § 52-196a (e) (3). The plaintiffs can defeat the special motion to dismiss if they "[set] forth with particularity the circumstances giving rise to the complaint ... and [demonstrate] to the court that there is probable cause, considering all [of the defendants'] valid [constitutional] defenses, that the [plaintiffs] will prevail on the merits of the complaint ...." General Statutes § 52-196a (e) (3).

**\*\*18** Whether and how to manage and accelerate proceedings at the trial court level is one policy determination

the legislature clearly and unambiguously provided for in § 52-196a, directing in significant detail how a special motion to dismiss should be filed and resolved. In the present case, for example, following these directives closely, the trial court ruled on the motion in just over seven months from the filing of the complaint.[7]

Whether to permit one party to halt the trial court proceedings and to launch the parties on an appellate track in the event the motion is denied is an altogether different policy determination, however, about which the legislature said almost nothing. An interlocutory appeal takes an action that the plaintiffs have a constitutional **\*972** right to file and pursue and deposits it in an entirely different court system not known for its dispatch. If permitted, this appeal comes after the plaintiffs have made a preliminary showing, in short order and "with particularity," that there is probable cause that they will prevail on their complaint, despite the defendants' constitutional challenges. General Statutes § 52-196a (e) (3). Moreover, appellate review of these rulings—often requiring findings of fact by which to measure the plaintiffs' claims and the defendants' arguments of intrusion on protected rights—will have to be undertaken on a record constructed hastily, and intentionally so. This is not a recipe for the solemn and meticulous scrutiny often required to adjudicate weighty constitutional issues, and I would not presume that the legislature intended our appellate courts to take up these cases on an interlocutory basis without more specific legislative direction.

Nevertheless, the defendants claim, and the majority today agrees, that § 52-196a not only changed the procedure by which defendants may speedily contest the merits of a lawsuit at the trial level but also permits defendants to take an appeal when that procedure is unsuccessful. I disagree.

### IV

In Connecticut, "an appeal is purely a statutory privilege accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met." (Internal quotation marks omitted.) State v. Coleman, 202 Conn. 86, 88–89, 519 A.2d 1201 (1987). That is, we do not determine as a policy matter whether to afford litigants an appeal from a particular ruling, let alone an interlocutory ruling: only the legislature does so. There are two ways that the legislature may signal to our courts

its policy choice to permit interlocutory appeals. Both ways require a close examination **\*973** of the statutory language, pursuant to § 1-2z, which I do not agree that the majority has undertaken.

### A

The first is the clear and unambiguous way, namely, the legislature could have made explicit in § 52-196a that the denial of a special motion to dismiss is immediately appealable. Anti-SLAPP statutes in numerous other states contain precisely this kind of specific language permitting interlocutory appeals from the denial of similar motions. Among the states with specific language authorizing an interlocutory appeal are those whose legislation served as a model for Connecticut's anti-SLAPP statute, according to the very legislative history the majority cites. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2017 Sess., p. 4602, testimony of Klarn DePalma, vice president and general manager, WFSB-TV (noting that language of Connecticut's anti-SLAPP statute is most similar to statutes from California, Oregon, Texas and Washington); see also Cal. Civ. Proc. Code § 425.16 (i) (Deering Supp. 2021); Or. Rev. Stat. § 31.150 et seq. (2017); Tex. Civ. Prac. & Rem. Code Ann. § 27.008 (West 2020); Wn. Rev. Code Ann. § 4.105.080 (West 2021). Also, among the states with explicit statutory appeal language are those that made the right to an interlocutory appeal explicit only after a court had ruled that it would not infer such a right. See Wynn v. Bloom, 852 Fed. Appx. 262, 262 n.1 (9th Cir. 2021) (Nevada); Schwern v. Plunkett, 845 F.3d 1241, 1244 (9th Cir. 2017) (Oregon). Although the absence of explicit language authorizing an immediate appeal from the denial of a special motion to dismiss is not determinative of whether such a right exists; see, e.g., Hartford Accident & Indemnity Co. v. Ace American Reinsurance Co., 279 Conn. 220, 238, 901 A.2d 1164 (2006); Connecticut's legislature has demonstrated in several contexts that, when it intends to permit **\*974** an interlocutory ruling to be immediately appealable, it knows how to authorize it expressly.[8] Two of these enabling statutes in particular warrant closer examination in comparison to § 52-196a.

**\*\*19** The first is the prejudgment remedy statute, General Statutes § 52-278l (a),[9] which the majority itself cites because it is mentioned in the legislative history of § 52-196a.

As the majority points out, then Representative William Tong described the nature of the special motion to dismiss proceeding under § 52-196a as a "substantial hearing" or "[mini-trial] at the outset," akin to a prejudgment remedy hearing. 60 H.R. Proc., Pt. 16, 2017 Sess., p. 6945. It is true that both statutes provide for a trial court's early examination of whether the statutory requirements have been satisfied. The difference, of **\*975** course, is that § 52-278*l* expressly authorizes an appeal from an order "granting or denying a prejudgment remedy" and includes among its provisions a shortened appeal period (seven days) and authority for the trial court to order a stay in the event of an appeal if the party taking the appeal posts a bond, thus protecting the adverse party from any damages that may result from the stay. Had Representative Tong been asked to comment further on the analogy between a ruling on a prejudgment remedy and the denial of a special motion to dismiss, he would have had to observe that our anti-SLAPP statute contains no appeal provision, unlike § 52-278*l* and numerous anti-SLAPP statutes in other states. [10]

Also worth examining is General Statutes § 31-118, concerning labor injunctions. That statute not only explicitly authorizes an appeal when a court "issues or denies" a temporary injunction arising out of a labor dispute but also provides its own distinct appeal period (two weeks) and directs the parties and the reviewing court on the appellate procedure to undertake. General Statutes § 31-118. In particular, the statute requires that "the record shall be ... made available to counsel within two weeks"; "[t]he appellant shall file his brief within two weeks ... and the appellee within one week thereafter"; no extensions of time are allowed except for "illness or other acts of God"; the appeal **\*976** must be heard no "later than two weeks from the date the appeal is perfected"; and the appeal "shall take precedence over all matters except older matters of the same character." General Statutes § 31-118. Section 52-196a contains none of these details.

Both § 31-118 and § 52-278*l*, with their explicit appeal provisions, provide particularly apt comparisons to our anti-SLAPP statute because they involve similar preliminary determinations *at the trial level*. See General Statutes § 31-115 (temporary injunctive relief requires "finding of facts by the court" that (a) unlawful acts have been threatened and are forthcoming; (b) substantial and irreparable injury; (c) harm to complainant; (d) no adequate remedy at law; and (e) inadequate protection of complainant's property); General Statutes § 52-278d (a) (1) ("there is probable cause that a

judgment in the amount of the prejudgment remedy sought ... will be rendered in the matter in favor of the plaintiff"). Whereas the legislature has decided as a policy matter that rulings on temporary labor injunctions and prejudgment remedies are worthy of interlocutory appellate review by the nonprevailing party, as the majority concedes, the legislature has made no such explicit policy decision regarding our anti-SLAPP statute.

**\*\*20** The only portion of the statute that arguably hints at a right to appeal the denial of a special motion to dismiss is subsection (d) of § 52-196a, which provides in relevant part: "The court shall stay all discovery upon the filing of a special motion to dismiss. The stay of discovery shall remain in effect until the court grants or denies the special motion to dismiss and any interlocutory appeal thereof...." This language is a far cry from authorizing an interlocutory appeal, however, and the majority does not contend otherwise. Staying discovery until the trial court rules on a special motion to dismiss and an appellate court rules on a possible interlocutory **\*977** appeal does little to imply that the legislature intended statutorily to grant defendants the right to an immediate appeal. At most, this language shows that the legislature was aware that, in unique circumstances, such as when a party files a public interest appeal pursuant to General Statutes § 52-265a, a denial of a special motion to dismiss may be immediately appealable. [11] See *Lafferty v. Jones*, 336 Conn. 332, 336–38 and n.3, 246 A.3d 429 (2020) (granting petition to file expedited public interest appeal, pursuant to § 52-265a, from trial court's sanction revoking defendants' opportunity to pursue special motion to dismiss under § 52-196a), cert. denied, —— U.S. ——, 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021). The present appeal could have been a viable candidate for certification under that statute. But acknowledging in a statute that appellate courts could have the authority to hear interlocutory appeals through another jurisdictional avenue is not the same as providing a right to appeal in the statute itself.

### B

The majority is correct that we have said that the absence of specific language conferring the right to appeal "is not determinative of whether such a right exists. ... Rather, we presume that the legislature is aware of our [long-standing] final judgment jurisprudence." (Citation omitted.) **\*978** *Hartford Accident & Indemnity Co. v. Ace American Reinsurance Co.*, supra, 279 Conn. at 238,

Smith v. Supple, --- A.3d ---- (2023)

346 Conn. 928

901 A.2d 1164. This leads to the second way in which the legislature can signal to appellate courts its policy choice to permit interlocutory appeals. Specifically, the legislature can include language in the statute that satisfies the test articulated in 🚩*Curcio.* See 🚩*id.* That is, we presume that the legislature has taken note of the "circumstances in which an interlocutory ruling is deemed [by this court] to have the attributes of a final judgment" under our appeal statutes "so as to permit an immediate appeal." *Saunders* v. *KDFBS, LLC,* 335 Conn. 586, 591, 239 A.3d 1162 (2020); see 🚩*Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.,* supra, at 238, 901 A.2d 1164.

Specifically, we have held that an "otherwise interlocutory order is appealable in two circumstances: (1) [when] the order or action terminates a separate and distinct proceeding, [and] (2) [when] the order or action so concludes the rights of the parties that further proceedings cannot affect them." 🚩*State* v. *Curcio,* supra, 191 Conn. at 31, 463 A.2d 566. No one contends that the first prong of 🚩*Curcio* is implicated in the present case or by § 52-196a. Rather, the only question is whether the denial of a special motion to dismiss satisfies the second prong of the 🚩*Curcio* test, which "focuses on the nature of the right involved. It requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right already secured to them and that that right will be irretrievably lost and the [parties] irreparably harmed unless they may immediately appeal." (Internal quotation marks omitted.) 🚩*Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.,* supra, 279 Conn. at 226, 901 A.2d 1164.

1

**\*\*21** In undertaking a second prong 🚩*Curcio* analysis, the " 'essential predicate' " is to identify properly the nature of the right implicated. 🚩*Id., at 231, 901 A.2d 1164.* "The right of the party **\*979** must be of a statutory or constitutional nature." [12] E. Prescott, supra, § 3-1:2.3, p. 92. With the lack of interlocutory review not implicating any constitutional right, the majority describes the statutory right at stake in the present case several ways. For example, quoting our decision in 🚩*Convalescent Center of Bloomfield, Inc.* v. *Dept. of Income Maintenance,* 208 Conn. 187, 195, 544 A.2d 604

(1988), the majority suggests that, as in that case, § 52-196a protects "the right not to have to go to trial on the merits" or the right "to avoid litigation on the merits that can be costly and burdensome ...." [13] (Emphasis omitted; internal quotation marks omitted.) It also refers to a "right to avoid litigation," a "right to avoid the costly and onerous litigation process altogether," a "right to avoid costly and burdensome litigation on the merits," and a right that "shields [the **\*980** defendants] from litigation akin to the right against double jeopardy or the other types of immunity from suit in the civil context ...." (Emphasis omitted; internal quotation marks omitted.) None of these phrases appears in the statute's text.

The majority does not explain why it eschews characterizing the nature of the right implicated by § 52-196a as "immunity from suit ...." Instead, the majority forgoes the required § 1-2z analysis and characterizes this right as merely being akin to immunity from suit, despite the fact that this kind of analysis applies only to common-law defenses. See footnote 13 of this opinion. If asked to define the phrase "immunity from suit" for a legal dictionary, however, a lexicographer would be hard-pressed to craft a better definition than any of the phrases the majority uses to describe the right it claims the statute protects and that I compiled in the preceding paragraph. In fact, our case law defines immunity from suit precisely using these very phrases. For example, we have often said that "the essence of the protection of immunity from suit is an entitlement not to stand trial or face the other burdens of litigation." (Internal quotation marks omitted.) *Blakely* v. *Danbury Hospital,* 323 Conn. 741, 746, 150 A.3d 1109 (2016). We have also described state sovereign immunity, which is an immunity from suit, as a "doctrine [that] protects against suit as well as liability—in effect, against having to litigate at all." 🚩*Shay* v. *Rossi,* 253 Conn. 134, 166, 749 A.2d 1147 (2000), overruled in part on other grounds by 🚩*Miller* v. *Egan,* 265 Conn. 301, 828 A.2d 549 (2003).

**\*\*22** Using the proper legal parlance is important because, when we seek to define statutory rights with such significant consequences, we should speak precisely so that we may expect the legislature also to speak precisely when granting these rights. Words matter. And, as with all statutory interpretation exercises this court under-takes, **\*981** it is elementary that § 1-2z governs our exercise of divining the precise nature of the statutory right at issue, as we have recognized very recently.

For example, in *Sena v. American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 213 A.3d 1110 (2019), we looked "to [General Statutes] § 28-13 to determine the nature of the immunity afforded to political subdivisions" when they are sued for actions taken by their police and fire departments in response to declared state emergencies. Id., at 45, 213 A.3d 1110. We described this issue as "a question of statutory construction"; id.; and, therefore, pursuant to § 1-2z, we first examined the plain language of § 28-13, which we determined to be ambiguous. See id., at 47–48, 213 A.3d 1110. Only then did § 1-2z permit us to consider the relevant legislative history, which led us to ultimately conclude that § 28-13 provided immunity from suit. See id., at 48–52, 213 A.3d 1110. Based on this conclusion, we held that the denial of a motion for summary judgment premised on the immunity conferred by § 28-13 was immediately appealable under the second prong of *Curcio*. See id., at 52, 213 A.3d 1110; see also *Trinity Christian School* v. *Commission on Human Rights & Opportunities*, supra, 329 Conn. at 694, 189 A.3d 79 (under § 1-2z, we must first look to statute's language to determine whether legislature provided any indication that it intended to grant immunity from suit); *Harger* v. *Odlum*, 153 Conn. App. 764, 769–73, 107 A.3d 430 (2014) (determining pursuant to § 1-2z that General Statutes § 52-190a does not grant immunity from suit, and thus pretrial denials of this statutory right are not immediately appealable under second prong of *Curcio*).

Unlike in *Sena*, the majority in the present case, in its search for the nature of the right conferred on defendants by § 52-196a, only briefly examines any of the statute's plain language and, when it does, does not consider the language of subsection (b), in which the so-called "right" is described. Neither does the majority **\*982** consider whether any language is ambiguous, which could arguably justify the majority's reference to particular legislators' statements about the statute's purpose that nevertheless do not refer to immunity from suit or a right to appeal. Instead, the majority resorts to characterizing the nature of the right found in § 52-196a, ultimately concluding that the right conferred by the statute may be vindicated only if the defendant has a right to an interlocutory appeal. Since 2003 and the passage of § 1-2z, however, to guard against possibly inaccurate portrayals of legislative intent, the legislature has directed us to examine a statute's text first, along with "its relationship to other statutes." General Statutes § 1-2z. We do not consider extratextual evidence, such as legislative history, unless the

text is ambiguous or unless it yields absurd or unworkable results. See General Statutes § 1-2z.

Because I believe that the majority's description of the right is merely another way of describing an immunity from suit, I first undertake what I consider to be a proper § 1-2z analysis of § 52-196a to determine whether the legislature, not having explicitly created a right to an interlocutory appeal in the statute; see part IV A of this opinion; nonetheless manifested an intent to confer on defendants a right to immunity from suit, the denial of which, under our case law, creates a right to an immediate interlocutory appeal. I conclude that the legislature did not do so. [14] Nor do I agree with the majority that the legislative history it recounts supports a conclusion that the legislature intended to provide immunity **\*983** from suit by granting defendants a right not to litigate akin to immunity from suit.

2

**\*\*23** A corollary to the "presum[ption] that the legislature is aware of our [long-standing] final judgment jurisprudence"; *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. at 238, 901 A.2d 1164; is that the legislature is also aware of how to signal under *Curcio* that the denial of a right is immediately appealable. As I discussed previously, and as guided by § 1-2z, this is particularly true when determining whether a statute grants immunity from suit. Specifically, we have stated that, "when the legislature intends to confer immunity from liability or from suit, it does so in *distinctive and unmistakable terms* ...." (Emphasis added; footnotes omitted.) *Trinity Christian School* v. *Commission on Human Rights & Opportunities*, supra, 329 Conn. at 696, 189 A.3d 79. For example, we previously have noted specific examples of statutory language conferring immunity from suit, including the phrases, "no action may be brought" and "shall not be liable ...." (Footnotes omitted; internal quotation marks omitted.) Id.; see General Statutes § 52-557e ("[n]o action may be brought to recover damages against any licensed physician for any decision or action taken by him as a member of a hospital utilization review committee"); General Statutes § 52-557*o* ("[n]o action for trespass shall lie"); see also *Sena* v. *American Medical Response of Connecticut, Inc.*, supra, 333 Conn. at 47–52, 213 A.3d 1110 (holding that denial of motion for summary judgment premised on § 28-13 was immediately appealable under second prong

of 🔲 *Curcio* because statute provided immunity from suit based on language that attorney general must " 'appear for and defend' " political subdivisions, as well as legislative history emphasizing state's taking on cost and burdens of litigation). Applying these principles to **\*984** the text of § 52-196a, I cannot locate in my review of the statute's plain language any "distinctive and unmistakable terms" even suggesting an immunity from suit or an immunity of any kind. *Trinity Christian School* v. *Commission on Human Rights & Opportunities,* supra, at 696, 189 A.3d 79.

My review begins with subsection (b) of § 52-196a, which actually confers the right to file the special motion. In relevant part, § 52-196a (b) provides: "In any civil action in which a party files a complaint ... against an opposing party that is based on the opposing party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, *such opposing party may file* a special motion to dismiss the complaint ...." (Emphasis added.) The subsections that follow subsection (b) detail the procedure a defendant must follow to go about exercising this right. For example, subsection (c) sets the deadline for when a defendant must file a special motion to dismiss at thirty days from the return date, absent good cause found by the trial court. Subsection (d) provides for a stay of discovery during the pendency of the motion, which, for the same reasons explained in part IV A of this opinion as to why this language does not support a statutory right to appeal, also does not provide any kind of immunity. Subsection (e) governs when and how the trial court must conduct a hearing on the motion. Specifically, the trial court is required to conduct "an expedited hearing" and must "rule on a special motion to dismiss as soon as practicable." General Statutes § 52-196a (e) (1) and (4). Finally, subsection (f) not only does not show any legislative intent to create an immunity from suit but supports my analysis that this statute provides only a procedural benefit to defendants. Subsection (f), the fee shifting provision, provides **\*985** defendants with a significant financial benefit in the event that a special motion to dismiss is improperly denied. In particular, if unsuccessful at trial, a defendant may raise a first amendment defense on appeal, and, if successful, this court may hold that the special motion to dismiss was improperly denied, may vacate the judgment, and then may remand the case to the trial court with direction to dismiss the plaintiff's action and to determine the appropriate award of costs and attorney's

fees under subsection (f). See 🔲 *Gurliacci* v. *Mayer,* 218 Conn. 531, 576, 590 A.2d 914 (1991) (requiring trial court to determine attorney's fees on remand); *Medical Device Solutions, LLC* v. *Aferzon,* 207 Conn. App. 707, 782, 264 A.3d 130 (remanding case to "[trial] court with instructions to determine, if possible, what portion of the fees and costs it awarded under [Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. was] reasonably incurred to litigate that portion of the CUTPA claim that was not barred by the statute of limitations"), cert. denied, 340 Conn. 911, 264 A.3d 94 (2021). Additionally, if successful at trial, the defendant may then file a motion for attorney's fees with the trial court. See Practice Book § 11-21 ("[m]otions for attorney's fees shall be filed with the trial court within thirty days following the date on which the final judgment of the trial court was rendered").

**\*\*24** Section 52-196a does not contain the kind of "unmistakable terms" that have led us to conclude that a statute creates a right to "immunity from suit," whether described as such by our case law in this usual way, or described synonymously as a "right to avoid litigation," or a "right not to have to go to trial on the merits," or a right "akin" to immunity from suit. Rather, the plain language of § 52-196a clearly and unambiguously creates only a new *procedure* for defendants to raise as early as possible in the litigation their *preexisting* right to immunity from liability when the underlying **\*986** defense is premised on their exercise of a first amendment constitutional right or state constitutional analogue. The legislature plainly wanted to confer on defendants the procedural right to raise this defense in the trial court before being burdened by the costs and inconvenience of discovery. But, as this court has previously recognized, "[t]here is a crucial distinction to be drawn between a right not to be tried and a right whose remedy requires the dismissal of charges. ... The former necessarily falls into the category of rights that can be enjoyed only if vindicated prior to trial. The latter does not." [15] (Internal quotation marks omitted.) 🔲 *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.,* supra, 279 Conn. at 232, 901 A.2d 1164. In striking a balance between the rights of plaintiffs and defendants, the legislature's decision not to include distinctive and unmistakable language providing a right to immunity from suit should lead us to conclude that the legislature did not view the right to an immediate appeal as within that bundle of rights critical to the policy it was implementing—i.e., a right that "can be enjoyed only if vindicated prior to trial." (Internal quotation marks omitted.)

Id.; see *Englert v. MacDonell,* 551 F.3d 1099, 1105 (9th Cir. 2009) (collateral order doctrine was not satisfied by Oregon's anti-SLAPP statute "because it was not intended to provide a right not to be tried, as distinguished from a right to have the legal sufficiency of the evidence underlying the complaint reviewed by a nisi **\*987** prius [i.e., trial] judge before a defendant is required to undergo the burden and expense of a trial").

In the context of *Curcio*'s second prong, "[w]e have [also] said that the claimed right cannot be 'a contingent right created by statute and subject to the discretion of the trial court'; *State v. Garcia,* 233 Conn. 44, 66, 658 A.2d 947 (1995) [overruled in part on other grounds sub silentio by *Sell v. United States,* 539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003)]; rather, the right must exist independently of the order from which the appeal is taken." *Hartford Accident & Indemnity Co. v. Ace American Reinsurance Co.,* supra, 279 Conn. at 231, 901 A.2d 1164. In the present case, the rights created by § 52-196a (e) (3) are contingent on "an initial showing, by a preponderance of the evidence," by the defendant, and a "probable cause" showing by the plaintiff. The legislature's use of the phrases "initial showing" and "probable cause," by their nature, strongly suggests that the legislature contemplated the trial court's exercising some degree of discretion. See *TES Franchising, LLC v. Feldman,* 286 Conn. 132, 137, 943 A.2d 406 (2008) (in ruling on application for prejudgment remedy, "[i]n its determination of probable cause, the trial court is vested with broad discretion" (internal quotation marks omitted)). Moreover, this relatively low probable cause burden necessary for the plaintiff to defeat the special motion to dismiss demonstrates that the legislature recognized that many special motions to dismiss may be denied, and yet it decided not to expressly create a right to immunity from suit, undermining any argument that an immediate appeal is necessary to vindicate the statutory right at issue.

I draw from the statutory language that the legislature intended for the trial court, if called on by a defendant, to act as a gatekeeper, early in the litigation and in an expedited fashion, to consider and rule on the viability **\*988** of the alleged constitutional violations before a defendant is burdened by the costs and inconvenience of discovery. In the words of the United States Court of Appeals for the Ninth Circuit construing a similarly worded statute, the Oregon legislature provided the defendant with the right to have the

"legal sufficiency of the evidence underlying the complaint reviewed by a nisi prius [i.e., trial] judge ...." *Englert v. MacDonell,* supra, 551 F.3d at 1105. [16] This is eminently sensible because, when the trial court is tasked with acting as a gatekeeper, which is most often a trial court function; see, e.g., *State v. Schiappa,* 248 Conn. 132, 163 n.39, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); all that is required is a preliminary showing that the party may prevail on the facts and law, which may lead to an incomplete or inadequate record for appellate review of constitutional questions. See part V of this opinion.

**\*\*25** Thus, I disagree with the majority that the plain language of § 52-196a creates a right—"akin" or otherwise —to immunity from suit. Rather, under our well established rules of statutory construction, the statute's plain language clearly and unambiguously creates a new and valuable *procedure* for a defendant to raise, as early as possible in the litigation, his or her preexisting right to immunity from liability when the underlying defense is premised on his or her exercise of a first amendment right or state constitutional analogue.

**\*989** 3

Even if I were to agree that the language of § 52-196a is ambiguous with respect to the nature of the statutory right created (which not even the majority contends), I disagree that the legislative history supports a conclusion that the legislature intended to create a right akin to immunity from suit.

First, I make an observation about reliance on legislative history in this context generally. Given the primacy of legislative text under § 1-2z and the traditional approach of strictly construing statutory appellate rights; see E. Prescott, supra, § 2-1:1.2, p. 44; it is at least arguable that we should not be looking to extraneous sources, like legislative history, for something that the legislature can say explicitly and relies on us not to infer. Cf. *Envirotest Systems Corp. v. Commissioner of Motor Vehicles,* 293 Conn. 382, 390, 978 A.2d 49 (2009) ("the existence of uncertainty in a statute with regard to [a sovereign immunity] waiver is not an ambiguity but, rather, an answer").

Putting that aside, in my view, the majority reads far more into statements made by particular legislators than can reasonably

be inferred. Of course, not a single legislator mentioned the idea of an interlocutory appeal. I do not believe that the legislature would have us review the statements of individual legislators just to get a sense of the policy the legislature was trying to effect and then extrapolate from there whether going one step further (in this case, an interlocutory appeal) would, in our view, be consistent with that policy and therefore conclude that the legislature must have so intended.

The majority essentially reads the legislative history, sub silentio, to confer on defendants a right to an error-free gatekeeper. As an example, the majority writes **990** that "[t]he extensive legislative history of the statute indicates that the legislature was particularly concerned about defendants laboring under the burden of having to defend against SLAPP suits, which are by definition frivolous and oppressive, as a consequence of having exercised their first amendment rights." The majority's characterization of the statutory purpose is inarguable: to deter and weed out abusive and frivolous claims "designed to chill free speech and the expression of constitutional rights ...." (Emphasis omitted; internal quotation marks omitted.) But the majority holds that the legislative history makes clear that this weeding out function extends beyond the trial court, the usual gatekeeper. In its view, the weeding out process is not complete until an appellate court has reviewed a trial judge's very preliminary determinations of the defendant's "initial showing" and the plaintiff's showing of "probable cause" that he will prevail on the merits. See part V of this opinion. The majority *has* to read this into the legislative history because not once does a legislator mention extending the gatekeeping function beyond the trial court, to an appellate court's interlocutory review, if a defendant, after availing himself of the significant benefits of the trial court's speedy determination, is unsuccessful in convincing the trial court of the merits of its special motion to dismiss. In my view, the available legislative history is far too thin a reed on which to upset the usual rule that all preserved issues are reviewable when an aggrieved party appeals at the end of the case, and not until then.

**26** I read the scant legislative history to lean the other way: against permitting an interlocutory appeal. Specifically, Representative Tong explicitly clarified that "it's a bill to protect people against *liabilities* ...." (Emphasis added.) 60 H.R. Proc., supra, p. 6879. Nowhere in the legislative history is there any reference to or suggestion of the statute's providing immunity from suit. Rather, **991** as Representative Tong explicitly stated, the statute's intended purpose is to "[provide] for a special motion to dismiss

so that early in the process somebody who's speaking and [has] exercised [his] constitutional rights can *try* to dismiss a frivolous or abusive claim that has no merit and [short-circuit] a litigation where it might otherwise cost a great deal of money to continue to prosecute." (Emphasis added.) Id.; see id., p. 6884, remarks of Representative Tong. Like the language contained in the statute, Representative Tong's statement indicates only that the legislature intended to create a process to weed out frivolous and abusive lawsuits early in the litigation so as to prevent the needless expense and burdens of litigation. In other words, the legislature wanted to ensure that defendants did not have to incur the cost of litigation until a gatekeeper—the trial court—determined that there is "probable cause" that the lawsuit has merit. Id., pp. 6905, 6909, remarks of Representative Tong. The lack of an immediate appeal from a denial of a motion to dismiss does not undermine the legislature's goal of ensuring that this gatekeeping function occurs "as quickly as possible to avoid ... undue litigation and abuse of the process ...." Id., p. 6921, remarks of Representative Tong.

Importantly, the legislative history shows that § 52-196a was the result of balancing the two interests at stake here: (1) the defendant's right to free speech, and (2) the plaintiff's right to have a claim heard. See id., pp. 6881–82, remarks of Representative Rosa C. Rebimbas ("this legislation does provide for an expedited hearing and the purpose in that, again, is as the good [c]hairman had indicated it is a gentle balance between free speech by being able to resolve any issues once it's brought before the court's attention"); id., p. 6909, remarks of Representative Tong ("the claimant who has generally a right to have his or her claims heard"). By providing a procedural remedy, not a right to immunity from suit, **992** the legislature strikes this balance. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2017 Sess., pp., 4779–80, testimony of Eric Parker, on air anchor and chief investigative reporter, WFSB-TV ("It sets up a clear test. If the complaint shows a bare minimum of validity, it moves forward. If it does not, the defendant can end the litigation quickly and without the months of delays and expenses that come with it. It doesn't mean valid lawsuits won't get prosecuted. Those claims do exist and they should be allowed to move forward. The plaintiffs deserve every ounce of the rights the courts give them."). Thus, I do not read the legislative history to do any more than the text of the statute explicitly says, i.e., speak to the creation of a procedure that permits a defendant to obtain prompt review of an alleged SLAPP lawsuit.

4

The majority cites to a handful of cases from other jurisdictions that it claims apply "a ⚑ *Curcio*-esque analysis" and support its conclusion that an interlocutory appeal lies from the "denial of a special motion to dismiss ...."[17] The majority tells us that this case law is "particularly instructive" because of Senator John A. Kissel's description of Connecticut's anti-SLAPP statute as "a compilation of some of the best [anti-SLAPP] laws out there from throughout the United States." 60 S. **993 Proc., Pt. 6, 2017 Sess., p. 2236; see also 60 H.R. Proc., supra, p. 6884, remarks of Representative Tong ("twenty-nine other states have adopted ... legislation very similar to the construct we have here"). The majority would apparently have us infer from such a general legislative statement that permitting an interlocutory appeal from a trial judge's considered denial of a special motion to dismiss would place Connecticut's anti-SLAPP statute among "the best laws out there ...." This is the majority's own value judgment. Whether I agree with that judgment is not important. There are states that provide for interlocutory appeals and some that do not.

**27 What is important is that, having compiled examples of "the best laws out there," the legislature chose not to include what at least as many jurisdictions as the majority cites specifically did include: a statute explicitly permitting an interlocutory appeal.[18] See ⚑ Cal. Civ. Proc. Code § 904.1 (a) (13) (Deering Supp. 2021); ⚑ Ga. Code Ann. § 9-11-11.1 (e) (Supp. 2019); ⚑ Nev. Rev. Stat. § 41.670 (4) (2019); N.M. Stat. § 38-2-9.1 (C) (Cum. Supp. 2015); ⚑ Okla. Stat. Ann. tit. 12, § 1437 (West Cum. Supp. 2021); 27 Pa. Stat. and Cons. Stat. Ann. § 8303 (West 2009); Tenn. Code Ann. § 20-17-106 (West Supp. 2019); Tex. Civ. Prac. & Rem. Code Ann. § 27.008 (West 2020); Wn. Rev. Code Ann. § 4.105.080 (West 2021); see also Ill. Sup. Ct. R. 306 (a) (9) (West 2020). In fact, although the legislative history of § 52-196a recites that our anti-SLAPP statute is most similar in language to the statutes from California, Oregon, Texas and Washington; see Conn. Joint Standing Committee Hearings, Judiciary, **994 Pt. 8, 2017 Sess., p. 4602; in 2017, when the legislature enacted § 52-196a, the anti-SLAPP statutes in California, Texas, and Washington included language explicitly authorizing an immediate appeal from a denial of a motion under those statutes. See 2014 Cal. Stat. c. 71, § 17; see also Tex. Civ.

Prac. & Rem. Code Ann. § 27.008 (West 2015); Wn. Rev. Code Ann. § 4.24.525 (5) (d) (West 2017).

The legislature's reliance on Oregon's anti-SLAPP statute is also important to note because the Oregon legislature had amended its statute in 2009—before Connecticut's legislature enacted § 52-196a—to add language permitting an immediate appeal. 2009 Or. Laws c. 449, §§ 1 and 3 (effective January 1, 2010); see House Committee on Judiciary, Staff Measure Summary on Senate Bill No. 543 (amending Oregon law to authorize "an immediate appeal [from] the denial of an anti-SLAPP ... motion"). The original version of Oregon's statute was explicitly premised on California's anti-SLAPP statute, except that it did not include language providing for an immediate right to appeal from the denial of a special motion to strike, as California's did. See ⚑ Englert v. MacDonell, supra, 551 F.3d at 1105–1107; see also ⃞ Or. Rev. Stat. §§ 30.142 and ⃞ 30.144 (2001). The statutory language also did not include a right not to go to trial and thus did not provide immunity from suit. See ⚑ Englert v. MacDonell, supra, at 1105–1107. Because of this, courts had held that the denial of a motion under Oregon's anti-SLAPP statute was not immediately appealable. See, e.g., ⚑ id. In response, the Oregon legislature then amended the statute to specifically provide the right to appeal. See Schwern v. Plunkett, supra, 845 F.3d at 1244. My conclusion that Connecticut's legislature did not intend to provide either an immediate right to appeal or immunity from suit is supported by its decision not to include specific language authorizing an interlocutory appeal, as other state legislatures had, or a right to **995 immunity from suit, despite presumably knowing that the absence of such language, as in the original version of Oregon's anti-SLAPP statute, would likely lead a court to conclude that there is no right to an immediate appeal.

Cases that have held that the denial of a motion under an anti-SLAPP statute is immediately appealable, notwithstanding the lack of explicit language granting the right to appeal, are distinguishable from the present case in one of three ways: (1) the anti-SLAPP statute at issue contained language significantly different from that found in § 52-196a;[19] (2) the legislative history of the particular anti-SLAPP statute demonstrated compellingly that the legislature in fact intended to create immunity from suit, which the history of § 52-196a does not demonstrate;[20] or, most often, (3) the particular court's statutory construction analysis was not

346 Conn. 928

governed by principles consistent with § 1-2z or our case law regarding statutory immunity from suit. [21]

**\*\*28** More consistent with the analysis the legislature has directed Connecticut courts to undertake under **\*996** § 1-2z are cases from other courts that have reached the opposite conclusion from that of the majority based solely on scrutiny of the particular state statute at issue under established state law principles more consistent with § 1-2z. For example, as explained, courts have interpreted Oregon's original version of its anti-SLAPP statute, which has language similar to our statute, as not creating either a right to an immediate appeal or immunity from suit and, thus, holding that the denial of a motion under its statute was not appealable. See *Englert v. MacDonell*, supra, 551 F.3d at 1105–1107 (interpreting what is now Or. Rev. Stat. §§ 31.150 and 31.152, and holding that defendants could not immediately appeal from trial court's order denying special motion to strike under collateral order doctrine). Similarly, courts have held that denials of motions filed under Nevada's original version of its anti-SLAPP statute, which, like Oregon's original version, did not include an explicit right to appeal or immunity from suit, were not immediately appealable because "the values underlying th[is] particular anti-SLAPP statute can be satisfied through the normal appellate process." [22] *Metabolic Research,Inc. v. Ferrell*, 693 F.3d 795, 800 (9th Cir. 2012); see id., at 801–802 (citing Nevada case law in determining that denial of special motion to dismiss under Nevada's anti-SLAPP statute was not immediately appealable under collateral order doctrine because statute did not expressly provide for immediate right to appeal or establish immunity from suit).

Thus, it is only fair to say about the case law from other jurisdictions that courts in those states review the particular language of their anti-SLAPP legislation under their own rules of construction. This court must do the same.

**\*997** V

The majority responds to the plaintiffs' floodgates argument (i.e., that permitting interlocutory appeals from denials of special motions to dismiss will result in "endless appeals") by saying that the influx of appeals will not likely be significant. The majority is probably right. That is not *my* floodgates concern though. Rather, my concern stems from what I

view as an unwarranted weakening of our final judgment jurisprudence.

Only very recently, and with some justification, members of this court have lamented the "murky state of our final judgment jurisprudence" under *Curcio*'s second prong and the expansion of the supposedly " 'narrow' " exception to our final judgment rule under that prong. *U.S. Bank National Assn.* v. *Crawford*, 333 Conn. 731, 760, 219 A.3d 744 (2019) (*McDonald, J.*, dissenting). With today's decision, I fear the murkiness has become more pronounced and the narrow exception widened further. These are the floodgates that concern me.

This uncertainty, I believe, is avoidable if we follow the traditional approach of construing strictly the right to appeal derived from statute. In employing § 1-2z principles and following our statutory construction jurisprudence in this context, we should look for and locate *explicit* language in statutes before concluding that a statute confers a right to appeal. We also should look for "distinctive and unmistakable" statutory language before concluding that a statute confers a right (any right, however characterized) that, under *Curcio*'s second prong, can be vindicated only by resort to an interlocutory appeal. *Trinity Christian School v. Commission on Human Rights & Opportunities*, supra, 329 Conn. at 696, 189 A.3d 79. When it comes to appeal rights derived from Connecticut statutes, the legislature and this court have a well-developed language by which we speak to one **\*998** another clearly. In the present case, the majority concedes that there is no explicit language establishing the right to appeal. Nor does the majority rely on any specific statutory language as providing immunity from suit. In my view, absent any mention whatsoever in the legislative history of an appeal from a denial of a special motion to dismiss or immunity from suit, the majority is left to postulate that the legislature intended to protect defendants from alleged SLAPP suits *so much* that, even after a considered decision by a gatekeeping trial judge, the legislature must have intended this protection to extend to what is supposed to be a rare interlocutory appeal process. My floodgates concern is that, with respect to future second prong *Curcio* claims based on a statutory right, this court has now indicated that it will consider legislative history—specifically, whether there is any evidence regarding how strongly proponents of particular legislation felt about the rights they were conferring—to determine whether a party has the right to an immediate appeal. I would instead look for something much more

explicit, and for the most obvious of reasons: because that is what I believe the legislature has directed us to do when scrutinizing statutes, and particularly statutes relied on as giving rise to the right to an interlocutory appeal.

**\*\*29** The majority seeks to cabin its holding today by insisting that the "colorable claim" standard will limit appeals from denials of special motions to dismiss under § 52-196a. In the first instance, of course, after today's decision, *any* denial of a motion to dismiss is appealable, not just erroneous ones. A plaintiff will have to challenge the appeal as not raising a colorable claim of error for an appellate court even to consider dismissing the appeal. It is worthwhile examining what will be reviewed in these interlocutory appeals and how challenges to their colorability will necessarily be handled under the majority's announced standard.

**\*999** Recall that many (or perhaps most) rulings denying special motions to dismiss will be made on the basis of probable cause determinations about the strength of the plaintiff's "initial showing," considering the defendant's valid defenses. General Statutes § 52-196a (e) (3). Those rulings are made based on a factual record the statute requires to be assembled quickly and at the most preliminary stage of the proceedings. General Statutes § 52-196a (g) ("[t]he findings or determinations made pursuant to subsections (e) and (f) of this section shall not be admitted into evidence at any later stage of the proceeding"). Therefore, many appeals from denied motions—like the present case—will be heard based on the record the parties could muster to that point. [23] Because they are preliminary rulings based on probable cause, other than in the clearest of cases—factually and legally—these rulings will likely be reviewed only for clear error. See, e.g., *TES Franchising, LLC v. Feldman*, supra, 286 Conn. at 137, 943 A.2d 406 ("[i]n its determination of probable cause, the trial court is vested with broad discretion which is not to be overruled in the absence of clear error" (internal quotation marks omitted)); id., at 138 n.6, 943 A.2d 406 ("we conclude that the clear error standard in this context is a heightened standard of deference that exceeds the level of deference afforded under the abuse of discretion standard"); *\*1000 Augeri v. C. F. Wooding Co.*, 173 Conn. 426, 429, 378 A.2d 538 (1977) ("[A]t the hearing on an application for a prejudgment remedy ... [t]he hearing ... is not intended to be a full-scale trial on the merits. ... In reaching its determination of probable success on the merits [the court] is essentially weighing probabilities, and in this it must have a broad discretion."). Nonetheless, defendants are advised by today's ruling that they have a right to avoid

trial that they can vindicate only by appealing. A plaintiff might challenge a defendant's appeal as "not colorable." But, as the majority today admits, a "colorable claim is one that is superficially well founded but that may ultimately be deemed invalid ...." (Internal quotation marks omitted.) "[T]he defendant need not convince the trial court that he necessarily will prevail; he must demonstrate simply that he *might* prevail." (Emphasis in original; internal quotation marks omitted.) This is quite a low bar. The Appellate Court, the workhorse court of our appellate system, will therefore be charged in most cases with determining whether there is superficially a well-founded basis on which the defendant *might* prevail in his appeal. [24] If the defendant overcomes this minor obstacle, the Appellate Court will move on to review the trial court's denial of the defendant's motion based on the standards of an "initial showing" and "probable cause ...." General Statutes § 52-196a (e) (3). Because these determinations are so fact specific and, in many instances, perhaps discretionary, it is remarkably optimistic to predict that the "line between colorable and noncolorable claims" will "become more discernable" as "our jurisprudence develops."

**\*\*30** I know it is not lost on the majority that permitting these interlocutory appeals comes at a cost, and not only to the appellate system. If the legislature intended **\*1001** for these rulings to be appealed, it is within its control to authorize an immediate appeal. But in this context, plaintiffs' cases are interrupted by the special motion to dismiss procedure and ultimately delayed by an appeal from the denial in the first instance. A potentially yearslong process follows if the appeal overcomes the colorable claim standard. Plaintiffs have little recourse for their cases being stalled. [25]

Time will tell whether most appeals will survive, although today's evidence is that most will: the court today dismisses none of the three appeals before us. See *Pryor v. Brignole*, 346 Conn. 534, 546, —— A.3d —— (2023). Time will tell also whether permitting interlocutory appeals will yield many reversals, that is, clear error in a trial court's gatekeeping, probable cause determination.

Implicit in the majority opinion is that all of this is worth it —and more important, it believes, the legislature considers it worth it—if even one defendant had a meritorious special motion to dismiss that should have been granted and he should not have been exposed to trial. No statutory scheme is error free, of course. But "[w]e do not presume error ...." (Internal quotation marks omitted.) *State v. Milner*, 325 Conn. 1, 13, 155 A.3d 730 (2017). I am not suggesting that the

majority does presume error. I am suggesting that, without further explicit instruction from the legislature, I am **\*1002** unwilling to conclude that the legislature intended for us to expend appellate resources in a search for error in the preliminary, discretionary gatekeeping determinations of trial judges.

Accordingly, because I do not interpret § 52-196a as granting a right to an immediate appeal or to immunity from suit, the denial of the defendants' special motion to dismiss pursuant to § 52-196a was not immediately appealable. Therefore, the Appellate Court should dismiss the defendants' appeal.

Accordingly, I respectfully dissent.

### All Citations

--- A.3d ----, 346 Conn. 928, 2023 WL 3214149

## Footnotes

\*      This case was originally argued on October 12, 2022, before a panel consisting of Chief Justice Robinson, and Justices McDonald, D'Auria, Mullins, Ecker and Alexander. Thereafter, Judge Prescott was added to the panel. He has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this opinion.

1      "SLAPP is an acronym for strategic lawsuit against public participation ...." (Internal quotation marks omitted.)
        *Lafferty* v. *Jones*, 336 Conn. 332, 337 n.4, 246 A.3d 429 (2020), cert. denied, ⸺ U.S. ⸺, 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021).

2      General Statutes § 52-196a provides in relevant part: "(b) In any civil action in which a party files a complaint, counterclaim or cross claim against an opposing party that is based on the opposing party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, such opposing party may file a special motion to dismiss the complaint, counterclaim or cross claim.

                                                    * * *

        "(d) The court shall stay all discovery upon the filing of a special motion to dismiss. The stay of discovery shall remain in effect until the court grants or denies the special motion to dismiss and any interlocutory appeal thereof. Notwithstanding the entry of an order to stay discovery, the court, upon motion of a party and a showing of good cause, or upon its own motion, may order specified and limited discovery relevant to the special motion to dismiss.

                                                    * * *

        "[e] (3) The court shall grant a special motion to dismiss if the moving party makes an initial showing, by a preponderance of the evidence, that the opposing party's complaint, counterclaim or cross claim is based on the moving party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, unless the party that brought the complaint, counterclaim or cross claim sets forth with particularity the circumstances giving rise to the complaint, counterclaim or cross claim and demonstrates to the court that there is probable cause, considering all valid defenses, that the party will prevail on the merits of the complaint, counterclaim or cross claim. ..."

3    The plaintiffs also brought this action against a student newspaper at Trinity and certain individuals associated with the newspaper, but they later withdrew the complaint as to those defendants. For the sake of simplicity, all references herein to the defendants are to Supple, Montejo, Xiong-Calmes, and Moreno.

4    In 2017, Smith also published a post in the "Alumni for a Better Trinity College" group on Facebook, which lamented the racism being experienced by "Western" and "American" individuals. In that post, Smith wrote in relevant part: "The new racism is every bit as ugly as the old; and it is every bit as divisive. Until we get beyond this kind of hate, we have no real hope of living together as fellow citizens and friends. ..." Smith continued: "Trinity needs a genuine, open discussion of where we have arrived and clarity about all the ways in which the new racism, with its anti-Western and anti-American sentiments, is descending on [Trinity]."

5    Although this language was taken from a particular Facebook post authored by Smith; see footnote 4 of this opinion; the defendants' flyers neither contained quotation marks nor otherwise attributed a source.

6    General Statutes § 52-196a (a) (2) defines "right of free speech" as "communicating, or conduct furthering communication, in a *public forum* on a matter of public concern ...." (Emphasis added.)

7    In reaching this conclusion, the trial court looked to the New Jersey Supreme Court's decision in *State* v. *Schmid*, 84 N.J. 535, 423 A.2d 615 (1980), appeal dismissed sub nom. *Princeton University* v. *Schmid*, 455 U.S. 100, 102 S. Ct. 867, 70 L. Ed. 2d 855 (1982), which noted that another private college, Princeton University, was a "predominantly private, unregulated and autonomous" institution, lacking the "close nexus" to the state necessary for it to be subject to the first amendment; (internal quotation marks omitted) id., at 548, 423 A.2d 615; and that "the attachment of [f]irst [a]mendment requirements to [Princeton] University by virtue of the general public's permitted access to its property would still be problematic." Id., at 551, 423 A.2d 615.

8    General Statutes § 52-196a (a) (4) broadly defines "right of association" as "communication among individuals who join together to collectively express, promote, pursue or defend common interests ...."

9    Because the trial court found that the defendants had failed to meet their burden under the first prong of § 52-196a (e) (3), it did not reach the issue of whether the plaintiffs met their burden under the statute's second prong.

10    General Statutes § 52-263 provides: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge, or from the decision of the court granting a motion to set aside a verdict, except in small claims cases, which shall not be appealable, and appeals as provided in sections 8-8 and 8-9."

11    Our determination of whether there is an appealable final judgment in the present case turns in part on whether the anti-SLAPP statute confers a right *independent* of the first amendment itself. The first amendment provides immunity from liability, and we have previously held that immunity from liability is not appealable under *Curcio*. See *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. at 232, 901 A.2d 1164 ("There is a crucial distinction to be drawn between a right not to be tried and a right [the] remedy [of which] requires the dismissal of charges. ... The former necessarily falls into the category of rights that can be enjoyed only if vindicated prior to trial. The latter does not." (Internal quotation marks omitted.)).

12    Historically, the term "SLAPP," or "strategic lawsuit against public participation," appears to have been coined in 1988, when it "was used in two separate scholarly articles," in which the authors, Professors Penelope Canan and George W. Pring, "posited that there was a nationwide trend in which large commercial interests utilized litigation to intimidate citizens who otherwise would exercise their constitutionally protected right to speak in protest against those interests. The scholars asserted that the goal of such litigation was not to prevail, but to silence or intimidate the target, or to cause the target sufficient expense so that he or she would cease speaking out. ... [S]een in this stark light, SLAPP suits are an improper use of our courts." *LoBiondo* v. *Schwartz*, 199 N.J. 62, 85–86, 970 A.2d 1007 (2009), citing P. Canan & G. Pring, "Strategic Lawsuits Against Public Participation," 35 Soc. Probs. 506 (1988), and P. Canan & G. Pring, "Studying Strategic Lawsuits Against Public Participation: Mixing Quantitative and Qualitative Approaches," 22 Law & Society Rev. 385 (1988).

13    The proceedings in the Senate on the anti-SLAPP statute were similar to those in the House of Representatives. Speaking in support of the bill, Senator Paul R. Doyle described the special motion to dismiss as intended "to assist people [who] are sued on [the basis of] their free speech rights to have a means to quickly get rid of frivolous lawsuits." 60 S. Proc., Pt. 6, 2017 Sess., p. 2235. He described it as "a mechanism that can save money for defendants that are wrongly targeted for simply exercising their rights ... on the [first] [a]mendment and other matters of public concern." Id., pp. 2235–36, remarks of Senator Doyle; see id., pp. 2236–37, remarks of Senator John A. Kissel (describing high costs of litigation and anti-SLAPP statute as response to "someone with a lot of money [who] wants to develop property ... [or] wants to shut down newspaper[s] or broadcasters or anything like that, or just people [who] ... if you mention their name they file a lawsuit and just hope for the best").

14    In the property development context, one court has aptly described SLAPP suits as a "figurative litigation 'asteroid,' " stating that "the [a]nti-SLAPP statute aims to remedy the [fallout] from the unwarranted maintenance of litigation launched to deter, punish or intimidate efforts at critical public comment and participation in governmental proceedings involving the [suit bringer's] interests. Thus, metaphorically, the [wrongfully brought] litigation, within the scope of the statute, is akin to a 'killer asteroid' intended to make extinct the complaints and complainants opposing the plaintiff's initiatives that require governmental approval." *MCB Woodberry Developer, LLC* v. *Council of Owners of Millrace Condominium, Inc.*, 253 Md. App. 279, 287, 265 A.3d 1140 (2021).

15    To this end, Representative Tong stated that the usual 120 day rule would continue to apply to the trial court's decision on the pending special motion to dismiss; see 60 H.R. Proc., supra, p. 6920; see also General Statutes § 51-183b; but also indicated his "hope" and "expect[ation] that the court would act before then .... I think the reason why it says as soon as practicable in [§ 52-196a (e) (4)] is because of the constitutional rights implicated .... They're important. It's important to vindicate those rights often because when you're speaking on a matter of public concern or you're trying to exercise a right to associate or petition the government, it's time sensitive." 60 H.R. Proc., supra, p. 6921.

16    The plaintiffs argue that the statute's legislative history makes it clear that its purpose is to provide only a procedural means for short-circuiting litigation. We acknowledge that the anti-SLAPP statute provides a procedural mechanism to stay discovery and to dismiss a lawsuit before discovery ensues. The statute, however, creates this procedural mechanism to achieve an important substantive goal, namely, protecting the parties from expensive and time-consuming lawsuits on the merits. In that sense, the statute provides an "expedited off-ramp" for a party to avoid further litigation.

17    The dissent places significant emphasis on the fact that the legislature has not expressly provided for a right to an immediate appeal in our anti-SLAPP statute. See part IV A of the dissenting opinion. We disagree. To reiterate, the fact that § 52-196a does not itself provide an express right of appellate jurisdiction does not

Case: 4:22-cv-01110-AGF    Doc. #: 146-1    Filed: 06/09/23    Page: 28 of 35 PageID
#: 1327

thereby foreclose our inquiry under our final judgment jurisprudence set forth in *State* v. *Curcio, supra,* 191 Conn. at 31, 463 A.2d 566. By definition, an analysis under the *Curcio* test is *only* ever required in cases in which the legislature has not expressly provided a right to interlocutory appeal within the statute at issue. See, e.g., *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. at 238, 901 A.2d 1164 ("Although the legislature is free to make it clear in the language of a statute that an immediate appeal may be taken from an order of the court, the absence of such language is not determinative of whether such a right exists. ... Rather, we presume that the legislature is aware of our [long-standing] final judgment jurisprudence. ... Consequently, unless the legislature has made its intent clear regarding the appealability of an interlocutory order under a particular statute, our determination of whether that order is immediately appealable hinges on whether the order meets the test articulated in *Curcio*." (Citations omitted).). In deciding whether an order meets the test set forth in *Curcio*, we previously have considered —as we consider today—among other things, a statute's purpose and legislative history, our own and other courts' final judgment jurisprudence, and public policy. See, e.g., *id.*, at 232–38, 901 A.2d 1164; see also, e.g., *U.S. Bank National Assn.* v. *Crawford,* supra, 333 Conn. at 743, 219 A.3d 744; *Sena* v. *American Medical Response of Connecticut, Inc.*, supra, 333 Conn. at 46–52, 213 A.3d 1110.

18    The plaintiffs correctly observe that this form of argument is best understood as a policy consideration to be weighed by courts in determining whether a final judgment exists under the second prong of *Curcio*. See *U.S. Bank National Assn.* v. *Crawford*, supra, 333 Conn. at 745–46, 219 A.3d 744.

19    The legislative history of the anti-SLAPP statute bears out the importance of the attorney's fees provision in ensuring the appropriate use of the special motion to dismiss. Representative Tong described the attorney's fees provision as a measure against "the very frivolousness that the statute is designed to avoid or deter" because the special motion to dismiss is "an extraordinary remedy ... to terminate a litigation early"; he emphasized that, "if a party avails [itself] of this process [it] should do so in good faith as well and have a good basis for doing so, so ... the attorney's fees provision is a check on the parties because of the extraordinary nature of the relief sought to ensure that ... the parties do so in good faith and don't waste the court's time." 60 H.R. Proc., supra, pp. 6911–12; see id., pp. 6955–56, remarks of Representatives Tong and Craig Fishbein (discussing purpose of mandatory attorney's fees provision).

20    As we discuss subsequently in this opinion, colorability requires only a superficially well founded claim of a right to avoid litigation under the anti-SLAPP statute. See, e.g., *In re Santiago G.*, 325 Conn. 221, 231, 157 A.3d 60 (2017).

21    As our appellate courts start to address the substantive provisions of the anti-SLAPP statute, the reach and the applicability of the statute will become clearer. This will also allow the dividing line between colorable and noncolorable claims that a trial court improperly denied a motion to dismiss to become more discernable. Importantly, then, defendants considering an appeal from a denial of a special motion to dismiss will have guidance in making that determination as our jurisprudence develops.

22    An examination of federal and sister state case law is particularly instructive with respect to the jurisdictional issue before us because the legislative history of our anti-SLAPP statute signifies that it was modeled after anti-SLAPP statutes that came before it in other states. Senator John A. Kissel noted that Connecticut's anti-SLAPP statute "is a compilation of some of the best laws ... from throughout the United States" and that "[w]e are not the first state to move in this direction ...." 60 S. Proc., Pt. 6, 2017 Sess., p. 2236. Likewise, Representative Tong, advocating for the passage of Connecticut's anti-SLAPP statute, noted that "twenty-

nine other states have adopted ... legislation very similar to the construct we have here." 60 H.R. Proc., supra, p. 6884.

23    In addition to the decisions discussed subsequently in this opinion, we note that numerous other states have enacted legislation specifically providing for interlocutory appeals of denials of anti-SLAPP special motions to dismiss. See, e.g., *Benton* v. *Benton*, 39 Cal. App. 5th 212, 216–18, 252 Cal. Rptr. 3d 118 (2019) (noting that legislature provided for interlocutory appeal from denial of special motion to strike under California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16 (i), with commercial speech exception provided by Cal. Civ. Proc. Code § 425.17 (e)), review denied, California Supreme Court, Docket No. S258466 (November 26, 2019); *Geer* v. *Phoebe Putney Health System, Inc.*, 310 Ga. 279, 280, 282–85, 849 S.E.2d 660 (2020) (discussing interlocutory appeal procedure under Georgia's anti-SLAPP statute, Ga. Code Ann. § 9-11-11.1 (e)); *Stark* v. *Lackey*, 136 Nev. 38, 39 n.1, 458 P.3d 342 (2020) (discussing Nevada's anti-SLAPP statute, Nev. Rev. Stat. § 41.670 (4), which makes denial of special motion to dismiss "independently appealable" via interlocutory appeal to Nevada Supreme Court); *Cordova* v. *Cline*, 396 P.3d 159, 163–65 (N.M. 2017) (concluding that interlocutory appeal provided by New Mexico's anti-SLAPP statute, N.M. Stat. Ann. § 38-2-9.1, is available to parties regardless of whether they have pending counterclaims); *Steidley* v. *Community Newspaper Holdings, Inc.*, 383 P.3d 780, 782 (Okla. Civ. App. 2016) (discussing Okla. Stat. Ann. tit. 12, § 1437, "which provides a specific right to appeal the denial of a motion to dismiss brought pursuant to the Oklahoma Citizens Participation Act"); *Penllyn Greene Associates, L.P.* v. *Clouser*, 890 A.2d 424, 432 n.8 (Pa. Commw. 2005) (noting right to "an interlocutory appeal as of right" from denial of special motion to dismiss based on "immunity" under Pennsylvania's anti-SLAPP statute, 27 Pa. Stat. and Cons. Stat. Ann. § 8303), appeal denied, 591 Pa. 719, 919 A.2d 960 (2007); *Nandigam Neurology, PLC* v. *Beavers*, 639 S.W.3d 651, 663–64 (Tenn. App. 2021) (noting that Tennessee's anti-SLAPP statute, Tenn. Code Ann. § 20-17-106, provides express right to interlocutory appeal to intermediate appellate court from denial or grant of special motion to dismiss); *In re Lipsky*, 460 S.W.3d 579, 585–86 n.2 (Tex. 2015) (noting that Texas legislature amended interlocutory appeal statute, Tex. Civ. Prac. & Rem. Code Ann. § 51.014, to make denials of special motions to dismiss appealable in light of conflicting decisions on that point from that state's intermediate appellate courts); cf. *Ryan* v. *Fox Television Stations, Inc.*, 366 Ill.Dec. 153, 979 N.E.2d 954, 958–59 n.1 (Ill. App. 2012) (discussing Ill. Sup. Ct. R. 306 (a) (9), which invoked Illinois Supreme Court's authority under Illinois constitution to allow interlocutory appeals from denials of special motions to dismiss under anti-SLAPP statute).

24    Massachusetts' anti-SLAPP statute is similar to ours. It provides "a procedural remedy that permits the defendant in a SLAPP suit to file a 'special' motion to dismiss early in the litigation, which a judge shall grant, 'unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party.' [The statute] also include[s] the automatic stay of discovery [upon] the filing of a special motion to dismiss." *Fabre* v. *Walton*, supra, 436 Mass. at 520, 781 N.E.2d 780.

25    Maine's anti-SLAPP statute, which is also similar in its wording to our anti-SLAPP statute, provides in relevant part: "When a moving party asserts that the civil claims, counterclaims or cross claims against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of the United States or the Constitution of Maine, the moving party may bring a special motion to dismiss. ... The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any

346 Conn. 928

arguable basis in law and that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based. ..." Me. Rev. Stat. Ann. tit. 14, § 556 (2003). The statute then provides that "[a]ll discovery proceedings are stayed upon the filing of the special motion under this section, except that the court, on motion and after a hearing and for good cause shown, may order that specified discovery be conducted. The stay of discovery remains in effect until notice of entry of the order ruling on the special motion." Me. Rev. Stat. Ann. tit. 14, § 556 (2003).

26 We note that the Florida Supreme Court has not conclusively determined whether, under Florida law, the denial of a special motion to dismiss creates irreparable harm for purposes of certiorari jurisdiction over interlocutory appeals. See *Geddes* v. *Jupiter Island Compound, LLC*, 341 So. 3d 353, 353 (Fla. App. 2022) (disagreeing with *Gundel* and certifying conflict to Florida Supreme Court); *WPB Residents for Integrity in Government, Inc.* v. *Materio*, 284 So. 3d 555, 556 (Fla. App. 2019) (same); see also H. Blum, Note, "SLAPPing Back in Federal Court: Florida's Anti-SLAPP Statute," 76 U. Miami L. Rev. 345, 368 and n.160 (2021).

27 Subsequent United States Supreme Court case law has established that, for an order to fall within the "small" and "narrow" class that qualifies for interlocutory review under the collateral order doctrine, it must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." (Internal quotation marks omitted.) *Will* v. *Hallock*, 546 U.S. 345, 349, 126 S. Ct. 952, 163 L. Ed. 2d 836 (2006). This court previously has deemed collateral order doctrine case law under *Cohen* instructive in our application of *Curcio*'s second prong. See *Melia* v. *Hartford Fire Ins. Co.*, 202 Conn. 252, 255–57, 520 A.2d 605 (1987) (relying on *Cohen* and concluding that discovery orders, including those implicating attorney-client privilege, are not appealable final judgments); see also *U.S. Bank National Assn.* v. *Crawford*, supra, 333 Conn. at 744, 219 A.3d 744 ("we consider federal court decisions to be persuasive when we are considering the scope of [our] authority" to "treat appeals that are otherwise interlocutory in character as appeals from final judgments if they satisfy *Curcio*," despite lack of statutory discretionary jurisdiction such as that conferred by 28 U.S.C. § 1292 (b)).

28 We note that the Ninth Circuit also previously held that the then effective version of Oregon's anti-SLAPP statute did not create a right to an immediate appeal. See *Englert* v. *MacDonell*, 551 F.3d 1099, 1107 (9th Cir. 2009). In that case, the court found it particularly instructive that the Oregon legislature had not made any special provision in the statute, similar to that providing for an appeal in California's anti-SLAPP statute, for appellate relief from the denial of a motion to strike. See id., at 1105–1106. The court held that "[t]his provide[d] compelling evidence that [Oregon's anti-SLAPP statute] was intended to do nothing more than provide the defendants with a procedural device to obtain prompt review by a nisi prius judge of the likelihood that the plaintiff would be able to come forward with sufficient evidence to get to a jury." Id., at 1107. In contrast, our anti-SLAPP statute is not devoid of any reference to an appeal. In fact, although § 52-196a does not provide an express grant of an immediate appeal from denials of special motions to dismiss, the language in subsection (d) very well may indicate that the legislature intended for the availability of an immediate appeal under the auspices of *Curcio*. See *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. at 237–38, 901 A.2d 1164 (legislature is presumed to be aware of Connecticut's final judgment jurisprudence).

346 Conn. 928

29    "Although not expressly enumerated in the first amendment, the right of association has been recognized as a fundamental right under the first amendment as well. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the liberty [en]sured by the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment, which embraces freedom of speech." (Internal quotation marks omitted.) *State* v. *Bonilla*, 131 Conn. App. 388, 394, 28 A.3d 1005 (2011).

30    Before the trial court, the defendants specifically argued that their rights under the anti-SLAPP statute were implicated because their conduct in posting the flyers around campus was related to a "matter of public concern" under (1) the "health or safety" category, (2) the "environmental, economic or community well-being" category, and (3) the "public official or public figure" category. General Statutes § 52-196a (1) (A), (B) and (D).

31    The record indicates that, some time after the posting of the flyers, local news organizations, such as The Hartford Courant and WFSB-TV, reported on the controversy surrounding the club and the response on campus. The record further indicates that, some time after the posting of the flyers, a petition seeking to prevent the club's formal recognition was circulated on the Internet for signatures.

32    Regardless of whether "community" means the community at large or the campus community at Trinity, an issue we need not conclusively address for purposes of this appeal, the defendants have at a minimum asserted a colorable claim by describing the general newsworthiness of the controversy on and off of campus; see footnote 31 of this opinion; and that the controversy impacts both the campus and surrounding community. In addition, the defendants have at least a superficially well founded claim that, because the definition of "right of free speech" requires use of a "public forum," when the statutory definition of the "right of association" does not, the fact that Trinity is a private institution has no bearing on the analysis of the latter right under the first step of § 52-196a (e) (3). Similarly, the defendants also have asserted a colorable claim that the trial court erred in imposing a state action requirement under their right of association claim. The anti-SLAPP statute was created to target actions when, often times, the underlying dispute is between two private parties. See footnote 15 of this opinion and accompanying text. Indeed, the tort of defamation itself typically involves disputes between private parties, with the subject matter of the particular dispute dictating the scope of the first amendment protections warranted. See, e.g., *Gleason* v. *Smolinski*, 319 Conn. 394, 430–32, 125 A.3d 920 (2015).

33    Because we conclude that the defendants have asserted a colorable claim under the "right of association" category on a matter relating to "community well-being," we need not consider whether the conduct at issue may also constitute an exercise of the "right to free speech" or a "matter of public concern" relating to either "health or safety" or "public official[s] or public figure[s]," as defined in § 52-196a (a). Because the trial court's decision in the present case focused exclusively on the first step of the burden shifting analysis set forth in § 52-196a (e) (3), we likewise express no opinion as to whether the plaintiffs may ultimately succeed in showing that there is probable cause, considering all valid defenses, that they will prevail. See footnote 9 of this opinion.

1    SLAPP stands for "strategic lawsuit against public participation ...." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, 336 Conn. 332, 337 n.4, 246 A.3d 429 (2020), cert. denied, ⸺ U.S. ⸺, 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021).

2    A paradigmatic example of a SLAPP case is a "[lawsuit] directed at individual citizens of modest means for speaking publicly against [wealthy] development projects." (Internal quotation marks omitted.) *Demoulas Super Markets, Inc.* v. *Ryan*, 70 Mass. App. 259, 262, 873 N.E.2d 1168 (2007); see also, e.g., *Sipple* v. *Foundation for National Progress*, 71 Cal. App. 4th 226, 238, 83 Cal. Rptr. 2d 677 (1999), review denied, California Supreme Court, Docket No. S078979 (July 28, 1999).

3    The constitution of Connecticut, article first, § 10, known as the "open courts provision" of the state constitution, provides in relevant part: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law ...."

4    It is not clear whether the parties undertook any discovery, but no order of the court permitting discovery appears in the record.

5    Section 52-196a (e) (1) requires the court to hold a hearing no later than sixty days after the date of the filing of the special motion to dismiss, unless, among other things, the court, "for good cause shown, is unable to schedule the hearing during the sixty-day period."

July 19, 2021, would have been the sixtieth day after the defendants filed their special motion. At a time when the courts were still hampered by COVID-19 restrictions and hearing most matters remotely, the trial court in this matter recognized that the legislature directed that the court make these motions a priority and heard the parties with admirable dispatch on the sixty-second day after the defendants filed their motion. As contemplated by § 52-196a (e) (2), both parties attached affidavits to their submissions. It does not appear that the trial court took any evidence, but the defendants asked the court to take judicial notice of the Trinity College student handbook.

6    Section 52-196a (a) (2) defines " '[r]ight of free speech' " as "communicating, or conduct furthering communication, in a *public forum* on a matter of public concern ...." (Emphasis added.)

7    In the companion cases also released today—*Pryor* v. *Brignole*, 346 Conn. 534, ⸺ A.3d ⸺, 2023 WL 3214174 (2023), and *Robinson* v. *V. D.*, 346 Conn. 1002, ⸺ A.3d ⸺ (2023)—the trial court in those cases also took up and ruled on the motions promptly: in *Pryor*, within about ten and one-half months from the filing of the complaint, and, in *Robinson*, within four and one-half months from the filing of the complaint.

8    See General Statutes § 9-325 (providing for review of questions of law by Supreme Court in election cases); General Statutes § 31-118 (aggrieved party "may appeal" from grant or denial of temporary injunction in cases involving labor disputes); General Statutes § 42-110h (order granting or denying class certification in action under Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., "shall be immediately appealable by either party"); General Statutes § 51-164x (a) (review by Appellate Court of orders closing courtroom); General Statutes § 52-235 (a) (allowing for reservation of questions of law to Supreme Court or Appellate Court); General Statutes § 52-265a (a) (aggrieved party "may appeal" to Supreme Court from order or decision that involves matter of substantial public interest); General Statutes § 52-278*l* (a) (order granting or denying prejudgment remedy "shall be deemed a final judgment for purposes of appeal"); General Statutes § 52-405 ("[w]hen, in any action demanding an accounting, a judgment is rendered ordering such accounting, appeal may be had from such judgment to the Appellate Court, as if it were a final judgment"); General Statutes § 54-56e (f) ("[a]n order of the court denying a motion to dismiss the charges against a defendant who has completed such defendant's period of probation or supervision or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal").

9    General Statutes § 52-278*l* (a) provides: "An order (1) granting or denying a prejudgment remedy following a hearing under section 52-278d or (2) granting or denying a motion to dissolve or modify a prejudgment remedy under section 52-278e or (3) granting or denying a motion to preserve an existing prejudgment remedy under section 52-278g shall be deemed a final judgment for purposes of appeal."

10    Although we are not obliged to defer even to a formal opinion of the attorney general; see, e.g., *Crandle* v. *Connecticut State Employees Retirement Commission*, 342 Conn. 67, 82, 269 A.3d 72 (2022) (" '[a]lthough an opinion of the attorney general is not binding on a court, it is entitled to careful consideration and is generally regarded as highly persuasive' "); this obvious difference between § 52-278*l* and § 52-196a likely explains

why now Attorney General Tong argues, as an amicus in *Pryor* v. *Brignole*, 346 Conn. 534, —— A.3d ——, 2023 WL 3214174 (2023), one of two companion cases also released today; see footnote 7 of this opinion; that § 52-196a does not create an independent interlocutory right to appeal or any right that satisfies the second prong of *Curcio*. See *Pryor* v. *Brignole*, Conn. Supreme Court Briefs & Appendices, October Term, 2022, Brief of Amicus Curiae State of Connecticut pp. 4–7.

11  I do not rule out the possibility that, in rare circumstances involving a first amendment claim, the denial of a special motion to dismiss under § 52-196a may be immediately appealable pursuant to *Curcio*. See *Dayner* v. *Archdiocese of Hartford*, 301 Conn. 759, 769–72, 23 A.3d 1192 (2011) (pretrial denial of ministerial exception defense under first amendment was immediately appealable, not because of any right granted under any statute but because defense itself provided right to immunity from suit), overruled in part by *Hosanna-Tabor Evangelical Lutheran Church & School* v. *Equal Employment Opportunity Commission*, 565 U.S. 171, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012). I simply am not convinced that the legislature intended for all denials of special motions to dismiss under § 52-196a to be immediately appealable.

12  Common-law rights that already are secured and would be lost without the right to an immediate appeal may also come within *Curcio*'s second prong. See, e.g., *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 785–87, 865 A.2d 1163 (2005) (explaining why purpose of absolute immunity under common law, protecting against threat of suit, compels conclusion that denial of motion for summary judgment on ground of such immunity gives rise to immediately appealable final judgment due to irreparable harm). No common-law right is at issue in the present case.

13  *Convalescent Center of Bloomfield, Inc.* v. *Dept. of Income Maintenance*, supra, 208 Conn. at 196–202, 544 A.2d 604, involved the common-law defenses of collateral estoppel and res judicata. The majority's analogy to this court's case law holding that the pretrial denial of those common-law defenses, as well as immunity for statements made in judicial and quasi-judicial proceedings, are immediately appealable is, in my view, not fitting. See *Blakely* v. *Danbury Hospital*, 323 Conn. 741, 746–47, 150 A.3d 1109 (2016); *Convalescent Center of Bloomfield, Inc.* v. *Dept. of Income Maintenance*, supra, at 194–95, 544 A.2d 604. The pretrial denials of these common-law defenses were based on common-law rights, which required this court to determine whether these rights were akin to immunity from suit by providing a right to avoid litigation, whereas the present case involves a statutory defense, which we must examine under the dictates of § 1-2z. See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 40, 45, 213 A.3d 1110 (2019). Additionally, it is unclear if this court's holdings in those cases involving res judicata and/or collateral estoppel were correct in light of analogous federal case law. See *Strazza Building & Construction, Inc.* v. *Harris*, 346 Conn. 205, 210–11 n.2, 288 A.3d 1017 (2023).

14  Of course, I recognize that the second prong of *Curcio* may be satisfied in a case that involves a right other than immunity from suit. See, e.g., *In re Teagan K.-O.*, supra, 335 Conn. at 755–59, 242 A.3d 59 (allowing immediate appeal from interlocutory order in family matters due to importance of right of family to remain together without interference of state). But neither the defendants nor the majority asserts any other kind of right, and thus my analysis will be limited to immunity from suit, which, in my view, is synonymous with the nature of the right the majority describes.

15  More specifically, we have explained that, if a statute confers only immunity from liability, "a right whose remedy requires [only] the dismissal of charges," pretrial rulings denying a motion based on that more limited immunity are not immediately appealable under the second prong of *Curcio* because an immunity from liability defense can be vindicated after trial. (Internal quotation marks omitted.) *Hartford Accident*

*& Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. at 232, 901 A.2d 1164. Denials of a claimed right of immunity from suit, i.e., the right not to be tried and to be free of having to litigate, on the other hand, are immediately appealable because such a right cannot be vindicated after trial. See id.; *Shay* v. *Rossi,* supra, 253 Conn. at 163–64, 749 A.2d 1147.

16  I recognize that, after the Ninth Circuit decided *Englert,* Oregon's legislature amended its anti-SLAPP statute to expressly permit an interlocutory appeal. See 2009 Or. Laws c. 449, §§ 1 and 3. That is a legislative prerogative, consistent with what I believe Connecticut's legislature expects of our courts under § 1-2z—to interpret the plain language of legislation consistently, without conjecture. The fact that other state legislatures have amended their anti-SLAPP statutes after a court had ruled that the statutory language did not allow for an immediate appeal should not alter our § 1-2z analysis but, rather, shows that the legislature is responsible for clearly stating its intention to authorize an appeal.

17  Although the majority is concerned about "the protections afforded by the anti-SLAPP statute [that] would be irrevocably lost by virtue of having to litigate a putative SLAPP suit to conclusion following a trial court's erroneous denial of a special motion to dismiss," the majority's holding allows an interlocutory appeal from *all* denials of special motions to dismiss, not just erroneous denials. An appellate court can never know if the trial court committed error until it has heard the appeal. Indeed, because, in my view, the majority's "colorable claim" standard ensures that virtually every defendant's interlocutory appeal will survive a motion to dismiss; see part V of this opinion; it is inevitable that many appeals the majority's opinion sanctions will go to judgment and that it will be determined on appeal that the trial court did *not* commit error.

18  I agree with the majority that the lack of explicit statutory language providing a right to appeal is not relevant to this court's analysis under the second prong of *Curcio.* I nevertheless rely on the fact that other state legislatures have explicitly included a right to appeal in their anti-SLAPP statutes to emphasize the irrelevance of the case law from these jurisdictions, on which the majority relies.

19  *NCDR, L.L.C.* v. *Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 750–52 (5th Cir. 2014), decided under the federal collateral order doctrine, involved Texas' anti-SLAPP statute, which contains language much more explicit and definite than § 52-196a: "An appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss a legal action ... or from a trial court's failure to rule on that motion in the time prescribed ...." Tex. Civ. Prac. & Rem. Code Ann. § 27.008 (b) (West 2020).

20  See *Gundel* v. *AV Homes, Inc.*, 264 So. 3d 304, 310 (Fla. App. 2019) (legislative history showed that statute created right not to be subject to litigation).

21  See *Morse Bros., Inc.* v. *Webster*, 772 A.2d 842, 848–49 (Me. 2001); *Duracraft Corp.* v. *Holmes Products Corp.*, 427 Mass. 156, 159–67, 691 N.E.2d 935 (1998); see also *Franchini* v. *Investor's Business Daily, Inc.*, 981 F.3d 1, 7 and n.6 (1st Cir. 2020) (applying Maine case law); *Los Lobos Renewable Power, LLC* v. *AmeriCulture, Inc.*, 885 F.3d 659, 666–67 (10th Cir.), cert. denied, ––– U.S. ––––, 139 S. Ct. 591, 202 L. Ed. 2d 427 (2018); *Henry* v. *Lake Charles American Press, L.L.C.*, 566 F.3d 164, 178, 180–81 (5th Cir. 2009).

22  In 2013, Nevada amended its anti-SLAPP statute to provide for an immediate right to appeal. See 2013 Nev. Stat. c. 176, § 4; see also *Wynn* v. *Bloom*, 852 Fed. Appx. 262, 262 n.1 (9th Cir. 2021).

23  See, e.g., *Burton* v. *Mason*, Docket No. X06-UWY-CV-21-5028294-S, 2021 WL 6101177, *5 (Conn. Super. December 10, 2021) ("[b]ased on this record, the court cannot conclude that it is more likely than not that

Case: 4:22-cv-01110-AGF    Doc. #: 146-1    Filed: 06/09/23    Page: 35 of 35 PageID #: 1334

this matter was brought 'based on' the defendants' exercise of their rights to free speech, association or to petition the government"); *Robinson* v. *DeGray,* Docket No. KNL-CV-20-6049156-S, 2021 WL 1914162, *5 (Conn. Super. April 14, 2021) (based on record at time of hearing on special motion to dismiss, defendant failed to establish that statements made during work related grievance proceedings involved matters of public concern); *Littlefield* v. *Aurora,* Docket No. FST-CV-20-6045400-S, 2020 WL 5624108, *3 (Conn. Super. August 31, 2020) (based on record before trial court, defendants failed to show plaintiffs' complaint was based on defendants' exercise of first amendment rights).

24    Most of these motions will be decided by the Appellate Court after the parties each file a ten page memorandum of law. Most rulings—granting or denying motions to dismiss—are issued without written opinions.

25    Plaintiffs can seek attorney's fees under § 52-196a (f) (2). But that subsection provides that fees are to be awarded only if the court "finds that such special motion to dismiss is frivolous and solely intended to cause unnecessary delay ...." General Statutes § 52-196a (f) (2). By its terms, the statute appears to permit fees only for frivolous motions. Even if, presumably, this subsection would extend to frivolous *appeals* of motions that have been correctly denied, this is not a prevailing party standard. The standard for frivolousness does not guarantee a plaintiff compensation for fees and certainly not for the costs of delay. Cf. General Statutes § 52-196a (f) (1) (awarding "the moving party costs and reasonable attorney's fees" if trial court grants special motion to dismiss, without caveat).

---

End of Document                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.