UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| HANS MOKE NIEMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:22-cv-01110-AGF |
| | ) | |
| SVEN MAGNUS ØEN CARLSEN, PLAY | ) | |
| MAGNUS AS, CHESS.COM, LLC, | ) | |
| DANIEL RENSCH, and HIKARU | ) | |
| NAKAMURA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This action arises out of Defendants' alleged concerted efforts to blacklist Plaintiff

Hans Moke Niemann ("Niemann"), a 19-year-old chess prodigy, from the world of

professional chess.  Niemann alleges that after he defeated the highest-ranked chess

player in history, Defendant Sven Magnus Øen Carlsen ("Carlsen"), at the Sinquefield

Cup chess tournament in St. Louis, Missouri in September of 2022, Carlsen falsely

accused Niemann of cheating, withdrew from the tournament, and thereafter began a

campaign, along with the other Defendants, to defame Niemann and exclude him from

professional chess competitions.

The other Defendants, Carlsen's accused co-conspirators, are: Play Magnus AS

d/b/a Play Magnus Group ("Play Magnus"), an online recreational chess platform

founded by Carlsen; Chess.com LLC ("Chess.com"), the world's largest online

recreational chess platform; Daniel Rensch ("Rensch"), Chess.com's top executive; and

Hikaru Nakamura ("Nakamura"), a Chess.com streaming partner and well-known chess player.  In August of 2022, shortly before Niemann's victory against Carlsen at the Sinquefield Cup, Play Magnus and Chess.com announced a plan to merge.  The merger was completed on December 15, 2022, with Carlsen serving as a brand ambassador of the newly consolidated company.

Niemann alleges that the merger was an attempt to monopolize what he terms the "Competitive Chess Market"[1] and that Defendants' concerted attempt to blacklist him from that market further constituted an improper and unreasonable restraint of trade, in violation of federal antitrust laws.  Based on these theories, Niemann asserts claims against all Defendants alleging violations of §§1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  Niemann further asserts state-law claims against all Defendants for slander, libel, tortious interference with contract and business expectancies, and civil conspiracy. Finally, he asserts a breach of contract claim against Chess.com only, alleging that Chess.com unlawfully revoked an invitation to Niemann to participate in one of its events.  Niemann seeks damages of not less than $100 million with respect to his state-law claims and further seeks treble damages under the Clayton Act,  15 U.S.C. § 15, with respect to his antitrust claims.

Following limited jurisdictional discovery permitted by the Court, the parties filed status reports confirming that complete diversity of citizenship was lacking in this case

---

[1]     Niemann defines the "Competitive Chess Market" as "professional chess tournaments and online recreational chess platforms."  ECF No. 75, Second Am. Compl. ("SAC") at ¶ 47.

2

from the outset.  *See* ECF Nos. 137, 140 & 148.  The Court thus concludes that its subject matter jurisdiction is limited to federal question jurisdiction under 28 U.S.C. § 1331 with respect to Niemann's federal antitrust claims and supplemental jurisdiction under 28 U.S.C. § 1367 with respect to Niemann's state-law claims.

This matter is now before the Court on Defendants' motions to dismiss.  ECF Nos. 81, 83, 86, 89 & 126.  Each Defendant argues that Niemann fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Defendants Rensch, Nakamura, and Play Magnus further seek dismissal for lack of personal jurisdiction.  Defendant Chess.com alternatively seeks to compel arbitration with respect to Niemann's breach of contract claim.  For the reasons set forth below, the Court will grant Defendants' motions to dismiss for failure to state a claim as to Niemann's federal antitrust claims only and will decline supplemental jurisdiction over Niemann's remaining state-law claims, without reaching Defendants' alternative arguments.

## BACKGROUND

The following facts are taken from Niemann's second amended complaint.  The Court also considers "[d]ocuments necessarily embraced by the pleadings," meaning "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading."  *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

## Alleged Competitive Chess Market

At all relevant times, the game of chess has been regulated by the International Chess Federation, a Swiss-based federation popularly known by its French acronym,

3

"FIDE" (Fédération Internationale des Échecs).  In its current form, FIDE is made up of

national chess organizations in 200 countries and has been recognized by the

International Olympic Committee as an official global sporting organization.  As the

official body overseeing professional chess, FIDE sets the rules of international chess

competitions; organizes and sanctions the highest-level professional chess tournaments,

including the World Chess Championship; and certifies tournament arbiters.  In addition,

FIDE calculates professional chess players' official performance ratings used for

bestowing titles such as "Grandmaster," and for determining which players qualify for

FIDE-sanctioned tournaments.

Only FIDE-sanctioned events affect players' official FIDE performance ratings.

To qualify as FIDE-sanctioned, a tournament or match must adhere to strict parameters

established by FIDE.  The vast majority of FIDE-sanctioned events are held in person,

with participants playing matches "over the board," meaning physically sitting across

from each other and moving chess pieces by hand.  FIDE-sanctioned tournaments are run

by tournament organizers that, along with FIDE, are responsible for tournament logistics,

security, and anti-cheating measures.

Outside of FIDE-sanctioned chess events, there are a "large variety" of online

platforms, including Chess.com and Play Magnus, which allow people of any skill level

to play recreational chess.  SAC at ¶ 36.  These online recreational chess platforms have

their own ranking systems and occasionally host tournaments and events allowing top-

ranked professional chess players to compete for prize money.  However, they have no

official role in governing professional chess.  They do not host FIDE-sanctioned events,

4

and a player's ranking or performance on these platforms does not impact their official
FIDE performance rating or their qualification for official FIDE-sanctioned events.

    As noted above, Niemann defines the Competitive Chess Market to include both
professional chess tournaments and online recreational chess platforms.  SAC at ¶ 47.

**<u>Chess.com</u>**

    Through a series of acquisitions, Chess.com has become the world's largest and
most popular online recreational chess platform.  Chess.com currently has more than 100
million members who play over 10 million online chess games on its platform each day.
This is more than three times the number of games hosted by other major online
recreational chess platforms such as Lichess.org, a free and open-source website
maintained by a non-profit organization.  SAC at ¶ 38.

    To attract members to its platforms, Chess.com solicits top chess professionals
from all over the world to play recreational matches and create content on its platform,
pursuant to streaming partner agreements.  Players with streaming partner agreements
create content, including articles, interviews, and online streaming videos during which
top players play chess live and/or offer commentary regarding topics of interest to chess
fans.  Chess.com partners with many of the world's most famous competitive chess
players, including Carlsen and Nakamura.  SAC at ¶ 39.

    Chess.com also sponsors many FIDE-sanctioned chess tournaments and other
prestigious professional chess events.  According to Niemann, "Chess.com can exert its
dominance to determine which players will succeed or fail by controlling who is, and
who is not, invited to the events and tournaments it sponsors, and who can use its leading

online Chess.com platform." SAC at ¶ 46. Niemann further alleges that "[a]s the dominant source of chess-related news and events, access to Chess.com also has a major influence on top chess players' image and public exposure." SAC at ¶ 46.

## Play Magnus

Carlsen founded his own eponymous online recreational chess platform, Play Magnus, in 2014. Play Magnus thereafter acquired several other chess websites and chess content creators, including Chess24.com, one of the most popular chess websites worldwide, making Play Magnus the "second most dominant commercial enterprise in chess." SAC at ¶¶ 51–52.

## Chess.com's Merger with Play Magnus

In August 2022, shortly before Niemann's victory against Carlsen at the Sinquefield Cup, Carlsen and Chess.com executive Rensch announced via online video that their companies would merge, with Chess.com acquiring Play Magnus for approximately $83 million and with plans to finalize the merger in approximately six to eight weeks. SAC at ¶¶ 67–69. Thus, at the time Niemann defeated Carlsen at the Sinquefield Cup, Play Magnus and Chess.com were in the midst of negotiating terms for the sale of Carlsen's Play Magnus brand. SAC at ¶ 70.

The merger officially closed on December 16, 2022, and its finalization was again announced by Carlsen and Rensch via online video. In connection with the merger, Chess.com announced that Carlsen would be a Chess.com brand ambassador and would regularly compete in Chess.com events. Niemann alleges that, as a brand ambassador for Chess.com, "Carlsen's already-outsized influence over who receives invitations to top

6

chess events increased significantly." SAC at ¶ 72. Niemann further alleges that the merger "solidified Chess.com's monopoly over the Competitive Chess Market by, among other things, providing it total control over Chess24, one of the last few alternatives to Chess.com for online chess, and purchasing the Play Magnus brand, which has become virtually synonymous with chess." SAC at ¶ 73. According to Niemann, the "merger leaves no meaningful alternative for engaging or promoting oneself in competitive chess, either professionally through [the consolidated company's] sponsored in-person events, or online because [the consolidated company] collectively dominate[s] nearly every major online chess website." SAC at ¶ 201.

Because Chess.com has significant commercial relationships with only certain of the world's top chess players, including Carlsen and Nakamura, Niemann alleges that the company also has a vested financial interest in ensuring that these select players maintain stellar reputations and competitive standing as two of the top-ranked chess players in the world. Niemann alleges that Chess.com's interest in protecting Carlsen's reputation as the greatest chess player and ensuring his continued success is particularly critical due to the $82 million investment that Chess.com made to acquire Play Magnus. SAC at ¶ 203.

**Niemann's Victory at the Sinquefield Cup and Its Aftermath**

Niemann alleges that his surprise victory over Carlsen at the Sinquefield Cup in St. Louis on September 4, 2022, "effectively dashed Carlsen's two remaining statistical ambitions, namely: achieving a 2900 FIDE performance rating for the first time in history; and breaking his own world-record unbeaten streak in FIDE-sanctioned events," both of which "would have solidified Carlsen as arguably the greatest chess player of all

time and made his burgeoning chess empire even more valuable."  SAC at ¶ 7.

Niemann alleges that, as a result of this upset, Carlsen retaliated by falsely accusing Niemann of cheating during their in-person match at the Sinquefield Cup and demanding that the tournament organizers immediately disqualify Niemann, even though Carlsen had no legitimate basis to suspect Niemann of cheating.  When the organizers refused to disqualify Niemann, Carlsen withdrew from the tournament.  SAC at ¶¶ 8-9.

However, due to Carlsen's accusations, the tournament organizers enhanced the anti-cheating measures for the rest of the Sinquefield Cup, including imposing a 15-minute tape delay on all broadcasts of tournament games.  According to Niemann, Carlsen knew that this sudden and unexplained implementation of new anti-cheating measures would be interpreted by the chess community and public to mean that tournament organizers believed cheating had occurred.  SAC at ¶ 87.

The following day, September 5, 2022, Carlsen posted on Twitter to announce that he had withdrawn from the Sinquefield Cup.  Carlsen included a link in his post to a video of "soccer manager José Mourinho infamously reacting to a controversial referee decision by saying 'I prefer really not to speak. If I speak, I am in big trouble.'"  SAC at ¶¶ 89–90.  According to Niemann, Carlsen knew that the announcement of his surprise withdrawal, combined with the enhancement of anti-cheating measures and the above-noted reference to the soccer coach, would convey a message to the public that Niemann cheated against Carlsen.

Shortly thereafter, several chess-related and other media outlets reported on Carlsen's withdrawal, interpreting Carlsen's actions as accusing Niemann of cheating.

8

Chess.com streaming partner Nakamura also posted live-streamed online videos around this time in which Nakamura indicated that he had played with Carlsen for 20 years, that it was "very obvious" why Carlsen withdrew from the Sinquefield Cup, and that Nakamura had heard similar accusations regarding Niemann from several different chess players.  SAC at ¶¶ 104–05.  Nakamura also republished a tweet, which Nakamura claimed was a "legitimate tweet" and which stated that top players knew that Niemann had been banned twice on Chess.com for cheating.   SAC at ¶ 106.  Niemann alleges that this republished tweet was false.

On September 5, 2022, immediately after Carlsen announced his withdrawal from the Sinquefield Cup, Chess.com banned Niemann from its website, deleted Niemann's "slack account," and forbade Niemann from participating in any further Chess.com events, including the Chess.com Global Championship for which Niemann had previously qualified and was to receive guaranteed prize money.  Niemann alleges that Chess.com unfairly singled him out because it allowed several other players who had previously been banned from online chess for cheating in high profile events to still play in Chess.com's Global Championship and other Chess.com events.

The next day, September 6, 2022, Nakamura streamed another online video again referring to rumors regarding Niemann's alleged cheating and questioning why Carlsen would make such an accusation if there was "no hard proof."  SAC at ¶ 107.

On September 6, 2022, Niemann gave a public interview unequivocally denying that he had cheated at the Sinquefield Cup or in any other FIDE-sanctioned event but

9

admitting that he had used a "chess engine"[2] in a handful of non-FIDE sanctioned recreational chess games on Chess.com when he was 12 and 16 years old.  SAC at ¶ 109.

On September 8, 2022, Chess.com executive Rensch posted a statement on the company's Twitter account indicating that the company had reached out to Niemann to explain its decision to remove him from Chess.com, and that the company had "shared detailed evidence with [Niemann] concerning [its] decision, including information that contradicts [Niemann's] statements regarding the amount and seriousness of his cheating on Chess.com" and had invited Niemann to provide a response.  SAC at ¶ 111.  Niemann alleges that Chess.com never shared any such evidence with him.

On September 10, 2022, the Sinquefield Cup's Chief Arbiter, Chris Bird, issued a statement confirming that there was "no indication that any player has been playing unfairly in the 2022 Sinquefield Cup.  This includes all rounds played to date."  SAC at ¶ 157.  Around this same time, Tony Rich, the executive director of the Saint Louis Chess Club, which hosted the Sinquefield Cup, denied that there was any indication of cheating by any player during the tournament.

On September 19, 2022, Niemann and Carlsen were slated to play against each other at the Julius Baer Generation Cup.  However, Carlsen resigned from his match with Niemann after making one move.  Niemann alleges that this unprecedented act intentionally sent a clear message to the public that Carlsen stood by his accusation that Niemann was a cheater.  That implication was reflected in news articles covering

---

[2]      Niemann describes a "chess engine" as a computer program designed to calculate the optimal chess move in any given situation.  SAC at ¶ 109.

Carlsen's resignation.

When asked about the meaning of his abrupt resignation in an interview on September 21, 2022, Carlsen laughed and declined to comment but stated that "people can draw their own conclusions, and they certainly, certainly have."  SAC at ¶ 132. Carlsen then referred to a professional chess player widely rumored to have cheated in online games on Chess.com, Maxim Dlugy, and suggested that Dlugy was Niemann's mentor.  SAC at ¶¶ 134–36.

The next day, September 22, 2022, Nakamura played a recording of Carlsen's interview on his (Nakamura's) streaming channel and indicated that it was "very clear" why Carlsen referenced Dlugy, that Dlugy was caught in wrongdoing during Chess.com tournaments, and that Nieman attended Dlugy's academy in New York City.  SAC at ¶ 139.  Contrary to these accusations, Dlugy was not Niemann's coach or mentor, and Niemann never attended Dlugy's academy in New York City.

On September 21, 2022, the Sinquefield Cup Chief Arbiter, Bird, issued the following statement on Twitter: "To all the folks who contacted me looking for comments / interviews: As Chief Arbiter of the 2022 #SinquefieldCup, I would only say one player withdrew for personal reasons, and there is no indication that any player played unfairly in any of those games."  SAC at ¶ 159.

On September 23, 2022, Rensch was interviewed by The Guardian and stated with respect to the Sinquefield Cup that he was "not going on the record on anything that [he thought] about the over-the-board scandal" with Niemann and Carlsen but that readers could "imply what [they want] based on what [he was] saying," and Rensch also

referenced "a lot of smoke, a lot of evidence, and a lot of reason to believe in the DNA of who someone is."  SAC at ¶ 111.

Thereafter, media outlets referenced the cheating accusations against Niemann in their social media posts and news articles.  Play Magnus also posted a meme on Twitter referring to the "most outrageous cheating scandals in chess" and depicting two fictional characters questioning how Carlsen was defeated.  SAC at ¶ 119.  The post did not name Niemann or the Sinquefield Cup, but Niemann alleges that the implication was clear.  On September 19, 2022, Play Magnus also published a live-streamed interview online during which a commentator stated with respect to the Sinquefield Cup cheating allegations that he had seen things "that were previously unavailable" and that Carlsen' "side [was] much more credible."  SAC at ¶ 120.

On September 23, 2022, FIDE issued a statement admonishing Carlsen's behavior and stating that it was prepared to investigate the situation "when the adequate initial proof [was] provided."  SAC at ¶ 164.  On September 26, 2022, Carlsen posted on Twitter stating that Carlsen "believe[d] that Niemann has cheated more – and more recently – than he has publicly admitted"; that Niemann's "over the board progress has been unusual"; that throughout their game at the Sinquefield Cup, Carlsen "had the impression that [Niemann] wasn't tense or even fully concentrating on the game in critical positions, while outplaying [Carlsen] as black in a way [Carlsen thought] only a handful of players can do; and that "[t]his game contributed to changing [Carlsen's] perspective."  SAC at ¶ 142.

Carlsen's post further stated:

> We must do something about cheating, and for my part going forward, I don't want to play against people that have cheated repeatedly in the past, because I don't know what they are capable of doing in the future.
>
> There is more that I would like to say. Unfortunately, at this time I am limited in what I can say without explicit permission from Niemann to speak openly. So far I have only been able to speak with my actions, and those actions have stated clearly that I am not willing to play chess with Niemann.

SAC at ¶ 144.

According to Niemann, Carlsen knew that no tournament organizer would choose to invite Niemann to play in an event if it meant that the world's number one player, Carlsen, would not attend the event.

Niemann also alleges that, shortly after Carlsen's above-noted post on Twitter, Chess.com and Rensch leaked to VICE Media years-old emails between Dlugy and Rensch in which Dlugy appeared to admit to cheating on Chess.com and indicated that one of his students helped him cheat by using a chess engine.   On September 28, 2022, VICE published these emails as part of an article titled "Chess Grandmaster Maxim Dlugy Admitted to Cheating on Chess.com, Emails Show," with a byline stating that "Dlugy, who is one of Hans Niemann's coaches and was recently namedropped by Magnus Carlsen, cheated in his own tournaments in 2017 and 2020, according to emails he exchanged with Chess.com."  SAC at ¶ 151.  The same day, Nakamura reacted to the VICE article during a live-streamed online video, stating that Niemann was "not being completely clean about what's going on," and also questioned the identity of the student who used a chess engine to help Dlugy cheat.   SAC at ¶ 152–54.

During the same month (September of 2022), Carlsen verbally told other

prominent chess players that Niemann cheated against Carlsen in the Sinquefield Cup and that Carlsen had received from Chess.com definitive proof of Niemann cheating in over-the-board games. Carlsen also paid a prominent chess player to scream "Ukse Hans," which Niemann alleges is Norwegian for "Cheater Hans," from the stands at the closing ceremony of the European Club Cup on October 9, 2022, after which the entire Norwegian chess team, including Carlsen, were observed publicly chanting "Ukse Hans" in the town where the cup was held. SAC at ¶¶ 125–26.

Niemann alleges that, notwithstanding the accusations against him, independent experts in cheat detection have concluded that there was no evidence that Niemann cheated in any of his games against Carlsen, including at the Sinquefield Cup, particularly given the ample anti-cheating measures used at the event.

**Chess.com's October 4, 2022 Report Regarding Niemann**

On October 4, 2022, the day before Niemann was scheduled to begin competing in the U.S. Chess Championship tournament, the Wall Street Journal published an article titled "Chess Investigation Finds That U.S. Grandmaster 'Likely Cheated' More Than 100 Times." SAC at ¶ 169. The article referenced a Chess.com investigation and report, which Niemann alleges was leaked by Chess.com to the newspaper. Hours after the article was published, Chess.com published the above-noted report on its website.

The report stated that Niemann "cheated much more than he has publicly admitted to, including in many prize events, at least 25 streamed games, and 100+ rated games on Chess.com, as recently as when he was 17 years old." SAC at ¶ 172. The report accused Niemann of cheating in games while live-streaming (with both his face and computer

14

screen visible to the public), even though Rensch previously indicated that he did not believe Niemann cheated in any live-streaming games.  Niemann alleges that the live-streaming videos referenced in the report also plainly show that Niemann was not cheating.  Further, the report found that Niemann cheated in games where, according to Niemann, Niemann lost or played so poorly that no reasonable person with knowledge of chess could possibly conclude that Niemann cheated.

The report also stated that Niemann confessed to these cheating offenses during a call with Rensch in 2020.  Niemann alleges that this statement is false, as demonstrated by the fact that Chess.com claimed it was not fully aware of the extent of Niemann's alleged cheating until 2022, when it investigated the issue following Carlsen's accusations.  However, the report conceded that there was no "concrete evidence proving that [Niemann was] cheating over the board," that "over the board" professional chess was not Chess.com's domain of expertise, and that Chess.com did not "advocate" for that conclusion.  SAC at ¶ 177.

Finally, the report stated that Chess.com "uninvited [Niemann] from [its] upcoming major online event and revoked his access to [the Chess.com] site based on [its] experience with him in the past, growing suspicions among top players and [its] team about his rapid rise of play, the strange circumstances and explanations of his win over [Carlsen], as well as [Carlsen's] unprecedented withdrawal."  SAC at ¶ 188.

Hours after Chess.com posted its report, Nakamura live-streamed an online video reiterating "the fact that [Niemann] has cheated in these tournaments" and asking: "What happens with the US Championship? Because, honestly, I feel like there's a real chance

15

that now that this has dropped, you could have top players in the event say they're not going to play against [Niemann]."  SAC at ¶ 190.

**Other Alleged Consequences of Cheating Accusations Against Niemann**

Niemann had previously arranged for a match against teenage Grandmaster Vincent Keymer, to be hosted in Germany.  However, Keymer has now refused to play in this match, specifically based on the accusations of cheating against Niemann.   Niemann had also been negotiating to compete in the Tata Steel Chess Tournament, one of the world's most prestigious chess tournaments and sponsored by Chess.com.[3]  However, the Tata Steel Chess Tournament has now ceased all contact with Niemann.

Niemann alleges that Carlsen's refusal to participate in any tournament that invites Niemann, combined with Chess.com's banning of Niemann from any of its events, threatens to cut Niemann off from the vast majority of tournaments.  In a typical year, Niemann could expect to participate in approximately 15 major chess tournaments, each of which Niemann alleges would (i) generate approximately $5,000 to $15,000 in appearance fees for Niemann; (ii) give Niemann access to potential cash prizes ranging between approximately $5,000 to $100,000; and (iii) provide Niemann the opportunity to play matches against highly rated competitors to increase his FIDE rating.  Niemann alleges that, by being excluded from these tournaments, he will lose any opportunity to obtain any appearance fees or cash prizes, as well as the ability to improve his FIDE rating.  Further, Niemann alleges that his streaming career has been destroyed as a result

---

[3]      It is unclear from the complaint whether the Tata Steel Chess Tournament is a FIDE-sanctioned tournament.

of his ban from the Chess.com platform.  Finally, he alleges that because of the cheating accusations, he cannot obtain employment as a chess teacher at a reputable school.

According to Niemann, Defendants' actions demonstrate that they are able to use their influence over the Competitive Chess Market to similarly blacklist other professional chess players in order to maintain the status of their own agents, such as Carlsen and Nakamura.

**Niemann's Lawsuit**

As noted above, Niemann's second amended complaint asserts the following causes of action against all Defendants: (1) slander, (2) libel, (3) Clayton Act, 15 U.S.C. § 15(a), by violations of the Sherman Act, 15 U.S.C. § 1, et seq., and (4) Clayton Act, 15 U.S.C. § 15(a), by violations of the Sherman Act, 15 U.S.C. § 2, et seq.; Niemann further asserts a fifth cause of action for breach of contract against Chess.com only.

Each Defendant argues that Niemann fails to plausibly allege an antitrust injury or the other required elements of a federal antitrust claim; that Niemann's state-law counts are subject to Connecticut's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute and should be dismissed under that statute; and that the state-law counts fail to state a plausible claim for relief in any event.[4]  Rensch, Nakamura, and Play Magnus further seek dismissal for lack of personal jurisdiction.  And Chess.com separately seeks dismissal of Niemann's breach of contract claim for failure to state a

---

[4]    Although each Defendant has filed a separate motion to dismiss, each incorporates the others' arguments.

claim or, alternatively, because the contract claim is subject to a binding arbitration provision.[5]  Niemann opposes each of these arguments.

## DISCUSSION

### Personal Jurisdiction over Defendants Rensch, Nakamura, and Play Magnus

As noted above, while all Defendants seek dismissal for failure to state a claim, Defendants Rensch, Nakamura, and Play Magnus further seek dismissal for lack of personal jurisdiction. "[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007).

Because analysis of personal jurisdiction "depends on the relationship between the claims and contacts, [courts] generally evaluate specific jurisdiction on a claim-by-claim basis." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007); *see also* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d § 1351, at 299 n.30 (2004) ("There is no such thing as supplemental specific personal jurisdiction; if separate claims are pled, specific personal jurisdiction must independently exist for each claim and the existence of personal jurisdiction for one claim will not provide the basis for another claim").

The parties have not adequately addressed the issue of personal jurisdiction with respect to Niemann's federal antitrust claims.  In particular, the parties fail to address

---

[5]      Chess.com argues that the Court should enforce the arbitration provision only if it is not inclined to dismiss the contract claim on the merits.

whether personal jurisdiction is established with respect to the antitrust claims by virtue

of the nationwide service of process permitted under the Clayton Act, 15 U.S.C. § 22,[6]

and pursuant to Federal Rule of Civil Procedure to Rule 4(k)(1)(C).[7]  *See, e.g.*, *In re Fed.*

*Fountain, Inc.*, 165 F.3d 600, 602 (8th Cir. 1999) (holding that, when a federal statute

permits nationwide service of process, Congress has "exercised its authority to furnish

federal district courts with the power to exert personal jurisdiction nationwide").  The

jurisdictional issue is further complicated by the fact that the circuits are divided over the

proper interpretation of the venue and service-of-process language of the Clayton Act,

*see KM Enters.*, 725 F.3d at 726–28 (describing split), and the Eighth Circuit has not

weighed in.

But because, as discussed below, Niemann has failed to state a federal antitrust

claim, the above-noted provisions cannot provide a basis for personal jurisdiction.  *See,*

*e.g.*, *Tamburo v. Dworkin*, 601 F.3d 693, 701 n. 6 (7th Cir. 2010) (noting the circuit split

---

[6]     This section provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation
> may be brought not only in the judicial district whereof it is an inhabitant,
> but also in any district wherein it may be found or transacts business; and all
> process in such cases may be served in the district of which it is an inhabitant,
> or wherever it may be found.

15 U.S.C. § 22.  The "first clause sets venue anywhere the corporation is an 'inhabitant,'
is 'found,' or 'transacts business,' while the second clause provides for nationwide
(indeed, worldwide) service of process and therefore nationwide personal jurisdiction."
*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 724 (7th Cir. 2013).

[7]     Rule 4(k)(1)(C) provides that "[s]erving a summons or filing a waiver of service
establishes personal jurisdiction over a defendant . . . when authorized by a federal
statute."

with respect to the venue and service-of-process language of the Clayton Act but holding that because the plaintiff "failed to adequately plead a federal antitrust claim, these jurisdictional options drop out of the case" and the court "need not" address the issue).

Nor need the Court reach the question of personal jurisdiction with respect to Niemann's state-law claims because, as noted below, the Court will decline to exercise subject matter jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c). *See Sinochem*, 549 U.S. at 431 (recognizing that federal courts have "leeway to choose among threshold grounds for denying audience to a case on the merits"). Therefore, the Court turns to Defendants' other arguments for dismissal.

## Federal Antitrust Claims (Counts 3 and 4)

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff's claims must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The reviewing court accepts the plaintiff's factual allegations as true and draws all reasonable inferences in favor of the nonmoving party. *Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017). But "[c]ourts are not bound to accept as true a legal conclusion couched as a factual allegation, and factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

There is no heightened pleading requirement for antitrust claims. *Foam Supplies, Inc. v. Dow Chem. Co.*, No. 4:05CV1772 CDP, 2006 WL 2225392, at *3 (E.D. Mo. Aug. 2, 2006). However, "[g]iven the unusually high cost of discovery in antitrust cases, the limited success of judicial supervision in checking discovery abuse, and the threat that

discovery expense will push cost-conscious defendants to settle even anemic cases, the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc*., 797 F.3d 538, 543 (8th Cir. 2015) (citations omitted).

Niemann asserts claims under § 1 and § 2 of the Sherman Act, both of which apply to professional sports operating interstate. *See, e.g.*, *Flood v. Kuhn*, 407 U.S. 258, 282–83 (1972). Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. This section only governs conduct between separate entities.[8] *Copperweld Corp.*, 467 U.S. at 767–68. Further, not every agreement that restrains competition violates § 1. Rather, federal courts have "understood § 1 to outlaw only *unreasonable* restraints." *Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2283 (2018) (citation omitted and emphasis in original). Niemann asserts that Defendants violated § 1 by conspiring to refuse to deal with Niemann, including by Chess.com banning Niemann from its platform and by Carlsen refusing to play against Niemann. Niemann alleges that these actions constituted an unlawful group boycott against Niemann participating in the Competitive Chess Market. As noted above, Niemann defines the Competitive Chess Market as "professional chess tournaments and online recreational chess platforms." SAC at ¶ 47.

---

[8]     In this respect, the Court questions whether and to what extent the alleged concerted actions here would fall within the purview of § 1, given the unity of interest among the alleged conspirators. *See Copperweld Corp. v. Indep. Tube Corp*., 467 U.S. 752, 766–68 (1984) (holding that the coordinated actions of a corporation and its officers, or between a corporation and its wholly owned subsidiary, fall outside the reach of § 1). But because the parties do not address this issue, the Court will not either.

Section 2 of the Sherman Act governs the conduct of a single firm, and such conduct "is unlawful only when it threatens actual monopolization." *Copperweld*, 467 U.S. at 767. Specifically, § 2 makes it unlawful to "monopolize, or attempt to monopolize. . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. Niemann alleges that all Defendants violated § 2 by attempting to monopolize the Competitive Chess Market.[9] Niemann argues that this attempt was carried out by Chess.com acquiring Play Magnus and by Chess.com using its monopolistic power to try to control which chess players participate in the Competitive Chess Market.

I.      Antitrust Injury

"As the Supreme Court has noted repeatedly, Congress enacted the antitrust laws to protect competition, not competitors." *Midwest Commc'ns v. Minnesota Twins, Inc.*, 779 F.2d 444, 450 (8th Cir. 1985) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)). Thus, to recover damages under the Clayton Act for a violation of either § 1 or § 2 of the Sherman Act, "a plaintiff must prove the existence of *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (emphasis in original). This requires that the plaintiff "be the target of the anticompetitive activity, not one who has

---

[9]      Niemann has not explained how § 2 applies to individual Defendants Carlsen, Nakamura, and Rensch, who are not alleged to possess any share of the Competitive Chess Market. But because the parties do not focus on this argument and because Niemann's antitrust claims fail for other reasons, the Court need not address it.

merely suffered indirect, secondary, or remote injury." *Midwest Commc'ns*, 779 F.2d at 451 (citations omitted).

"[A]n antitrust injury . . . should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be the type of loss that the claimed violations would be likely to cause." *Id.* at 450 (cleaned up and quoting *Brunswick Corp,* 429 U.S. at 489).  This showing "requires proof that the possibility for the alleged harm to competition actually existed and that competition was diminished by the defendants' actions." *St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851, 864 (8th Cir. 1998).  The inquiry is dispositive: "if the injury alleged or proven is not an 'antitrust injury,' the plaintiff does not have a claim cognizable under the antitrust laws." *Midwest Commc'ns*, 779 F.2d at 450.

Niemann fails to plausibly allege an antitrust injury.  Again, Niemann defines the Competitive Chess Market as "professional chess tournaments and online recreational chess platforms."  SAC at ¶ 47.  But Niemann's alleged injuries are not connected to any harm to competition in this market.  Indeed, Niemann does not even compete in this market as he operates neither a professional chess tournament nor an online recreational chess platform.

For example, even assuming without deciding that Niemann has plausibly alleged that Chess.com's decision to ban Niemann from its platform and Carlsen's decision not to play against Niemann were the products of a conspiracy among all Defendants (the basis for Niemann's § 1 claim), the injury allegedly resulting from this conspiracy is an injury to Niemann alone, not to competition within the Competitive Chess Market.  Niemann

does not allege that his ban impacted competition among the professional chess

tournaments or online recreational chess platforms that comprise that market.  And

Niemann's alleged individualized professional and reputational injuries are not the type

that the antitrust laws were intended to prevent.  *See, e.g.*, *Martin v. Am. Kennel Club,*

*Inc.*, 697 F. Supp. 997, 999–1002 (N.D. Ill. 1988) (dismissing antitrust boycott claim

because a dog handler's suspension "had no significant effect on either the supply of or

demand for professional handlers' services" or "on the fees charged for handling dogs");

*Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 681–82 (N.D. Ill. 2000)

(holding that a psychiatrist failed to allege antitrust injury arising from a conspiracy to

blacklist him from a health organization because his individual harm was unrelated to

competition in the relevant market); *Schwendinger v. Mercy Med. Ctr.-Clinton, Inc.*, No.

313CV00039HDVRAW, 2013 WL 12161820, at *11 (S.D. Iowa Sept. 25, 2013)

(dismissing a health professional's boycott claim alleging a conspiracy to "blackball" and

defame him because the alleged "injuries to his own business and professional interests

were not the result of any alleged increase of price or reduction of output").

Nor can Niemann plausibly allege an antitrust injury resulting from Chess.com's

merger with Play Magnus (the basis for Niemann's § 2 claim).  Niemann appears to argue

that the merger is anticompetitive because it eliminates competition among online

recreational chess platforms.[10]  Whether or not that is true, the alleged target of such an

---

[10]     Niemann does not explain how, if at all, the merger affected competition with
respect to professional chess tournaments, or how the governing body FIDE and its own
professional chess tournaments—which Niemann admits are separate from and not
hosted by online platforms such as Chess.com—impact that market.

anticompetitive merger would be other online recreational chess platforms, not Niemann. Niemann claims his injuries were caused by his ban from Chess.com, Carlsen's refusal to play against him, and the accusations of cheating leveled against him, but not by the merger between Chess.com and Play Magnus.  Indeed, the complaint is replete with allegations that Niemann's injuries arise primarily from Carlsen's personal animus against Niemann.  "The causal connection between the alleged antitrust violations and [Niemann's] asserted injury is tenuous at best" and insufficient to state an antitrust claim. *Midwest Commc'ns*, 779 F.2d at 451; *see also Brunswick Corp.*, 429 U.S. at 487 ("If the acquisitions here were unlawful, it is because they brought a 'deep pocket' parent into a market of 'pygmies.' Yet respondents' injury . . . bears no relationship to the size of either the acquiring company or its competitors.").

II.    Other Elements of Antitrust Claims

Although Niemann's antitrust claims may be dismissed for failure to plead antitrust injury alone, the claims also suffer from other defects.  With respect to his group boycott claim under § 1, as noted above, the Sherman Act only proscribes unreasonable restraints of trade.  The parties devote much of their briefs to debating whether the alleged group boycott of Niemann on the Chess.com platform should be considered a per se, or presumptively unreasonable, restraint or whether it should instead be analyzed under the so-called "rule of reason," under which the Court must consider the actual effect of the restraint on the relevant market.

The Court agrees with Defendants that Niemann's ban from Chess.com for alleged cheating is likely subject to the rule of reason.[11]  And as "[f]acially neutral rules that prohibit cheating are essential to promote fair competition and to preserve the integrity of the game," *Blubaugh*, 2004 WL 392930, at *17, Chess.com's enforcement of its anti-cheating rule would not constitute an illegal boycott.  *See, e.g.*, *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1345 (5th Cir. 1988) ("Because the eligibility rules do not violate the antitrust laws, enforcement of them through suspension and other restrictions does not constitute an illegal group boycott.").

But even if Niemann's ban from the platform should be analyzed under the per se approach, he would still fail to state a claim because, as discussed above, the ban here is

---

[11]     Niemann relies heavily on *Blalock v. Ladies Prof'l Golf Ass'n*, 359 F. Supp. 1260 (N.D. Ga. 1973), to argue that Defendants' alleged boycott was a per se violation under § 1.  The district court in *Blalock* found that an agreement among a female professional golfer's competitors to suspend her from their association for alleged cheating was a per se violation of § 1, and the court therefore did not inquire further as to the reasonableness of the suspension.  359 F. Supp. at 1265–66.  However, "[t]he continued viability of the *per se* rule stated in *Blalock* . . . is limited.  *Blubaugh v. Am. Cont. Bridge League*, No. IP 01-358-C H/K, 2004 WL 392930, at *16 (S.D. Ind. Feb. 18, 2004), *aff'd,* 117 F. App'x 475 (7th Cir. 2004).  "[S]ince *Blalock* was decided, the Supreme Court and the circuits have analyzed such cases involving restrictions in sports and other competitive leagues under the rule of reason[,] . . . recogniz[ing] . . . [that] competition would be impossible without collective agreements among competitors about the rules of the competition and enforcement of those rules."  *Id.* at 15 (collecting cases, including *NCAA v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 101 (1984)).  Further, *Blalock* did not consider whether the plaintiff pled an antitrust injury.  Because Niemann seeks damages under the Clayton Act, a showing of antitrust injury is required regardless of whether the alleged restraint is considered a per se violation or not.  *See Atl. Richfield*, 495 U.S. at 344–45 ("[P]roof of a per se violation and of antitrust injury are distinct matters that must be shown independently," and "even in cases involving per se violations, the right of action under § 4 of the Clayton Act is available only to those private plaintiffs who have suffered antitrust injury.") (citations omitted).

not plausibly tied to any anticompetitive intent or effect.  *See Univ. of Okla.*, 468 U.S. at

103–04 ("Both per se rules and the Rule of Reason are employed to form a judgment

about the competitive significance of the restraint," and the inquiry in both cases is

"confined to a consideration of impact on competitive conditions.").  Niemann has not

plausibly alleged that the ban was intended to or did result in anticompetitive effects in

the Competitive Chess Market.

Niemann's ban resulted from his alleged violation of Chess.com's rules regarding

cheating.  As noted above in the discussion of antitrust injury, Niemann has not plausibly

alleged that Chess.com's enforcement of its rules—whether fair or not as applied to

Niemann—adversely affected competition among the professional chess tournaments and

online recreational chess platforms that comprise the Competitive Chess Market.[12]  *See,*

*e.g. Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 434 (6th Cir. 2008)

(affirming the dismissal of a college football coach's group boycott claim because his ban

from coaching at member schools "was the result of [the coach's] rules violations," not

"from some anticompetitive purpose," and because he failed to allege anticompetitive

effects "on the coaching market" resulting from enforcement of those rules).

---

[12]      To address this deficiency, Niemann points to his allegations that Defendants'
actions may cause other chess players to fear similar blacklisting.  But other chess players
do not compete in Niemann's defined Competitive Chess Market, as they are neither
professional chess tournaments nor online recreational chess platforms.  Further,
Niemann's allegation is purely speculative.  He has not alleged that any other chess
player was actually chilled from participating in professional chess tournaments or online
recreational chess platforms.  Indeed, Niemann himself has not been banned from
participating in the entire Competitive Chess Market because that market includes
professional chess tournaments operated by the admittedly independent entity, FIDE, and
there is no indication that Niemann has been banned by FIDE.

Niemann's attempted monopolization claim under § 2 is likewise deficient.  "[T]o establish an attempted monopolization claim under the Sherman Act, a plaintiff must prove: (1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success."  *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 857 (8th Cir. 2020).

To demonstrate specific intent to eliminate competition, Niemann points to his allegations that Chess.com acquired Play Magnus, and that Chess.com used its "monopolistic power to control who plays in the Competitive Chess Market."  ECF No. 108 at 71.  With respect to the latter allegation, Niemann's focus on Chess.com's actions against individual chess players again misses the mark.  Regardless of Chess.com's ties to Carlsen, individual chess players are not Chess.com's competitors.  *See, e.g.*, *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 924 (E.D. Mo. 2010) (holding that an attempted monopolization claim failed where the plaintiff and defendant did not compete in the same market).  And the actions taken against Niemann, including banning him from the Chess.com platform, did not increase Chess.com's market power. *See Wigod v. Chicago Mercantile Exch.*, 981 F.2d 1510, 1520 (7th Cir. 1992) ("By disciplining Wigod and removing him as a member of the Exchange, the Merc neither acquired additional power nor performed an illegal act to maintain existing power. The Merc does not compete with Wigod.  By removing Wigod from the Exchange, it did not acquire more power.").

Niemann also fails to plausibly allege an attempted monopolization with respect to Chess.com's acquisition of Play Magnus.  Although Niemann pleads that Chess.com and Play Magnus were the dominant online recreational chess platforms, Niemann does not dispute that a variety of other such platforms exist.  And Niemann provides little to no information about the relative strength of Chess.com's or Play Magnus's share of this portion of the market.  *See Trone*, 974 F.3d at 857 ("Dangerous probability of success is examined by reference to the offender's share of the relevant market.").

Nor does Niemann plausibly allege that Chess.com possessed sufficient market share among the professional chess tournament portion of Niemann's self-defined Competitive Chess Market.  Indeed, Niemann admits that Chess.com only occasionally hosts tournaments on its platform and generally does not host FIDE-sanctioned events. And despite acknowledging that FIDE consists of chess organizations in 200 countries, Niemann alleges no facts about these organizations or their or FIDE's role in the alleged market.  Niemann's claim that Chess.com is dangerously close to monopolizing the Competitive Chess Market is thus insufficiently supported by facts.  *See Process,* 753 F. Supp. 2d at 928 (holding that no reasonable inference of attempted monopolization could exist without "any factual detail about [the parties' relative] market share," particularly in light of "other allegations indicating a competitive market with several participants"). For all of these reasons, the Court will dismiss Niemann's antitrust claims.

III.   Leave to Amend

In a short paragraph at the end of his opposition, Niemann requests leave to amend his complaint should the Court conclude that any of his claims is deficient.  But Niemann

29

has neither submitted a proposed amended complaint nor indicated how he could cure his failure to state an antitrust claim. Moreover, he has already amended his complaint twice, including in response to substantially similar motions to dismiss raising these issues, and he has failed to cure the noted deficiencies. Further leave to amend in this respect would be futile, and the Court will thus dismiss the antitrust claims with prejudice. *See, e.g.*, *Cornelia I. Crowell GST Tr. v. Possis Med., Inc*., 519 F.3d 778, 783 (8th Cir. 2008) ("Generally, parties should not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim."); *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp*., 559 F.3d 772, 782 (8th Cir. 2009) ("The district court did not err or abuse its discretion in concluding that amendment would be futile and in dismissing with prejudice.").

## State-Law Claims

"In the usual case where all federal claims are dismissed . . ., the balance of factors to be considered under the supplemental jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Starkey v. Amber Enterprises, Inc.*, 987 F.3d 758, 765 (8th Cir. 2021) (citation omitted); *see also* 28 U.S.C. § 1367(c). Given the early stage of this case and the Court's dismissal of all federal claims, the Court will exercise its discretion to decline supplemental jurisdiction over Niemann's state-law claims and to dismiss those claims without prejudice.[13]

---

[13]    Chess.com's alternative argument to compel arbitration relates solely to Niemann's state-law breach of contract claim over which the Court will decline

## CONCLUSION

Accordingly, and for the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendants' motions to dismiss Plaintiff's second amended complaint are **GRANTED in part**, as set forth above.  ECF Nos. 81, 83, 86, 89 & 126.  Counts 3 and 4 are **DISMISSED with prejudice** for failure to state a claim.  The Court declines to exercise supplemental jurisdiction over the remaining Counts, which are **DISMISSED without prejudice**.

**IT IS FURTHER ORDERED** that Defendants' joint motion to stay the Rule 16 conference is **DISMISSED as moot**.  ECF No. 141.

All claims against all parties having been resolved, the Court will enter a separate Order of Dismissal.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 27th day of June, 2023.

---

supplemental jurisdiction.  Therefore, the Court need not resolve that argument.